**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF NEW YORK,<br><br>                    Plaintiff,<br><br>          v.<br><br>EXXON MOBIL CORPORATION,<br>EXXONMOBIL OIL CORPORATION, ROYAL<br>DUTCH SHELL PLC, SHELL OIL COMPANY,<br>BP P.L.C., BP AMERICA INC., and AMERICAN<br>PETROLEUM INSTITUTE,<br><br>                    Defendants. | Case No.<br><br>Date: |

**<u>NOTICE OF REMOVAL</u>**

## TABLE OF CONTENTS

**Page**

NOTICE OF REMOVAL ................................................................................... 1

TIMELINESS OF REMOVAL .......................................................................... 2

NATURE OF THE ACTION ............................................................................. 2

GROUNDS FOR REMOVAL............................................................................ 12

I.     The City's Claims Are Governed by Federal Common Law and Therefore Are
       Subject to Removal. ................................................................................ 14

       A.     The City's Claims Necessarily Arise under Federal Common Law.................... 14

              1.     The City's Claims Implicate Transboundary Pollution. ........................... 15

              2.     The City's Claims Implicate Foreign Affairs. ......................................... 20

       B.     The Artful Pleading Doctrine Supports This Court's Jurisdiction....................... 26

       C.     Jurisdiction Is Independently Authorized by *Grable*............................................ 27

II.    This Action Is Removable under the Federal Officer Removal Statute. ......................... 30

       A.     The Courts Construe the Federal Officer Removal Statute Broadly in
              Favor of Removal. ................................................................................ 30

       B.     Defendants Satisfy All Elements of the Federal Officer Removal Statute........... 32

              1.     Defendants "Acted Under" Federal Officers. ........................................ 33

                     (a)    Defendants Acted under Federal Officers by Supplying
                            Highly Specialized Fuels for Military Use. ................................. 36

                     (b)    Defendants Acted under Federal Officers during the
                            Korean War and World War II. ............................................... 42

                     (c)    Defendants Acted under Federal Officers by Constructing
                            Pipelines for Oil Transportation.............................................. 47

                     (d)    Defendants Acted under Federal Officers by Constructing,
                            Operating, and Managing Government Petroleum
                            Production Facilities. ........................................................... 49

                     (e)    Defendants Acted under Federal Officers by Supplying and
                            Managing the Strategic Petroleum Reserve and Allocating
                            Products Pursuant to the Emergency Petroleum Allocation
                            Act...................................................................................... 52

                     (f)    Defendants Acted under Federal Officers by Developing
                            Mineral Resources on the Outer Continental Shelf and
                            Other Federal Lands.............................................................. 55

              2.     The City's Claims Are Related to Defendants' Activities "Under
                     Color of Federal Office." ..................................................................... 67

              3.     Defendants Have Colorable Federal Defenses. ...................................... 71

III.    This Action Is Removable under the Outer Continental Shelf Lands Act........................ 75

IV.    This Action Arises Out of Federal Enclaves...................................................... 80

V.    This Court Has Diversity Jurisdiction under the Fraudulent Joinder Doctrine. ............... 82

VI.    This Representative Action on Behalf of New York City Consumers Is Removable under the Class Action Fairness Act............................................ 86

VII.    The City's Claims Include Federal Constitutional Elements............................................. 90

COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS ............................................. 93

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation hereby remove this action from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1331, 1332(a), 1332(d), 1441, 1442(a), and 1453(b); and 43 U.S.C. § 1349(b)(1). To the extent any part of the City of New York's causes of action can be construed as non-federal, this Court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as those causes of action over which the Court has original jurisdiction. All other defendants that have been properly joined and served, or purported to be served, have consented to this Notice of Removal.[1]

While artfully pleaded as a consumer protection action brought under municipal law, this lawsuit by the City of New York (the "City") is in reality a transparent attempt to re-litigate issues of federal law the Second Circuit has already decided against it in *City of New York* v. *Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021) ("*City of New York II*"), *aff'g*, *City of New York* v. *BP p.l.c.*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018) (Keenan, J.) ("*City of New York I*"). The City's second bite at the apple again seeks to wade into complex areas of federal regulation on climate change and to substitute the City's judgment for that reflected in longstanding decisions by the federal government about national and international energy policy and environmental protection. A suit of this nature should be heard by a federal court.

---

[1] Consenting defendants are Royal Dutch Shell plc and Shell Oil Company; BP p.l.c., and BP America Inc.; and the American Petroleum Institute ("API"). By filing or consenting to this Notice of Removal, Defendants do not waive any right, defense, affirmative defense, or objection, including without limitation any challenges to personal jurisdiction, insufficient process, and/or insufficient service of process. *See, e.g.*, *Rivera* v. *Bally's Park Place, Inc.*, 798 F. Supp. 2d 611, 615-16 (E.D. Pa. 2011). Where used in this Notice, "Defendants" refers to two or more defendants named in this lawsuit.

## TIMELINESS OF REMOVAL

1.      The City filed this action in the Supreme Court of the State of New York, County of New York, as Index No. 451071/2021, on April 22, 2021.  No Defendant was served prior to April 29, 2021.

2.      This Notice of Removal is timely because it is filed within 30 days of service.  *See* 28 U.S.C. § 1446(b).

## NATURE OF THE ACTION

3.      This action is the City of New York's attempt to re-litigate *City of New York I*, in which this Court dismissed—in a ruling affirmed by the Second Circuit—the City's complaint that sought to limit and ultimately end Defendants' production of fossil fuels because of their connection to climate change.

4.      Plaintiffs' strategy in both cases was developed over many years.  In June 2012, climate activists and plaintiffs' lawyers assembled in La Jolla, California for a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies."  Ex. 1.[2]  There, they hatched the strategy for this and many other lawsuits currently pending against Defendants.  Participants at the La Jolla conference—including Matthew Pawa, founder of the "Global Warming Legal Action Project"—discussed using civil litigation and enforcement authority to "maintain[] pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming."  *Id.* at 27.  Some participants noted that "pressure from the courts offers the best current hope for gaining the energy industry's cooperation in converting to renewable energy."  *Id.* at 27-28.  In particular, they saw civil litigation as a vehicle for accomplishing their goals, with one commentator observing: "Even if your ultimate goal might be

---

[2]   "Ex." refers to an Exhibit attached to this Notice of Removal.

to shut down a company, you still might be wise to start out by asking for compensation for injured parties." *Id.* at 13.

5.      The climate activists, including Pawa, reconvened in New York City in January 2016 to implement their plan to use law enforcement and tort suits to target the fossil fuel production of the largest oil and gas companies in the world.  Together, they agreed on an "Exxon campaign" to undermine Exxon Mobil Corporation's ability to conduct business.  Ex. 2.  The campaign's goals included:

- "delegitimiz[ing] [Exxon] as a political actor,"

- "establish[ing] in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm," and

- "driv[ing] divestment from Exxon." *Id.*

6.      With the contours of the campaign in place, Pawa recruited prospective litigants. Initially, he found them in a group of state attorneys general for whom he conducted a secret briefing on climate-change litigation in early 2016.  *See* Ex. 3.  Soon thereafter, twenty attorneys general, calling themselves the "Green 20," held a press conference with Al Gore where they pledged to regulate the speech of energy companies, including Defendants, whom they perceived as an obstacle to enacting their preferred policy responses to climate change.  *See* Ex. 4 at 2.  Over the past several years, many of the attorneys general associated with the Green 20 have filed lawsuits against Exxon Mobil Corporation and other energy companies, all with the goal of limiting—if not terminating—these companies' production and sales of fossil fuels, including by stifling speech on political issues and questions.[3]

---

[3]      *See State* v. *Exxon Mobil Corp.*, Civ. No. 20-6132568 (Conn. Super. Ct. Sept. 14, 2020); *State* v. *BP America Inc.*, Case No. N20C-09-097 (Del. Super. Ct. Sept. 10, 2020); *District of Columbia* v. *Exxon Mobil Corp.*, Civ. No. 20-2892 (D.C. Sup. Ct. June 25, 2020); *State* v. *Am.*

7.      Pawa next promoted the climate activists' playbook to include tort suits filed by municipal litigants.  In turn, numerous municipalities—including the City of New York—joined in the effort to file lawsuits against energy companies to shape national and international energy policy.[4]

8.      A trial court in Texas recently concluded that these lawsuits amounted to a "crusade" against Exxon Mobil Corporation "aimed to chill and suppress ExxonMobil's speech through legal actions and related campaigns."  *City of San Francisco* v. *Exxon Mobil Corp.*, 2020 WL 3969558, at *3, *8 (Tex. App.  June 18, 2020) (internal quotation marks omitted).  A Texas appellate court likewise expressed dismay over California municipalities' "[l]awfare," which it considered "an ugly tool by which to seek the environmental policy changes the California Parties

---

*Petrol. Indus.*, Civ. No. 20-3837 (Minn. Dist. Ct. June 24, 2020); *Commonwealth* v. *ExxonMobil Corp.*, Civ. No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019); *People* v. *ExxonMobil Corp.*, Civ. No. 18-452044 (N.Y. Sup. Ct. Oct. 24, 2018); *State* v. *Chevron Corp.*, Civ. No. 18-4716 (R.I. Super. Ct. July 2, 2018).

[4]     *See Anne Arundel County* v. *BP P.L.C.*, Civ. No. 21-565 (Md. Cir. Ct. April 26, 2021); *City of Annapolis* v. *BP P.L.C.*, Civ. No. 21-250 (Md. Cir. Ct. Feb. 22, 2021); *County of Maui* v. *Sunoco LP*, Civ. No. 20-283 (Haw. Cir. Ct. Oct. 12, 2020); *City of Charleston* v. *Brabham Oil Co.*  Civ. No. 2020-CP-10-3975 (S.C. Com. Pl. Sept.  9, 2020); *City of Hoboken* v. *Exxon Mobil Corp.*, Civ. No. 20-3179 (N.J. Super. Ct. Sept. 2, 2020); *City & County of Honolulu* v. *Sunoco LP*, Civ. No. 20-380 (Haw. Cir. Ct. Mar. 9, 2020); *Mayor & City Council of Baltimore* v. *BP p.l.c.*, Civ. No. 18-4219 (Md. Cir. Ct. July 20, 2018); *King County* v. *BP p.l.c.*, Civ. No. 18-11859 (Wash.  Super. Ct. May 9, 2018); *Bd. of Cnty Comm'rs of Boulder Cnty.* v. *Suncor Energy (U.S.A.), Inc.*, Civ. No. 18-30349 (Colo. Dist. Ct. Apr. 17, 2018); *City of Richmond* v. *Chevron Corp.*, Civ. No. 18-55 (Cal. Super. Ct. Jan. 22, 2018); *City of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3243 (Cal.  Super. Ct. Dec. 20, 2017); *County of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3242 (Cal. Super. Ct. Dec. 20, 2017); *City of Oakland* v. *BP p.l.c.*, Civ. No. 17-87588 (Cal. Super. Ct. Sept. 19, 2017); *City of San Francisco* v. *BP p.l.c.*, Civ. No. 17-561370 (Cal. Super. Ct. Sept. 19, 2017); *City of Imperial Beach* v. *Chevron Corp.*, Civ. No. 17-1227 (Cal. Super. Ct. July 17, 2017); *County of Marin* v. *Chevron Corp.*, Civ. No. 17-2586 (Cal. Super. Ct. July 17, 2017); *County of San Mateo* v. *Chevron Corp.*, Civ. No. 17-3222 (Cal. Super. Ct. July 17, 2017).

desire, enlisting the judiciary to do the work that the other two branches of government cannot or will not do." *Id.* at *20.

9.      The City's first action—brought in 2018 against many of the same Defendants here—is no exception.[5]  The City's suit asserted nuisance and trespass claims under New York law, seeking to impose liability on defendants' "worldwide fossil fuel production and the use of their fossil fuel products, [which] continue[] to emit greenhouse gases and exacerbate global warming." *City of New York I*, 325 F. Supp. 3d at 471 (quoting Amended Complaint); *see id.* at 468 (noting that defendants were allegedly "collectively responsible, through their production, marketing, and sale of fossil fuels, for over eleven percent of all the carbon and methane pollution from industrial sources that has accumulated in the atmosphere since the Industrial Revolution"). Quoting the City's pleadings, the Court described the City's suit as follows:

> Despite their early knowledge of climate change risks, Defendants extensively promoted fossil fuels for pervasive use, while denying or downplaying these threats. ([Am. Compl.] ¶¶ 93-94). . . .
>
> The City alleges that Defendants' ongoing conduct continues to exacerbate global warming and cause recurring injuries to New York City. (*Id*. ¶ 9.)  Defendants continue to produce, market, distribute, and sell fossil fuels in massive quantities; to promote fossil fuel consumption in these massive quantities; and to downplay the threat posed by climate change.  (*Id*. ¶ 131.)  This ongoing conduct will cause increasingly severe injuries to New York City, including new and more significant encroachments upon and interferences with City property, and increasingly severe threats to public health.  (*Id*.)  The City brings this suit to "shift the costs of protecting the City from climate change impacts back onto the companies that have done nearly all they could to create this existential threat."  (*Id*. ¶ 2.)

*City of New York I*, 325 F. Supp. 3d at 469-70.

10.      In a July 2018 opinion, this Court dismissed the City's complaint "with prejudice in its entirety." *Id.* at 476.  In particular, this Court held that the City's climate change-based

---

[5]      Defendants in *City of New York* were BP p.l.c., Chevron Corporation, ConocoPhillips, ExxonMobil Corporation, and Royal Dutch Shell plc.

claims were necessarily governed by federal common law, not state law, because "a federal rule of decision is necessary to protect uniquely federal interests." *Id.* at 471 (quoting *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)).  The City contended that its claims were not governed by federal common law because "the City bases liability on defendants' production and sale of fossil fuels—not defendants' direct emissions of [greenhouse gases]." *Id.* at 471.  This Court disagreed:  "[R]egardless of the manner in which the City frames its claims . . . , the amended complaint makes clear that the City is seeking damages for global-warming related injuries resulting from greenhouse gas emissions, and not only the production of Defendants' fossil fuels." *Id.* at 471-72.  Because the City's claims were "based on the 'transboundary' emission of greenhouse gases," this Court concluded that the City's "claims arise under federal common law and require a uniform standard of decision." *Id.* at 472.

11.     The Second Circuit affirmed, holding that "the City's claims must be brought under federal common law" because they are "federal claims," and state law is not competent to address these issues, which "demand a unified federal standard." *City of New York II*, 993 F.3d at 95, 98. The Second Circuit thus sustained the district court's determination that federal common law necessarily applied to the City's claims.  Federal common law, and not state law, governs claims seeking redress for global climate change, the court explained, because climate change is a "uniquely international problem of national concern" that is "not well-suited to the application of state law." *Id.* at 85-86.  Although the City had pleaded only state-law claims in its amended complaint, the Second Circuit explained that "[a]rtful pleading cannot transform" a complaint seeking redress for the effects of climate change into "anything other than a suit over greenhouse gas emissions." *Id.* at 91.  The court concluded that the City could not "disavow[] any intent to address emissions" while "identifying such emissions" as the source of its harm. *Id.*  The court

rejected the City's framing of the action as a local issue, and found instead that the true nature of the claims amounted to a "clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *Id.* "Such a sprawling case," the court held, "is simply beyond the limits of state law." *Id.* at 92.

12.     In addition, the Second Circuit held that the City's action raised "significant federalism concerns." *Id.* Permitting the suit to proceed under state law, the court reasoned, would risk "upsetting the careful balance" struck by Congress and the Executive between preventing climate change, on the one hand, and "energy production, economic growth, foreign policy, and national security, on the other." *Id.* at 93. The Second Circuit also rejected the City's attempt to sidestep "numerous federal statutory regimes and international treaties" regulating greenhouse gas emissions by pressing state-law claims seeking to recover damages for harms allegedly caused by those emissions. *Id.* at 86.

13.     Three weeks after the Second Circuit's ruling, the City commenced this action as an end-run around that decision. Although purportedly brought under municipal consumer protection law, this action is really a veiled attempt to achieve the same ends this Court and the Second Circuit denied in the City's first suit. The City has filed this lawsuit, like its predecessor, to influence national energy policy and the United States' international position on climate change, and to limit—and ultimately stop—the production and sale of fossil fuels. Indeed, the City has done little to mask the core purpose of this lawsuit.

14.     In a press release announcing the action, Mayor de Blasio proclaimed that this lawsuit—filed on Earth Day—was an important part of the City's efforts to "do everything in [its] power to . . . stop climate change in its tracks." Press Release, City of New York, New York City Sues ExxonMobil, Shell, BP, and the American Petroleum Institute for Systematically and

Intentionally Deceiving New Yorkers (Apr. 22, 2021), https://www1.nyc.gov/office-of-the-mayor/news/293-21/new-york-city-sues-exxonmobil-shell-bp-the-american-petroleum-institute-systematically.  The City's allegations make clear what it believes is required to "stop climate change in its tracks":  reductions in, if not the cessation of, the production and sale of fossil fuels in an effort to curb global greenhouse gas emissions.  *See* Ex. 5 ¶ 3 ("[T]he extraction, refinement, and combustion of [Defendants'] fossil fuels are the primary driver of climate change.").  Tellingly, the press release included statements from City agencies not charged with enforcing consumer protection laws: the Mayor's Office of Climate and Sustainability, the Mayor's Office of Climate Resiliency, and the Department of Health and Mental Hygiene.  *See* Press Release, *supra*.  Indeed, as the Director of the Mayor's Office of Climate Resiliency asserted in the press release:

> There's undeniable scientific evidence that oil, gas, and coal are warming our planet and making climate disasters more frequent and more severe.  We won't be able to protect New York City from climate change unless we stop these companies from lying to New Yorkers — and that's what we intend to do.

