**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF NEW YORK,<br><br>               Plaintiff,<br><br>    v.<br><br>EXXON MOBIL CORPORATION,<br>EXXONMOBIL OIL CORPORATION, ROYAL<br>DUTCH SHELL PLC, SHELL OIL COMPANY,<br>BP P.L.C., BP AMERICA INC., and AMERICAN<br>PETROLEUM INSTITUTE,<br><br>               Defendants. | Case No. 21-cv-04807 (VEC) |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S<br>MOTION TO REMAND</u>

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ....................................................................................................... 4

    A.    The City's First Lawsuit Challenging Defendants' Production, Promotion, and Sale of Fossil Fuels Was Dismissed with Prejudice. ........................................ 4

    B.    The Second Circuit Affirmed Dismissal of the City's First Lawsuit and Held That Federal Common Law Governed the City's Nominal State-Law Claims. .......................................................................................................... 5

    C.    The City Again Seeks Redress for Global Climate Change, This Time Nominally Under a Municipal Consumer Protection Law. ........................... 7

LEGAL STANDARD ............................................................................................... 9

ARGUMENT ............................................................................................................ 9

I.    This Court Has Diversity Jurisdiction Under the Fraudulent Joinder Doctrine.................. 9

    A.    The City Has Committed "Outright Fraud" By Joining EMOC. ........................... 11

    B.    The City's Gamesmanship Further Demonstrates Fraudulent Joinder. ............... 12

    C.    The City's Arguments Against Fraudulent Joinder Dodge the Applicable Standard. .......................................................................................................... 14

II.    The City's Claims Are Governed by Federal Common Law and Are Thus Removable. ..................................................................................................... 16

    A.    The City's Claims Necessarily Arise Under Federal Common Law. ................... 16

        1.    The City's Claims Implicate Transboundary Pollution. ........................... 17

        2.    The City's Claims Implicate Foreign Affairs. ......................................... 19

    B.    The Artful Pleading Doctrine Supports This Court's Jurisdiction and the Well-Pleaded Complaint Rule Is No Obstacle to Removal. ................................ 21

    C.    Jurisdiction Is Independently Authorized by *Grable*. ........................................ 24

III.    This Action Is Removable Under the Federal Officer Removal Statute. ........................ 27

    A.    This Court Must Credit Defendants' Theory of the Case at the Removal Stage ................................................................................................................. 28

    B.    The City's Arguments as to Each Element Ignore the Liberal Standard for Federal Officer Removal. ............................................................................... 29

        1.    Defendants "Acted Under" Federal Officers. .......................................... 29

        2.    The City's Claims Are Related to Defendants' Activities "Under Color of Federal Office." ......................................................................... 32

i

3.     Defendants' Defenses Are "Colorable." ..................................................... 34

IV.     This Action Is Removable Under the Outer Continental Shelf Lands Act...................... 35

V.     This Action Arises out of Federal Enclaves. ................................................... 38

VI.     This Representative Action on Behalf of New York City Consumers Is
Removable Under the Class Action Fairness Act............................................. 40

VII.     The Substantial First Amendment Issues Necessarily Raised by the City's Lawsuit
Warrant Federal Jurisdiction.................................................................... 42

VIII.     The City Is Not Entitled to Attorneys' Fees or Costs. ....................................... 44

CONCLUSION................................................................................................... 45

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*,
    731 F.3d 740 (7th Cir. 2013) ................................................40

*Agyin* v. *Razmzan*,
    986 F.3d 168 (2d Cir. 2021).................................27, 28, 29, 32

*Akin* v. *Big Three Indus., Inc.*,
    851 F. Supp. 819 (E.D. Tex. 1994) ......................................39

*Connecticut* v. *Am. Elec. Power Co.*,
    582 F.3d 309 (2d Cir. 2009) .................................................41

*Am. Elec. Power Co.* v. *Connecticut*,
    564 U.S. 410 (2011)......................................................16, 17

*Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*,
    844 F.2d 1202 (5th Cir. 1988) .........................................37-38

*Arlington County* v. *Express Scripts Pharm. Inc.*,
    996 F.3d 243 (4th Cir. 2021) ...........................................32, 34

*Baker* v. *Atl. Richfield Co.*,
    962 F.3d 937 (7th Cir. 2020) ....................................... *passim*

*Banco Nacional de Cuba* v. *Sabbatino*,
    376 U.S. 398 (1964)......................................................17, 19

*Battle* v. *Seibels Bruce Ins. Co.*,
    288 F.3d 596 (4th Cir. 2002) ...............................................24

*Bd. of Comm'rs* v. *Tenn. Gas Pipeline Co.*,
    850 F.3d 714 (5th Cir. 2017) ...............................................26

*Bd. of Cnty. Comm'rs of Boulder Cnty.* v. *Suncor Energy (U.S.A.) Inc.*,
    965 F.3d 792 (10th Cir. 2020) .............................................32

*Bedminster Fin. Grp., Ltd.* v. *Umami Sustainable Seafood, Inc.*,
    2013 WL 1234958 (S.D.N.Y. Mar. 26, 2013) .......................44

*Briarpatch Ltd., L.P* v. *Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004)................................................10

*In re Briscoe*,
    448 F.3d 201 (3d Cir. 2006)................................................................................12, 15

*Calhoon* v. *Bonnabel*,
    560 F. Supp. 101 (S.D.N.Y. 1982).........................................................................9

*City of Milwaukee* v. *Illinois*,
    451 U.S. 304 (1981)................................................................................................16

*City of New York* v. *BP p.l.c.*,
    325 F. Supp. 3d 466 (S.D.N.Y. 2018)........................................................... *passim*

*City of New York* v. *Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021)............................................................................. *passim*

*County of San Mateo* v. *Chevron Corp.*,
    960 F.3d 586 (9th Cir. 2020) ...........................................................................31, 32

*Cuomo* v. *Crane Co.*,
    771 F.3d 113 (2d Cir. 2014)..................................................................................35

*Dart Cherokee Basin Operating Co.* v. *Owens*,
    574 U.S. 81 (2014).................................................................................................41

*In re Deepwater Horizon*,
    745 F.3d 157 (5th Cir. 2014) ................................................................................37

*In re Defender Assoc. of Phila.*,
    790 F.3d 457 (3d Cir. 2015)..................................................................................33

*Doe* v. *Exxon Mobil Corp.*,
    573 F. Supp. 2d 16 (D.D.C. 2008) .......................................................................11

*Durham* v. *Lockheed Martin Corp.*,
    445 F.3d 1247 (9th Cir. 2006) ..............................................................................39

*E.R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)...............................................................................................35

*Empire HealthChoice Assurance* v. *McVeigh*,
    396 F.3d 136 (2d Cir. 2005)..................................................................................23

*EP Operating Ltd. P'ship* v. *Placid Oil Co.*,
    26 F.3d 563 (5th Cir. 1994) ..............................................................................36, 37

*Massachusetts* v. *EPA*,
    549 U.S. 497 (2007)...............................................................................................26

*Connecticut* v. *Exxon Mobil Corp.*,
   2021 WL 2389739 (D. Conn. June 2, 2021)..............................................39

*Connecticut* v. *Exxon Mobil Corp.*,
   No. 21-1446 (2d Cir. filed June 10, 2021)..............................................21

*Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*,
   545 U.S. 546 (2005).............................................................................9

*Federated Dep't Stores, Inc.* v. *Moitie*,
   452 U.S. 394 (1981).......................................................................21, 22

*Fracasse* v. *People's United Bank*,
   747 F.3d 141 (2d Cir. 2014).................................................................21

*Fry* v. *Napoleon Cmty. Schs.*,
   137 S. Ct. 743 (2017)..........................................................................28

*Gordon* v. *Air & Liquid Sys. Corp.*,
   990 F. Supp. 2d 311 (E.D.N.Y. 2014) ..................................................34

*Grable & Sons Metal Prod., Inc.* v. *Darue Eng'g & Mfg.*,
   545 U.S. 308 (2005)......................................................................24, 43

*Humble Pipe Line Co.* v. *Waggoner*,
   376 U.S. 369 (1964)............................................................................38

*Hustler Magazine, Inc.* v. *Falwell*,
   485 U.S. 46 (1988)..............................................................................42

*Isaacson* v. *Dow Chem. Co.*,
   517 F.3d 129 (2d Cir. 2008)....................................................31, 32, 34

*Jefferson County* v. *Acker*,
   527 U.S. 423 (1999)........................................................27, 28, 29, 33

*Jograj* v. *Enter. Servs., LLC*,
   270 F. Supp. 3d 10 (D.D.C. 2017) .......................................................38

*Juliana* v. *United States*,
   947 F.3d 1159 (9th Cir. 2020) .............................................................26

*Kuperstein* v. *Hoffman-Laroche, Inc.*,
   457 F. Supp. 2d 467 (S.D.N.Y. 2006)...................................................15

*Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*,
   754 F.2d 1223 (5th Cir. 1985) .......................................................36, 38

*Latiolais* v. *Huntington Ingalls, Inc.*,
  951 F.3d 286 (5th Cir. 2020) ...............................................................27, 32, 33, 37

*Legg* v. *Wyeth*,
  428 F.3d 1317 (11th Cir. 2005) ...................................................................................9

*Lucky Brand Dungarees, Inc.* v. *Marcel Fashions Grp., Inc.*,
  140 S. Ct. 1589 (2020).................................................................................................13

*Marcus* v. *AT&T Corp.*,
  138 F.3d 46 (2d Cir. 1998)................................................................................16, 21, 23

*Martin* v. *Franklin Cap. Corp.*,
  546 U.S. 132 (2005).......................................................................................................44

*Mayor & City Council of Baltimore* v. *BP P.L.C.*,
  952 F.3d 452 (4th Cir. 2020) .....................................................................................31

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*,
  488 F.3d 112 (2d Cir. 2007)........................................................................................32

*Miss. River Fuel Corp.* v. *Cocreham*,
  390 F.2d 34 (5th Cir. 1968) ........................................................................................38

*Monahan* v. *New York City Dep't of Corr.*,
  214 F.3d 275 (2d Cir. 2000).......................................................................................13

*Moran* v. *Cont'l Cas. Co.*,
  2001 WL 1717214 (N.D.N.Y. Nov. 16, 2001) .......................................................15

*N. Am. Olive Oil Ass'n* v. *D'Avolio Inc.*,
  457 F. Supp. 3d 207 (E.D.N.Y. 2020) .....................................................................43

*N.J. Carpenters Vacation Fund* v. *HarborView Mortg. Loan Tr.*
  *2006-4*, 581 F. Supp. 2d 581 (S.D.N.Y. 2008) ......................................................40

*N.Y. Times Co.* v. *Sullivan*,
  376 U.S. 254 (1964)......................................................................................................43

*Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*,
  471 U.S. 845 (1985)......................................................................................................16

*Nat'l Rev., Inc.* v. *Mann*,
  140 S. Ct. 344 (2019)....................................................................................................42

*Native Vill. of Kivalina* v. *ExxonMobil Corp.*,
  696 F.3d 849 (9th Cir. 2012) .....................................................................................17

*Newton* v. *Cap. Assur. Co., Inc.*,
    245 F.3d 1306 (11th Cir. 2001) ........................................................................24

*Norwalk* v. *Air-Way Elec. Appliance Corp.*,
    87 F.2d 317 (2d Cir. 1937).............................................................................14

*Pampillonia* v. *RJR Nabisco, Inc.*,
    138 F.3d 459 (2d Cir. 1998).............................................................10, 11, 14, 15

*Phila. Newspapers, Inc.* v. *Hepps*,
    475 U.S. 767 (1986).................................................................................42, 43

*Purdue Pharma L.P.* v. *Kentucky*,
    704 F.3d 208 (2d Cir. 2013)...........................................................................41

*Qatar* v. *First Abu Dhabi Bank PJSC*,
    432 F. Supp. 3d 401 (S.D.N.Y. 2020)...............................................................44

*Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988)....................................................................................43

*Rivet* v. *Regions Bank of Louisiana*,
    522 U.S. 470 (1998)....................................................................................23

*Rodriguez* v. *Casa Chapa S.A. de C.V.*,
    394 F. Supp. 2d 901 (W.D. Tex. 2005)...............................................10, 11, 14, 16

*Ruppel* v. *CBS Corp.*,
    701 F.3d 1176 (7th Cir. 2012) ........................................................................30

*Snyder* v. *Phelps*,
    562 U.S. 443 (2011)................................................................................35, 42

*Song* v. *Charter Comm'cns, Inc.*,
    2017 WL 1149286 (S.D. Cal. Mar. 28, 2017) .....................................................40

*United States* v. *Standard Oil Co.*,
    332 U.S. 301 (1947)....................................................................................16

*Synergy Advanced Pharms, Inc. v. CapeBio, LLC*,
    797 F. Supp. 2d 276, 282 (S.D.N.Y. 2011)..........................................................9

*Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*,
    87 F.3d 150 (5th Cir. 1996) ......................................................................36, 37

*Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)....................................................................................16

*Watson* v. *Philip Morris Cos.*,
    551 U.S. 142 (2007)........................................................................................28, 30

*Williams* v. *Int'l Gun-A-Rama*,
    416 F. App'x 97 (2d Cir. 2011) ..............................................................................44