*Id*.

15.    The City's choice of counsel speaks volumes, too.  The Complaint's signature block includes counsel from Sher Edling LLP, Ex. 5 at 58, which reportedly received grants worth $1.75 million from Resources Legacy Fund, a San Francisco-based non-profit organization that advocates for climate policies aimed at curbing the production and sale of fossil fuels, *see* Spencer Walrath, *Law Firm Behind Washington D.C. Climate Lawsuit Received Over $1.7 Million in Grant Money from Activist Foundation*, Energy In Depth (July 7, 2020), https://eidclimate.org/law-firm-behind-washington-d-c-climate-lawsuit-received-over-1-7-million-in-grant-money-from-activist-foundation/.  It includes the Chief of the Corporation Counsel's Environmental Law Division, which "represent[s] the City and its agencies in an extensive range of environmental matters,

including . . . Clean Air Act compliance and enforcement; . . . natural resources preservation; [and] sustainability and resilience issues." *Environmental Law*, N.Y.C. L. Dep't, https://www1.nyc.gov/site/law/divisions/environmental-law.page (last visited May 25, 2021).

16.     Unsurprisingly, the Complaint's allegations confirm the City's public statements about the lawsuit's purpose.  For example, the Complaint alleges that using Defendants' "products still significantly increases greenhouse gas emissions," which "are the primary cause of climate change." Ex. 5 ¶ 26.  According to the Complaint, Defendants' alleged "deception" is actionable because it allegedly "enabled the unabated and expanded *extraction, production*, promotion, marketing, and sale of fossil fuel products." *Id.* ¶ 8 (emphasis added); *see also id.* ¶ 84 (Defendants' allegedly "false and misleading representations are material because they . . . deter consumers from adopting cleaner, safer alternatives to their fossil fuel products."); *id.* ¶¶ 92, 100 (same).  Indeed, the Complaint asserts that "the extraction, refinement, and combustion of [Defendants'] fossil fuels are the primary driver of climate change." *Id.* ¶ 3; *see also id.* (Defendants' fossil fuels play a "central role in causing" climate change).  And it alleges that climate change is, in turn, "driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to people in New York City and elsewhere." *Id.* ¶ 18; *see also id.* ¶ 3 (alleging that "continued use of [Defendants'] fossil fuel products will wreak havoc on the planet, causing irreversible changes to the climate system with severe and deadly consequences for people and the environment").  The only solution, in the City's view, is to cease reliance on fossil fuels.  *See id.* ¶ 1 ("Climate change is one of the greatest threats facing humanity."); ¶ 37 (describing Defendants' business as posing an "existential threat[]").  Indeed, the Complaint alleges that Defendants "have not wavered in their commitment to maintaining fossil fuels as the core driver of their business model during the

next decade, the crucial window of time in which the world must dramatically slash greenhouse gas emissions in order to avoid the most catastrophic effects of the climate crisis." *Id.* ¶ 42.  In short, the City sued Defendants (again) because they have allegedly "cut greenhouse gas emissions from their brand but not their business." *Id.* ¶ 37.

17.     These allegations make clear that the fundamental issue raised in the Complaint is not the accuracy of representations made in advertisements about the nature of the products being sold, but whether Defendants' products should be sold *at all*.  *See, e.g.*, *id.* ¶ 20 ("Defendants' investment in clean energy sources is miniscule and their business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change."); ¶ 35 ("ExxonMobil, Shell, and BP each spend negligible amounts on clean energy resources, and they continue to ramp up fossil fuel production and investment in new fossil fuel development."); ¶ 42 (accusing Defendants of "doubling down on fossil fuel extraction, production, and sales").  With this lawsuit, the City functionally seeks to force Defendants to significantly reduce, if not cease, their fossil fuel activities altogether, in an effort to curb global greenhouse gas emissions.

18.     Indeed, the City's Complaint is merely a repackaged version of its 2018 lawsuit, advancing many of the same allegations and relying on the same theories of liability.  There, as here, the City claimed that defendants "ha[d] known for decades that their fossil fuel products pose a severe risk to the planet's climate," and yet "downplayed the risks and continued to sell massive quantities of fossil fuels, which has caused and will continue to cause significant changes to the City's climate."  993 F.3d at 86-87; *compare with* Ex. 5 ¶ 3 (alleging that Defendants have known that their fossil fuel products "warm the planet by creating greenhouse gas pollution," and yet

continue to market their products to consumers, thereby "causing irreversible changes to the climate system").  There, as here, the City alleged that Defendants have:

- "promote[d] disinformation," *compare* Ex. 6 ¶ 100, *with* Ex. 5 ¶ 14(c);

- "bombard[ed] . . . consumers" with allegedly misleading advertisements, *compare* Ex. 6 ¶ 109, *with* Ex. 5 ¶ 40;

- portrayed fossil fuels as "environmentally responsible," and "environmentally beneficial," *compare* Ex. 6 ¶ 6, *with* Ex. 5 ¶ 6;

- misleadingly portrayed natural gas as "cleaner-burning," *compare* Ex. 6 ¶ 109(b), *with* Ex. 5 ¶ 65; and

- used strategies akin to those the tobacco industry purportedly used to "downplay" the risks of cigarettes, *compare* Ex. 6 ¶ 6, *with* Ex. 5 ¶ 27;

- all while maintaining "business plans . . . based upon more of the same: exploration, production, and sale of fossil fuels," Ex. 6 ¶ 9, *see* Ex. 5 ¶ 20 (alleging that Defendants' "business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change.").

19.    The only difference is that the City now attempts to bypass the adverse decision in its earlier case by focusing on an even "earlier moment," 993 F.3d at 97, in the causal chain than Defendants' production and sale of fossil fuels—namely, statements in Defendants' marketing materials that purportedly created the demand for Defendants' products in the first instance, *see, e.g.*, Ex. 5 ¶ 26.  But as the Second Circuit correctly recognized in the prior case, the City's case still "hinges on the link between the release of greenhouse gases and the effect those emissions have on the environment generally." 993 F.3d at 97.  The City's focus on the "earlier moment" of

Defendants' advertising "is merely artful pleading and does not change the substance of its claims." *Id.*

20.     At bottom, then, this lawsuit is merely the City's attempt to have a do-over.  The product of a well-organized, long-term campaign by climate activists, this action, just like the City's first, is a thinly veiled effort to compel Defendants to curb greenhouse gas emissions by reducing—if not eliminating—their fossil fuel production efforts.  The City's attempt to judicially enforce its policy preferences cannot be countenanced and should be heard in federal court.

## GROUNDS FOR REMOVAL

21.     A defendant may remove "any civil action brought in State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a).  Regardless of the City's characterization of its claims, this Court has original jurisdiction on multiple grounds.[6]

22.     With this lawsuit, the City seeks to impermissibly re-litigate issues the Second Circuit has already decided against it in *City of New York*.  The City's claims in this action—just like those in *City of New York*—represent a blatant effort to extraterritorially regulate Defendants' fossil fuel production and sales activities.  Accordingly, this action is removable on multiple independent grounds.  ***First***, the City's claims necessarily concern transboundary pollution and foreign affairs, and therefore "must be brought under federal common law." *City of New York II*,

---

[6]     Removal jurisdiction under 28 U.S.C. § 1441(a) is coextensive with original jurisdiction under 28 U.S.C. § 1331.  *See Wis. Dep't. of Corr.* v. *Schactz*, 524 U.S. 381, 390 (1998) ("Since a federal court would have original jurisdiction to hear this case had [the plaintiff] originally filed it there, the defendant may remove the case from state to federal court." (citing 28 U.S.C. § 1441(a)));  *see also* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722 (4th ed. Apr. 2020 Update) ("Generally, then, removal based on Section 1441(a) embraces the same class of cases as is covered by Section 1331, the original federal-question jurisdiction statute.").

993 F.3d at 95. Accordingly, the City's claims are subject to removal as necessarily federal claims, under the artful-pleading and *Grable* doctrines. **Second**, this action meets the elements of the federal officer removal statute, 28 U.S.C. § 1442, because the City's claims are "connected or associated" with fossil fuel production activities that Defendants have undertaken at federal direction for decades. **Third**, this action is removable under the Outer Continental Shelf Lands Act ("OCSLA") because this case arises out of, or in connection with, operations Defendants conducted on the Outer Continental Shelf. **Fourth**, the City's claims arise out of Defendants' substantial fossil fuel production activities on federal enclaves, warranting the exercise of federal enclave jurisdiction.

23.     The City, for its part, will likely respond to this Notice of Removal by claiming that this action asserts more modest, consumer protection claims under municipal law. But even if the City's post hoc characterization of its lawsuit was accurate (it is not), this case would *still* be properly removed for several independent reasons. **Fifth**, there is diversity jurisdiction. The lone named Defendant (ExxonMobil Oil Corporation) that is a citizen of the same state as the City (New York) is fraudulently joined in this action. Disregarding that fraudulently joined Defendant creates complete diversity, and the amount-in-controversy plausibly exceeds $75,000—thus, there is diversity jurisdiction. *See* 28 U.S.C. § 1332(a). **Sixth**, under Plaintiff's characterization of this suit, it is "in substance" a class action brought on behalf of New York City consumers, thereby creating removal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).[7] **Seventh**, assuming *arguendo* that the City's claims focus on Defendants' promotions, by challenging

---

[7]     If the City challenges this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds. *Cf. Betzner* v. *Boeing Co*., 910 F.3d 1010, 1014-16 (7th Cir. 2018) (holding that district court erred by requiring evidentiary submissions by defendant to support removal in advance of ruling on jurisdiction).

Defendants' speech on an issue of public concern—climate change—the City's lawsuit necessarily incorporates federal-law elements mandated by the First Amendment to the United States Constitution into its cause of action.

I.   **The City's Claims Are Governed by Federal Common Law and Therefore Are Subject to Removal.**

24.    Section 1331 supplies this Court with jurisdiction over this suit because federal common law governs the City's claims. Plaintiff's claims arise under federal common law because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the foreign affairs and navigable waters of the United States. This Court's jurisdiction is therefore warranted under the artful pleading doctrine, *Grable* and its progeny, or both.

A.   **The City's Claims Necessarily Arise under Federal Common Law.**

25.    Under the Second Circuit's decision in *City of New York II*, the City's claims here must arise, if at all, under federal common law; accordingly, "those federal claims," 993 F.3d at 95, are subject to federal question jurisdiction, *see, e.g.*, *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997).

26.    Although "there is no federal *general* common law," *City of New York II*, 993 F.3d at 89 (quoting *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938)), there remain "some limited areas" in which the governing legal rules are supplied not by state law, but by "what has come to be known as 'federal common law,'" *Tex. Indus.*, 451 U.S. at 640 (1981) (quoting *United States* v. *Standard Oil Co.*, 332 U.S. 301, 308 (1947). In particular, federal common law governs areas implicating "uniquely federal interests," *City of New York II*, 993 F.3d at 90, such as where the issue is, by nature, "within the national legislative power" and there is a "demonstrated need for a federal rule of decision" on that issue, *Am. Elec. Power Co.* v. *Connecticut* ("*AEP*"), 564 U.S. 410, 421-22 (2011) (internal quotation marks and citation omitted). Such uniquely federal interests are

14

also present where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641.  As the Supreme Court has repeatedly recognized, "if federal common law exists, it is because state law cannot be used." *City of Milwaukee* v. *Illinois* ("*Milwaukee II*"), 451 U.S. 304, 314 n.7 (1981); *see Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 508 (1988).

27.     Here, as in *City of New York*, the City's claims necessarily arise under federal common law because they implicate two "uniquely federal interests":  transboundary pollution and foreign affairs.  993 F.3d 81, 90 (2d Cir. 2021).

### 1.     *The City's Claims Implicate Transboundary Pollution.*

28.     The United States Supreme Court has long recognized that "[e]nvironmental protection is undoubtedly an area within national legislative power" for which "federal courts may . . . fashion federal [common] law."  *AEP*, 564 U.S. at 421 (internal quotation marks and citation omitted); *see also Illinois* v. *City of Milwaukee* (*"Milwaukee I"*), 406 U.S. 91, 103 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law.").  Thus, federal common law is to be applied to "transboundary pollution suits."  *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *see, e.g.*, *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 487-88 (1987).

29.     *City of New York* demonstrates this principle in action.  There, the City sued several energy companies—including several Defendants here—for their "worldwide fossil fuel production and the use of their fossil fuel products, [which] continue[] to emit greenhouse gases and exacerbate global warming."  325 F. Supp. 3d at 471.  The City advanced causes of action for public nuisance, private nuisance, and trespass under New York law stemming from defendants' "production, ***promotion***, and sale of fossil fuels."  993 F.3d at 88 (emphasis added).  Specifically, the City argued that defendants' production, marketing, promotion, distribution, and sale of fossil

fuels "downplay the threat posed by climate change[, which] will cause increasingly severe injuries to New York City."  325 F. Supp. 3d at 470.  There, as here, the City attacked defendants' promotion and marketing of fossil fuels.

30.    In a July 2018 opinion, this Court dismissed the City's complaint "with prejudice in its entirety."  *Id.* at 476.  In particular, this Court held that the City's climate change-based claims were necessarily governed by federal common law, not state law, because "a federal rule of decision is necessary to protect uniquely federal interests."  *Id.* at 471 (quoting *Tex. Indus.*, 451 U.S. at 640).  Although the City conceded that "federal common law has long applied to" suits against "direct emitters of interstate pollution," it nonetheless contended that its claims were not governed by federal common law because "the City bases liability on defendants' production and sale of fossil fuels–not defendants' direct emissions of [greenhouse gases]."  *Id.* at 471.  This Court disagreed:  "[R]egardless of the manner in which the City frames its claims . . . , the amended complaint makes clear that the City is seeking damages for global-warming related injuries resulting from greenhouse gas emissions, and not only the production of Defendants' fossil fuels."  *Id.* at 472.  Because the City's claims were "ultimately based on the 'transboundary' emission of greenhouse gases," the Court concluded that the City's "claims arise under federal common law and require a uniform standard of decision."  *Id.*

31.    The Second Circuit affirmed last month, holding that federal common law, not state law, governs claims seeking redress for global climate change, a "uniquely international problem of national concern" that is "not well-suited to the application of state law."  *City of New York II*, 993 F.3d at 85-86.  That court rejected the City's effort to characterize its action as challenging only defendants' "production, promotion, and sale of fossil fuels," not the "regulation of emissions":

Though the City admits (as it must) that greenhouse gas emissions play a role in the case, the City insists that such emissions are only a link in "the causal chain" of the City's damages.  So, because it is not seeking to directly penalize emitters, and because it seeks damages rather than abatement, the City argues that its claims will not result in the regulation of global emissions.  In other words, we are told that this is merely a local spat about the City's eroding shoreline, which will have no appreciable effect on national energy or environmental policy.  We disagree.

Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions.  It is precisely *because* fossil fuels emit greenhouse gases – which collectively "exacerbate global warming" – that the City is seeking damages. . . . Put differently, the City's complaint whipsaws between disavowing any intent to address emissions and identifying such emissions as the singular source of the City's harm.  But the City cannot have it both ways.

*Id.* at 88, 91.

32.     The "goal" of the City's action, the court summarized, is "to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)."  *Id.* at 93.  But "[s]uch a sprawling case is simply beyond the limits of state law."  *Id.* at 92.  The application of federal common law was necessary, the court explained, because the "City would effectively regulate the Producers' behavior far beyond New York's borders."  *Id.*  The City sought to impose massive liability on defendants to limit—if not cease—their production and promotion of fossil fuels.  And because "[g]reenhouse gases once emitted 'become well mixed in the atmosphere,'" meeting the City's preferred fossil fuel emission levels would require fossil fuel producers to "cease *global* production altogether."  *Id.* at 92-93.  Any actions the producers take "must undoubtedly take effect across every state . . . all without asking what the laws of those other states require."  *Id.* at 92.  The City's transboundary emissions claims thereby "implicate the conflicting rights of [s]tates," and thus "pose[] the quintessential example of when federal common law is most needed."  *Id.*

33.     *City of New York* follows a "mostly unbroken string of cases" which have "applied federal law to disputes involving interstate air or water pollution."  993 F.3d at 91.

34.     In *Milwaukee I*, a unanimous Supreme Court held that a suit for interstate water pollution arose under federal law and was within the jurisdiction of the federal district courts.  406 U.S. at 108.  In that case, the State of Illinois filed a motion for leave to pursue an original action in the Supreme Court.  *Id.* at 94.  The proposed action sought to abate a nuisance allegedly created by Milwaukee and its sewerage authorities by their discharges of inadequately treated sewerage into Lake Michigan.  *Id.* at 93.  The Court denied the motion to invoke its original jurisdiction, but held that Illinois could seek relief in federal district court under the federal common law of nuisance.  *See id.* at 107-08.  The Court characterized the issue before it as whether "pollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. §] 1331(a)."  *Id.* at 99.  It ruled in the affirmative, giving "laws" its "natural meaning" and holding that an action based on federal common law, as much as an action based on a federal statute, supports federal question jurisdiction.  *Id.* at 99-100.  The Court was explicit: "federal common law . . . is [an] ample basis for federal jurisdiction under 28 U.S.C. [§] 1331(a)."  *Id.* at 102 n.3.