*Willingham* v. *Morgan*,
    395 U.S 402 (1969).........................................................................................27, 31, 34

*In re WorldCom, Inc. Sec. Litig.*,
    2003 WL 21031974 (S.D.N.Y. May 5, 2003) .........................................................44

*Zschernig* v. *Miller*,
    389 U.S. 429 (1968).................................................................................................20

**STATUTES AND CONSTITUTIONAL PROVISIONS**

28 U.S.C. § 1331 ...........................................................................................................9

28 U.S.C. § 1332 ..............................................................................................9, 10, 40

28 U.S.C. § 1367 ...........................................................................................................9

28 U.S.C. § 1441 .....................................................................................................9, 10

28 U.S.C. § 1442................................................................................................27, 32, 33

28 U.S.C. § 1453(b) ....................................................................................................40

42 U.S.C. § 15927(b) ..................................................................................................26

43 U.S.C. § 1349(b) ...............................................................................................36, 37

N.Y.C.A.C. §§ 20-700 *et seq.* .......................................................................................7

U.S. Const. art. I, § 8, cl. 17..........................................................................................38

**OTHER AUTHORITIES**

14C Charles Alan Wright et al., Federal Practice and Procedure
    § 3722 (4th ed. 2020) ..............................................................................................9, 22

*Climate Damage and Deception*, Sher Edling LLP,
    https://www.sheredling.com/cases/climate-cases/# (last visited Aug. 13, 2021) .....................9

Cong. Research Serv., R42432, *U.S. Crude Oil and Natural Gas Production in*
    *Federal and Nonfederal Areas* 3, 5 (2018), available at https://bit.ly/3eMqdyA ...................36

COUNCIL ON ENVT. QUALITY REP. TO CONGRESS ON CARBON CAPTURE,
UTILIZATION, AND SEQUESTRATION (2021), https://www.whitehouse.gov/wp-
content/uploads/2021/06/CEQ-CCUS-Permitting-Report.pdf ................................................25

EPA, *Inventory of US Greenhouse Gas Emissions and Sinks* (2021)............................................25

Exxon Mobil Corp, Environmental Performance,
https://web.archive.org/web/20161111122132/https://www.exxon.com/en/envi
ronment .........................................................................................................................................13

Shell, Shell Nitrogen Enriched Gasoline, http://web.archive.org/web/
20150908135405/https://www.shell.us/motorist/shell-fuels/shell-nitrogen-
enriched-gasolines.html ...............................................................................................................13

Shell, Shell V-Power Nitro+ Premium Gasoline,
http://web.archive.org/web/20150820025413/https://www.shell.us/motorist/
shell-fuels/shell-v-power-nitro-plus-premium-gasoline.html......................................................13

Jude Clemente, *President Obama's Support for America's Shale Oil and Natural
Gas*, Forbes (Dec. 31, 2019),
https://www.forbes.com/sites/judeclemente/2020/12/31/president-obamas-
support-for-americas-shale-oil-and-natural-gas/?sh=2c05e1d41883 .....................................25

Press Release, City of New York, New York City Sues ExxonMobil, Shell, BP,
and The American Petroleum Institute for Systematically and Intentionally
Deceiving New Yorkers (Apr. 22, 2021), https://www1.nyc.gov/office-of-the-
mayor/news/293-21/new-york-city-sues-exxonmobil-shell-bp-the-american-
petroleum-institute-systematically .........................................................................................3, 8

S. Rep. No. 109-14 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3.............................................40, 41

Spencer Walrath, *Law Firm Behind Washington D.C. Climate Lawsuit Received
Over $1.7 Million in Grant Money from Activist Foundation*, Energy In Depth
(July 7, 2020), https://www.energyindepth.org/law-firm-behind-washington-
d-c-climate-lawsuit-received-over-1-7-million-in-grant-money-from-activist-
foundation/ .....................................................................................................................................9

U.S. Dep't of Energy, *DOE National Labs Partner with ExxonMobil for $100
Million in Joint Research* (May 8, 2019),
https://www.energy.gov/articles/doe-national-labs-partner-exxonmobil-100-
million-joint-research.....................................................................................................................25

Defendants Exxon Mobil Corporation ("ExxonMobil"), ExxonMobil Oil Corporation ("EMOC"), Royal Dutch Shell plc, Shell Oil Company, BP p.l.c., BP America Inc., and American Petroleum Institute ("API"), respectfully submit this brief in opposition to Plaintiff's motion to remand.[1]

## PRELIMINARY STATEMENT

Three years ago, the City of New York (the "City") filed a complaint accusing BP, Chevron, ConocoPhillips, ExxonMobil, and Royal Dutch Shell of promoting oil and natural gas sales by misleading the public about climate change.[2]  The City chose its forum (federal district court in New York City), its causes of action (public nuisance, private nuisance, and trespass), and the operative factual allegations (including that defendants allegedly "promote fossil fuel consumption" by "downplay[ing] the threat posed by climate change," Notice Ex. 6 ¶ 131).  The Honorable John F. Keenan granted the energy companies' motion to dismiss the City's amended complaint, *see City of New York* v. *BP p.l.c.* ("*City of New York I*"), 325 F. Supp. 3d 466, 475–76 (S.D.N.Y. 2018), and the City appealed.  On appeal, the City argued that its complaint challenged "the production, *promotion*, and sale of fossil fuels" but did not seek to regulate air pollution.  *City of New York* v. *Chevron Corp.* ("*City of New York II*"), 993 F.3d 81, 91 (2d Cir. 2021) (quoting City's Br. 40) (emphasis added).  The Second Circuit disagreed, holding that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions" and affirmed the dismissal on April 1, 2021.  *Id.*  As of today, the City has not sought further appellate review.

---

[1]   By filing this brief in opposition to the City's motion to remand, Defendants do not waive any right, defense, affirmative defense, or objection, including any challenges to personal jurisdiction over Defendants.

[2]   ECF No. 1-6, Notice Ex. 6, Am. Compl., *City of New York* v. *BP p.l.c.*, *et al.*, No. 18-cv-0182-JFK (S.D.N.Y. Mar. 16, 2018).

Instead, less than one month after the Second Circuit's ruling, the City filed a new, duplicative action in state court.  This action, like its 2018 counterpart, accuses Defendants of promoting oil and natural gas sales by misleading the public about climate change.[3]  Attempting to evade the federal judgment it lost and avoid the federal forum that it previously selected, the City named EMOC, a New York-incorporated affiliate of ExxonMobil that had not been named in the 2018 complaint, as a defendant in the new action.  None of the allegations in the 2021 complaint make specific reference to EMOC.  By joining a sham defendant to this litigation, the City hopes to re-litigate in state court claims it brought, could have brought, or should have brought in federal court in 2018.

The City's gamesmanship should not be rewarded.  As in its 2018 lawsuit, the City seeks relief here that would suppress fossil-fuel sales to reduce greenhouse gas emissions and combat what the City believes are fossil fuels' "severe and deadly consequences for people and the environment."  Compl. ¶ 3.[4]  The City's stated goal is to encourage consumers to "purchase fewer—or no—fossil fuel products" at all.  *Id.* ¶ 24.  It hopes to accomplish this by controlling the public statements energy companies make in nationwide communications about their products and climate change that have allegedly "enabled the unabated and expanded" extraction, production, and sale of fossil fuels.  *Id.* ¶ 8.  Such litigation requires a court to pass judgment on the accuracy of statements about the merits of fossil fuels and what role, if any, they might play in meeting energy demand as society transitions toward a lower-carbon future.  Resolving such claims necessarily implicates the myriad laws, regulations, and treaties of the United States concerning fossil fuel production and greenhouse gas emissions.

---

[3]    Unlike the 2018 lawsuit, the City did not name Chevron and ConocoPhillips as defendants here.

[4]    "Compl." refers to ECF No. 1-5, Notice Ex. 5, Summons and Verified Complaint.  "Br." refers to ECF No. 38, Mem. of Law ISO Pl.'s Mot. to Remand.

The City offers a fig leaf in response.  Despite having filed this lawsuit on Earth Day, designated as lead attorney the chief of the City's Environmental Law Division, and boasted in a press release that this lawsuit could help "stop climate change in its tracks," the City assures the Court that its lawsuit has nothing to do with combating climate change or curbing greenhouse gas emissions.[5]  In the City's telling, this is simply a consumer-protection lawsuit under the New York City Consumer Protection Law ("CPL") that will have no effect on energy companies' ability "to extract, produce, and sell as much fossil fuel as they desire."  Br. 3.  This Court should not be fooled.  The City has crafted its Complaint to obscure the centrality of federal law (and thereby try to evade federal jurisdiction) by focusing on public statements that allegedly induce greenhouse gas emissions, rather than on the emissions themselves.  But as the Second Circuit explained only a few months ago, "the City's focus on this 'earlier moment' in the global warming lifecycle is merely artful pleading and does not change the substance of its claims."  *City of New York II*, 993 F.3d at 97.  The inherently federal nature of the asserted claims and requested relief in the Complaint, and not Plaintiff's artful pleading, demonstrates that this case belongs in federal court.

Seven separate grounds provide independent bases for federal subject matter jurisdiction:

- *First*, this Court has diversity jurisdiction because the City fraudulently named EMOC as a defendant in this action.  The Complaint lacks a single substantive allegation against EMOC and was filed a mere three weeks after the Second Circuit affirmed dismissal of the City's 2018 lawsuit.  EMOC's appeal to the City is clear: as a New York resident, EMOC would spoil diversity jurisdiction.  The City therefore joined EMOC as a "strawman" defendant in an attempt to circumvent federal jurisdiction and re-litigate its 2018 action in state court.

- *Second*, the City's claims necessarily arise under federal common law because they implicate the regulation of transboundary pollution and foreign affairs.  They also require the resolution of substantial, disputed questions of federal law about national

---

[5]   Press Release, City of New York, New York City Sues ExxonMobil, Shell, BP, and The American Petroleum Institute for Systematically and Intentionally Deceiving New Yorkers (Apr. 22, 2021), https://www1.nyc.gov/office-of-the-mayor/news/293-21/new-york-city-sues-exxonmobil-shell-bp-the-american-petroleum-institute-systematically.

energy policy and environmental protection.  The City cannot disavow any intent to curb greenhouse gas emissions when its requested relief is predicated on shifting consumer demand from fossil fuels to alternative sources of energy.

- *Third*, the City's claims are connected to actions Defendants undertook at the direction of federal officers, warranting removal under the federal officer statute.

- *Fourth*, this action is removable under the Outer Continental Shelf Lands Act because the City's claims necessarily arise out of or in connection with Defendants' operations on the Outer Continental Shelf.

- *Fifth*, this action arises out of Defendants' promotional activities occurring on federal enclaves across the country and within New York City.

- *Sixth*, the Class Action Fairness Act permits removal of this case because it is in substance a representative action on behalf of a class of New York City consumers.

- *Seventh*, the City's claims involve federal constitutional elements because they target Defendants' speech on a matter of public concern.

Litigation about the appropriate level of fossil fuel production and the national and global issues presented by climate change belongs in a federal forum.  Because of the overtly federal nature of this lawsuit, removal is proper.  The motion to remand should be denied.

## **BACKGROUND**

A.  **The City's First Lawsuit Challenging Defendants' Production, Promotion, and Sale of Fossil Fuels Was Dismissed with Prejudice.**

On January 9, 2018, the City filed a lawsuit against BP, Chevron, ConocoPhillips, ExxonMobil, and Royal Dutch Shell in the Southern District of New York.  *City of New York I*, 325 F. Supp. 3d at 468.  The City alleged that the defendants "extensively promoted fossil fuels for pervasive use," and misled the public by "denying or downplaying" the risks of climate change. *Id.* at 469.  The defendants allegedly caused "recurring" and "increasingly severe injuries" to the City by "continu[ing] to produce, market, distribute, and sell fossil fuels in massive quantities" and "promote fossil fuel consumption in these massive quantities."  *Id.* at 469–70.  That complaint purported to proceed under state common law.  *Id.* at 470.

4

The defendants moved to dismiss, arguing the City's tort claims were governed by federal common law, not state law, and that the Clean Air Act displaced any and all federal common law claims based on domestic greenhouse gas emissions. *Id*. The City opposed dismissal, arguing it had brought state-law claims, not claims under federal common law, because liability was based on the "production and sale of fossil fuels—not defendants' direct emissions." *Id.* at 471.

Judge Keenan rejected the City's argument and granted the motion to dismiss, concluding that federal common law governed the City's claims even though the complaint referenced only state law. Because the City's claims were "based on the 'transboundary' emission of greenhouse gases," Judge Keenan concluded they "arise under federal common law and require a uniform standard of decision." *Id.* at 472. Judge Keenan went on to dismiss the City's complaint with prejudice because the Clean Air Act displaces claims arising from domestic greenhouse gas emissions, and foreign policy considerations precluded any remaining claims premised on extraterritorial greenhouse gas emissions. *Id*. at 472–76.

### B. The Second Circuit Affirmed Dismissal of the City's First Lawsuit and Held That Federal Common Law Governed the City's Nominal State-Law Claims.