35.     The Supreme Court subsequently reaffirmed the jurisdictional holding of *Milwaukee I* in *AEP*.  In that case, plaintiffs sued several electric utilities, contending that the utilities' greenhouse gas emissions contributed to global climate change and created a "substantial and unreasonable interference with public rights, in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law."  564 U.S. at 418 (internal quotation marks and citation omitted).  In determining whether plaintiffs had properly stated a claim for relief, the Court determined that federal common law governs claims involving "air and water in their ambient or interstate aspects."  *Id.* at 421 (internal quotation marks and citation omitted).  The Court rejected the notion that state law could govern public nuisance claims related to global

climate change, reasoning that "borrowing the law of a particular State would be inappropriate." *Id.* at 422 (internal quotation marks and citations omitted).

36.     Here, the City now purports to assert claims under municipal consumer protection law, as opposed to state public nuisance law in its earlier suit.  But the City cannot so easily sidestep the application of federal common law that *City of New York*, *Milwaukee I*, and *AEP* demand.  Just as in *City of New York*, this is a transboundary pollution suit that aims to "effectively regulate the Producers' behavior far beyond New York's borders."  *City of New York II*, 993 F.3d at 92.

37.     The Complaint alleges that using Defendants' "products still significantly increases greenhouse gas emissions," which "are the primary cause of climate change." Ex. 5 ¶ 26.  It claims that Defendants' "deception" is actionable because it allegedly "enabled the unabated and expanded *extraction*, *production*, promotion, marketing and sale of fossil fuel products." *Id.* ¶ 8 (emphasis added); *see also id.* ¶ 84 (Defendants' allegedly "false and misleading representations and omissions are material because they . . . deter consumers from adopting cleaner, safer alternatives to fossil fuel products."); *id.* ¶¶ 92, 100 (same).

38.     The Complaint also asserts that "the extraction, refinement, and combustion of [Defendants'] fossil fuels" play a "central role" in causing climate change.  *Id.* ¶ 3.  And it alleges that climate change is, in turn, "driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to people in New York City and elsewhere."  *Id.* ¶ 18.

39.     In other words, it "is precisely *because* fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that the City" seeks to hold Defendants liable here. *City of New York II*, 993 F.3d at 91; *see* Ex. 5 ¶¶ 1, 37, 41.  The City has sued Defendants because

they have allegedly "cut greenhouse gas emissions from their brand but not their business." *Id.* ¶ 37.

40.     These allegations demonstrate that the core issue raised in the Complaint is not the accuracy of representations made in advertisements about Defendants' products, but rather whether Defendants should continue to extract, produce, and sell fossil fuel products. *See, e.g.*, *id.* ¶ 20 ("Defendants' investment in clean energy sources is miniscule and their business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change."); ¶ 35 ("ExxonMobil, Shell, and BP each spend negligible amounts on clean energy resources, and they continue to ramp up fossil fuel production and invest in new fossil fuel development."); ¶ 42 (accusing Defendants of "doubling down on fossil fuel extraction, production, and sales").

41.     This lawsuit thus directly implicates the transboundary pollution of fossil fuel activities and "must be brought under federal common law." *City of New York II*, 993 F.3d at 95.

## 2.     *The City's Claims Implicate Foreign Affairs.*

42.     It is well settled that actions involving foreign affairs arise under federal common law. *See, e.g.*, *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 425 (1964) (holding that issues involving "our relationships with other members of the international community must be treated exclusively as an aspect of federal law."); *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 381, 388 (2000) (striking down a Massachusetts law barring state entities from transacting with companies doing business in Myanmar because the law "undermine[d] the President's capacity . . . for effective diplomacy"). The Supreme Court has made clear that claims that significantly implicate the "exercise of state power that touches on foreign relations must yield to the National Government's policy." *Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 413 (2003).

43.     The Second Circuit, too, has explained that "there is federal question jurisdiction over actions having important foreign policy implications." *Republic of Philippines* v. *Marcos*, 806 F.2d 344, 353 (2d Cir. 1986); *see also In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 118 (2d Cir. 2010) (reasoning that state laws that prevent the President from "wield[ing] the full coercive power of the national economy as a tool of diplomacy in negotiating a process for settling claims . . . compromise[] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." (internal quotation marks and citation omitted)).

44.     In *Marcos*, the Second Circuit held that federal jurisdiction existed over a state-law action seeking an injunction barring defendant from transferring or encumbering certain New York properties.   806 F.2d at 354.   This was so, the court held, because defendant was a former Philippine dictator, such that the action had clear "implications . . . for United States foreign relations." *Id.* at 354.   Similarly, in *Banco Nacional de Cuba*, the Supreme Court considered an action brought by an instrumentality of the Cuban government against a commodities broker. Justice Harlan wrote that the Court was "constrained to make it clear" that an action concerning "our relationships with other members of the international community must be treated exclusively as an aspect of federal law," 376 U.S. at 425, and thus federal jurisdiction over such actions is appropriate.

45.     Indeed, actions like this one, which "implicat[e] . . . our relations with foreign nations," are "the quintessential example of when federal common law is most needed." *City of New York II*, 993 F.3d at 92.

46.     The City's new lawsuit, just like its predecessor, is a transparent attempt to force Defendants to reduce—if not eliminate—their fossil fuel production activities to achieve the City's preferred greenhouse gas emissions levels. *See supra* ¶¶ 13-19.   But given the way in which

21

greenhouse gases spread, doing so would require Defendants to undertake systemic changes not only across the country, but across the world.  The City's claims thus "effectively" seek to require Defendants to take action "across every state (and country)" all "without asking what the laws of those other states (or countries) require."  993 F.3d at 92.  In sum, the City is requesting a global remedy for its alleged injuries—one that cannot be achieved without the engagement of foreign companies and governments.

47.     The upshot of this purported extraterritorial regulation is that the City's claims will necessarily interfere with a carefully calibrated network of "international treaties" that struck a "balance . . . between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other."  *City of New York II*, 993 F.3d at 93.

48.     That complex web of agreements can be traced to at least 1959, when President Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of the national security." Adjusting Imports of Petroleum and Petroleum Products into the United States, Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 10, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, as amended by Pub. L. No. 85-686, 72 Stat. 678, § 8(a) (Aug. 20, 1958).

49.     The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States and to regulate 'patterns of international trade.'"  Statement by the President Upon Signing Proclamation Governing Petroleum Products, 1 Pub. Papers 240-41 (Mar. 10, 1959).  President Eisenhower further explained the United States' foreign and domestic policy: "Petroleum, wherever it may be

produced in the free world, is important to security, not only of ourselves, but also of the free people of the world everywhere." *Id*.

50.    After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks—through government stocks or industry-obligated stocks—equivalent to at least 90 days of net oil imports. *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040 U.N.T.S. 271. The United States meets part of its obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve.[8]

51.    In the 1990s, in response to President Clinton's signing of the Kyoto Protocol, an international commitment to reduce greenhouse gas emissions, the Senate resolved that the nation should not be a signatory to any protocol that "would result in serious harm to the economy or fail to regulate the emissions of developing nations." *See* S. Res. 98, 105th Cong., 1st Sess. (1997).

52.    Subsequently, President Obama promoted shale oil and natural gas development as a means to reduce greenhouse gas emissions and to encourage "greater energy independence." Jude Clemente, *President Obama's Support for America's Shale Oil and Natural Gas*, Forbes (Dec. 31, 2019), https://www.forbes.com/sites/judeclemente/2020/12/31/president-obamas-support-for-americas-shale-oil-and-natural-gas/#4bd1e46b1883. During President Obama's presidency, domestic gas production increased 35%, and domestic crude oil production increased 80%. *Id.* President Obama also issued a series of directives in May 2011, "which included additional lease sales, certain offshore lease extensions, and steps to streamline permitting, all

---

[8]    *See, e.g.*, 42 U.S.C. § 6231(b); Nat'l Energy Pol'y Dev. Grp., National Energy Policy, 8-17 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

towards the President's goal of expanding safe and responsible domestic oil and gas production . . . as part of his long-term plan to reduce our reliance on foreign oil."[9]

53.     In 2016, the United States under President Obama joined the Paris Agreement[10] under the United Nations Framework Convention on Climate Change.  The Agreement calls upon signatories to reduce greenhouse gas emissions by determining, planning, and regularly reporting on the contributions that they undertake to mitigate climate change.  Joining the Paris Agreement, President Obama proclaimed, would "help other nations ratchet down their dangerous carbon emissions over time, and set bolder targets as technology advances, all under a strong system of transparency that allows each nation to evaluate the progress of all other nations."  Remarks by the President on the Paris Agreement, White House (Oct. 5, 2016), https://obamawhitehouse .archives.gov/the-press-office/2016/10/05/remarks-president-paris-agreement.

54.     President Trump subsequently cited foreign affairs implications in his decision to withdraw from the Paris Agreement, a decision based, in large part, on his Administration's conclusion that the treaty did not strike the right balance between environmental protection, on the one hand, and economic growth and national security, on the other.  *See* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://it.usembassy.gov/statement-president-trump-paris-climate-accord/.

---

[9]    Press Release, Off. of the Press Sec'y, Obama Administration Holds Major Gulf of Mexico Oil and Gas Lease Sale (Dec. 13, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/12/13/obama-administration-holds-major-gulf-mexico-oil-and-gas-lease-sale.

[10]   *See* Paris Agreement to the United Nations Framework Convention on Climate Change, Dec. 12, 2015, T.I.A.S. No. 16-1104.

55.     The United States reversed course when President Biden rejoined the Paris Agreement on his first day in office.  *See* Depositary Notification, Acceptance by the United States of America, Paris Agreement, Reference C.N. 10.2021.Treaties-XXVII.7.d (Jan. 20, 2021).

56.     Subsequent presidential administrations may strike a different "balance" between the "prevention of global warming" and "energy production, economic growth, foreign policy, and national security, on the other."  *City of New York II*, 993 F.3d at 93.  But under the City's view, it would be left to a New York state court judge or jury to strike that balance among competing national and international policy imperatives.

57.     The very existence and purpose of this lawsuit conflicts with the national position of the United States on international affairs.  The United States has consistently opposed the "establishment of sovereign liability and compensation schemes" to address climate change on the international level.  Brief for the United States, *City of Oakland* v. *BP PLC*, No. 18-16663 (9th Cir. May 17, 2019) (citing Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://2009-2017.state.gov/s/climate/releases/2015/248980.htm), Dkt. 97; *see also City of New York I*, 325 F. Supp. 3d at 475.

58.     In reaction to this and similar lawsuits, foreign governments might adopt their own "liability and compensation" schemes for past use of fossil fuels, contrary to the foreign policy of the United States.  Thus, this lawsuit infringes upon the foreign policy of the United States regarding the proper way to address the issue of climate change on the international stage.

59.     By asking a state court to weigh in on precisely those issues, this case would "implicate countless foreign governments and their laws and policies."  *City of New York I*, 325 F. Supp. 3d at 475.

60.     The City's claims thus infringe on the federal government's environmental, trade, and energy policies, which require the United States to speak with one voice in coordinating with other nations.  *See United States* v. *Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively.").

**B.     The Artful Pleading Doctrine Supports This Court's Jurisdiction.**

61.     Although the City purports to assert claims exclusively under municipal law, courts have long recognized that claims may arise under federal common law regardless of the label a plaintiff affixes to its claims.  *See, e.g.*, *Standard Oil Co.*, 332 U.S. at 307 (holding that certain claims asserted under state law must be governed by federal common law because they involved "matters essentially of federal character"); *City of New York II*, 993 F.3d at 91 (holding that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions"); *Marcos*, 806 F.2d at 352 (holding that plaintiff's state law claims arose under federal common law, and that federal question jurisdiction thus existed); *Nordlicht* v. *New York Tel. Co.*, 799 F.2d 859, 862 (2d Cir. 1986) (holding that the plaintiff's claims concerning interstate telecommunications "ar[o]se under federal common law," even though the complaint "purport[ed] to rely solely on state law"), *abrogated on other grounds by Marcus* v. *AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998).

62.     "Artful pleading cannot transform" the City's complaint into "anything other than a suit over global greenhouse gas emissions."  *City of New York II*, 993 F.3d at 91.  The City may not use "[a]rtful pleading" to disguise this lawsuit as a "local issue," when in reality it amounts to a "clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *Id.*  Although the City has pleaded only local law here, the well-pleaded complaint rule does not allow a plaintiff to "exalt form over substance," *Standard Fire Ins. Co.* v. *Knowles*, 568 U.S. 588, 595 (2013), by affixing a local-law label to a claim that is necessarily federal in nature.  *Accord*

*Federated Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 n.2 (1981) (noting courts will "determine whether the real nature of the claim is federal, regardless of plaintiff's characterization"). The nature of the City's claims is federal, and the artful pleading doctrine thus provides for federal jurisdiction here.

### C.     Jurisdiction Is Independently Authorized by *Grable*.

63.     The *Grable* doctrine provides a separate and independently sufficient basis for jurisdiction. *See Grable & Sons Metal Prod., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Under the *Grable* doctrine, a lawsuit "arises under" federal law, warranting federal question jurisdiction, if a plaintiff's claims (i) "necessarily raise" stated federal issues (ii) that are "actually disputed" and (iii) "substantial," and (iv) that are "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314). Where these requirements are met, federal jurisdiction is proper "because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" *Id.*

64.     *First*, an action "necessarily raise[s]" federal issues, warranting the exercise of *Grable* jurisdiction, where it requires applying "principles of federal common law." *Newton* v. *Cap. Assur. Co., Inc.*, 245 F.3d 1306, 1309 (11th Cir. 2001). Put differently, claims that implicate an area where "federal common law alone governs" necessarily raise a federal question. *Battle* v. *Seibels Bruce Ins. Co.*, 288 F.3d 596, 607-08 (4th Cir. 2002).

65.     In both *Newton* and *Battle*, plaintiffs asserted claims relating to Standard Flood Insurance Policy ("SFIP") contracts. *See* 245 F.3d at 1308; 288 F.3d at 607. In both cases, plaintiffs purported to assert claims solely under state law. But because SFIP contracts "are interpreted using principles of federal common law rather than state contract law," *Newton,* 245 F.3d at 1309, each court held that "federal common law *alone* govern[ed]" plaintiffs' claims,

regardless of how plaintiffs characterized them, *Battle*, 288 F.3d at 607.   And because the plaintiffs' right to relief thus "necessarily depend[ed] on resolution of a substantial question of federal law," *Grable* jurisdiction was properly exercised.  *Id.*

66.     So, too, here.  As described *supra*, "federal common law *alone* governs" the City's claims which, like *City of New York II*, directly implicate the transboundary pollution of fossil fuel activities.  993 F.3d at 91.  The allegations asserted in the Complaint—coupled with the context in which the City brought this suit—make clear that this action is not about how Defendants advertise their products, but whether their products should be sold at all.  The Complaint is a vehicle for "maintaining pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming."  Ex. 1 at 27.

67.     Just like transboundary pollution claims, claims that implicate foreign policy and foreign affairs also "must be treated *exclusively* as an aspect of federal law," *Banco Nacional de Cuba*, 376 U.S. at 425 (emphasis added), and thus "necessarily depend[] on [the] resolution of a substantial question of federal law," *Battle*, 288 F.3d at 607-08.  As described *supra* ¶¶ 42-60, the City's claims implicate the United States' international climate-change policy, which has, for decades, carefully calibrated and balanced environmental policy with economic development.  Climate-change litigation necessarily involves the relationship between the United States and all other nations, because such claims "depend on a global complex of geophysical cause and effect involving all nations of the planet."  *California* v. *BP p.l.c.*, 2018 WL 1064293, at *5 (N.D. Cal. Feb. 27, 2018), *vacated on other grounds*, 969 F.3d 895 (9th Cir. 2020).  Because the City's claims implicate the "exercise of state power that touches on foreign relations," municipal law "must yield to the National Government's policy, given the concern for uniformity in this country's dealings

with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government." *Garamendi*, 539 U.S. 413 (internal quotation marks omitted).

68.     In sum, the City's claims—which strongly implicate both transboundary pollution and U.S. foreign affairs—must be governed by federal common law, and therefore necessarily raise a question of federal law.

69.     *Second*, the City cannot deny that the federal questions presented here are disputed. Among other things, the City's claims question whether, pursuant to a host of longstanding international agreements, the United States should have struck a different balance between the benefits and alleged harms of Defendants' conduct.

70.     *Third*, the federal questions raised here are also substantial.  This action sits at the intersection of federal energy and environmental regulations, which implicate foreign policy and national security considerations.  This action also implicates the proper constitutional relationship among the states and also between the states and the federal government.  The substantiality inquiry is satisfied where the federal issues in a case concern even *one* of these subjects.  *See, e.g.*, *NASDAQ OMX Grp., Inc.* v. *UBS Sec., LLC*, 770 F.3d 1010, 1029 (2d Cir. 2014) (issues related to "fair and orderly market[s]"); *In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (issues relating to the state secrets privilege); *Grynberg Prod. Corp.* v. *British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993) (issues relating to allocation of international mineral resources).

71.     *Fourth*, the exercise of federal jurisdiction is fully consistent with the principles of federalism: federal courts are the traditional and appropriate fora for litigation regarding the intersection of national energy and environmental law, and foreign policy.  *See Massachusetts* v.

*EPA*, 549 U.S. 497, 519 (2007) (explaining that the "sovereign prerogatives" to force reductions in greenhouse gas emissions "are now lodged in the [f]ederal [g]overnment").

## II.    This Action Is Removable under the Federal Officer Removal Statute.

72.    The federal officer removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  "To invoke the statute, a defendant who is not himself a federal officer must demonstrate that (1) the defendant is a 'person' under the statute, (2) the defendant acted 'under color of federal office,' and (3) the defendant has a 'colorable federal defense.'"  *Agyin* v. *Razmzan*, 986 F.3d 168, 174 (2d Cir. 2021).  So long as federal officer jurisdiction is necessary as to one defendant, jurisdiction over the entire action is permissible.  *See* 28 U.S.C. § 1367.  Defendants satisfy these criteria here.