A Second Circuit panel unanimously affirmed the dismissal on April 1, 2021, holding that the City's claims were governed by federal common law even though they were pled under state law. *City of New York II*, 993 F.3d at 91, 95. As the Second Circuit explained, federal common law governs claims seeking redress for global climate change, regardless of the plaintiff's chosen cause of action, because climate change is a "uniquely international problem" which is "not well-suited to the application of state law." *Id.* at 85–86.

*First*, the Second Circuit rejected the City's argument that the case concerned only the "production, promotion, and sale of fossil fuels," but not the direct regulation of emissions. *Id.* at 91. By targeting an "earlier moment" in the causal chain of emissions (*i.e.*, the production,

promotion, and sale of fossil fuels), the City argued it was not seeking to directly regulate global emissions. *Id.* But, the Second Circuit explained, the City's claims hinged on the link between fossil fuels releasing greenhouse gases and the effect of those emissions on the environment; "artful pleading" of claims could not "transform" the complaint into "anything other than a suit over greenhouse gas emissions" governed by federal law. *Id.* Nor could the City "disavow[] any intent to address emissions" while "identifying such emissions" as the source of its harm. *Id.*

*Second*, despite the City's framing of the action as a local dispute focusing on local harms, the Second Circuit held that the City's claims amounted to a "clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *Id.* Because any steps the defendants might take to mitigate their liability would "take effect across" jurisdictions, the case implicated the "conflicting rights" of states and foreign nations, "the quintessential example of when federal common law is most needed." *Id.* at 92. "Such a sprawling case," the court held, "is simply beyond the limits of state law." *Id.*

*Third*, subjecting the defendants' global operations to a multitude of state laws "could undermine important federal policy choices." *Id.* at 93. The Second Circuit reasoned that allowing "this suit to proceed under state law would further risk upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *Id.* Given these significant federal policy interests and the need for uniformity, the Second Circuit held that federal common law applied.

Following the Second Circuit's decision, the City declined to seek rehearing and the 150 days for the City to seek review from the Supreme Court expires on August 30, 2021. No certiorari petition has been filed to date.

**C.   The City Again Seeks Redress for Global Climate Change, This Time Nominally Under a Municipal Consumer Protection Law.**

Just three weeks after the Second Circuit's ruling, the City commenced this action against ExxonMobil, Royal Dutch Shell, Shell Oil Company, BP, and BP America, as well as EMOC (an ExxonMobil affiliate incorporated in New York) and API (a trade association).  The City attempts to bypass the Second Circuit's decision by focusing again on an "earlier moment" in the causal chain of greenhouse gas emissions.  *City of New York II*, 993 F.3d at 97.  Specifically, the City challenges Defendants' marketing and promotion as purportedly increasing consumer demand for fossil fuels, relative to other forms of renewable energy, resulting in increased greenhouse gas emissions.  *See, e.g.*, Compl. ¶ 26.

Like in the 2018 lawsuit, the City alleges Defendants engaged in a campaign to mislead consumers about climate change by failing to disclose the climate impacts of their "emissions-reducing" fossil fuel products and by "greenwashing" their corporate brands.  *See* Compl. ¶¶ 20, 26, 34.  According to the City, Defendants' conduct amounted to actionable "deception" under the CPL, New York City Administrative Code §§ 20-700 *et seq.*, because it "enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and sale of fossil fuel products," and corresponding climate impacts.  Compl. ¶ 8 (emphasis added).  Much like its previous lawsuit, the City's claims are largely driven by its allegations that the emissions caused by the use of Defendants' fossil fuels are the primary drivers of climate change, causing harm to the City and its residents.  *Id.* ¶ 3; *see id.* ¶ 18 ("Consumer use of fossil fuel products . . . is a significant contributor to climate change" that creates "threats to people in New York City.").  The identical language used in both of the City's complaints drives home the similarities between the cases.[6]

---

[6]   *Compare*, *e.g.*, Notice Ex. 6 ¶ 100, *with* Compl. ¶ 14(c) (claiming that Defendants "promote[d] disinformation"); Notice Ex. 6 ¶ 109, *with* Compl. ¶ 40 (claiming that Defendants "bombard[ed] . . . consumers" with deceptive advertisements); Notice Ex. 6 ¶ 6, *with* Compl. ¶ 6 (claiming that Defendants portrayed fossil fuels as

The City's allegations make clear that it does not challenge the factual accuracy of representations about Defendants' products, but whether Defendants' products should be sold *at all*. The City takes issue with Defendants' "doubling down on fossil fuel extraction, production, and sales" and "maintaining fossil fuels as the core driver of their business model during the next decade" precisely because it is "the crucial window of time *in which the world must drastically slash greenhouse gas emissions*." *Id*. ¶ 42 (emphasis added). Its remand motion likewise acknowledges that this suit is about Defendants' allegedly using "unlawful deception *to inflate the market for their fossil-fuel products*," as Defendants "plan to *dramatically ramp up* fossil-fuel production in the coming years," with corresponding increases in greenhouse gases. Br. 5, 12 (emphasis added).

The City's own public statements confirm that this lawsuit is part of a larger scheme to decrease fossil fuel sales and curb greenhouse gas emissions. The City filed this lawsuit on Earth Day, when Mayor Bill de Blasio proclaimed the lawsuit an important part of the City's efforts to "do everything in [its] power to . . . *stop climate change in its tracks*." Press Release, *supra* n.5 (emphasis added). The Director of the Mayor's Office of Climate Resiliency echoed that theme: "We won't be able *to protect New York City from climate change* unless we stop these companies from lying to New Yorkers—and that's what we intend to do." *Id.* (emphasis added).

Tellingly, this suit is being litigated not by the City's Department of Consumer and Worker Protection, but by its attorneys focused on environmental matters and climate change. Both the City's Complaint and Remand Brief were signed by the Chief of the City's Environmental Law Division. The City is also represented by Sher Edling LLP, which has brought over a dozen similar

---

"environmentally responsible"); Notice Ex. 6 ¶ 109(b), *with* Compl. ¶ 65 (claiming that Defendants misleadingly portrayed natural gas as "cleaner-burning"); Notice Ex. 6 ¶ 6, *with* Compl. ¶ 27 (comparing Defendants' strategies to those purportedly used by the tobacco industry to "downplay" the risks of cigarettes).

lawsuits against the same or similar energy companies across the country aimed at curtailing fossil fuel use,[7] and has reportedly received grants worth $1.75 million from Resources Legacy Fund, an organization that advocates curbing the production and sale of fossil fuels.[8]

## LEGAL STANDARD

"The removal process was created by Congress to protect defendants." *Legg* v. *Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005). A defendant may remove any civil action over which a federal district court has original jurisdiction. 28 U.S.C. § 1441(a). That applies to "all civil actions arising under the Constitution, laws, or treaties of the United States," *id.* § 1331, or where the matter in controversy exceeds $75,000 and is between citizens of different states, *id.* § 1332(a). Although the party opposing remand bears the burden of establishing jurisdiction exists in federal court, *see Synergy Advanced Pharms., Inc.* v. *CapeBio, LLC*, 797 F. Supp. 2d 276, 282 (S.D.N.Y. 2011), removal is proper if jurisdiction exists over any single claim, *see* 28 U.S.C. § 1367; *Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005). The inherently federal nature of the claims stated on the face of the complaint, not the plaintiff's characterization of them as state law claims, is controlling. *See Calhoon* v. *Bonnabel*, 560 F. Supp. 101, 104–05 (S.D.N.Y. 1982); *see also* 14C Charles Alan Wright et al., Federal Practice and Procedure § 3722.1 (4th ed. 2020).

## ARGUMENT

**I.      This Court Has Diversity Jurisdiction Under the Fraudulent Joinder Doctrine.**

The City of New York is attempting to re-litigate claims it already brought or could have brought in 2018. *See City of New York II*, 993 F.3d 81. To muddy the waters and avoid federal

---

[7]   *See Climate Damage and Deception*, Sher Edling LLP, https://www.sheredling.com/cases/climate-cases/# (last visited Aug. 13, 2021).

[8]   *See* Spencer Walrath, *Law Firm Behind Washington D.C. Climate Lawsuit Received Over $1.7 Million in Grant Money from Activist Foundation*, Energy In Depth (July 7, 2020), https://www.energyindepth.org/law-firm-behind-washington-d-c-climate-lawsuit-received-over-1-7-million-in-grant-money-from-activist-foundation/.

court, the City named EMOC, a New York-based affiliate of ExxonMobil, as a defendant here, even though EMOC was not named in the previous complaint and the current complaint makes no factual allegations that specifically reference EMOC.  The purpose of the addition is clear: there was complete diversity between the parties in the 2018 action.  By adding a New York entity as a defendant, the City seeks to defeat diversity jurisdiction in the hopes of staying out of federal court and evading the preclusive effect of the previous federal judgment.

The City's gamesmanship runs headlong into the fraudulent joinder doctrine, which "prevent[s] plaintiffs from joining non-diverse parties in an effort to defeat federal jurisdiction." *Briarpatch Ltd., L.P* v. *Phoenix Pictures, Inc.*, 373 F.3d 296, 302 (2d Cir. 2004).  A matter is removable to federal court where there is diversity of citizenship and an amount in controversy in excess of $75,000.  28 U.S.C. §§ 1332(a), 1441.  No defendants in the current action are citizens of New York except for EMOC, Notice ¶ 178, and the amount in controversy exceeds $75,000, *see id.* ¶¶ 189–91.

To show fraudulent joinder, "the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court." *Pampillonia* v. *RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998).  A plaintiff commits "outright fraud" when it joins a defendant merely as a "strawman to defeat jurisdiction," such as when "the evidence is overwhelming" that a plaintiff has "no real interest in gaining a judgment against" it.  *Rodriguez* v. *Casa Chapa S.A. de C.V.*, 394 F. Supp. 2d 901, 908 (W.D. Tex. 2005).  That is precisely what the City has done by joining the only non-diverse Defendant, EMOC, here.

A.      **The City Has Committed "Outright Fraud" By Joining EMOC.**

The City's Complaint demonstrates that the City has joined EMOC as a "strawman defendant" with no alleged connection to the events at issue and against whom the City has "no real interest in gaining a judgment." *Id*.  The Second Circuit has held that fraudulent joinder supports diversity jurisdiction where, as here, "the only mention of [the diverse party] in the complaint" is allegations concerning the location where the party "was incorporated" or had "an office." *Pampillonia*, 138 F.3d at 461.  Aside from identifying the location of EMOC's state of incorporation and principal place of business, and observing that it is a wholly owned subsidiary of ExxonMobil, the Complaint contains *no allegations* specific to EMOC at all.  Instead, the Complaint refers to EMOC and ExxonMobil collectively as "ExxonMobil" in an attempt to conflate the two entities.  Compl. ¶ 11(e).  But EMOC and ExxonMobil are not the same economic or legal entity, and the City cannot state a claim against these distinct parties by fusing the two together.  *See Doe* v. *Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 32 (D.D.C. 2008).

The City has not explained its inclusion of EMOC as a defendant here, let alone contested that it named EMOC as a defendant solely to improperly defeat diversity, despite Defendants' invoking this argument in their Removal Notice.  Notice ¶¶ 183–87.  That silence betrays the City's true, improper purpose.  By failing to allege any wrongdoing specifically against EMOC, the City has failed to allege that EMOC has any "real connection with the controversy." *Pampillonia*, 138 F.3d at 461.  The only explanation is that the City joined EMOC here as a "strawman to defeat jurisdiction." *Rodriguez*, 394 F. Supp. 2d at 908.

The City also has "no real interest in gaining a judgment against" EMOC. *Id*.  The City has made no suggestion that a judgment against ExxonMobil, EMOC's parent company, would not yield complete relief.  Indeed, the City did not include EMOC in its 2018 action evidently because it did not believe it needed a judgment against EMOC to obtain complete relief.  And the

City has not explained why it needs relief against EMOC now.  It has not directed any injunctive relief specifically against EMOC, nor does it seek civil penalties from EMOC specifically.  *See* Compl. Prayer for Relief.  Indeed, in the unlikely event the City is able to prove its case, it has not indicated *anything* that it seeks from EMOC that it could not obtain from ExxonMobil, other than to use EMOC's citizenship to defeat diversity jurisdiction.

### B.   The City's Gamesmanship Further Demonstrates Fraudulent Joinder.

A court may "look to more than just the pleading allegations to identify indicia of fraudulent joinder." *In re Briscoe*, 448 F.3d 201, 219–20 (3d Cir. 2006).  The Court need not look far to identify indicia of fraud here.  In 2018, the City sued substantially the same defendants in federal court on a similar climate-change theory, and lost.  Now, the City has added EMOC as a defendant in an attempt to end run unfavorable Second Circuit precedent, circumvent federal jurisdiction, and try its luck in state court.