### A.    The Courts Construe the Federal Officer Removal Statute Broadly in Favor of Removal.

73.    The federal officer removal statute is to be "liberally construed" in favor of a federal forum.  *Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *accord Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 136 (2d. Cir. 2008).  Courts have repeatedly held that "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute."  *Leite* v. *Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014); *see also Gordon* v. *Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 316 (E.D.N.Y. 2014) (distinguishing federal officer removal statute from general removal statute).  The Supreme Court has emphasized that the policy of providing the protection of a federal forum to federal officers "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)."  *Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969).  Thus, courts must apply a "broad construction" of the statute—"particularly with respect to private parties who claim to be 'acting under' a federal officer."  *Agyin*, 986 F.3d at 175.

74.     "Not only must the words of § 1442 be construed broadly but a court also 'must credit [the d]efendants' theory of the case' when evaluating the relationship between the defendants' actions and the federal officer." *Id*. at 175 (citing *Isaacson*, 517 F.3d at 137); *see also Jefferson County* v. *Acker*, 527 U.S. 423, 432 (1999)) ("[W]e credit the [defendants]' theory of the case for purposes of [all] elements of our jurisdictional inquiry"); *accord Baker* v. *Atl. Richfield Co.*, 962 F.3d 937, 947 (7th Cir. 2020).   At this stage, a defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 941, 945.  Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue, because the sole issue is *where* such merits will be adjudicated.  *See Willingham*, 395 U.S. at 407 (holding that a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").

75.     Despite the City's attempt to characterize its claims otherwise, the City's suit arises from Defendants' production and sale of fossil fuels—including such activities conducted under the direction of federal officers for decades—which the City claims were "enabled" by Defendants' allegedly deceptive promotions.  *See* Ex. 5  ¶¶ 8, 27.  As explained above, the Complaint is aimed at stopping or reducing Defendants' promotion, and thereby their production and sale, of fossil fuels, which are allegedly "the primary driver[s] of climate change."  *See, e.g.*, *id*. at ¶ 3.  Where "[b]oth the [plaintiffs] and the [defendants] have reasonable theories of this case," the court's role is "to credit only the [defendants'] theory" so long as the theory is "plausible.'"  *Baker*, 962 F.3d at 941, 947.  Defendants' theory that the City's purported injuries necessarily rely on Defendants' production and sale of fossil fuels is more than plausible, and thus should be credited by this Court.

31

**B.     Defendants Satisfy All Elements of the Federal Officer Removal Statute.**

76.     Defendants satisfy all three elements of the federal officer removal statute here.

77.     ***First***, Defendants are "persons" within the meaning of the statute who "acted under" a federal officer.  Defendants are corporations, Ex. 5 ¶¶ 11-14, which qualify as "persons" within the meaning of Section 1442.  *Isaacson*, 517 F.3d at 135-36.  Defendants have "acted under" federal officers because the U.S. government has exerted extensive subjection, guidance, or control over Defendants' production and supply of oil and gas, and Defendants, "through contractual relationships with the Government, perform[ed] jobs that the Government otherwise would have performed" itself.  *Id.* (citing *Watson*, 551 U.S. at 154).  Defendants have "acted under" federal officers in numerous ways, including by:  (1) supplying the federal government with highly specialized, noncommercial-grade fuels for military use; (2) producing oil and gas for the U.S. military during wartimes under specific government guidance and directives; (3) constructing pipelines for oil transportation at the federal government's direction and control; (4) building, operating, and managing government petroleum production facilities; (5) supplying fuel for and managing the Strategic Petroleum Reserve and allocating their products pursuant to the Emergency Petroleum Allocation Act; and (6) developing mineral resources on the Outer Continental Shelf ("OCS") and other federal lands through highly technical leases that were overseen and managed by federal supervisors.  Defendants refer to the declarations of two prominent historians, Professor Tyler Priest of the University of Iowa and Professor Mark Wilson of the University of North Carolina at Charlotte, attached as Exhibits 7 and 70 to this Notice, that explain in detail how Defendants "acted under" the direction, guidance, supervision, and control of federal officers.

78.     ***Second***, the City's claims relate to the actions Defendants performed "under color of federal office" because the claims are "*connected* or *associated*, with acts under color of federal office."  *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc).  As

explained above, the Complaint targets Defendants' production and supply of oil and gas—conduct that occurred, at least in part, "*because of* what [Defendants] were asked to do by the Government." *Isaacson*, 517 F.3d at 137; *see also Baker*, 962 F.3d at 945 (removal appropriate where plaintiffs challenge even a "small, yet *significant*" portion of defendants' conduct under federal officers).[11]

79.     *Third*, Defendants have several "colorable federal defenses," including res judicata based on the preclusive effect of the federal judgment in *City of New York*, as well as the government-contractor defense, preemption, federal immunity, and defenses based on the commerce clause, due process, the foreign affairs doctrine, and the First Amendment.

### 1.     *Defendants "Acted Under" Federal Officers.*

80.     Oil and gas are at the heart of economic, energy, and security policies of the United States, and have been for decades.  It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports."  42 U.S.C. § 15927(b)(1); *see also* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national

---

[11]  It is generally accepted that greenhouse gases from fossil fuel combustion, such as carbon dioxide, remain in the atmosphere for hundreds, even thousands, of years.  *See* Alan Buis, "The Atmosphere:  Getting a Handle on Carbon Dioxide," NASA's Jet Propulsion Laboratory (Oct. 9, 2019), https://climate.nasa.gov/news/2915/the-atmosphere-getting-a-handle-on-carbon-dioxide/#:~:text=Once%20it's%20added%20to%20the,timescale%20of%20many%20human%20lives (explaining that carbon dioxide lasts in the atmosphere "between 300 to 1,000 years").  By targeting Defendants' "expanded extraction, production, promotion, marketing, and sale of fossil fuel products," Ex. 5 ¶ 8, and the localized climate harms that allegedly resulted from billions of consumers' "continued use of [Defendants'] fossil fuel products," *id.* ¶ 3, the Complaint necessarily challenges the decades' worth of Defendants' activities under federal officers discussed in Section II.B.1, including Defendants' production and supply of oil and gas during World War II and the Korean War.

security, technology, infrastructure, and energy production.").  As Professor Wilson explains: "Over the last 120 years, the U.S. government has relied upon and controlled the oil and gas industry to obtain oil and gas supplies and expand the production of petroleum products, in order to meet military needs and enhance national security."  Ex. 7 ¶ 1.

81.     Defendants "acted under" federal officers because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production and supply and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 143, 152; s*ee also St. Charles Surgical Hosp., LLC* v. *Louisiana Health Serv. & Indem. Co.*, 990 F.3d 447, 454-55 (5th Cir. 2021) ("[A] removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive. . . . Instead, the 'acting under' inquiry examines the *relationship* between the removing party and relevant federal officer, requiring courts to determine whether the federal officer 'exert[s] a sufficient level of subjection, guidance, or control' over the private actor."); *Agyin*, 986 F.3d at 176-77 ("Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.") (citing *Ruppel* v. *CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)).

82.     At root, the City challenges Defendants' production and supply of fossil fuels, including to the federal government.  The federal government relies on private firms like Defendants to produce and supply oil, gas, and petroleum products, which the government otherwise would need to do itself.  Defendants thus have "assist[ed]" the federal government "in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm."  *Cty. Bd. of Arlington Cty., Virginia* v. *Express Scripts Pharmacy, Inc.*, 2021 WL 1726106, at *4 (4th Cir. May 3, 2021) (quoting *Watson*, 551 U.S. at

153-54).  As the examples below demonstrate, the federal government has relied on Defendants to produce and supply oil and gas and associated products, including from federal lands and specialized jet fuels for the military.  Absent Defendants' production and supply, the government itself would have had to perform these tasks.

83.     Where, as here, a private party has specifically contracted with "the Government to produce an item that [the Government] needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong.  *Baker*, 962 F.3d at 942; *see also Arlington*, 2021 WL 1726106, at *4 ("[C]ourts, like this one, 'have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.'" (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017))); *Agyin*, 986 F.3d at 175 ("The Supreme Court has said, for example, that a private company acting pursuant to a contract with the federal government has this ['acting under'] relationship.").  Because Defendants have produced and supplied significant quantities of fossil fuel products in furtherance of federal objectives pursuant to contracts with the U.S. government and under the U.S. government's direction, control, and "close supervision," Defendants have a "special relationship" with the U.S. government that satisfies the "acting under" element of the federal officer removal test.  *Isaacson*, 517 F.3d at 137.

84.     Defendants acted under federal officers in many respects, each directly stemming from the U.S. government's policies to promote the production of oil and gas to meet the country's military and national economy needs—even as the public and the world increasingly recognized and understood the link between greenhouse gas emissions and global climate change.  Each of the examples below demonstrates that Defendants have produced or supplied oil and gas under the direction, supervision, and control of the federal government.  Any one of them alone is sufficient

to support federal officer removal, and each demonstrates the strong federal interest in petroleum production, which the City now seeks to disrupt.[12]

### (a) Defendants Acted under Federal Officers by Supplying Highly Specialized Fuels for Military Use.

85.    Defendants acted under federal officers by producing and supplying highly specialized, noncommercial-grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense ["DOD"] capabilities," Ex. 8.   Federal officer removal precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Ruppel*, 701 F.3d at 1181.

86.    During World War II, for instance, the federal government asserted substantial control over Defendants, directing the development and production of high-octane aviation fuels ("avgas").[13]  Because avgas was "the most critically needed refinery product during World War II and was essential to the United States' war effort," *Shell Oil Co.* v. *United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*"), the United States government "exercised significant control" over the means of its production, including production by Defendants, during World War II.  "The government exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor," *Exxon Mobil Corp.* v. *United States*, 2020 WL 5573048, at *1 (S.D. Tex. Sept. 16, 2020), *appeal docketed*, No. 20-20590 (5th Cir. Nov. 13,

---

[12]   These examples are by no means an exhaustive collection of the factual bases that support the grounds for removal asserted herein.   Defendants expressly reserve all rights to include additional support for any and all grounds for removal in any further briefing should the City challenge removal.

[13]   Approximately  80% of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country.  Ex. 9, at 169.

2020), in order to maximize production of fuel for the military and direct the allocation of pivotal resources, *see, e.g.*, *United States* v. *Shell Oil Co.*, 294 F.3d 1045, 1049-50 (9th Cir. 2002) ("*Shell I*").

87.     As another example, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs during the Cold War.[14]  Shell Oil Company produced millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."  Ex. 12; *see* Ex. 13.  Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program.  Exs. 14-19.  Under the OXCART program, Shell Oil Company "tested" "refinery procedures" to ensure fuels were "up to standard."  Ex. 20 at 4.  In providing specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company acted under federal officers, *see, e.g.*, Ex. 14 at 1 ("This work is under the technical direction of Colonel H. Wilson[.]"), and helped the government to produce an essential item that it needed for national defense purposes*, see Watson*, 551 U.S. at 153.

---

[14]   *See* Ex. 10, at 61-62 ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low volatility, low-vapor-pressure kerosene fuel for the craft. The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300F at sea level.  Manufacturing this special fuel required petroleum byproducts."); Ex. 11 at 24 ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements . . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids.").

88.     To this day, Defendants continue to supply DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements.  U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of DOD capabilities, and, as such, must be available on specification, on demand, on time, every time.  In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants and contractors to deliver fuel to every corner of the world, ashore and afloat."  Ex. 8.  "By 2010, the U.S. military [was] the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel."  Ex. 7 ¶ 40.  Shell Oil Company, BP, and Exxon Mobil Corporation (or their predecessors, subsidiaries, or affiliates) have been three of the top four suppliers of fossil fuel products to the U.S. military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[15]  *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.   DESC procures a range of military-unique, petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels.  In fiscal year 2008, for example, the DESC purchased 134.9 million barrels of fuel products in compliance with military specifications, totaling $17.9 billion

---

[15]   The Complaint improperly conflates the activities of defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates.  Although Defendants reject the City's attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this Notice of Removal only, Exxon Mobil Corporation and ExxonMobil Oil Corporation describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that the Complaint, as pleaded, can and should be removed to federal court.

in procurement actions.  *See id.* at 2.  And "[t]he U.S. military services and the North Atlantic Treaty Organization forces use an estimated 5 billion gallons of JP-8 [jet fuel] each year."[16]

89.    In addition, from at least 2010-2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with DOD's Defense Logistics Agency ("DLA") to supply specialized JP-5 and JP-8 military jet fuel.[17]  *See* Exs. 21-29.  DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with "military unique additives that are required by military weapon systems." *See* Ex. 30, at 5, 10, §§ 3.1, 6.1; *id.* Ex. 31 at 5, 11, §§ 3.1, 6.1.

90.    Similarly, BP entities contracted with DLA to provide a significant quantity of specialized military fuels over decades—including approximately 1.5 billion gallons of specialized military fuels for DOD's use *in the past four years alone*.  Ex. 32, at 5.  Since 2016, BP entities entered into approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76, together with fuels containing specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI") and, for F-76 fuels, lubricity improver additive ("LIA").  *Id.*  Such additives are essential to support the high performance of the military engines they fuel.

91.    DOD exerted significant control over the BP entities' actions in fulfilling these contracts, requiring that these specialized military fuels (1) ignite, and do not freeze, at low temperatures from high altitudes; (2) rapidly dissipate accumulated static charge so as not to

---

[16]   Subcommittee on Jet-Propulsion Fuel 8, Committee on Toxicology, National Research Council, Toxicologic Assessment of Jet-Propulsion Fuel 8 (2003), https://www.ncbi.nlm.nih.gov/books/NBK207616/.

[17]   These contract examples are not an exhaustive collection of the contracts that Defendants executed with the federal government to supply specialized military fuels during the relevant time period.

produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating); (3) efficiently combust to allow for longer flights on less fuel; and (4) maintain the integrity of the fuel handling systems over a long period of time.[18]

92.    To meet its unique operational needs, DOD required the BP entities to supply each fuel in accordance with highly specialized, DOD-mandated specifications.  These fuel contracts are far more specialized and prescriptive than for fuel intended for consumer-type vehicles.

93.    In particular, the specifications require particular amounts of "military unique additives that are required by military weapons systems," such as SDA, FSII, and CI/LI.[19]  "[T]his [additive] requirement is unique to military aircraft and engine designs,"[20] and each additive served a vital role in allowing the DOD to fulfill its mission safely and efficiently:

- DOD *required* the BP entities to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling.  If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.[21]

- DOD *required* the BP entities to use FSII to depress the freezing point of military jet fuels.  FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes, which would result in slush or ice crystal formation causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout.[22]

---

[18]    Ex. 33 § 1.2.2 (MIL-HDBK-510A); Ex. 34, tbl. 1, 2-9 (Air Force Wright Aeronautical Lab., *Military Jet Fuels, 1944-1987*, AFWAL-TR-87-2062 (Dec. 1987)) [hereinafter, "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigation of Byproduct Application to Jet Fuel*, NREL/SR-510-30611, at 4-6 (Oct. 2001), https://www.nrel.gov/docs/fy02osti/30611.pdf.

[19]    Ex. 35 at 15 ¶ 6.1 (MIL-DTL-83133J (JP-8) specs).  Several of the BP entities' DLA contracts to supply JP-8 required that the BP entities meet the specifications of MIL-DTL-83133J.  Ex. 36, at 14.

[20]    Ex. 35, at 15, § 6.1 (MIL-DTL-83133J (JP-8) specs.

[21]    Ex. 33 at 9, § 1.4.1.2 (MIL-HDBK-510A); Ex. 34 at 35 ("This electrical charge can accumulate and produce incendiary spark discharges; many aircraft fuel system fires have resulted.").

[22]    Ex. 37 (MIL-DTL-85470B (FSII) specs); Ex. 33 at 9, § 1.4.1.1 (MIL-HDBK-510A); Ex. 34, at 30, 41-44; Ex. 38 (Department of Army Technical Manual, *Petroleum Handling Operations*

- DOD *required* the BP entities to use additives such as CL/LI and LIA to (1) improve lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevent corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.[23]

94.     In addition, DOD specifications required the BP entities to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point, specifications which are essential to the performance of the military function.[24]   The specifications also required adherence to specific testing methods for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability.[25]   If the fuels did not conform to the exact specifications, DOD exerted control over the BP entities by requiring them to either repair or replace the products at no increase in contract price.

95.     DOD's detailed specifications for the makeup of these military jet fuels and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Defendants and the government.  *See Baker*, 962 F.3d at 943 (holding that the government's detailed specifications for the makeup of materials and the

---

*for Aviation Fuel*, TM 10-1107 at 6 (Feb. 1960)) ("The jet aircraft is subject to wider and more rapid changes of temperature. . . . Consequently, any water present may freeze before it can reach the sumps of jet aircraft. When this happens, ice particles may clog the fuel screens and cause fuel starvation.")

[23]   Ex. 39 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H (CI/LI) specs); Ex. 33 § 1.4.1.3 (MIL-HDBK-510A); Ex. 34, at 28, 30, 38-39; Ex. 40 (MIL-PRF-32490 (LIA) specs).

[24]   Ex. 34, at 17-35 (describing the necessity for specific physical and chemical requirements in military jet fuels); Exs. 41-44 (the JP-5 specs (MIL-DTL-5624W); (MIL-DTL-16884N and -16884P (NATO-76) specs); and Def Stan 91-091 Issue 9 Jet A-1) specs).