The procedural history and timing of the City's prior action are telling.  On the heels of the Second Circuit's decision affirming dismissal of the City's 2018 action, which sought redress for Defendants' fossil-fuel promotion, 993 F.3d at 91, the City brought this lawsuit, again seeking redress for injuries allegedly stemming from the same conduct.  Like its 2018 complaint, the City's 2021 complaint brought suit against ExxonMobil, Royal Dutch Shell, and BP.  In addition, the City joined Shell Oil Company, an indirectly wholly owned subsidiary of Royal Dutch Shell; BP America, a wholly owned subsidiary of BP; and API, a trade association that purportedly seeks to "grow[] its member companies' oil and natural gas businesses," Compl. ¶ 74.  While API was the subject of multiple allegations in the 2018 complaint, it was not named as a defendant there.  *See City of New York I*, 325 F. Supp. 3d at 468.  The City also joined EMOC in an attempt to destroy diversity and evade the preclusive effect of the previous federal judgment.

The City could have brought consumer protection claims in its 2018 action, but declined to do so. The doctrine of *res judicata* bars the City from litigating its claims because its new causes of action share "a common nucleus of operative facts" with the claims it previously asserted, *Lucky Brand Dungarees, Inc.* v. *Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594–95 (2020), and "could have been raised in that action," *Monahan* v. *New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Allen* v. *McCurry*, 449 U.S. 90, 94 (1980)). Both lawsuits arise out of Defendants' promotion of fossil fuels and their alleged misrepresentation about their products' risks and benefits. The City tries to bury the *res judicata* issue with a cursory assertion in its analysis of the federal officer removal statute that "[t]he claims at issue here, involving recent misleading advertising, could not have been raised in that earlier case." Br. 31. The City is wrong. The Complaint references allegedly deceptive advertisements and promotional campaigns that were in existence long before 2018, and therefore could have been raised in that earlier case. *See, e.g.*, Compl. ¶¶ 31–32, App'x at 1–3.[9]

Although the City claims that this action involves "different parties, for different conduct, and seeking different relief," Br. 38, the essential theory alleged here is the same one the Second Circuit and Judge Keenan rejected. As in the instant case, the City's claims in the 2018 suit were premised on allegations that **(i)** "Defendants continue to produce, *market*, distribute, and sell fossil fuels," **(ii)** Defendants "*promote* fossil fuel consumption" despite their role in climate change, and

---

[9] For example, the Complaint refers to advertisements for Synergy fuel stating that this fuel "[c]ontinually improve[s] environmental performance." Compl. ¶ 31(f). ExxonMobil has advertised its fuels in this way since 2016. *See* Exxon Mobil Corp, Environmental Performance, https://web.archive.org/web/20161111122132/ https://www.exxon.com/en/environment. And the statements that the Complaint challenges in paragraph 32(b) have appeared since at least 2015. *See* Shell, Shell Nitrogen Enriched Gasolines, http://web.archive.org/web/ 20150908135405/https://www.shell.us/motorist/shell-fuels/shell-nitrogen-enriched-gasolines.html, and Shell, Shell V-Power Nitro+ Premium Gasoline, http://web.archive.org/web/20150820025413/https://www.shell.us/ motorist/shell-fuels/shell-v-power-nitro-plus-premium-gasoline.html. *See also, e.g.*, Compl., App'x at 23 n.31 (challenging a BP YouTube marketing video that allegedly aired on December 6, 2017); *id.* at 32 (challenging API's "Power Past Impossible" campaign, which allegedly ran from November 2017 to January 2018).

**(iii)** Defendants "*downplay* the threat" posed by the climate change impacts of these products. *City of New York I*, 325 F. Supp. 3d at 469–70 (emphases added).  As the Second Circuit found, the City's prior complaint challenged the defendants' promotion of fossil fuels in an effort to "slow[] global climate change."  *See City of New York* II, 993 F.3d at 91.

Similarly, here, the City challenges Defendants' promotion of fossil fuels as deceptive because it seeks to "attract[] new consumers to their fossil fuel products and prevent[] the mass defection of existing customers to cleaner alternatives that contribute substantially less to climate change."  Compl. ¶¶ 8, 18–33.  According to the Complaint, Defendants' fossil fuel products "are the primary driver of climate change" and are "driving up global temperatures, increasing the frequency of deadly weather events, eroding coastal shorelines, and creating other unprecedented threats to people in New York City and elsewhere."  *Id.* ¶¶ 3, 18.  The present action, like its 2018 counterpart, asserts that Defendants' promotion of their products contributes to the alleged harms of climate change.  The City has simply repackaged its prior lawsuit under the guise of consumer protection law to re-litigate it in state court by adding a non-diverse defendant.  The fraudulent joinder doctrine forbids this type of gamesmanship.  *See Pampillonia*, 138 F.3d at 461.

### C.   The City's Arguments Against Fraudulent Joinder Dodge the Applicable Standard.

The City incorrectly contends that Defendants' fraudulent joinder argument is "unsupported" by the case law.  Br. 37.  Rather than address the applicable standard for fraudulent joinder, the City dodges it or applies the wrong standard.

First, the City argues that its actions do not amount to the egregious level of fraud described in *Rodriguez.*  Br. 38.  But *Rodriguez* does not establish the minimum level of misconduct for the fraudulent joinder doctrine.  Rather, the doctrine simply requires that there is "actual fraud." *Norwalk* v. *Air-Way Elec. Appliance Corp.*, 87 F.2d 317, 320 (2d Cir. 1937).  Actual fraud is

present whenever a plaintiff joins a "strawman" defendant in an attempt to defeat diversity. *Rodriguez*, 394 F. Supp. 2d at 908. Defendants have demonstrated sufficient indicia of fraud here, *In re Briscoe*, 448 F.3d at 219–20, by showing that the City has joined EMOC as a sham defendant.

The City also seeks refuge in two decisions applying a prong of the fraudulent joinder doctrine not at issue here. Br. 39 (citing *Moran* v. *Cont'l Cas. Co.*, 2001 WL 1717214 (N.D.N.Y. Nov. 16, 2001); *Kuperstein* v. *Hoffman-Laroche, Inc.*, 457 F. Supp. 2d 467 (S.D.N.Y. 2006)). Both cases are inapposite, as the defendants there did not argue that the plaintiffs had committed outright fraud, but rather argued there was "no possibility" that plaintiffs "could state claims against them." *Moran*, 2001 WL 1717214, at *3; *see Kuperstein*, 457 F. Supp. 2d at 470–73. As the City acknowledges, this is a different ground for fraudulent joinder, and one that Defendants need not establish in order to prevail. Br. 38–39. Here, Defendants argue that the City committed "outright fraud" in the pleadings, which is a separate path to showing fraudulent joinder. *Pampillonia*, 138 F.3d at 461. Neither of the City's cases considered whether "outright fraud" was present and are therefore not relevant.[10]

Moreover, it is not "outlandish" to question why the City has joined a non-diverse defendant with no alleged connection to this case. Br. 37. The complete lack of substantive allegations lodged specifically against EMOC, and the context in which this action has been brought, show that the City joined EMOC as a "strawman" defendant to defeat diversity jurisdiction. This artifice amounts to "outright fraud" for purposes of the fraudulent joinder

---

[10]   To the extent *Moran* can be read to suggest that Defendants cannot establish fraudulent joinder without showing "that there is no possibility that plaintiffs can state claims against them," 2001 WL 1717214, at *3, it misstates clear Second Circuit law that "outright fraud" is its own viable path to showing fraudulent joinder, *see Pampillonia*, 138 F.3d at 461 (a defendant must demonstrate "***either*** that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court" (emphasis added)).

doctrine.  *Rodriguez*, 394 F. Supp. 2d at 908.  Because EMOC's citizenship should be disregarded, diversity of citizenship and therefore federal subject matter jurisdiction are present here.

## II.     The City's Claims Are Governed by Federal Common Law and Are Thus Removable.

### A.     The City's Claims Necessarily Arise Under Federal Common Law.

Under the Second Circuit's decision in *City of New York II*, the City's claims here must arise, if at all, under federal common law.  993 F.3d at 95.  Section 1331 thus vests this Court with federal question jurisdiction over this suit.  *See Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985).  Federal common law governs "uniquely federal interests," *City of New York II*, 993 F.3d at 90, such as where the issue is, by nature, within the "national legislative power" and there is a "demonstrated need for a federal rule of decision," *Am. Elec. Power Co.* v. *Connecticut* ("*AEP*"), 564 U.S. 410, 421–22 (2011).  This includes issues "so vitally affecting interests, powers and relations of the Federal Government as to require uniform national disposition," *United States* v. *Standard Oil Co.*, 332 U.S. 301, 307 (1947), as when "the interstate or international nature of the controversy makes it inappropriate for state law to control," *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981).  "[I]f federal common law exists, it is because state law cannot be used."  *City of Milwaukee* v. *Illinois*, 451 U.S. 304, 314 n.7 (1981).

The Second Circuit has long recognized that claims may arise under federal common law regardless of whether a plaintiff affixes a federal law label.  *See Marcus* v. *AT&T Corp.*, 138 F.3d 46, 55–56 (2d Cir. 1998); *City of New York II*, 993 F.3d at 92–93.  Although the City purports to bring claims solely under "New York City local law," Br. 7, the artful pleading doctrine requires the Court to assess the "substance" of the City's claims and determine whether they in fact arise under federal law, 993 F.3d at 97.

Here, as in *City of New York*, the City's claims necessarily arise under federal common law because they implicate two "uniquely federal interests": transboundary pollution and foreign

affairs.  *Id.* at 90; *see also Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) (transboundary pollution); *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 425 (1964) (foreign affairs).  Accordingly, this Court has federal question jurisdiction over this suit.

> ### 1.     The City's Claims Implicate Transboundary Pollution.

"Environmental protection is undoubtedly an area within national legislative power" for which federal courts may "fashion" federal common law.  *AEP*, 564 U.S. at 421; *see also City of New York II*, 993 F.3d at 91 ("For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution.").  Because the City's claims here, like those in its prior action, implicate the federal common law of transboundary pollution, they "are governed by federal common law."  *Id.* at 99.

Judge Keenan and the Second Circuit came to the same conclusion regarding the City's 2018 action.  There, as here, the City argued that its purported state law claims were not governed by federal common law because the City merely challenged "the production, promotion, and sale of fossil fuels" but did not seek to regulate emissions.  *Id.* at 91.  Judge Keenan rejected that argument, holding that "regardless of the manner in which the City frames its claims," the City's claims were "ultimately based on the 'transboundary' emission of greenhouse gases."  *City of New York I*, 325 F. Supp. 3d at 472 (citation omitted).  The Second Circuit rejected the City's attempt to characterize its action as a "modest litigation akin to a product liability suit," and affirmed Judge Keenan's dismissal: "Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions.  It is precisely *because* fossil fuels emit greenhouse gases – which collectively 'exacerbate global warming' – that the City is seeking damages."  *City of New York II*, 993 F.3d at 91.  Application of federal common law was necessary in light of the "real risk that subjecting the Producers' global operations to a welter of different

17

states' laws could undermine important federal policy choices." *Id.* Those same risks warrant the same conclusion here.

The Complaint implicates interstate pollution and renders the application of federal common law necessary. The goal of the City's renewed action is to suppress fossil fuel sales and thereby curb greenhouse gas emissions by imposing liability on Defendants for failing to shift consumer demand from fossil fuels to alternative sources of energy. As in its 2018 action, the City alleges that Defendants are liable for their continued promotion, marketing, and sale of fossil fuels "precisely because these fossil fuels emit greenhouse gases," and are alleged to "collectively 'exacerbate global warming.'" *Id.* The Complaint endeavors to trace Defendants' advertisements to the climate impacts it seeks to curb through this suit.[11] It alleges that **(i)** Defendants' advertising allegedly influences "consumers' decision to purchase" fossil fuel products rather than "cleaner" alternatives, *see, e.g.*, Compl. ¶¶ 84, 92, 100; **(ii)** consumers' use of those products along with "the extraction, refinement, and combustion of [Defendants'] fossil fuels" produces greenhouse gas emissions, *id.* ¶ 3; **(iii)** these emissions play a "central role" in contributing to climate change, *see, e.g.*, *id.* ¶¶ 3, 26, 83; and **(iv)** climate change causes harms including "driving up global temperatures" and "creating other unprecedented threats to people in New York City and elsewhere," *id.* ¶ 18.

In sum, the Complaint alleges that Defendants' marketing is "deceptive" precisely because it seeks to "attract[] new consumers" to fossil fuel products and prevent "the mass defection of existing customers to cleaner alternatives that contribute substantially less to climate change."

---

[11]   The City's claims are not limited to challenging allegedly misleading statements in Defendants' advertisements. In alleging Defendants' "omissions . . . are deceptive and misleading in their own right," the Complaint makes clear that it seeks to impose liability on Defendants merely for the "sale or offering for sale" of fossil fuel products, regardless of whether those sales were accompanied by any false or misleading statement. *See*, *e.g.*, Compl. ¶ 81.

Compl. ¶ 8.  By controlling the public statements of energy companies about their products, the City hopes to persuade consumers to "purchase fewer—or no—fossil fuel products" at all, and thereby reduce "a primary driver of climate change and the resultant dangers to the environment and people."  *See* Compl. ¶ 24.  As in *City of New York II*, however, it is the role of the federal government to balance the goals of "prevent[ing] global warming" while ensuring "energy production, economic growth, foreign policy, and national security."  993 F.3d at 93.