[25]   *See* Ex. 45 (ASTM D1655-20 Jet A specs).

compulsion to provide the product to the government's specifications demonstrated the necessary "acted under" relationship to support federal officer removal); *Arlington*, 2021 WL 1726106, at *5-6 (finding "acting under" prong satisfied where defendants had provided services to federal officers pursuant to detailed contracts requiring special formulations and imposing pricing, delivery, and audit/inspection rights).  These specialized jet fuels are not the category of heavily regulated civilian products such as those described by the Supreme Court in *Watson*; rather, they are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction. *See Watson*, 551 U.S. at 154 ("Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war."); *Winters* v. *Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398-99 (5th Cir. 1998); *Baker*, 962 F.3d at 946.

### (b) Defendants Acted under Federal Officers during the Korean War and World War II.

96.     At the advent of the Korean War, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81-774 ("DPA").  The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[26]  As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on [the] industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952."  Ex. 7 ¶ 28.

---

[26]   *See* Ex. 46 at 122.  *See also Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

97.     The government also invoked the DPA immediately after the 1973 Oil Embargo to address immediate and critical petroleum shortages by the military.  Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the [DOD]" and provided companies that complied with immunity from "damages or penalties."  Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973).  The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors or subsidiaries] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."[27]  By complying with these production orders, Defendants "*assist[ed]*" with "the duties or tasks of the federal superior" to alleviate petroleum shortages that posed a grave threat to the nation's security forces.  *Watson*, 551 U.S. at 152.

98.     Decades earlier, as the United States prepared to enter World War II, its need for large quantities of oil and gas to produce avgas for planes, oil for ships, lubricants, and synthetic rubber far outstripped the nation's current capacity. The government created agencies to control the petroleum industry, including Defendants, to build refineries; direct the production of certain petroleum products; and manage scarce resources for the war effort.  "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory."  Ex. 49 at 1 (emphases added); *see also* Ex. 50.

---

[27]  Ex. 47 at 78.  The companies included Amoco Oil Co., Atlantic Richfield Co., Exxon Co., U.S.A., Mobil Oil Corp., and Shell Oil Co.  *Id.* (listing companies and quantities); Ex. 48 (reporting on directives).

99.     In 1941, President Roosevelt created the Office of Petroleum Coordinator and designated Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense. *See* 2020 WL 5573048, at *10 (S.D. Tex. Sept. 16, 2020).  President Roosevelt explained that:

> [r]ecent significant developments indicate the need of coordinating existing Federal authority over oil and gas and insuring that the supply of petroleum and its products will be accommodated to the needs of the Nation and the national defense program ... One of the essential requirements ... which must be made the basis of our petroleum defense policy ... is the development and utilization with maximum efficiency of our petroleum resources and our facilities, present and future, for making petroleum and petroleum products available, adequately and continuously, in the proper forms, at the proper places, and at reasonable prices to meet military and civilian needs.

*Id.*  The Office of Petroleum Coordinator issued "directives" and "recommendations" to the oil and gas industry, requiring refineries to prioritize the production of aviation gasoline.

100.     In 1942, President Roosevelt established several agencies to oversee wartime production. Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").  The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods.  The PAW centralized the government's petroleum-related activities.  It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies."  *See generally Shell I* (discussing federal control).  The "PAW told the refiners what to make, how much of it to make, and what quality."[28]  The Office of the Petroleum Coordinator for National

---

[28]  *Shell II*, 751 F.3d at 1286 (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945*, at 219 (1946)); *see also* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 at 11 (Nov. 28, 1945) ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the

Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*."[29]

101.    The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for production.  Ex. 7 ¶¶ 11, 14-15.  As Professor Wilson explains: "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them."  *Id*. ¶ 11.  Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines."  *Id.*

102.    The PAW's directives to Defendants were often coercive.  The PAW's message to the oil and gas industry was clear:  It would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way."  Ex. 51 at 8.  The PAW maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."  Ex. 52 at 1.  In sum, the federal government deployed an array of directions, threats, and sanctions to ensure Defendants assented to PAW's production directives.  The structure of the wartime relationship between PAW and Defendants was one of "subjection, guidance, or control" over Defendants' petroleum production, which

---

disposition of the products were all closely scheduled, by daily telegraphic directives when necessary."); Ex. 50 at 212 ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available.").

[29]    Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 (Nov. 28, 1945) (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

satisfies the "acting under" requirement of Section 1442(a)(1).  *St. Charles Surgical Hosp.,* 990 F.3d at 455.

103.    The court in *Exxon Mobil Corp.* v. *United States* acknowledged the long history of federal government control over Defendants' lawful oil production-related activities in finding that the government was responsible for certain environmental response costs under CERCLA:  "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry."  2020 WL 5573048, at *11.  The court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officers' direction.  *Id.* at *11-12 (J. Howard Marshall, the former Chief Counsel for the Petroleum Administration for War, testified that "companies that 'weren't making essential war materials' were simply not able to run their refineries.").  In fact, the federal government "insiste[d] on having the plants operate 24 hours a day, 7 days a week, year round."  *Id.* at *8.  Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials."  *Id.* at *14.  Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, under "direct contract with the Army Ordnance Department."  Ex. 9 at 222; *see Exxon Mobil Corp.*, 2020 WL 5573048, at *13.  The controls placed on the production of petroleum during World War II extended through the Korean War.  *See* 2020 WL 5573048 at *15 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products").

104.    DOD is the nation's single largest consumer of energy, and one of the world's largest users of petroleum fuel.  *See* Ex. 53 (discussing FY 2019 military fuel procurement).  For more than a century, "these products [have been] used for the war effort," including "many

'ordinary' products [that are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military machines." *Exxon Mobil Corp.*, 2020 WL 5573048, at *31 (emphasis added); *see also id.* at *47 (noting the "value of [the] petroleum industry's contribution to the nation's military success").  As two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces."  Ex. 54, at 2-3.  "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century."  Ex. 7 ¶ 2.  The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime."  *Id.*  Defendants' decades-long contractual relationship with the federal government to produce critical fuels that it needs for the U.S. military and during times of war—products that, "in the absence of Defendants, the Government would have had to produce itself"—is a classic example of the "special relationship" with federal officers sufficient to satisfy the "acting under" prong.  *Isaacson*, 517 F.3d at 137.

### (c)   Defendants Acted under Federal Officers by Constructing Pipelines for Oil Transportation.

105.   Defendants also acted under the federal government as agents in constructing and operating pipelines transporting oil for war.  During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines."  Ex. 55, at 3.  "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively"

(together, the "Inch Lines"). *Schmitt* v. *War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[30] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government. *WEP II*, 175 F. 2d at 335; *Schmitt* v. *War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947) ("*WEP I*").[31]

106.    Federal officers exerted operational control over the Inch Lines and Defendants' affiliates. WEP operated wholly on capital from the government, and "received no fee or profit." *WEP II*, 175 F.2d at 336; *see also, e.g.*, *WEP I*, 72 F. Supp. at 158. The government also required approval and set the salaries of all personnel that WEP employed. *See WEP II*, 175 F.2d at 336.

107.    Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants. The government required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines.[32]    The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and

---

[30]    The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony Vacuum Oil Company, Inc., and Tidal Pipe Line Company. Several of these companies are predecessors or affiliates of current Defendants. *See* Ex. 56.

[31]    These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

[32]    Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068-69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

"augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to Atlantic ports" that were "los[t] through enemy action."  *Id*.  The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum." *See* Ex. 57, at 25-26 ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [Oil companies] w[ere] ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these lines running to capacity, and that was done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

108.    The government controlled all oil that WEP moved through the pipelines on its behalf.[33]  During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts." Ex. 9, at 104-05, 108.  Defendants thus "provided the federal government with materials that it needed to stay in the fight at home and abroad."  *Baker*, 962 F.3d at 942. Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities.  *Watson*, 551 U.S. at 154.

> **(d)     Defendants Acted under Federal Officers by Constructing, Operating, and Managing Government Petroleum Production Facilities.**

109.    Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities.  During World War II, the government built "dozens of large government-owned industrial plants" that were

---

[33]   8 Fed. Reg. at 1069, § 1555.1(e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § 1555.2(d)(3) (same).

"*managed by private companies under government direction*."  Ex. 7 ¶ 14 (emphasis added). These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or of government-owned equipment within industrial facilities.  *Id.* at ¶ 19.  Some Defendants or their predecessors operated such production equipment and facilities for the government, building plants and manufacturing war products for the Allied effort.  *Id.* at ¶ 20.

110.    For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period.  The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . . Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas."  Ex. 58 at 94; *see also* Ex. 7 ¶ 23.

111.    In addition, the government's need for highly specialized fuels, discussed in Section II.B.I.a, *supra*, necessitated changes to Defendants' refining equipment and operations.  *See* Ex. 59 at 40 ("The refiner cannot build the equipment for making the fuel without knowing what its composition must be to meet the needs of the engine.").  The impacts of the government's particular fuel specifications on Defendants' operations were typically long-lasting.  For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998.  *See* Ex. 60.

112.    The federal government entered into contracts with predecessors or affiliates of Defendants Shell Oil Company and ExxonMobil to obtain "vast quantities of avgas."[34]   These contracts provided federal officers with the power to direct the operations of Defendants' facilities. For instance, the government's contract with Shell Oil Company's predecessor or affiliate specified that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943."[35]   To maximize production of this critical product, "[t]he Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell II*, 751 F.3d at 1287 (internal citations omitted).   At the federal government's direction, the oil companies, including certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war." *Id.*

113.    With respect to Exxon Mobil Corporation's affiliates, the federal government "exerted substantial control and direction over the refineries' actions, including decisions on how [and when] to use raw materials and labor." *Exxon Mobil Corp.*, 2020 WL 5573048, at *1, *8. Courts have concluded that, "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and that it "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *11, *14.  By helping the government produce essential items that

---

[34]    Several prior decisions discuss these contracts and the power that the federal government held over Defendants to control production of oil and gas.  *See, e.g.*, *Shell II*, 751 F.3d at 1286; *Exxon Mobil Corp.*, 2020 WL 5573048, at *31.

[35]    *Shell Oil Co.* v. *United States*, No. 1:06-cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 (emphases added).

it needed for national defense purposes, *see Watson*, 551 U.S. at 153, Defendants "acted under" a federal officer for purposes of the removal statute.

> **(e)** **Defendants Acted under Federal Officers by Supplying and Managing the Strategic Petroleum Reserve and Allocating Products Pursuant to the Emergency Petroleum Allocation Act.**

114.     In response to the Oil Embargoes of the 1970s, Congress also created the Strategic Petroleum Reserve ("SPR") in the Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 (1975), to protect the country's energy security.  The SPR was a "stockpile of government-owned petroleum managed by the [Department of Energy ("DOE")] [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[36]  Several Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

115.     The Act "declar[ed] it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1[9]78, and for an eventual storage system of at least 500 million barrels by December 1982."  Ex. 61 at 30.  From 1999 through December 2009, the U.S. government's "primary means of acquiring oil for the SPR" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[37]  During that time,

---

[36]   *See* H.R. Rep. No. 115-965, at 3 (2018), https://www.congress.gov/115/crpt/hrpt965/CRPT-115hrpt965.pdf.

[37]   U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited May 25, 2021).

"the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.  Ex. 62 at 18, 37.

116.    The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay these royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.  *See* Ex. 63.  The federal government also contracted with some of the Defendants (including their predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of oil under the RIK program, Ex. 64, and contracted with those Defendants to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve.  *See, e.g.*, Ex. 65, at 19.  Some Defendants also acted under federal officers by operating the SPR infrastructure for the government.[38]

117.    The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[39]  The United States has exercised

---

[38]    For example, from 1997 to 2019, the DOE leased to Defendant Shell Oil Company affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana.  *See* Ex. 62 at 16.  Under the lease agreement, "Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown.  *Id.*  In January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).  *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.  Similarly, ExxonMobil Pipeline Company was required to "make monthly lease payments; be responsible for operations and maintenance of the facility; and provide use of the facility in support of Government emergency oil drawdowns."  *Id.*  And the DOE has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas.  *See* U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[39]    *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are

this control, including as a result of President Bush's Executive Order to draw down the reserve in response to Hurricane Katrina in 2005 and President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011. *See* Ex. 66; Ex. 67 at 1, 17, 18, 21. Thus, the hundreds of millions of barrels of oil flowing through these facilities—the sale and combustion of which are necessarily part of the causal chain that forms the basis of the City's claims—were subject to federal government direction, control, and supervision. *See generally* U.S. Dep't of Energy, *2018-2022 Strategic Vision*, https://www.energy.gov/sites/prod/files/ 2019/12/f69/FE%20Strategic%20Vision.pdf (last visited May 25, 2021).

118.    Also in response to the oil embargoes of the 1970s, Congress passed the Emergency Petroleum Allocation Act of 1973, Pub. L. No. 93-159, 87 Stat. 627 (1973), to manage shortages and "distribute [petroleum products] fairly across the total spectrum of petroleum use in this country." Ex. 68 at 35. Pursuant to the Act, from 1974 to 1981, the federal government implemented an "omnibus mandatory allocation program covering every facet of the petroleum industry and affecting, if not dictating, virtually every domestic transaction involving crude oil and covered petroleum products."[40] This program required that Defendants distribute available gasoline supplies to wholesale purchasers (largely service stations) on a pro rata basis. *See* Ex. 68 at 37. Further, the program mandated that Defendants regularly report to the federal government on their crude oil supplies and refining activities; when a Defendant's crude oil supplies exceeded

---

required by a severe energy supply interruption or by obligations of the United States under the international energy program.").

[40]    *Emergency Petroleum Allocation Act Extension: Hearing on H.R. 15905, H.R. 151000, H.R. 15491, H.R. 16116, H.R. 16303, H.R. 16757, and S. 3717 (and all identical bills) Before the Subcomm. on Communications and Power of the H. Comm. on Interstate and Foreign Commerce*, 93d Cong. 8 (1974) (statement of Hon. John C. Sawhill, Deputy Administrator, Federal Energy Office).

a certain benchmark, it was forced to sell to others who fell below that benchmark. *See id.* at 41. Congress deemed the allocation system, and the oil companies' participation in it, necessary due to "shortages of crude oil" that constituted "a national energy crisis which is a threat to the public health, safety, and welfare" requiring "prompt action by the Executive branch."[41] By "work[ing] hand-in-hand with the government, assisting the federal government" to achieve a task that furthers the objectives of the federal government, Defendants were "acting under" federal officers. *Ruppel*, 701 F.3d at 1181.

     **(f)**     **Defendants Acted under Federal Officers by Developing Mineral Resources on the Outer Continental Shelf and Other Federal Lands.**

119.     Congress first passed OCSLA in 1953, providing federal control over the OCS to ensure the "expeditious and orderly development" of what it recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs." 43 U.S.C. § 1332(3). The initial regulations "went well beyond those that governed the average federally regulated entity at that time." Ex. 70 ¶ 19. As Professor Priest explains: "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS." *Id.* (citing 19 Fed. Reg. 90 (May 8, 1965), C.F.R. § 250.11, 2656) (emphases added). Notably, the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." *Id.* ¶ 20.

120.     Federal officials in the Department of the Interior—whom the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration. *See id.* ¶ 19. Federal supervisors had

---

[41]   Pub. L. No. 93-159, sec. 2(a)(1) & (3), 87 Stat. 628.

complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26, and had authority to suspend operations in certain situations, *id*. ¶ 20.  The supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor."  *Id.* (internal quotation marks omitted).  As Professor Priest explains, these federal officials "did not engage in perfunctory, run-of-the-mill permitting and inspection."  *Id.* ¶ 22.  Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

121.    In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things: "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conduct casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and "required the installation of subsurface safety devices . . . on all OCS wells."  *Id.* ¶ 24 (citations omitted).  Professor Priest observes that through these OCS Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety."  *Id.* ¶ 25.  These controls went far beyond typical regulations, as the federal government imposed requirements as the resource owner to achieve its economic and policy goals.  *E.g.*, *id.* ¶¶ 28, 32.

122.    During the 1960s, U.S. domestic oil consumption increased 51%, compared to 36% during the previous decade.  Ex. 77 at 17.  Demand continued to climb into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil.  *See id*.  The United States increasingly turned to foreign countries, particularly in

the Middle East, for oil.  Ex. 78, at 591.  The amount of oil that the United States imported grew

from 3.2 million barrels per day in 1970 to 6.2 million barrels per day in 1973.  *Id*. at 591.  By

April 1973, President Nixon warned Congress of an impending national energy crisis.  *See* Ex. 79.

To avert the impending crisis, President Nixon ordered a dramatic increase in production on the

OCS.  *Id*.

123.    Before the nation's precarious energy balance could stabilize, events abroad would

exacerbate the crisis.  The 1973 OPEC Oil Embargo "led to nationwide shortages of petroleum, a

$60 billion drop in GNP, [and] more rapid inflation," among other harms.[42]  The government called

upon the oil and gas industry, including Defendants, to address this shortage.  *See infra* ¶¶ 124-

130.

124.    The nation's energy woes continued to mount in the mid-to-late 1970s, with a

natural gas shortage caused by an abnormally cold winter in 1976-77, a national coal strike in

1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979.

*National Energy Plan II*, at 1.  Yet the nation's dependency on imported oil continued to increase.

By 1977, the United States was importing up to 8.8 million barrels per day—fully half of the

nation's total domestic oil consumption.  *Id.* at 77, tbl. IV-1.  The growing influence of OPEC, the

quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and

the now-infamous gas lines, price controls, and rationing that accompanied these energy crises

spurred the U.S. government to take action over the ensuing decades to quickly and dramatically

increase domestic oil production.