The City argues that this action is "miles apart" from *City of New York II*, *see* Br. 12, because the claims here do "not directly or indirectly regulate Defendants' emissions" and the City "does not request any court order to limit or stop Defendants from producing or selling any of their products,"  Br. 10.  But the Second Circuit rejected this argument the last time the City made it: "the City's focus on this 'earlier moment' in the global warming lifecycle is merely artful pleading and does not change the substance of its claims."  993 F.3d at 93.  So too here, where the City challenges Defendants' marketing that purportedly drove the consumer demand for their products in the first place.  The City's case still "hinges on the link between the release of greenhouse gases and the effect those emissions have on the environment generally."  *Id.* at 97.  Federal common law therefore provides the rule of decision.

### 2.     The City's Claims Implicate Foreign Affairs.

The international nature and impacts of the City's claims are another reason why this suit arises only under federal common law.  Issues involving "our relationships with other members of the international community must be treated exclusively as an aspect of federal law" and heard in federal court.  *Sabbatino*, 376 U.S. at 425.  In their Notice of Removal, *see* Notice ¶¶ 48–55, Defendants recounted the calibrated network of international treaties, tracing back to 1959 and continuing through the Paris Agreement, that have struck a "balance . . . between the prevention

19

of global warming . . . on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *City of New York II*, 993 F.3d at 93.  As the Second Circuit acknowledged, addressing global warming is "a project that necessarily requires national standards and global participation" and "subjecting" energy companies' "global operations" to inconsistent state (or municipal) laws "could undermine important federal policy choices." *Id.*

This action, like the City's prior lawsuit, seeks to upset that "careful balance." *Id.*  It alleges that Defendants' advertisements are deceptive because they tout Defendants' "investments in clean energy resources" when these investments allegedly comprise a minimal percentage of Defendants' total capital expenditures.  Compl. ¶ 20, *see also id.*  ¶¶ 35, 40–41.  The Complaint functionally takes aim at Defendants' continued oil and gas production and asks the Court to decide whether Defendants' investments in alternative energy sources are, in fact, "too small" relative to their production of fossil fuel products.  Such a determination could result in relief that conflicts with the federal government's stance in global climate negotiations, in which the government projects what *it* believes is the right balance between fossil fuel and alternative energy sources, and seeks to garner global participation in striking *this* balance.  *See* Notice ¶¶ 48–55.

The City argues that this action is distinguishable from the foreign-affairs cases cited by Defendants because this action, on its face, concerns "the liability of private companies" and does not explicitly involve other nations.  Br. 13.  This is of no moment.  Even domestic cases touching on areas of traditional state concern can implicate foreign policy.  *See, e.g.*, *Zschernig* v. *Miller*, 389 U.S. 429, 432 (1968) (holding that a state probate statute constituted "an intrusion by the State into the field of foreign affairs" and was governed by federal common law).

The City also relies heavily on district court decisions in similar cases, which rejected attempts to remove state-law claims to federal court on the argument that those claims also

implicated transboundary pollution and foreign affairs.  Br. 7.  The City's cited cases are not

binding on this court, and were wrongly decided because they gave dispositive force to the *label*

the plaintiffs applied to their claims rather than the *substance* of the allegations.  Those decisions

are also subject to appellate review, and the *Connecticut* decision to which the City cites

throughout its brief is currently pending in the Second Circuit.  *See Connecticut* v. *Exxon Mobil*

*Corp.*, No. 21-1446 (2d Cir. filed June 10, 2021).  The pertinent decision that is binding on this

Court is *City of New York II*, which held the City's claims (similar to its claims here) are governed

by federal common law.  993 F.3d at 88.

### B.    The Artful Pleading Doctrine Supports This Court's Jurisdiction and the Well-Pleaded Complaint Rule Is No Obstacle to Removal.

The City has artfully pleaded its claims here, meaning that it purposefully omitted the core

federal nature of its claims from the Complaint in an attempt to keep its action in state court.  "The

artful-pleading doctrine, [a] corollary to the well-pleaded complaint rule, prevents a plaintiff from

avoiding removal 'by framing in terms of state law a complaint the real nature of [which] is federal,

regardless of plaintiff's characterization.'"  *Marcus*, 138 F.3d at 55–56 (quoting *Derrico* v.

*Sheehan Emergency Hosp.*, 844 F.2d 22, 27 (2d Cir. 1988)).[12]  As the Supreme Court explained in

*Federated Department Stores, Inc.* v. *Moitie*, courts must "determine whether the real nature of

the claim is federal, regardless of plaintiff's characterization."  452 U.S. 394, 398 n.2 (1981).

Although the City has framed its Complaint with reference to local law, this Court is not

bound by that characterization.  Under the artful pleading doctrine, this Court is empowered to

---

[12]    The City argues that the artful pleading doctrine is not a "stand-alone exception to the well-pleaded complaint rule."  Br. 15.  That is correct—it is a "corollary" to the rule, meaning when courts consider whether the well-pleaded complaint rule prevents removal, they must look past the plaintiff's "framing" of the complaint and embrace the complaint's "real nature."  *Marcus*, 138 F.3d at 55.  The City's cited case, *Fracasse* v. *People's United Bank*, 747 F.3d 141 (2d Cir. 2014), does not hold otherwise.  There, removal was premised on a preemption argument, so the court discussed artful pleading as it relates to preemption.  *Id*. at 144.

evaluate the claims asserted and determine which body of law provides the rule of decision for those claims.  Here, it is federal common law that provides the rule of decision because the City's claims arise, if at all, under the federal common law of **(i)** transboundary pollution, *see supra* § II.A.1, and **(ii)** foreign affairs, *see supra* § II.A.2.

This is clear from the face of the pleading.  The Complaint challenges Defendants' "unabated and expanded extraction, production, promotion, marketing and sale of fossil fuel products," because of the greenhouse gases released as a result.  Compl. ¶ 8.  The Complaint seeks to commandeer Defendants' advertising to persuade consumers to "purchase fewer—or no—fossil fuel products," and thereby reduce "a primary driver of climate change and the resultant dangers to the environment and people."  Compl. ¶ 24.  By seeking to suppress fossil fuel sales and thus reduce transboundary greenhouse gas emissions, the Complaint implicates the federal common law of transboundary pollution.  Similarly, the Complaint on its face implicates the federal common law of foreign affairs seeking to require Defendants' advertising to promote the City's preferred energy mix, which is not aligned with federal policy.  Because the federal nature of the City's claims is clear from the face of the Complaint, the well-pleaded complaint rule supports federal jurisdiction.  *Moitie*, 452 U.S. at 398 n.2.

The City argues that the Supreme Court's discussion of the artful pleading doctrine in *Moitie* is "cabined to the facts."  Br. 16 (citing *Rivet* v. *Regions Bank of Louisiana*, 522 U.S. 470, 472 (1998)).  This is not correct.  The Supreme Court in *Moitie*, citing Wright & Miller, described the doctrine as a "settled principle."  452 U.S. at 398 n.2.  And Wright & Miller cites an array of cases with varied facts to illustrate that, under the artful pleading doctrine, courts will "determine whether the real nature of the claim is federal, regardless of plaintiff's characterization."  14C Charles Alan Wright et al., Federal Practice and Procedure § 3722 (4th ed. 2020).  *Rivet* is not to

the contrary.  There, as well, the Supreme Court confirmed that a court may "uphold removal even though no federal question appears on the face of the plaintiff's complaint" where "a plaintiff has 'artfully pleaded' claims."  522 U.S. at 475.

The City argues that even if its claims are governed by federal common law, "arising-under jurisdiction would still not exist" because a state-law claim does not "arise[] under federal law for jurisdictional purposes whenever the claim is governed by federal common law."  Br. 14.  The City relies on *Empire HealthChoice Assurance* v. *McVeigh*, 396 F.3d 136 (2d Cir. 2005), for this principle, but that case holds no such thing.  To the contrary, in *Empire*, the Second Circuit confirmed: "[i]t is beyond dispute that if federal common law governs a case, that case presents a federal question within the subject matter jurisdiction of the federal courts, just as if the case were governed by a federal statute."  396 F.3d at 140.  In addition, neither party in *Empire* argued that any existing body of federal law governed the claims at issue, and the question for the court was whether it could "create federal common law," which the court declined to do.  *Id*. at 140–41. Here, by contrast, the question for this Court is whether the City's claims implicate the already recognized federal common law of transboundary pollution and foreign affairs.

The City also argues that a "fleet" of district court decisions have rejected Defendants' artful pleading doctrine argument.  Br. 7–8, 16 n. 6.  Those cases misinterpreted the well-pleaded complaint rule, giving dispositive force to the *label* plaintiffs applied to their claims rather than the *substance* of the allegations.  The Second Circuit in *City of New York II* did not endorse these decisions, and rather stated that "[e]ven if" they were correct, this would not "conflict with our holding."  993 F.3d at 94.  But those cases were not correctly decided because the well-pleaded complaint rule does not allow a plaintiff to affix a state-law label to a claim that is necessarily federal in nature.  *Marcus*, 138 F.3d at 55.  Although the City labels its claims as arising under a

municipal consumer protection law, the federal nature of those claims is clear from the face of the Complaint, thus demanding that federal common law apply.

### C. Jurisdiction Is Independently Authorized by *Grable*.

*Grable* supplies a separate and independently sufficient basis for jurisdiction. *See Grable & Sons Metal Prod., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). The *Grable* doctrine provides federal jurisdiction over a putative state or municipal law claim if a federal issue is necessarily raised, actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance approved by Congress. *Id.* at 314. Determining whether federal jurisdiction is present "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312–13.

Here, the City's allegations attempt to countermand federal energy and environmental policy. The federal government has already addressed, and is currently addressing, climate change and the nation's energy needs through domestic statutes and regulations, and international agreements. The City's allegations necessarily implicate those federal issues, requiring the application of *Grable* here.

***The City's Complaint necessarily raises federal issues that are actually disputed.*** This action necessarily raises federal issues, warranting the exercise of *Grable* jurisdiction, because it implicates federal common law. *Newton* v. *Cap. Assur. Co., Inc.*, 245 F.3d 1306, 1309 (11th Cir. 2001); *Battle* v. *Seibels Bruce Ins. Co.*, 288 F.3d 596, 607–08 (4th Cir. 2002); *see supra* § II.A. Moreover, the City's theory of liability would force a court to second-guess federal decision-making and policy regarding the propriety of developing and producing various energy sources such as natural gas, biofuels, and traditional fossil fuels in order to decide whether Defendants' statements promoting these activities were misleading.

24

For example, the Complaint alleges that Defendants' promotion of natural gas as "cleaner" is deceptive because "the supposed environmental benefits" of this product "are a mirage."  Compl. ¶ 6; *see also id.* ¶¶ 63–66.  This view conflicts with official federal policy, which has, for many years, supported investment in and development of natural gas as a means to reduce greenhouse gas emissions and to encourage "greater energy independence."[13]  Similarly, federal policies endorse Defendants' public statements regarding biofuels and carbon capture.  In 2019, ExxonMobil signed a $100 million agreement with Department of Energy laboratories to "explore ways to bring biofuels and carbon capture and storage to commercial scale across the power generation, transportation, and manufacturing sectors."[14]  ExxonMobil's public statements on biofuels are therefore the subject of a public-private partnership, and are under consideration by government agencies.  *Id*.  Moreover, the White House recently issued a report outlining how carbon capture will play "an important role" "in meeting climate goals, domestically and globally."[15]  Defendants' stance on carbon capture therefore aligns with that of the federal government, and the City's claims would force a court to second-guess these federal policies to determine that Defendants' statements are deceptive.

Additionally, this action demands that a state court pass judgment on the accuracy of statements about the merits of fossil fuels and what role, if any, they might play in meeting energy

---

[13]  Jude Clemente, *President Obama's Support for America's Shale Oil and Natural Gas*, Forbes (Dec. 31, 2019), https://www.forbes.com/sites/judeclemente/2020/12/31/president-obamas-support-for-americas-shale-oil-and-natural-gas/?sh=2c05e1d41883; *see also* Notice ¶ 52.  Recently, the EPA recognized that the switch from coal to natural gas for power generation played an important role in reducing greenhouse gas emissions. *See* EPA, *Inventory of US Greenhouse Gas Emissions and Sinks*, at 104 (2021).  Defendants' public statements that natural gas is a *relatively* cleaner burning fuel thus align with the energy policy endorsed by the federal government.

[14]  U.S. Dep't of Energy, *DOE National Labs Partner with ExxonMobil for $100 Million in Joint Research* (May 8, 2019), https://www.energy.gov/articles/doe-national-labs-partner-exxonmobil-100-million-joint-research.

[15]  Council on Envt. Quality Rep. to Congress on Carbon Capture, Utilization, and Sequestration (2021), at 6, 11, https://www.whitehouse.gov/wp-content/uploads/2021/06/CEQ-CCUS-Permitting-Report.pdf.

demand as society transitions toward lower emissions.  For instance, the City contends that Defendants deceived consumers whenever they described their efforts to "reduce the[ir] carbon footprint," so long as Defendants "continue to ramp up fossil fuel production" or "invest in new fossil fuel development."  Compl. ¶ 35.  Adjudicating that claim requires resolving a fundamental question of climate policy: whether the only way to reduce emissions is to reduce the production of fossil fuels—which still provide the majority of energy in the United States.