---

[42]    U.S. Dep't of Energy, National Energy Plan II, at 1 (May 1979), https://books.google.com/
books?id=VR7PpPbRKFgC&printsec=frontcover#v=onepage&q&f=false.

125.    In 1973, President Nixon established the goal of energy independence for the U.S. by 1980.  President Nixon dubbed this plan "Project Independence 1980" and, among other things, ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."  Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 17, 29 (Jan. 23, 1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/69?rgn=full+text;view=image.

126.    In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargoes of the 1970s.  Congress's express purpose in amending the statute was to foster "expedited exploration and development of the OCS in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments."[43]  Congress expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the [OCS] in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible."  43 U.S.C. § 1802(2).

127.    During the debate over the 1978 amendments, Senator Fritz Hollings proposed that the federal government create a national oil company to facilitate the development of oil and gas on the OCS.  Ex. 70 ¶ 52.  "In essence, Hollings called for the creation of a national oil company that would 'conduct this program by using the same drilling and exploration firms that are usually hired by oil companies.'"  *Id*. (internal citation omitted).  The proposal to create a government agency to develop the OCS was ultimately rejected—instead, the government decided to contract

---

[43]    43 U.S.C. § 1802 (1); *see California ex rel. Brown* v. *Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981).

with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government.  *See* Ex. 80, at 9275-76.

128.    This was not the only proposal at the time to create a national oil company.  *See* Ex. 70 ¶¶ 52-53; 121 Cong. Rec. H4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall); Ex. 80, at 9275-76.  Another proposal "would have formally established a 'Federal Oil and Gas Corporation'" that would be "'owned by the federal government' and 'in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship.'"  Ex. 70 ¶ 53.  Yet another proposal, from Representatives Harris and McFall, "would provide for the establishment of a National Energy and Conservation Corporation—to be called Ampower—similar to the Tennessee Valley Authority."  121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall). These proposals were ultimately rejected in favor of an arrangement by which the government would contract with private companies, including Defendants—*acting as agents*—to achieve this federal objective with expanded federal supervision and control.  *See* Ex. 70 ¶ 55.  The result was a closely supervised leasing program directed by the Department of the Interior and providing the federal government with control over the production sufficient to protect the national interests. *See id*. ¶ 46.  As the Supreme Court has explained, removal is appropriate where private companies have "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform."  *Watson*, 551 U.S. at 154.

129.    One of the Federal Energy Administration's first undertakings in 1974 was to propose significantly expanding the OCS leasing program, because "[r]ecent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products" and "[i]nterruptions in oil imports impose severe costs on the United States due to the

pervasive economic role of petroleum in almost every sector of the economy." Ex. 69 at App'x 2. This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to [e]nsure that the most favorable OCS exploration prospects become available for near-term development." *Id.*

130.    The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[44]  The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities "which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a)-(e).  Since 1977, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[45]

131.    In the 1990s, the Clinton Administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the

---

[44]    *See* H.R. Rep. No. 95-590, at 53 (Aug. 29, 1977), reprinted in 1978 U.S.C.C.A.N. 1450 (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

[45]    *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

central and western Gulf of Mexico" for energy companies' exploration and production.  Press Secretary, White House Office of Communications, Statement on North Slope Oil Bill Signing, 1995 WL 699656, at *1 (Nov. 28, 1995).  And in the 2000s, the Bush Administration opened up approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil."[46]

132.    As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies.  They reflect the creation of a valuable national security asset for the United States over time."  Ex. 70 ¶ 7(1) (emphasis added). The federal OCS program "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own."  *Id.*  The federal government "had no prior experience or expertise," and "[t]herefore . . . had little choice but to enlist the service of the oil firms who did."  *Id.* ¶ 18.  But it was the federal government, not the oil companies, that "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" in order to advance federal interests and accordingly, "[t]he policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling offshore."  *Id.* ¶ 7(2).  "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves."  *Id.*  The importance of the OCS to domestic energy security and economic prosperity has continued to the present, and across every administration.  *See id*. ¶ 79.  For example, in 2010, President Obama

---

[46]   George W. Bush, *Statement By President George W. Bush Upon Signing [H.R. 6111]*, White House Press Release, 2006 U.S.C.C.A.N. S73, S75 (2006).

announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." *Id.* ¶ 78.

133.   The leases require Defendants to "maximize the ultimate recovery of the hydrocarbons from the leased area"; require that drilling take place "in accordance with a government approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"; and specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[47]  Prior to exploration, development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewers, or other agencies.[48]  Under these requirements, OCS lessees are subject to exacting oversight by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[49]  BSEE carefully monitors compliance with the approved plan and must approve any significant modification thereof.

134.   The federal government retains the right to control a lessee's rate of production on the OCS from its lease.[50]  In particular, BSEE may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing

---

[47]   *See generally* Exs. 71-74; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multistep process for approval of development plans and BOEM oversight procedures).

[48]   *See* Offshore Oil and Gas Development: Legal Framework at 11-13.

[49]   *See, e.g.*, 30 C.F.R. §§ 250.101-115, 250.130-146, 250.168-295, 250.400-463 (BSEE) & 550.101-147 (BOEM).

[50]   *See* Ex. 71 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").

from a reservoir.[51]  This requirement has existed since 1974,[52] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[53]

135.   The United States controls federal mineral lessees like Defendants in other ways. An OCS lessee does not have an absolute right to develop and produce; rather, it has only an exclusive right to seek approval from the United States to develop and produce under the lease. *See Sec'y of the Interior* v. *California*, 464 U.S. 312, 337-39 (1984); *Vill. of False Pass* v. *Clark*, 733 F.2d 605, 614-16 (9th Cir. 1984).  Nor may a federal lessee assign its lease to another person without express government approval.  30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).  The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."  Ex. 71 § 14; Ex. 72 § 15(d); *see* 43 U.S.C. § 1341(b).  The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property.  The government reserves the right to purchase up to approximately 16% of lease production, less any royalty share taken in-kind.  43 U.S.C. § 1353(a)(2).  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the DOD (military operations), or the DOE (*e.g.*, Strategic Petroleum Reserve).  *Id*. § 1353(a)(3).

136.   Through federal leases, the government balances economic development with environmental considerations.  The Secretary may reduce or eliminate the United States' royalty

---

[51]   30 C.F.R. § 250.1159.

[52]   *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[53]   75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

share, and thus provide the lessee an additional economic incentive to produce oil and gas.[54]  The Secretary may suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."[55]

137.    As the above statutory and lease provisions demonstrate, a federal oil and gas lease is the means by which the federal government directs a lessee to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  These are activities that the federal government would itself have to undertake unless the Defendants did it for the government through the obligations of federal leases on federal lands.  Under *Watson*, this is not run-of-the-mill regulation.  On the contrary, it is the kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157; *Isaacson*, 517 F.3d at 137.

138.    In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department was nearly one billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 35% of domestic oil production and 25% of domestic natural gas production.[56]  The federal

---

[54]   43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.").

[55]   43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons).

[56]   *See* Cong. Research. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands through royalty regimes that have resulted in billions of dollars of revenue to the federal government.  If not for the lessees' activities under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself to implement Congress's directives regarding production of oil and gas from the OCS in furtherance of the federal government's energy policy objectives.

139.    Defendants similarly acted under the federal government's direction, supervision, and control in developing mineral resources on federal lands onshore.[57]  The Interior Department's Bureau of Land Management ("BLM") leases, like OCS leases, are contracts to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees.  For instance, the Secretary of the Interior may also direct lessees to deliver any reserved production to the General Services Administration (government civilian operations), the DOD (military operations), or the DOE (*e.g.*, Strategic Petroleum Reserve)[58]; take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States"[59]; reduce or eliminate the United States' royalty share, thereby providing lessees with an additional economic incentive to produce oil and gas[60]; compel lessees to offer a percentage of lease

---

[57]  "Oil and gas produced from the [onshore] Federal and Tribal mineral estate are significant parts of the nation's energy mix.  For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States."  Ex. 75 at 1.

[58]  43 U.S.C. § 1353(a)(3).

[59]  30 U.S.C. § 192.

[60]  43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (Mineral Leasing Act ("MLA") leases).

production "small" refiners[61]; and even direct or grant suspensions of operations.[62]  The federal

government also uniquely reserves the authority to determine the value of production for purposes

of determining how much royalty a lessee owes, which is a provision included in BLM leases.[63]

BLM leases further provide that the United States "reserves the right to specify rates of

development and production in the *public interest*."[64]  As with OCS leases, BLM leases require

lessees to cease any operations that would result in the destruction of threatened or endangered

species or objects of historic or scientific interest.  Ex. 74 § 6.

140.    The federal government's control over onshore and offshore oil and gas production

is thus fundamentally different from the government's regulation of tobacco products, which the

Supreme Court addressed in *Watson*.  There, the Court recognized that a private party does not

come within the scope of the federal officer removal statute "simply [by] *complying* with the law."

*Watson*, 551 U.S. at 152.  Accordingly, "a highly regulated firm cannot find a statutory basis for

removal in the fact of federal regulation alone," even "if the regulation is highly detailed and even

if the private firm's activities are highly supervised and monitored."  *Id.* at 153.  This is because

mere regulation does not indicate that the federal government would undertake the regulated

activity if private actors did not—the government regulates tobacco products because of their

health risks, not because tobacco production is a federal imperative.  The City's claims, by contrast,

seek to punish Defendants for activities conducted under the close supervision of the federal

---

[61]   43 USC 1353(b).

[62]   *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[63]   *See* Ex. 74 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on
products . . . .").  A typical commercial private lease would never reserve similar unilateral
authority to one contracting party to control a material economic term of the lease contract.
*See* Ex. 76 (Commercial Lease – Texas Association of Realtors, Form TAR-2101).

[64]   *Id*. § 4 (emphasis added).

government that effectuate national energy policy and support the national defense.  The City's claims thus implicate precisely the type of "special relationship" between private contractors and the federal government that supports federal officer removal.  *Id.* at 157.

> **2.** ***The City's Claims Are Related to Defendants' Activities "Under Color of Federal Office."***

141.    The City's claims are "for or relating to" acts Defendants performed "under color of federal office."  To meet this prong, there need only be "a connection or association between the act in question and the federal office."  *Sawyer*, 860 F.3d at 258 (4th Cir. 2017) (internal citation omitted); *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*").  The Removal Clarification Act of 2011 inserted the words "or relating to" into the federal officer removal statute, which "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court." *Def. Ass'n of Philadelphia*, 790 F.3d at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).  Even before the Removal Clarification Act, a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred *at least in part* '*because of* what they were asked to do by the Government.'" *Id.* at 471 (quoting *Isaacson*, 517 F.3d at 137) (emphasis added).  The Act, however, "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais*, 951 F.3d at 292; *see also Agyin*, 986 F.3d at 174 n. 2 (discussing *Def. Ass'n of Philadelphia*, 790 F.3d at 467, and noting that Congress's addition of "the 'or relating to' language [was] 'intended to broaden'" the statute's application).

142.    It is, therefore, not necessary "that the complained-of conduct *itself* was at the behest of a federal agency"; rather, it is "sufficient" if the City's "allegations are directed at the relationship between the [Defendants] and the federal government" for at least *some* of the time

frame relevant to the City's claims.  *Baker*, 962 F.3d at 944-45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470-71; *Papp* v. *Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016).  For instance, in *Baker*, an analogous case, the federal officer removal statute applied where certain products that allegedly contributed to plaintiff's purported pollution-based harms had, at times, been "critical wartime commodities" subject to "price control[s]," detailed federal oversight, and mandatory orders "setting aside" a portion of the defendants' products for the government's own use.  *Id.* at 940-41, 945.  The defendants did not have to show that federal officers directed the alleged pollution itself, or even the defendants' storage and waste disposal practices; rather it was "enough for the present purposes of removal that at least some of the pollution arose from the federal acts." *Id.* at 945.  Similarly, in *Def. Ass'n of Philadelphia*, the "for or relating to" element was satisfied even though the Federal Community Defender was *not* directed by the government in the specific conduct at issue in the suit (representing defendants in state post-conviction proceedings) because that conduct was "related to" acts that were done under federal direction (representing defendants in federal habeas proceedings).  790 F.3d at 471-72.  And in *Papp*, the "for or relating to" element was satisfied in a failure-to-warn lawsuit where the defendant established a "connection" between manufacturing aircraft for the federal government and plaintiff's alleged asbestos exposure, even though the government had not directly prohibited the defendants from issuing asbestos-related warnings.  842 F.3d at 812-813.

143.    Courts in the Second Circuit have long taken a broad reading of the connection required for federal officer removal.  As one court explained, "In *Isaacson*, it was enough that the contractual relationship [between defendants and the government] gave rise to [the plaintiff's harm], even if the contract did not call for it."  *Gordon*, 990 F. Supp. 2d at 318; *see also Isaacson*, 517 F.3d at 137-38 (The hurdle erected by the "for or relating to" requirement is "quite low, as the

statute does not require that the prosecution must be for the very acts [that] . . . have been done . . . under federal authority.").  Under Defendants' theory of the case, the City's claims relate to numerous federal activities, especially when construed "in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466, and giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

144.    The City alleges that Defendants' promotions "enabled the unabated and expanded extraction, production, promotion, marketing, and sale" of fossil fuel products, which, in turn, "are the primary cause of climate change."  Ex. 5 ¶¶ 8, 26; *see also id.* ¶ 20 (Defendants' "business models continue to center on developing, producing, and selling more of the very same fossil fuel products driving climate change."); ¶ 35 (alleging that ExxonMobil, Shell, and BP have "continue[d] to ramp up fossil fuel production and invest in new fossil fuel development"); ¶ 42 ("[Defendants] have been doubling down on fossil fuel extraction, production, and sales").

145.    The City's suit, at its core, targets Defendants' production and supply of oil and gas, and Defendants' promotion of that oil and gas—which includes oil and gas that Defendants extracted and produced under federal officers.  The City takes issue with Defendants' advertisements *because* they allegedly enabled Defendants to continue to produce and sell fossil fuels—which necessarily encompasses production of fossil fuels that Defendants carried out under the guidance, supervision, and control of the federal government.  By challenging Defendants' production, promotion, and sales of *all* oil and gas products, the City's allegations are necessarily "directed at the relationship between the [Defendants] and the federal government." *Baker*, 962 F.3d at 945 (internal citations omitted).  A clear "connection" or "association" thus exists between Defendants "acting under" federal officers by extracting and producing oil and gas pursuant to

federal contracts and specifications to help carry out the federal government's objectives to bolster the country's military and economic security, and the City's attempt to attack Defendants for that very same conduct.  *See Latiolais*, 951 F.3d at 292.

146.    A recent decision from the Fourth Circuit, *County Board of Arlington County, Virginia*, confirms that the City's claims are "related to" Defendants' production and sale of oil and gas products under the direction and control of federal officers.  In *Arlington*, a municipality sued pharmacies in state court, asserting that they "caused an opioid epidemic" because "they were 'keenly aware of the oversupply of prescription opioids'" but "failed to 'tak[e] any meaningful action to stem the flow of opioids into the communities.'"  2021 WL 1726106, at *2 (citation omitted).  The defendants there removed to federal court on the ground that they "operate the [TRICARE Mail Order Pharmacy ('TMOP')] as subcontractors," serving as part of a "federal health insurance program administered by DOD to 'provide[] medical care to current and retired service members and their families.'"  *Id.* (citation omitted).  Relying on "guideposts" established in *Watson* v. *Philip Morris Cos.*, 551 U.S. 142 (2007), the Fourth Circuit applied the liberal policy favoring federal officer removal to conclude that the defendants "acted under" a federal officer "in operating the TMOP in accordance with the DOD contract."  *Arlington*, 2021 WL 1726106, at *2.

147.    The Fourth Circuit reiterated that Congress has abandoned "the old 'causal nexus' test," such that a removing defendant need show only "a *connection or association* between the act in question and the federal office."  *Id.* at *8 (emphasis added) (internal citations omitted).  Although the plaintiff in that case argued that "this requirement is not met" because the "Complaint did not even mention the distribution of opioids to veterans, the DOD contract or the operation of the [TMOP]," the Fourth Circuit held that this "position would elevate form over substance"

70

insofar as "Arlington's claims seek monetary damages due to harm arising from 'every opioid prescription' filled by pharmacies" such as the ones operated by defendants. *Id.* at *9.

148.    So, too, here.  Although the City tries to characterize its claims as involving only alleged misrepresentations about oil and gas rather than the production and sale of those products (including to the federal government), this disregards the substance of the Complaint, which makes clear that the City seeks to force Defendants to stop or substantially curtail fossil fuel extraction and production to "drastically slash greenhouse gas emissions in order to avoid the most catastrophic effects of the climate crisis."  Ex. 5  ¶ 42.   Indeed, the Complaint alleges that Defendants' supposed "deception . . . ha[s] enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and sale of fossil fuel products."  *Id*. ¶ 8 (emphasis added).

149.    At a minimum, Defendants have shown that—as in the City's first suit—they are being sued, at least in part, "*because of*" their production and supply of oil and gas products under the direction, control, and supervision of the federal government, *Isaacson*, 517 F.3d at 137, and thus Defendants have acted "under color of federal office."

### 3.    *Defendants Have Colorable Federal Defenses.*

150.    "Courts have imposed few limitations on what qualifies as a colorable federal defense."  *Id*., 517 F.3d at 138.  This element of the federal officer removal statute requires only that a defendant "raise a claim that is defensive and based in federal law."  *Id.* (internal quotation marks and citations omitted).   Here, Defendants intend to raise several meritorious federal defenses, including the government-contractor defense, *see Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 504-14 (1988); *Maguire* v. *Hughes Aircraft Corp.*, 912 F.2d 67, 70 (3d Cir. 1990); federal immunity, *see Campbell-Ewald* v. *Gomez*, 577 U.S. 153, 166-69 (2016); res judicata based on a federal judgment, *see Winters* v. *Taylor*, 333 F. App'x 113, 114, 117 (7th Cir. 2009); preemption, *see Farina* v. *Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); and others.