The City also seeks to discourage the production and sale of fossil fuels in contravention of the laws of the United States that "affirmatively promote[] fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land."  *Juliana* v. *United States*, 947 F.3d 1159, 1167 (9th Cir. 2020); *see also, e.g.*, 42 U.S.C. § 15927(b).

***The federal issues raised here are substantial***.  The City seeks to impose significant penalties on Defendants based on assertions that contradict established federal policies endorsed by the President and numerous federal agencies, and by various federal laws.  This constitutes a "collateral attack" on the "[federal] regulatory scheme" and on the federal system as a whole, which satisfies *Grable's* requirement that the disputed issues are "substantial."  *Bd. of Comm'rs* v. *Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017).

***The federal-state balance supports the federal forum***.  The exercise of federal jurisdiction is fully consistent with the principles of federalism.  This action challenges the promotion of certain energy sources and emissions-reduction measures in nationwide advertising as inherently misleading and seeks to commandeer those statements to effect a nationwide reduction in fossil fuel production and sales.  *See supra* 18.  Federal courts are the traditional and appropriate fora for such litigation.  *See Massachusetts* v. *EPA*, 549 U.S. 497, 519 (2007).  The City nonetheless asserts

that "[u]nder Defendants' theory of removal, *any* consumer protection claim for false or misleading advertising would be removable if the *subject matter of* the deceptive statements related in some credible way to 'energy,' 'environmental law,' or 'foreign policy.'"  Br. 21.  But the City cannot credibly claim that its action is merely related in some tangential way to greenhouse gas emissions, climate change, and the proper mix of energy sources.  Such topics form the very essence of its Complaint.

## III.    This Action Is Removable Under the Federal Officer Removal Statute.

Defendants properly removed this action because the claims necessarily take aim at Defendants' production and supply of oil and gas under the guidance, supervision, and control of the federal government.  *See* 28 U.S.C. § 1442(a)(1).  The Federal Officer Removal Statute authorizes removal where, as here, defendants are "'person[s]' under the statute," who "acted 'under color of federal office,'" and who have "a 'colorable federal defense.'"  *Agyin* v. *Razmzan*, 986 F.3d 168, 174 (2d Cir. 2021).  Suits may be removed "despite the nonfederal cast of the complaint," *Jefferson County* v. *Acker*, 527 U.S. 423, 431 (1999), reflecting the congressional policy that persons acting under federal officers "require the protection of a federal forum," *Willingham* v. *Morgan*, 395 U.S 402, 407 (1969).

This case falls squarely within the aim and elements of the statute.  It is undisputed that Defendants are persons under the statute.  Defendants have acted "under color of federal office" because the City's claims are "connected or associated" with fossil fuel production activities that Defendants have undertaken at federal direction for decades.  *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc), *see* Notice ¶ 141.  Finally, Defendants raise numerous colorable federal defenses.

A.     **This Court Must Credit Defendants' Theory of the Case at the Removal Stage.**

Defendants' theory of the case—that the City's suit arises from Defendants' production and sale of fossil fuels, including activities conducted under federal direction—is more than plausible and thus must be credited by the Court.  The federal officer removal statute is to be "liberally construed" in favor of a federal forum.  *Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 147 (2007).  Defendants' allegations in support of removal need only be "facially plausible," and must be given the "benefit of all reasonable inferences."  *Baker* v. *Atl. Richfield Co.,* 962 F.3d 937, 941, 945 (7th Cir. 2020).  Courts must credit defendants' "theory of the case when evaluating the relationship between the defendants' actions and the federal officer."  *Agyin*, 986 F.3d at 175 (internal quotation marks and citation omitted); *Acker*, 527 U.S. at 432 (crediting defendants' theory of the case and denying remand because "[t]o choose between [the parties'] readings . . . is to decide the merits of the case," which is inappropriate at the removal stage).

The City argues this case is about consumer deception, not fossil fuel production.  But that ignores the Complaint's allegations and the context in which it was filed.  "[S]etting aside any attempts at artful pleading," it is the "crux" or "gravamen" of the plaintiff's complaint that is key in assessing the theory of a case.  *Fry* v. *Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017).  And the gravamen of the Complaint, as Defendants have explained above, is that Defendants' alleged deception "enabled the unabated and expanded extraction [and] production" of fossil fuels, Compl. ¶ 8, which took place largely under the federal government's direction.

The City's focus on Defendants' alleged misstatements and omissions "does not change the substance of its claims," *City of New York II*, 993 F.3d at 97, which challenge Defendants' "misinformation" campaigns precisely because they purportedly led to the production and sale of *more* oil and gas.  The City alleges Defendants misinformed consumers about the environmental harms purportedly caused by Defendants' production and sale activities, including those directed

by federal officers.  Thus, "[t]he circumstances that gave rise to [Defendants' alleged] liability" necessarily target Defendants' actions under government supervision and control.  *See Acker*, 527 U.S. at 433.  Because this theory is plausible, the Court must properly credit it.  Defendants thus satisfy the elements of the federal officer removal statute.

### B.    The City's Arguments as to Each Element Ignore the Liberal Standard for Federal Officer Removal.

#### 1.    Defendants "Acted Under" Federal Officers.

Defendants have "acted under color of federal office."  Although the entirety of the federal officer removal statute is meant to be interpreted broadly, the "acting under" provision must be read "especially" broadly.  *Agyin*, 986 F.3d at 175.  To satisfy this prong, Defendants must show that their relationship with the government "involves 'an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'"  *Id*. at 175 (quoting *Watson*, 551 U.S. at 152).  The Supreme Court has approved removal in cases involving defendants "working hand-in-hand with the federal government" to further the government's ends, "help[ing] the Government to produce an item that it needed," and "perform[ing] a job that . . . the Government itself would have had to perform."  *Id.* at 175–77 (internal citation omitted).

Defendants, under federal government supervision and control, have regularly performed what otherwise would have been essential government functions: producing specialized, noncommercial-grade fuels for the military, Notice ¶¶ 85–95; producing oil and gas, operating government-owned facilities and equipment, and constructing pipelines as agents for the federal government and military during wartime, *id*. ¶¶ 96–113; supplying and managing the Strategic Petroleum Reserve, *id*. ¶¶ 114–117; distributing gasoline supplies to wholesale purchasers in response to oil embargoes, *id*. ¶ 118; and producing oil and gas on federal lands subject to federal leasing programs, *id*. ¶¶ 119–40.  Without Defendants, the federal government would have been

forced to develop the federally owned oil resources on the Outer Continental Shelf ("OCS") itself, and would have had to supply, operate, and manage federal oil reserves on its own—tasks that state-owned oil companies perform in other countries. *See id.* ¶¶ 127–28.[16]

Defendants provided many examples of how they "provided the federal government with materials that it needed to stay in the fight at home and abroad" during times of war. *Baker*, 962 F.3d at 942. *See* Notice ¶¶ 86, 96–97, 99–102, 105–108, 110. Defendants have also assisted the government in producing essential items for national defense purposes. *See Watson*, 551 U.S. at 154; Notice ¶ 88. Indeed, both Shell Oil Company and BP (or their affiliates) have recently contracted with the Department of Defense to supply vast quantities of military-grade fuels essential for supporting high performance military engines. *See id.* ¶¶ 89–94. Defendants have also "work[ed] hand-in-hand with the government" to achieve tasks that further the objectives of the federal government by, for example, assisting the government in creating strategic stockpiles of petroleum and developing valuable mineral resources on the OCS and federal lands. *Ruppel* v. *CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012). *See* Notice ¶ 116; *see also infra* Section IV.

Defendants performed these activities subject to federal officers' considerable "subjection, guidance, or control." *Watson*, 551 U.S. at 143. The City's cursory contention that Defendants' relationships with the federal government fail to show the requisite level of direction and control fails. Defendants cite numerous instances in which the federal government subjected Defendants to exacting standards and scrutiny, directing not just *what* Defendants would do for the government, but *how* they were required to do it. This included, among other things, detailed military specifications for specialized jet fuels, *see* Notice ¶¶ 86–95, and production directives

---

[16]    Defendants dispute the City's improper attempt to attribute to them the actions of their separately organized predecessors, subsidiaries, or affiliates, but accept the allegations as true solely for purposes of determining whether the pleading supports removal jurisdiction.

issued during war that told refiners "where and how to drill" and "what to make, how much of it to make, and what quality," *see id.* ¶¶ 96–103, 109–113.

The City attempts to diminish Defendants' relationships with the government on the grounds that it was a "commercial relationship" and involved "selling an off-the-shelf commodity," Br. 30, but this misconstrues the applicable standard for removal and ignores the facts.[17]  That an entity may have earned a profit in its dealings with the federal government does not preclude a finding that the entity "acted under" a federal officer.  *See Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (holding defendants need not show their relationship with the government was "coerced" for removal).  Nor does removal always require a showing that the product in question was unique to the government.  For instance, courts have held federal officer removal applicable where defendants produced materials used for *both* military and civilian goods.  *See, e.g.*, *Baker*, 962 F.3d at 940.  In any event, many products that Defendants supplied for the government, such as vast quantities of specialized military-grade jet fuel, are not "off-the-shelf" products, and Defendants' contractual relationships with the federal government through, for example, OCS leases, are "*not merely commercial transactions* between the federal government and the oil companies.  They reflect the creation of a valuable national security asset for the United States over time."  Notice Ex. 70 ¶ 7(1) (emphasis added).

The City attempts to foreclose a finding that Defendants "acted under" federal officers by relying on three cases: *Mayor & City Council of Baltimore* v. *BP P.L.C.* ("*Baltimore II*"), 952 F.3d 452 (4th Cir. 2020), *vacated and remanded*, 141 S. Ct. 1532 (2021); *County of San Mateo* v. *Chevron Corp.* ("*San Mateo II*"), 960 F.3d 586, 600 (9th Cir. 2020), *judgment vacated sub*

---

[17]  To the extent other courts have held otherwise, those decisions are inconsistent with the law in sister circuits and demonstrate the "grudging" approach to federal officer removal that the Supreme Court instructed against in *Willingham*, 395 U.S. at 407.

*nom.*, *Chevron Corp.* v. *San Mateo County, California*, 2021 WL 2044534 (U.S. May 24, 2021),

and *Bd. of Cnty. Comm'rs of Boulder Cnty.* v. *Suncor Energy (U.S.A.) Inc.* ("*Boulder II*"), 965

F.3d 792 (10th Cir. 2020) *vacated and remanded*, No. 20-783 (U.S. May 24, 2021).  This attempt

is similarly unavailing.  The evidentiary record submitted in this case contains detail that those

earlier courts had found lacking when they held that the "acting under" prong was not satisfied.

Defendants have submitted evidence of new categories of activities conducted pursuant to federal

officers' direction and control, and in other areas have supplemented the record that was before

those courts to better illustrate the requisite level of governmental control and the underlying

federal objective that Defendants' contracts with the government were intended to accomplish.[18]

The Court is certainly not bound by out-of-circuit decisions that relied on a less complete

evidentiary record than the record before it today.

### 2.    The City's Claims Are Related to Defendants' Activities "Under Color of Federal Office."

As every circuit court to consider the issue has recognized, when Congress inserted the

words "or relating to" in § 1442(a)(1) through the Removal Clarification Act of 2011, it

"broadened federal officer removal" to actions "alternatively *connected or associated*, with acts

under color of federal office."  *Latiolais*, 951 F.3d at 292; Notice ¶ 141.  Although the Second

Circuit has not yet directly addressed the issue, it has long taken a broad reading of the connection

required for federal officer removal.  *See Agyin*, 986 F.3d at 174 n.2; *Isaacson*, 517 F.3d at 137.[19]

---

[18]  Defendants also supplemented this record with evidence showing that their OCS leases are not generic "arm's-length" contracts, *cf.*, *San Mateo II*, 960 F.3d at 600, *Baltimore II*, 952 F.3d at 465, *Boulder II*, 965 F.3d at 823, but rather "fulfill basic governmental duties" that the federal government would otherwise have had to perform itself, *see* Notice ¶¶ 119–40.

[19]  Citing a single district court opinion, the City contends that "the nature of this connection must be causal."  Br. 26 n.10 (citing *Connecticut* v. *Exxon Mobil Corp.*, 2021 WL 2389739, at *11 (D. Conn. June 2, 2021)).  Yet that court did not apply the amended statutory language, instead relying on *Isaacson* which pre-dates the Act.  It also declined to follow a persuasive recent Fourth Circuit decision, which recognized that the amended language broadened the scope of the statute to require only a "connection" or "association" between defendants' acts in question and the federal office.  *See Arlington County* v. *Express Scripts Pharm. Inc.*, 996 F.3d 243, 256 (4th Cir.