151.     *Boyle* is analogous.  In *Boyle*, the Supreme Court applied a federal common-law government-contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest; and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy.  487 U.S. at 504-13.  In addition, as the Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" a contractor "who simply performed as the Government directed," may be immune from liability.  577 U.S. at 167 (quoting *Yearsley* v. *W.A. Ross Const. Co.*, 309 U.S. 18, 20-21 (1940)).  Here, Defendants produced oil and gas at the direction of the federal government, and thus have a colorable argument that they are immune from liability.

152.     Further, the doctrine of res judicata bars the City from litigating its claims, which were or could have been raised in *City of New York*.  The preclusive effect of a federal court decision is a federal defense.  *See Winters*, 333 F. App'x at 114 ("[The defendant] again removed the case to federal court, citing the federal defenses of claim preclusion, issue preclusion, and sovereign immunity."); *Bazuaye* v. *United States*, 41 F. Supp. 2d 19, 27 n.12 (D.D.C. 1999) ("[T]he claim of res judicata effect of prior federal judgment . . . is a federal defense." (citing *Rivet* v. *Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998)).  The City's claims are barred by res judicata because the *City of New York* judgment is "(1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause[s] of action."  *EDP Med. Comput. Sys., Inc.* v. *United States*, 480 F.3d 621, 624 (2d Cir. 2007) (internal citations omitted).  While the City has recast its claims as violations of a municipal consumer protection law, they nevertheless satisfy the fourth prong because the City's new causes of action share "a common nucleus of operative facts," *Lucky Brand*

*Dungarees, Inc.* v. *Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594-95 (2020), with the claims that the City asserted in *City of New York*, and "could have been raised in that action," *Monahan* v. *New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000).  Indeed, the Complaint shares many of the same theories—and indeed, the same language—as the complaint in *City of New York. See* ¶ 18, *supra*.

153.    Because the relief the City seeks would have "the practical effect" of "control[ling] conduct beyond the boundaries of [New York]," its claims are barred by the Commerce Clause, which "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State."  *Healy* v. *Beer Inst.*, 491 U.S. 324, 336-37 (1989). Similarly, imposing such extraordinary extraterritorial liability on lawful, government-encouraged conduct would constitute "a due process violation of the most basic sort." *Bordenkircher* v. *Hayes*, 434 U.S. 357, 363 (1978).  The foreign affairs doctrine also precludes exercises of state law that would "impair the effective exercise of the Nation's foreign policy."  *Garamendi*, 539 U.S. at 419 (quoting *Zschernig* v. *Miller*, 389 U.S. 429, 440 (1968)).  This prohibition extends to state-law causes of action.  *See Pink*, 315 U.S. at 230-31 ("[S]tate law must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement."). As explained above, the City's claims would interfere with the U.S. government's control of foreign policy, now and prospectively, including governmental efforts to address climate change and the allocation of costs through multilateral negotiations.  *See In re Assicurazioni Generali*, *S.P.A.*, 592 F.3d 113, 115, 119-20 (2d Cir. 2010).

154.    To the extent the City's claims target Defendants' statements, they are barred by the First Amendment.  As the Supreme Court has held, lobbying activity is protected from civil liability. *See E. R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961);

*United Mine Workers of Am.* v. *Pennington*, 381 U.S. 657, 671 (1965); *see also In re Dr. Reddy's Lab'ys, Ltd.*, 2002 WL 31059289, at \*13 (S.D.N.Y. Sept. 13, 2002) (*Noerr-Pennington* immunity "encompass[es] state law . . . claims that arise from government action"). This is true even if "the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988).

155.    Finally, the City's claims are barred by the U.S. Constitution and related doctrines, including: the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3; Due Process Clauses, *id.* amends. V & XIV, § 1, *State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 421 (2003), *BMW of N. Am.* v. *Gore*, 517 U.S. 559, 572-73 & n.19 (1996); derivative sovereign immunity, *see Yearsley*, 309 U.S. at 20-21; and the foreign affairs doctrine, *see Pink*, 315 U.S. at 230-31.

156.    These and other federal defenses are more than colorable, and thus satisfy the test for federal officer removal under the statute. *See Willingham*, 395 U.S. at 407 (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed"); *Isaacson*, 517 F.3d at 139 ("colorable" federal defense need not be "clearly sustainable" at removal stage because "the purpose of the statute is to secure that the validity of the defense will be tried in federal court"); *Gordon*, 990 F. Supp. 2d at 319 (noting that the "evidentiary standard" should not be "too high at the remand stage, given that the purpose of federal officer removal was to encourage the trial of such complex evidentiary questions in federal court"). *See also Cuomo* v. *Crane Co.*, 771 F.3d 113, 117 (2d Cir. 2014) (reversing remand in a failure-to-warn case where defendant produced asbestos materials for the government under "detailed and comprehensive specifications"; although such specifications "made no mention of asbestos warnings," the defendant had

"provided sufficient evidence to create at this preliminary stage a 'colorable' possibility" of a federal defense).  Accordingly, removal under Section 1442 is proper.

### III.   This Action Is Removable under the Outer Continental Shelf Lands Act.

157.    This Court also has original jurisdiction under OCSLA.  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

158.    OCSLA grants federal courts original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b).  The "language" of § 1349(b) is "straightforward and broad."  *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014).  The OCS includes all submerged lands that belong to the United States but are not part of any State.  43 U.S.C. §§ 1301, 1331.

159.    Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *EP Operating Ltd.* v. *Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).  "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA."  *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS] . . . should be made available for expeditious and orderly development."  43 U.S.C. § 1332.  The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal

Government relating to exploration for, and development and production of, minerals of the [OCS]." *Id.* § 1332(4) (emphasis added).

160.    Under OCSLA, the U.S. Department of the Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal OCS. *Id.* § 1334 *et seq.* Under this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres. In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." *The Impact of the President's FY 2017 Budget on the Energy and Min. Leasing and Production Missions of the Bureau of Ocean Energy Management (BOEM), the Bureau of Safety and Environmental Enforcement (BSEE), and the Bureau of Land Management (BLM): Hearing Before the Subcomm. on Energy and Min. Resources of the H. Comm. on Nat. Resources*, 114th Cong. 3 (2016) (Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Mgmt., Dep't of the Interior), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.[65] In 2019, OCS leases supplied more than 690 million barrels of oil, a figure that has risen substantially in each of the preceding six years, together with 1.034 trillion cubic feet of natural gas. Bureau of Safety & Envtl. Enf't, Outer Continental Shelf Oil and Gas Production, https://www.data.bsee.gov/ Production/OCSProduction/Default.aspx.

---

[65]  The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists. *See, e.g.*, *Plains Gas Sols., LLC* v. *Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co.* v. *Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 608 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

161.    Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on nearly 27 million OCS acres administered by the U.S. Department of the Interior under OCSLA.  Hopper, *supra*.

162.    For example, from 1947 to 1995, Defendant Exxon Mobil Corporation produced more than one billion barrels of crude oil and more than five billion barrels of natural gas from the federal OCS in the Gulf of Mexico alone.  U.S. Dep't of Interior, Mins. Mgmt. Serv., Gulf of Mexico Region, Production by Operator Ranked by Volume (1947-1995), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%201947%20-%201995.pdf. In 2020, Exxon Mobil Corporation produced more than 12 million barrels of crude oil from the OCS in the Gulf of Mexico, while affiliates of Royal Dutch Shell plc and BP p.l.c. produced over 139 million and 108 million barrels of crude oil, respectively.  U.S. Dep't of Interior, Bureau of Safety & Envtl. Enf't, Gulf of Mexico Region, Production by Operator Ranked by Volume (2020), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202020.pdf.

163.    Moreover, OCSLA makes clear that oil and gas activities on the OCS can only be governed by federal law.  As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS."  *Parker Drilling Mgmt. Servs., Ltd.* v. *Newton*, 139 S. Ct. 1881, 1887 (2019).  In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS.  43 U.S.C. § 1333(a)(1)(A).  Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State."  *Id.*  Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law.  "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]."  *Id.* § 1333(a)(2)(A).

164.    A substantial part of the City's claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals."  *In re Deepwater Horizon*, 745 F.3d at 163.  The City's claims arise out of Defendants' OCS operations because fossil fuel production on the OCS is part of the production about which Defendants allegedly misled New York City consumers.  The Complaint alleges that Defendants' supposed "deception . . . ha[s] enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and sale of fossil fuel products."  Ex. 5 ¶ 8 (emphasis added).  And the City alleges that, instead of investing in "clean energy sources," "ExxonMobil, Shell, and BP . . . have been doubling down on fossil fuel *extraction*, *production*, and sales."  *Id*. ¶ 41-42 (emphasis added).

165.    The Complaint, in fact, challenges Defendants' advertising relating to all of their products, regardless of where they were extracted or produced.  *See id*. ¶ 26 ("ExxonMobil, Shell, and BP . . . never disclose the material fact that fossil fuels—'emissions-reducing' or otherwise—are the primary cause of climate change."); ¶ 18 ("Consumer use of fossil fuel products . . . is a significant contributor to climate change, which is driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to people in New York City and elsewhere.").  A substantial quantum of those products are extracted and produced from OCS operations.  *See supra* ¶¶ 119-140.  Therefore, the City's claims necessarily encompass all of Defendants' exploration, production, extraction, and development on the OCS and fall within the "broad . . . jurisdictional grant of section 1349."  *EP Operating Ltd.*, 26 F.3d at 569.

166.    Moreover, Congress "intended" that "any dispute that alters the progress of production activities on the OCS," and thus "threatens to impair the total recovery of the

federally-owned minerals from the reservoir or reservoirs underlying the OCS," would fall within

OCSLA's "grant of federal jurisdiction." *Amoco Prod. Co.*, 844 F.2d at 1210. Consistent with

that intent, courts have repeatedly found OCSLA jurisdiction where the claims involved conduct

that occurred on the OCS or resolution of the dispute foreseeably could affect the efficient

exploitation of minerals from the OCS. *See, e.g.*, *EP Operating Co.*, 26 F.3d at 569-70; *United*

*Offshore* v. *S. Deepwater Pipeline*, 899 F.2d 405, 406-07 (5th Cir. 1990). That is precisely the

case here.

167.    Because resolution of this dispute foreseeably could affect the efficient exploitation

of minerals from the OCS, this Court has jurisdiction under OCSLA. The City's ultimate goal is

to force Defendants to stop or substantially curtail fossil fuel extraction and production to

"drastically slash greenhouse gas emissions in order to avoid the most catastrophic effects of the

climate crisis." Ex. 5 ¶ 42. According to the Complaint, the alleged deceptive advertisements are

purportedly material because without them consumers would have purchased fewer fossil fuels, or

more alternative energies, resulting in fewer greenhouse gas emissions. *Id.* ¶ 92 ("ExxonMobil,

Shell, and BP's false and misleading representations and omissions are material because they are

relevant and important to a consumer's decision to purchase fossil fuel products, are capable of

influencing a consumer's decision to purchase fossil fuel products, have the capacity to affect

consumer energy, transportation, and consumption choices, and deter consumers from adopting

cleaner, safer alternatives to fossil fuel products."). The City repeatedly claims that Defendants'

advertisements are misleading *in light of* Defendants' continued "fossil fuel production and sales."

*Id.* ¶ 6; *see also id.* ¶ 20 (Defendants' "business models continue to center on developing,

producing, and selling more of the very same fossil fuel products driving climate change."). The

civil penalties the City seeks to impose on Defendants for "countless" allegedly deceptive

advertisements, *see id.* ¶¶ 47, 52, 66, 81, 90, 98, would likewise discourage OCS production, jeopardizing the federal government's leasing program and impairing national energy security.

168.   Finally, OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims.  *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163.  This case is removable under OCSLA despite the City's artful pleading and ostensibly municipal claims.  As *Parker Drilling* explains, the choice-of-law "question under the OCSLA" is not one of "ordinary" preemption.  139 S. Ct. at 1893.  "OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law."  *Id.*  (internal quotation marks omitted).  Thus, the courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under" 43 U.S.C. § 1333(a)(2) such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint."  *Ten Taxpayer Citizens Grp.* v. *Cape Wind Assoc.*, 373 F.3d 183, 193 (1st Cir. 2004).  Accordingly, this lawsuit is removable under OCSLA.

## IV.   This Action Arises Out of Federal Enclaves.

169.   This Court has original jurisdiction under the federal enclave doctrine.

170.   The Constitution's "Enclave Clause" authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever" over all places purchased with the consent of a state "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."  U.S. Const., art. I, § 8 cl. 17.  "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331."  *Jones* v. *John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012).

171.   The "key factor" in determining whether federal enclave jurisdiction exists "is the location of the plaintiff's injury or where the specific cause of action arose."  *Sparling* v. *Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).  The "[f]ailure to indicate the federal enclave

status and the location of the exposure will not shield plaintiffs from the consequences" of "federal enclave status." *Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992). Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave. *See Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (finding defendant was permitted "to remove to federal court" because "some of [plaintiff's] claims arose on federal enclaves").

172.    Despite the City's artful pleading, it is apparent that the gravamen of the purported consumer harms at issue is Defendants' extraction, production, and sale of fossil fuels, and the alleged effects of climate change from the combustion of fossil fuel products. *See, e.g.*, Ex. 5 ¶¶ 18, 24. The City's true aim is to halt Defendants' oil and gas operations and thereby reduce fossil-fuel emissions. By targeting those operations, the City necessarily sweeps in those activities that occur on military bases and other federal enclaves. *See, e.g.*, *Humble Pipe Line Co.* v. *Waggonner*, 376 U.S. 369, 372-74 (1964) (noting that the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Miss. River Fuel Corp.* v. *Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States"). Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.[66]

173.    Moreover, the City of New York contains multiple federal enclaves within its borders, including the Statue of Liberty, Ellis Island, and Fort Tilden. In alleging that Defendants

---

[66]   U.S. Gov't Accountability Off., GAO-02-64R, U.S. Fish & Wildlife Service: Information on Oil and Gas Activities in the National Wildlife Refuge System 1 (Oct. 31, 2001), https://web.archive.org/web/20170211132957/http://www.gao.gov/new.items/d0264r.pdf.

are liable for "advertisements and other promotional statements directed at and viewed by NYC consumers," Ex. 5 at 91, the Complaint necessarily sweeps in any of Defendants' allegedly misleading promotional materials that were "directed at and viewed" on those federal enclaves.

174.    Because the City's claims arise out of federal enclaves, this Court has original jurisdiction over this action.

**V.    This Court Has Diversity Jurisdiction under the Fraudulent Joinder Doctrine.**

175.    The City's lawsuit is an effort to extraterritorially regulate Defendants' fossil fuel production activities that is merely cloaked in the garb of consumer protection law.  For that reason, removal under the preceding grounds is appropriate.  But even assuming—and notwithstanding all the evidence to the contrary—that this lawsuit was *actually* about consumer protection enforcement under municipal law, this action would *still* be removable on multiple grounds.  Put differently, no matter how this case is viewed, it belongs in federal court.

176.    A matter is removable to federal court where there is diversity of citizenship and an amount in controversy in excess of $75,000, thereby satisfying federal jurisdiction.  28 U.S.C. § 1332(a); 28 U.S.C. § 1441.  Here, the Court has diversity of citizenship jurisdiction because the City is a citizen of the State of New York and the only Defendant that is a citizen of New York is fraudulently joined in this action.  The Complaint alleges damages in excess of $75,000, thereby satisfying the amount-in-controversy requirement for federal jurisdiction.  28 U.S.C. § 1332(a).

177.    For diversity purposes, cities are citizens of the state in which they are located. *Moor* v. *County of Alameda*, 411 U.S. 693, 717 (1973).  Accordingly, the City is a citizen of the State of New York.

178.    All seven defendants are corporations and thus citizens of the state (or country) in which they have their principal place of business, and are incorporated.  28 U.S.C. § 1332(c)(1). Specifically, Exxon Mobil Corporation is incorporated in New Jersey and has its principal place

of business in Texas.  *See* Ex. 5 ¶ 11.  Royal Dutch Shell plc is incorporated in England and Wales, and has its principal place of business in the Hague, Netherlands.  *See id*. at ¶ 12.  Shell Oil Company is incorporated in Delaware with its principal place of business in Texas.  *See id*.  BP p.l.c. is incorporated in England and Wales with its principal place of business in London, England. *See id*. at ¶ 13.  BP America Inc. is incorporated in Delaware with its principal place of business in Texas.  *See id*.  API is a non-profit corporation based in Washington, D.C.  *See id*. at ¶ 14.  Thus, the only Defendant that the City alleges is a New York citizen is ExxonMobil Oil Corporation, because it is incorporated in the State of New York.  *Id*. ¶¶ 11-14.

179.    Diversity is normally defeated by the inclusion of at least one plaintiff and one defendant with common citizenship.  Under the fraudulent joinder rule, however, a plaintiff may not defeat federal diversity jurisdiction and a defendant's right of removal by "merely joining as defendants parties with no real connection with the controversy."  *Pampillonia* v. *RJR Nabisco, Inc.*, 138 F.3d 459, 460-61 (2d Cir. 1998).  As relevant here, the fraudulent joinder doctrine requires clear and convincing evidence that there is "outright fraud" in the plaintiff's pleadings. *Id*. at 461.  Here, the City has committed outright fraud in its pleadings by naming ExxonMobil Oil Corporation as a defendant in an attempt to destroy diversity.