Contrary to the City's contention, Defendants need not show that federal officers directed or "dictated the content of Defendants' advertisements . . . or the concealment of their products' known hazards."  Br. 28.  Indeed, courts have held the opposite in failure-to-warn cases, *see, e.g.*, *Latiolais*, 951 F.3d at 296, and the City's reliance on pre-amendment case law is unpersuasive.  It is not necessary "that the complained-of conduct *itself* was at the behest of a federal agency"— just that the "allegations are directed at the relationship between [defendants] and the federal government" for at least part of the time frame relevant to plaintiff's claims.  *Baker*, 962 F.3d at 944–45 (internal quotation marks and citation omitted).  Moreover, Defendants are not required to show that the City's injuries were caused *solely* by conduct taken under the direction of federal officers, only that the claims are "for or relating to" that conduct.  *Id.* at 943.  Under these broad standards, Defendants' conduct under the direction of the federal government "relat[es] to" the City's claims.  28 U.S.C. § 1442.

The City's attempt to distinguish cases that purportedly involved a more "direct connection between the tortious conduct and the acts taken under a federal officer," Br. 29, misstates the proper standard.  As noted, there need only be a "connection" or "association" between plaintiff's claims and defendant's conduct.[20]  For instance, the *Baker* court found a sufficient connection where "at least some of the pollution" at issue "arose from the federal acts."  962 F.3d at 940–41, 945.  In *In re Defender Association of Philadelphia*, the court found a sufficient connection where

---

2021) (noting that the "'connection or association' standard is broader than the old 'causal nexus' test that we abandoned after the Removal Clarification Act of 2011").  The City also relies on *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 488 F.3d 112 (2d Cir. 2007), Br. 28—yet another case that pre-dates the 2011 Removal Clarification Act and fails to apply the proper "connection" or "association" standard.

[20]  In urging the Court to find that Defendants failed to satisfy this element, the City relies on climate cases in which the courts did not heed the Supreme Court's direction to "credit [Defendants'] theory of the case."  *Acker*, 527 U.S. at 429.  *See* Br. 25–26, 28 (relying on *Baltimore II, Boulder II, San Mateo II*, and similar cases, none of which even acknowledge the rule that courts must "credit [Defendants'] theory of the case" at this stage); *id.* at 26–28 (relying on *Connecticut* and *Honolulu*, which cited the general proposition that courts must "credit [Defendants'] theory of the case," but then failed to do so).  None of these cases are controlling here.

the defendants allegedly misused federal grant funds in their work representing indigent defendants in state court, even though that specific work was not directed or authorized by the federal government. 790 F.3d 457, 461–62, 472 (3d Cir. 2015). And in *Arlington County*, the court found a sufficient connection where some of the oversupply of prescription opioids was linked to the defendants' duty to provide medical care to veterans as part of a health insurance program administrated by the Department of Defense ("DOD")—even though the complaint "did not even mention the distribution of opioids to veterans, [or] the DOD contract." 996 F.3d at 249, 256. Similarly, here the City has alleged that Defendants' supposed "deception" is actionable because it "enabled the unabated and expanded extraction [and] production of fossil fuel products," Compl. ¶ 8—at least some of which was done under federal direction and control. The City's claims, therefore, involve a sufficient connection between Defendants and the federal government.

### 3.   Defendants' Defenses Are "Colorable."

The City's argument that none of Defendants' asserted federal defenses apply relies on case law that improperly failed to credit Defendants' theory of the case. *See* Br. 30–31. The City also urges the Court to apply the wrong legal standard in evaluating this element—functionally requiring Defendants to "win [their] case before [they] can have it removed." *Willingham*, 395 U.S. at 407. But the federal defense need not be "clearly sustainable" at the remand stage, *Isaacson*, 517 F.3d at 139, nor should the "evidentiary standard" be too high given that the purpose of federal officer removal is "to encourage the trial of such complex evidentiary questions in federal court," *Gordon* v. *Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 319 (E.D.N.Y. 2014). Although the parties disagree about the strength and applicability of Defendants' asserted federal defenses, those defenses—including the government contractor defense, preemption, and federal immunity, *see* Notice ¶¶ 151, 153, 155—are at least "colorable," and the merits should be argued before a federal court. *Baker*, 962 F.3d at 944, 947.

For instance, the City claims the government contractor defense cannot apply because the government did not direct Defendants' advertising.  Br. 31.  But federal officers need not have directed the precise conduct at issue to present a "colorable" government contractor defense.  *See*, *e.g.*, *Cuomo* v. *Crane Co.*, 771 F.3d 113, 117 (2d Cir. 2014) (holding that manufacturer provided a "colorable" factual basis in a failure-to-warn case, even though government specifications "made no mention of asbestos warnings").  The City also contends that Defendants' res judicata defense is "frivolous."  Br. 31.  But as explained above, this ignores that the City *did* challenge Defendants' promotion activities in *City of New York I and* could have raised the same or similar instances of Defendants' allegedly deceptive advertising in that case.  *See supra* 13.

Finally, the City's assertions that the *Noerr-Pennington* doctrine is inapplicable and that it challenges only "misleading commercial speech" and non-lobbying activity that is not protected by the First Amendment are incorrect.  Br. 31.  The First Amendment contains broad protections for speech, particularly on issues of public concern like climate change.  *Snyder* v. *Phelps*, 562 U.S. 443, 452 (2011).  And under the *Noerr-Pennington* doctrine, the First Amendment protects even "decept[ive] . . . publicity campaign[s] to influence governmental action."  *E.R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961).  Thus, even if Defendants' speech was misleading, which it was not, Defendants have a "colorable" federal defense that the City's claims target protected speech to, for instance, influence the government—one of the largest consumers of Defendants' products in the world.  *See* Notice ¶ 104.  Whether the First Amendment shields Defendants' speech here is exactly the sort of "merits question" that a federal court should decide.  *Baker*, 962 F.3d at 944.

## IV. This Action Is Removable Under the Outer Continental Shelf Lands Act.

Removal of this action is also warranted under OCSLA, which vests federal courts with original jurisdiction over all actions "arising out of, or in connection with . . . any operation

conducted on the [OCS] which involves exploration, development, or production of the minerals, of the subsoil and seabed of the [OCS], or which involves rights to such minerals."  43 U.S.C. § 1349(b).  OCSLA provides a "broadly worded grant of original jurisdiction," *EP Operating Ltd. P'ship* v. *Placid Oil Co.*, 26 F.3d 563, 567 (5th Cir. 1994), and it is satisfied here.

Defendants engage in "operation[s] conducted on the [OCS]" that entail the "exploration" and "production" of "minerals."  43 U.S.C. § 1349(b).  The OCS reserves comprise a massive proportion of the nation's oil and gas, and have accounted for as much as 30% of annual U.S. oil production.[21]  Defendants (or their affiliates) are among the principal lessees of the more than 5,000 active oil and gas leases on OCS acres administered under OCSLA.  Notice ¶¶ 160–162.

The City's claims "aris[e] out of, or *in connection with*" Defendants' OCS operations. 43 U.S.C. § 1349(b) (emphasis added).  As the City concedes, Br. 32, OCSLA's jurisdictional sweep is "broad."  To protect the substantial federal interests in the OCS leasing program, Congress established original federal jurisdiction over "the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]."  *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985).  A plaintiff's claims "arise out of, or in connection with" operations on the OCS so long as those operations *contribute* to the injuries alleged.  *See Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

The City's claims arise in connection with Defendants' OCS operations because fossil fuel production on the OCS is part of the conduct about which Defendants allegedly misled New York City consumers.  The City alleges that Defendants' supposed deception has "enabled the unabated and expanded extraction, production, promotion, marketing, and sale of fossil fuel products,"

---

[21]   *See* Cong. Research Serv., R42432, *U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas* 3, 5 (2018), available at https://bit.ly/3eMqdyA.

Compl. ¶ 8, and that certain defendants "have been doubling down on fossil fuel extraction, production, and sales " instead of investing in "clean energy sources," *id.* ¶¶ 41–42.  By alleging that Defendants' advertisements about their fossil fuel *production* misled consumers, the Complaint sweeps in Defendants' substantial activities on the OCS.  *See* Notice ¶¶ 119–140, 165.

The City's efforts to resist this conclusion are unavailing.  The City argues that "Defendants' lies about the climate impacts of their products" were not "made on the OCS." Br. 33.  But contrary to the City's suggestion, the OCS operations need not be "the subject" of the action.  Br. 34.  OCSLA jurisdiction exists even if the Complaint pleads no substantive claims for specific conduct on the OCS.  *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014).  The City also argues that Defendants' OCS operations must be the "but-for" cause of the City's claims.  Br. at 33.  That is incorrect.  Congress's use of the phrase "in connection with," 43 U.S.C. § 1349(b)—separate and apart from the grant of jurisdiction over claims "arising out of" OCS operations—reflects that there is no such causal requirement.  *See Latiolais*, 951 F.3d at 292.  Cases that discussed "but-for" causation stated that such causation is *sufficient* for OCSLA jurisdiction, but not that it is *necessary*.  *See In re Deepwater Horizon*, 745 F.3d at 163; *Tennessee Gas Pipeline*, 87 F.3d at 155.

Finally, the City ignores that this Court has OCSLA jurisdiction because the relief the City seeks threatens to impair OCS production activities.  Courts find OCSLA jurisdiction satisfied if resolution of the dispute could affect the efficient exploitation of minerals from the OCS.  *See, e.g.*, *EP Operating*, 26 F.3d at 569–70 & n.15.  The City contends that the impact of a penalty award in this case on OCS production is "speculative."  Br. 35.  But Congress "intended" that "any dispute that alters the progress of production activities on the OCS" falls within OCSLA's "grant of federal jurisdiction."  *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th

Cir. 1988).  The City's goal in this lawsuit is to force Defendants to stop or substantially curtail

fossil fuel extraction and production to "drastically slash greenhouse gas emissions in order to

avoid the most catastrophic effects of the climate crisis."  Compl. ¶ 42.  In seeking costly relief,

the City's claims thus threaten the continued viability of the federal leasing program.  *Laredo*

*Offshore Constructors*, 754 F.2d at 1228.[22]  Thus, the Complaint aims to reduce exploration and

production of fossil fuels, including on the OCS, and this Court has jurisdiction under OCSLA.[23]

## V.    This Action Arises out of Federal Enclaves.

The Constitution's "Enclave Clause," authorizes Congress to "exercise exclusive

Legislation in all Cases whatsoever" over federal enclaves.  U.S. Const. art. I, § 8, cl. 17; *Jograj*

v. *Enter. Servs., LLC*, 270 F. Supp. 3d 10, 16 (D.D.C. 2017).  This action arises out of federal

enclaves in two distinct ways, each sufficient to justify federal enclave jurisdiction.

*First*, the Complaint targets Defendants' extraction, production, and sale of fossil fuels, as

well as the alleged effects of climate change from use of fossil fuels.  *See, e.g.*, Compl. ¶¶ 18, 24.

As a result, this action necessarily sweeps in those operations that occur on military bases and

other federal enclaves.  *See, e.g.*, *Humble Pipe Line Co.* v. *Waggoner*, 376 U.S. 369, 372–74 (1964)

(the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale

Air Force Base in Louisiana); *see also Miss. River Fuel Corp.* v. *Cocreham*, 390 F.2d 34, 35 (5th

Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and

ownership[] takes place within the exclusive jurisdiction of the United States").

---

[22]    The City asserts that, if OCSLA jurisdiction can be exercised here, cases involving "any petroleum-based product" would be "removable under OCSLA." Br. 34.  Not so.  The City's attempt to use consumer protection law to regulate fossil fuel production necessarily implicates production on the OCS; cases that involve (for example) a collision with a tanker truck would not automatically be removable under OCSLA without a showing that the suit sufficiently threatens OCSLA activities.

[23]    The City also misplaces reliance on district court opinions in other climate change cases.  Br. 32 n.11.  None of those decisions are binding, and they will now be subject to further appellate review.  *See supra* 21.

The City tries to escape this conclusion by ignoring the true gravamen of its Complaint. But contrary to the City's characterization, the Complaint does not "merely seek[] to stop Defendants from deceiving the City's consumers," Br. 36—it seeks to reduce or eliminate altogether consumers' demand for and use of fossil fuel products and thereby halt Defendants' extraction, production, and sale of the same—both on and off federal enclaves across the country, *see, e.g.*, Compl. ¶¶ 26, 42.[24]

Further, exercising federal enclave jurisdiction over this action will not cause some "sweeping change" in federal-state jurisdiction.  *Connecticut*, 2021 WL 2389739, at *13.  The *Connecticut* court ignored the fact that it is the *plaintiffs* in these climate change cases that seek to effect such a radical shift in federal/state court relations.  That is because the City's claims go far beyond traditional consumer protection claims.  They are trying to hold the oil and gas industry responsible for global climate change by pursuing inherently federal claims in state court.  Because the City's claims have a significant effect on both the production and sale of fossil fuels on federal enclaves, federal enclave jurisdiction is appropriate here.

*Second*, the advertising the City attacks as false obviously reaches federal enclaves, as would any changes the City wants made to that advertising.  For example, API's Super Bowl ads (aired during the most watched program in the world) and internet statements obviously reach federal enclaves such as Ellis Island and Fort Tilden.  *See* Compl. ¶ 71.  Even if the City's Complaint were properly viewed as a limited consumer protection action (and it is not), these allegations would suffice to establish federal enclave jurisdiction.  By the City's own allegations,

---

[24] There is also no rule that federal enclaves must be the *exclusive* locus in which a plaintiff's claims arose.  *See Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006); *Akin* v. *Big Three Indus., Inc.*, 851 F. Supp. 819, 825 (E.D. Tex. 1994).  Here, federal enclaves are the loci of a significant portion of the City's claims, which include nationwide (and worldwide) fossil fuel activities, many of which take place on federal enclaves.  *See* Notice ¶¶ 172–174.  A strong federal interest exists in exercising jurisdiction over the claims as a whole because many of them necessarily arise from federal enclaves.