180.    A plaintiff commits outright fraud where it joins a defendant merely as a "strawman to defeat jurisdiction," such as when "the evidence is overwhelming" that a plaintiff has "no real interest in gaining a judgment against" it.  *Rodriguez* v. *Casa Chapa S.A. de C.V.*, 394 F. Supp. 2d 901, 908 (W.D. Tex. 2005) (plaintiffs committed outright fraud on the pleadings when they joined non-diverse defendant but never sought discovery from the defendant).

181.    As in *Rodriguez*, the City has no real interest in obtaining a judgment against ExxonMobil Oil Corporation.   Indeed, in 2018, the City sued Defendants Exxon Mobil

Corporation, Royal Dutch Shell plc, and BP p.l.c., as well as Chevron Corporation and ConocoPhillips, in federal court, asserting causes of action for nuisance and trespass under state law stemming from defendants' production, promotion, and sale of fossil fuels. *See City of New York II*, 993 F.3d at 88. Notably, the City did not include ExxonMobil Oil Corporation as a defendant in that action, reflecting that the City was not interested in a judgment against ExxonMobil Oil Corporation. As explained above, *supra* ¶ 11, the Second Circuit affirmed dismissal of the action, unanimously holding that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions," and that such a suit could not proceed under state law. *Id.*

182.    Three weeks after the Second Circuit affirmed dismissal of *City of New York*, the City brought this lawsuit against many of the same defendants, once again attacking Defendants' marketing and promotion of fossil fuels. Although the City claims to seek damages for newly packaged causes of action here, the essential theory and injuries alleged are the same as in *City of New York*. This time, however, in an attempt to avoid federal jurisdiction the City sued Defendants in state court and added ExxonMobil Oil Corporation to destroy diversity.

183.    The Complaint contains no factual allegations about ExxonMobil Oil Corporation's activities that would explain why the City sued ExxonMobil Oil Corporation here when it chose not to do so in 2018.

184.    Indeed, aside from identifying the location of ExxonMobil Oil Corporation's state of incorporation and principal place of business, and noting that it is a wholly owned subsidiary of Exxon Mobil Corporation, the Complaint contains *no allegations* against ExxonMobil Oil Corporation. Instead, the Complaint refers to ExxonMobil Oil Corporation and Exxon Mobil Corporation collectively as "ExxonMobil" to conflate the two businesses. Ex. 5 ¶ 11.

185.    But ExxonMobil Oil Corporation and Exxon Mobil Corporation are not the same economic or legal entity, and the City cannot fuse the two together.  *See Doe* v. *Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 32 (D.D.C. 2008) (refusing to allow plaintiffs to conflate ExxonMobil Oil Corporation with Exxon Mobil Corporation, and awarding summary judgment to ExxonMobil Oil Corporation where "[n]early all of Plaintiffs' allegations and evidence" referred to Exxon Mobil Corporation and not ExxonMobil Oil Corporation).

186.    Based on the allegations in the Complaint and the City's prior litigation position, it appears the City's only possible interest in adding ExxonMobil Oil Corporation to this action is to defeat federal diversity jurisdiction and avoid dismissal from this Court and the Second Circuit. Its attempt to add ExxonMobil Oil Corporation as a "strawman defendant" amounts to outright fraud and should be rejected.  *See Rodriguez*, 394 F. Supp. 2d at 908.

187.    The City fraudulently joined ExxonMobil Oil Corporation in a transparent effort to avoid federal jurisdiction.

188.    ExxonMobil Oil Corporation's citizenship should be disregarded for the purpose of determining diversity jurisdiction, and diversity of citizenship is therefore present here.

189.    Finally, the amount in controversy plausibly exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).

190.    In noticing removal, a defendant need only include a "plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81, 89 (2014); *see also Jean-Louis* v. *Carrington Mortg. Servs., LLC*, 2021 WL 826213, at *2 n.15 (2d Cir. Mar. 4, 2021).  Here, the Complaint alleges that Defendants are liable under the New York City Code for a sweeping pattern of deception in "countless"

advertisements to consumers, and seeks civil penalties of up to $500 per violation.  *See* N.Y.C. Code § 20-703(b); Ex. 5 ¶¶ 47, 81, 90, 98, Prayer for Relief ¶ b.

191.    The City dedicates over fifty pages of its Complaint to cataloging Defendants' advertisements they claim to be deceptive.  And the City has attached a thirty-seven page long appendix to its Complaint containing over 120 "non-exhaustive examples" of allegedly deceptive advertisements and statements.  *See generally* Ex. 5, App'x.  At $500 per violation, which the City claims are "countless," there is far more than $75,000 in controversy here.  Accordingly, this Court has diversity jurisdiction.

## VI.    This Representative Action on Behalf of New York City Consumers Is Removable under the Class Action Fairness Act.

192.    This Court also has removal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the City seeks to represent a class of New York City consumers and CAFA's other statutory requirements are satisfied.

193.    CAFA permits removal of (i) any "class action" (ii) where minimal diversity exists; (iii) at least 100 class members are represented; and (iv) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs."  28 U.S.C. § 1332(d)(1), (2), (5), (11); *Blockbuster, Inc.* v. *Galeno*, 472 F.3d 53, 56 (2d Cir. 2006); *see also* 28 U.S.C. § 1453(b). All four criteria are satisfied here.

194.    CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B). CAFA's legislative history provides that "the definition of 'class action' is to be interpreted liberally.  Its application should not be confined solely to lawsuits that are labelled 'class actions' by the named plaintiffs or the state rulemaking authority.  Generally speaking, lawsuits that

resemble a purported class action should be considered class actions for the purpose of applying these provisions."  S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34 (formatting altered).  In other words, CAFA permits removal of a suit that is "in substance a class action" notwithstanding a plaintiff's "attempt to disguise the true nature of the suit."  *Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013); *see, e.g.*, *Williams* v. *Emprs Mut. Cas. Co.*, 845 F.3d 891, 900-01 (8th Cir. 2017); *Song* v. *Charter Commc'ns, Inc.*, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017).

195.    This action is a putative "class action" under CAFA.  The suit is filed on behalf of a class of "consumers in New York City," *e.g.*, Ex. 5 ¶ 2, to vindicate "the welfare of [the City's] more than 8.5 million residents, as well as the millions of additional people who work in or visit New York City every day."  *Id.* ¶ 10.  In seeking to "protect[] the public" from purportedly "deceptive and unconscionable business practices," *id.*, the Complaint alleges (i) efforts by Defendants to mislead *New York City consumers* and (ii) harm allegedly suffered by *New York City consumers*.  *See, e.g.*, *id.* ¶ 8 ("Defendants are intentionally depriving *NYC consumers* of information that is material to their purchasing decisions.") (emphasis added); ¶ 18 (noting that climate change "is driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to *people in New York City*) (emphasis added); ¶ 25 (Defendants take advantage of *NYC consumers* and prevent them from making informed choices.") (emphasis added); ¶ 40 (Defendants "are bombarding *NYC consumers* with advertisements that give the false impression that renewable and low-carbon energy is an extensive portion of their business.") (emphasis added); ¶ 67 ("In ads directed to *NYC consumers*, Defendants misleadingly downplay the emissions produced by these resources in order to greenwash their corporate image, distinguish themselves from competitors by exaggerating their

environmental credentials, build brand loyalty, and attract customers to their products.") (emphasis added).

196.    By suing in a representative capacity on behalf of "consumers in New York City," *id.* ¶ 2, the City has chosen to bring what is in substance a putative class action: a "representative suit[] on behalf of [a] group[] of persons similarly situated," 1 Alba Conte & Herbert B.  Newberg, *Newberg on Class Actions* § 1.1 (4th ed. 2002).

197.    Minimal diversity is satisfied here, too.  It demands only that "any member of a class of plaintiffs" be "a citizen of a State different from any defendant."   28 U.S.C. § 1332(d)(2)(A).  According to the Complaint, the putative class of New York City consumers includes citizens of New York State, whereas Defendant Shell Oil Company, for example, is a citizen of only Delaware and Texas.  *See* Ex. 5 ¶¶ 10, 12(c).  In fact, as discussed *supra* ¶¶ 175-191, complete diversity is present because no *properly* joined Defendant is a citizen of New York State.

198.    The number of represented plaintiffs necessary for CAFA jurisdiction is present here because the number of "consumers in New York City," Ex. 5 ¶ 2, plainly exceeds 100. *See* 28 U.S.C. § 1332(d)(5)(B); Ex. 5 ¶ 10 (estimating the City's population as more than 8.5 million residents).

199.    Finally, CAFA's $5,000,000 amount-in-controversy threshold is satisfied for the same reasons identified *supra* ¶ 189-91.  *See* 28 U.S.C. § 1332(d)(2).

200.    CAFA jurisdiction is therefore proper because this suit is in substance a "class action" on behalf of more than 100 purported class members, for which there is (greater than) minimal diversity, and an amount in controversy in excess of $5,000,000.

201.    The exercise of removal jurisdiction over this case not only complies with CAFA's requirements, but also furthers CAFA's legislative purposes.  CAFA's "primary objective" is to

ensure "Federal court consideration of interstate cases of national importance." *Dart Cherokee*, 574 U.S. at 89 (2014); *accord* Pub. L. No. 109-02, § 2(b)(2), 119 Stat. 5 (2005). The "Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce." S. Rep. No. 109-14, at 8; *see generally* John P. Frank, *Historical Bases of the Federal Judicial System*, 13 Law & Contemp. Probs. 3, 22-28 (1948). Prior to CAFA's enactment, however, plaintiffs were able to "'game' the procedural rules and keep nationwide or multi-state class actions in state courts." S. Rep. No. 109-14, at 4. The state courts in which these nationwide cases were brought were effectively "invite[d]" to "dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles." *Id.* at 24. To Congress, that was untenable. "[A] system that allows state court judges to dictate national policy" from the "local courthouse steps is contrary to the intent of the Framers when they crafted our system of federalism." *Id.* Because Congress "firmly believe[d]" that such "interstate class actions . . . properly belong in federal court," it enacted CAFA "to ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire." *Id.* at 5.

202.    The City's lawsuit is exactly the type of case Congress did not want to slip through the cracks. If allowed to proceed, the City's action could result in an outsized impact on all other states based on the dictates of a single state-court judgment. This suit is a veiled assault on the national (and international) oil and gas industry, and implicates the entire patchwork of relevant federal legislation and regulation. It is merely one of many coordinated suits brought by attorneys general, municipalities, and climate activists, who have stated clearly that they intend to use targeted litigation, such as this suit, in a concerted effort to stymie the operation of the oil and gas

industry.  Such a backdoor attempt to affect and supplant federal regulation of the oil and gas industry deserves a federal forum.

203.    CAFA jurisdiction is warranted because all of CAFA's statutory criteria are satisfied, and because CAFA was enacted to vest federal courts with jurisdiction over cases just like this one.

## VII.    The City's Claims Include Federal Constitutional Elements.

204.    The City's claims directly target speech on a matter of public concern.  Indeed, the City alleges that Defendants' advertisements discussing climate change constitute "false, falsely disparaging, or misleading" statements.  N.Y.C Code § 20-701; *see, e.g.*, Ex. 5 ¶¶ 83-84.  They allege that Defendants' statements misled the public in general and influenced public opinion.  *See, e.g.*, *id*. ¶ 20 ("Defendants have sought to mislead consumers, and induce purchases and brand affinity, with greenwashing advertisements designed to represent Defendants as environmentally responsible companies developing innovative green technologies and products."); *id.* ¶ 65 (Defendants "misleadingly portray gas as a 'cleaner burning' or 'sustainable' source of low-emission energy that is critical to combatting climate change."); *id.* ¶ 66 ("[T]hese advertisements (as well as countless others like them) tell a half-truth and create the misleading impression that expanding the production of natural gas is a win-win investment in the fight against climate change, with little to no downsides for the planet or its people."); *id.* ¶ 70 ("API's public messaging, including in advertising and statements directed at NYC consumers, misleadingly greenwashes fossil fuel's role in climate change.").

205.    The Supreme Court has made clear that where state-law claims target speech on matters of public concern like climate change, the First Amendment injects affirmative federal-law elements into the plaintiff's cause of action, including factual falsity, actual malice, and proof of causation of actual damages.  *See Phila. Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 774-76

(1986) (state standards "fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); *Milkovich* v. *Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection."); *see also Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 53, 56 (1988) (extending First Amendment substantive requirements beyond the defamation context to other state-law attempts to impose liability for allegedly harmful speech); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 811 (S.D. Tex. 2005) ("First Amendment protections and the actual malice standard . . . have been expanded to reach . . . breach of contract, misrepresentation, and tortious interference with contract or business."). Because the City's claims therefore necessarily raise issues of federal law, the exercise of federal jurisdiction under the *Grable* doctrine is warranted. *See Grable*, 545 U.S. at 314.

206. These First Amendment issues are not "defenses" but rather constitutionally required elements of the claim on which the City bears the burden of proof—by clear and convincing evidence—as a matter of federal law. *N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 280, 286 (1964) (public officials have the burden of proving with "convincing clarity" that a "statement was made with 'actual malice'").

207. These First Amendment issues are substantial and disputed. Although state-law misrepresentation claims are often not removable, such claims typically do not implicate the broader federal interests at issue in this case. As shown above, the federal interests implicated here are unquestionably "substantial" under *Grable*. So is the speech that the City is trying to suppress, because its claims address a subject of national and international importance that falls within the purview of federal authority over foreign affairs and domestic economic, energy, and

security policy.  "Climate change has staked a place at the very center of this Nation's public discourse," and "its causes, extent, urgency, consequences, and the appropriate policies for addressing it" are "hotly debated."  *Nat'l Rev., Inc.* v. *Mann*, 140 S. Ct. 344, 347-48 (2019) (Alito, J., dissenting from denial of certiorari).  Moreover, the City is a public entity seeking to use the machinery of its own state courts to impose de facto regulations on Defendants' nationwide speech on issues of national public concern and debate.  *Cf. Sullivan*, 376 U.S. at 264, 268 ("[An] action brought by a public official against critics of his official conduct" requires "safeguards for freedom of speech.").  But "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas."  *Falwell*, 485 U.S. at 56 (internal quotation marks and citation omitted).  First Amendment interests are at their apex where, as here, it is a governmental entity that seeks to use state-law claims to regulate speech on issues of "public concern."  *Hepps*, 475 U.S. at 775.  Given the compelling federal interests at stake here, federal courts may entertain the claims at issue in this case "without disturbing any congressionally approved balance of federal and state judicial responsibilities," making removal appropriate.  *Grable*, 545 U.S. at 314.

208.    Indeed, freedom of speech is "most seriously implicated . . . in cases involving disfavored speech on important political or social issues," chief among which in the contemporary context is the question of "[c]limate change," which "is one of the most important public issues of the day."  *Mann*, 140 S. Ct. at 346 (Alito, J., dissenting from denial of certiorari) (recourse to a federal forum is especially warranted in suits "concern[ing] a political or social issue that arouses intense feelings," because "a plaintiff may be able to bring suit in whichever jurisdiction seems likely to have the highest percentage of jurors who are sympathetic to the plaintiff's point of view" (citing *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984))).  The City's attempt to

regulate Defendants' speech on the important public matter of climate change through litigation thus necessarily raises substantial First Amendment questions that belong in federal court.

## COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS

209. Based on the foregoing, this Court has original jurisdiction of this action under 28 U.S.C. §§ 1331, 1332(a), 1332(d), 1441, 1442(a), and 1453(b); 43 U.S.C. § 1349(b)(1).

210. The United States District Court for the Southern District of New York is the appropriate venue for removal under 28 U.S.C. § 1441(a) because it is the federal judicial district encompassing the Supreme Court of the State of New York, New York County, where this suit was originally filed.

211. Copies of all process, pleadings, and orders from the state-court action being removed to this Court that Exxon Mobil Corporation and ExxonMobil Oil Corporation have obtained from the Supreme Court of the State of New York, New York County, and which are in the possession of Exxon Mobil Corporation and ExxonMobil Oil Corporation are attached hereto as Ex. 5. Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by ExxonMobil Corporation and ExxonMobil Oil Corporation in the action.

212. Pursuant to 28 U.S.C. § 1446(d), Exxon Mobil Corporation and Exxon Mobil Oil Corporation will promptly file a copy of this Notice of Removal, as well as a Notice of Filing of this Notice of Removal, with the Clerk of the Supreme Court of the State of New York, New York County, and serve a copy of the same on the City. A copy of this filing (without exhibits) is attached as Ex. 81. This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11, as required by 28 U.S.C. § 1446(a).

213. Exxon Mobil Corporation and ExxonMobil Oil Corporation reserve the right to amend or supplement this Notice of Removal. Exxon Mobil Corporation and ExxonMobil Oil

Corporation also reserve all defenses and objections available under applicable law, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses or objections.

WHEREFORE, Exxon Mobil Corporation and ExxonMobil Oil Corporation respectfully give notice that this action is hereby removed from the Supreme Court of the State of New York, New York County to the United States District Court for the Southern District of New York.

DATE:  May 28, 2021

Respectfully submitted,

EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION

By its attorneys,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON, LLP

/s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
Daniel J. Toal
twells@paulweiss.com
dtoal@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990

Justin Anderson
janderson@paulweiss.com
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
Fax:  (202) 223-7420

EXXON MOBIL CORPORATION

Patrick J. Conlon
patrick.j.conlon@exxonmobil.com
22777 Springwoods Village Parkway
Spring, TX 77389
Tel:  (832) 624-6336