Defendants broadcast by the internet and otherwise throughout the entire City, including its federal enclaves.  Federal enclave jurisdiction thus supports removal on this basis as well.

## VI.    This Representative Action on Behalf of New York City Consumers Is Removable Under the Class Action Fairness Act.

The lawsuit is properly removed under CAFA, *see* 28 U.S.C. §§ 1332(d), 1453(b), and the City's argument that it does not meet the requisite element of a "class action" misses the mark and is inconsistent with the legislative purposes behind CAFA.  CAFA defines a "class action" as "any civil action filed under Rule 23 . . . or similar state statute or rule *of* judicial proceeding authorizing an action to be brought by 1 or more representative persons." *Id.* § 1332(d)(1)(B).  This definition, Congress explained, "is to be interpreted liberally.  Its application should not be confined solely to lawsuits that are labeled 'class actions.'  Generally speaking, lawsuits that resemble a purported class action should be considered class actions for purposes of applying these provisions."  S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34 (formatting altered); *see also N.J. Carpenters Vacation Fund* v. *HarborView Mortg. Loan Tr. 2006-4*, 581 F. Supp. 2d 581, 588 (S.D.N.Y. 2008). In other words, CAFA permits removal of a suit that is "in substance a class action," notwithstanding a plaintiff's "attempts to disguise the true nature of the suit." *Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013).

*Song* v. *Charter Communications, Inc.* is particularly instructive.  2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017).  There, Song sued California cable companies for unlawfully charging their customers a monthly surcharge. *Id.* at *1.  Though not styled as a class action, the lawsuit was brought to put an end to the unlawful charges, not only for Song's benefit "but also for the benefit of the millions of California consumers" targeted by this scheme. *Id.*  The district court found CAFA jurisdiction satisfied, noting that lawsuits "that *resemble* a purported class action, should be considered class actions" under CAFA. *Id.* at 1 n.1. (emphasis added).

This case is no different.  The City alleges that defendants "intentionally depriv[ed] NYC consumers of information" in order to attract new consumers, prevent mass defection to renewables, and realize "massive profits" and expand their extraction and production of fossil fuels.  Compl. ¶ 8.  The Complaint is replete with allegations concerning Defendants' purported efforts to "mislead[] NYC consumers about the climate impacts of fossil fuel products," *id.* ¶ 19, and the injuries suffered by those consumers as a result of their use of fossil fuel products "increasing the frequency of deadly weather events" and "creating other unprecedented threats to people in New York City," *id.* ¶ 18.  *See also id.*  ¶¶ 20–21, 24–25, 35–37, 40, 47, 55, 57, 65.

Retaining jurisdiction here also furthers CAFA's legislative purposes.  The "primary objective" of CAFA is to "ensure Federal court consideration of interstate cases of national importance."  *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81, 89 (2014).  Prior to CAFA, plaintiffs were able to "game the procedural rules and keep nationwide or multi-state class actions in state courts," undermining basic federalism principles by allowing those courts to "dictate to 49 others what their laws should be."  S. Rep. 109-14, at 4, 24.  Congress enacted CAFA "to ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire."  *Id*. at 5.  And this is precisely the type of case Congress wanted to prevent from slipping through the cracks—a climate change case of national importance that would functionally regulate the oil and gas industry far beyond the City's borders.  This suit is a thinly veiled assault on the national (and international) oil and gas industry, implicating an entire framework of federal legislation and regulation.  Such a backdoor attempt to affect and supplant federal regulation of the oil and gas industry deserves a federal forum.[25]

---

[25]   The City misplaces reliance on *Purdue Pharma L.P.* v. *Kentucky*, 704 F.3d 208 (2d Cir. 2013).  In that case, the Second Circuit held that "*parens patriae* suits are not removable as 'class actions' under CAFA."  *Id.* at 212.  But "New York City may not assert *parens patriae* standing."  *Connecticut* v. *Am. Elec. Power Co.*, 582 F.3d 309,

## VII.    The Substantial First Amendment Issues Necessarily Raised by the City's Lawsuit Warrant Federal Jurisdiction.

The City's attempt to regulate through litigation Defendants' speech on climate change necessarily raises substantial First Amendment questions that belong in federal court, consistent with *Grable*.  Although the lawsuit asserts consumer protection causes of action, the City's lawsuit goes beyond consumer protection claims to target fully protected speech in an effort to impose a government viewpoint on private parties on an issue of public concern—climate change and national energy policy.  *See Nat'l Rev., Inc.* v. *Mann*, 140 S. Ct. 344, 347–48 (2019) (Alito, J., dissenting from denial of certiorari) ("Climate change has staked a place at the very center of this Nation's public discourse").  "[I]t is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas."  *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 44 (1988).  "Speech on matters of public concern is at the heart of the First Amendment's protection."  *Snyder,* 562 U.S. at 451–52.  First Amendment interests are thus at their apex where, as here, it is a governmental entity that seeks to use state-law claims to regulate speech on issues of "public concern."  *Phila. Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 775 (1986).

The speech implicated by the City's claims is protected by the First Amendment, making federal court intervention under *Grable* appropriate.  The City's lawsuit seeks civil penalties and injunctive relief because the oil and gas industry has expressed its views that differ from the City on climate change and national energy policy.  The vast majority of speech targeted by the Complaint is opinion or prediction of future events, *i.e.*, fully protected speech that cannot be

---

339 n.17 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011).  Here, the City is not protecting "quasi-sovereign" interests, but stepping in as a representative of a class of allegedly misled consumers.

proven false.[26]  The City attempts to argue that its Complaint only targets speech directed to the sale of products, but that argument fails because where a case involves political speech intertwined with commercial speech, the full protections accorded to political speech apply.  *Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988).

Where state law claims target speech on a matter of public concern, the First Amendment injects affirmative federal law elements into the plaintiff's cause of action.  *See, e.g.*, *Hepps*, 475 U.S. at 774–76 (1986).  Thus, the First Amendment issues that arise from the Complaint are not "defenses" but rather constitutionally required elements of the City's claims on which it bears the burden of proof.  *N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 280, 286 (1964) (public officials have the burden of proving with "convincing clarity" that a "statement was made with 'actual malice'").  These required elements are disputed and substantial issues that will likely dispose of the entire case.  This action therefore raises a substantial and disputed federal issue—whether a consumer protection law can be used by a governmental plaintiff to impose a government viewpoint on private parties without requiring litigation of substantial First Amendment issues.

The Supreme Court has recognized that such constitutional issues occupy a special place in the "substantiality" inquiry.  *See Grable*, 545 U.S. at 320 n.7.  And given the compelling federal interests at stake here, federal courts may entertain the claims at issue in this case "without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Id*. at 314.  The City's claims of false statements regarding the global phenomenon of climate change and how to address it mean this action involves national and international issues that can only be adjudicated in a federal forum.

---

[26] For example, the Complaint attacks an API Super Bowl advertisement stating that the petroleum industry could help people "lead better lives."  Compl. ¶ 71.  This is a statement of opinion regarding the future that merits full constitutional protection.  *See N. Am. Olive Oil Ass'n* v. *D'Avolio Inc.*, 457 F. Supp. 3d 207, 230 (E.D.N.Y. 2020).

## VIII.   The City Is Not Entitled to Attorneys' Fees or Costs.

Removal of this action was objectively reasonable, and no "unusual circumstances" warrant an award of costs and fees.  "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal."  *Martin* v. *Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005).  Removal is not "objectively unreasonable" unless foreclosed by "clearly established law."  *Williams* v. *Int'l Gun-A-Rama*, 416 F. App'x 97, 99 (2d Cir. 2011).  The law is not "clearly established" where there is even "a small measure of disagreement."  *Bedminster Fin. Grp., Ltd.* v. *Umami Sustainable Seafood, Inc.*, 2013 WL 1234958, at *11–12 (S.D.N.Y. Mar. 26, 2013).

*City of New York II* demonstrates that suits seeking redress for global climate change are subject to federal common law.  993 F.3d at 92.  That district courts in other circuits have remanded other climate change cases does not "foreclose" removal here.  Those decisions are distinguishable and misapplied the law to the facts of those particular cases, and in any event such district court decisions cannot "render the law clearly established."  *Williams*, 416 F. App'x at 99.  Moreover, removal was objectively reasonable in order to preserve the issues for appeal.  *See In re WorldCom, Inc. Sec. Litig.*, 2003 WL 21031974, at *3 (S.D.N.Y. May 5, 2003).

The City incorrectly argues that the Court should still award fees in light of unspecified "unusual circumstances" presented here.  Br. 44.  But the City cites no case awarding costs and fees due to "unusual circumstances" where objectively reasonable grounds for removal were present.  The City does not and cannot present any evidence that Defendants acted in bad faith or that "their motion rises to the level of abuse or harassment."  *Qatar* v. *First Abu Dhabi Bank PJSC*, 432 F. Supp. 3d 401, 416, 421 (S.D.N.Y. 2020).  To the contrary, Defendants' legal arguments are well-supported by precedent, including the Second Circuit's decision in *City of New York II.*

## **CONCLUSION**

For the foregoing reasons, this Court has subject matter jurisdiction, and the motion to remand should be denied.  *First*, under the fraudulent joinder doctrine, this Court has diversity jurisdiction because the City committed outright fraud in naming EMOC as a strawman defendant in an attempt to circumvent federal jurisdiction and re-litigate its 2018 action in state court. *Second*, as Judge Keenan and the Second Circuit already held, the City's claims arise under federal common law because they implicate the regulation of transboundary pollution and foreign affairs. 325 F. Supp. 3d at 471; 993 F.3d at 91.  They also require the resolution of substantial, disputed questions of federal law about national energy policy and environmental protection, making removal appropriate under *Grable*.  *Third*, the City's claims are connected or associated with fossil fuel production activities that Defendants undertook at federal direction, warranting removal under the federal officer statute.  *Fourth*, the City's claims necessarily arise out of Defendants' production of fossil fuels on the OCS warranting removal under OCSLA.  *Fifth*, this action arises out of Defendants' promotional activities occurring at federal enclaves within New York City. *Sixth*, this is in substance a representative action warranting CAFA removal.  *Seventh*, the case involves federal constitutional elements because it targets speech on a matter of public concern.

Although this action is purportedly brought under a municipal consumer protection law, the City seeks relief here that would suppress fossil fuel production and sales precisely because those sales contribute to greenhouse gas emissions and the global phenomenon of climate change. The City cannot artfully plead around the federal nature of its claims, nor may it fraudulently join a defendant to end run federal diversity jurisdiction and unfavorable precedent in this forum.

DATE:  August 16, 2021

Respectfully submitted,

By:

/s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.
Daniel J. Toal
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
Email: twells@paulweiss.com
Email: dtoal@paulweiss.com

Justin Anderson
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
Fax:  (202) 223-7420
Email: janderson@paulweiss.com

Patrick J. Conlon
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
Spring, TX 77389
Tel:  (832) 624-6336
Email: patrick.j.conlon@exxonmobil.com

*Attorneys for Defendants Exxon Mobil
Corporation and ExxonMobil Oil
Corporation*

Nancy G. Milburn
Diana E. Reiter
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Tel:  (212) 836-8383
Fax:  (212) 836-8689

Michael L. Simes
MCGUIREWOODS LLP
1251 Avenue of the Americas, 20th Floor
New York, NY 10020-1104
Tel:  (212) 548-7013
Email: msimes@mcguirewoods.com

Andrew G. McBride
MCGUIREWOODS LLP
2001 K Street NW, Suite 400
Washington, D.C. 20006-1040
Tel:  (202) 857-2487
Email: amcbride@mcguirewoods.com

Brian D. Schmalzbach (*pro hac vice*)
Kathryn M. Barber (*pro hac vice*)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Tel: (804) 775-100
Email: bschmalzbach@mcguirewoods.com
Email: kbarber@mcguirewoods.com

*Attorneys for Defendant American Petroleum
Institute*

David C. Frederick (*pro hac vice*)
James M. Webster, III (*pro hac vice*)
Daniel S. Severson
Grace W. Knofczynski (*pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
Email:  dfrederick@kellogghansen.com
Email:  jwebster@kellogghansen.com

Email:  nancy.milburn@arnoldporter.com
Email:  diana.reiter@arnoldporter.com

Matthew T. Heartney (*pro hac vice*)
John D. Lombardo (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail: matthew.heartney@arnoldporter.com
E-mail: john.lombardo@arnoldporter.com

Jonathan W. Hughes (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
Email: jonathan.hughes@arnoldporter.com

*Attorneys for Defendants BP P.L.C. and BP
AMERICA INC.*

Email:  dseverson@kellogghansen.com
Email:  gknofczynski@kellogghansen.com

*Attorneys for Defendants ROYAL DUTCH
SHELL PLC and SHELL OIL COMPANY*