**MEMO ENDORSED**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/7/2021

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| City of New York, *et al.*,<br>　　　　Plaintiffs,<br><br>v.<br><br>Exxon Mobil, *et al.*,<br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)　　Case No. 1:21-cv-4807-VEC |

## MOTION FOR LEAVE TO FILE
## PROPOSED *AMICUS CURIAE* BRIEF OF
## ENERGY POLICY ADVOCATES
## IN SUPPORT OF DEFENDANTS AND
## IN OPPOSITION TO REMAND

NOW COMES Energy Policy Advocates (hereinafter, "EPA") and moves for leave to file the proposed *amicus curiae* brief which is attached hereto. In support of this Motion, EPA states as follows:

1. EPA is a nonprofit corporation organized under the laws of Washington State, and its mission is to conduct research into government policy (including how such policies are made) using the federal Freedom of Information Act and similar state transparency statutes. Because of EPA's research, it has obtained records which shed additional light on this case, and on the propriety of this case being adjudicated in federal court.

2. EPA's interest in this case is set forth in the accompanying proposed brief.

3. It appears to be the universal practice of all of New York's federal courts to allow appropriate amicus briefing. See, e.g., *Onondaga Indian Nation v. New York*, 97-CV-445, 1997 U.S. Dist. LEXIS 9168, at *6 (N.D.N.Y. June 24, 1997), *Andersen v. Leavitt*, No. 03-cv-6115 (DRH) (ARL), 2007 U.S. Dist. LEXIS 59108, at *6

(E.D.N.Y. Aug. 13, 2007), *Kearns v. Cuomo*, No. 1:19-CV-00902 EAW, 2019 U.S. Dist. LEXIS 175384, at *4 (W.D.N.Y. Oct. 9, 2019), and *Auto. Club of N.Y., Inc. v. Port Auth.*, 2011 U.S. Dist. LEXIS 135391, at *8 (S.D.N.Y. Nov. 22, 2011).

4.  There is no strict timetable for filing an amicus brief in the district courts. Indeed, in *Andersen v. Leavitt*, No. 03-cv-6115 (DRH) (ARL), 2007 U.S. Dist. LEXIS 59108, at *13 (E.D.N.Y. Aug. 13, 2007), the prospective amicus made its appearance three years after the action was initiated, one year after defendants served their initial motion for summary judgment, and five months after briefing of summary judgment motions was completed." The *Andersen* Court nevertheless surveyed cases and accepted the amicus brief because it would not delay the court's adjudication of the case. Here, EPA seeks leave to appear as an amicus at a very early juncture, while a Motion for Remand remains pending and while briefing on that motion remains open. EPA's brief will therefore cause no delay for this Court or the parties.

5.  As the U.S. District Court for the Western District of New York has noted "*Amicus curiae* is Latin for 'friend of the court'—not 'friend of a party.'" *Kearns v. Cuomo*, No. 1:19-CV-00902 EAW, 2019 U.S. Dist. LEXIS 175384, at *13 (W.D.N.Y. Oct. 9, 2019). This Court noted in *Auto. Club of N.Y., Inc. v. Port Auth.*, 2011 U.S. Dist. LEXIS 135391, at *8 (S.D.N.Y. Nov. 22, 2011) that there is cause for concern when an amicus expresses apparent bias. EPA therefore did not consult the parties in preparing the instant brief and only asked their consent to its filing on August 24, 2021. On that date, undersigned wrote to all counsel for the parties in a single email requesting their consent to file an amicus brief. Only one counsel responded: Justin

Anderson, on behalf of Exxon Mobil, consents to the filing of this brief. EPA cannot represent what position(s) the other parties might have.

6. EPA respectfully submits that amicus briefing (and specifically, its amicus brief) is important in this case because EPA "has unique information or perspective" that the parties to the case cannot present on their own. *Auto. Club of N.Y., Inc. v. Port Auth.*, 2011 U.S. Dist. LEXIS 135391, at *6 (S.D.N.Y. Nov. 22, 2011). Further, EPA is uniquely positioned, considering the information that it has obtained through its research mission, to address the impact of this Court's previous holding in *Exxon Mobil Corporation v. Schneiderman*, 316 F.Supp. 3d 679 (S.D.N.Y. 2018), including how subsequent revelations inform considerations set forth in this Court's holding in that case, which inform a resolution of the instant case.

7. EPA has been following the issues raised in this case for quite some time and in numerous venues, and has become intimately familiar with the wave of similar suits that have been filed nationwide. Three U.S. Circuit Courts of Appeal have accepted EPA's amicus briefs in similar cases based upon similar causes of action. See *State of Minnesota v. American Petroleum Institute, et al.*, Case No. 21-1752 (8th Cir.), *State of Rhode Island v. Shell Oil Products Co.*, LLC, *et al.*, Case No. 19-1818 (1st Cir.), and *Mayor and City Council of Baltimore v. B.P. P.L.C.*, Case No. 19-1644 (4th Cir.). EPA's amicus briefs in similar cases based upon similar legal theories have also been accepted by the Supreme Court of the United States in *Shell Oil Products Co., LLC et al. v. State of Rhode Island* (Case No. 20-900) and *BP, p.l.c. et al. v. Mayor and City Council of Baltimore* (Case No. 19-1189).

WHEREFORE, EPA moves that this Court grant leave to file the attached *amicus curiae*

brief.

Respectfully submitted this the 30th day of August, 2021,

/s/Matthew D. Hardin
Matthew D. Hardin
S.D.N.Y. Bar No. 5815 (VT)
Hardin Law Office
1725 I Street NW, Suite 300
Washington, DC 20006
Phone: 202-802-1948
Email: MatthewDHardin@protonmail.com

*Counsel for Amicus Curiae*

**Certificate of Service**

I hereby certify that I served a true and correct copy of the foregoing upon all counsel of

record by filing the same through the Court's CM/ECF system.

Application GRANTED. EPA, as *Amicus Curiae*, is hereby granted leave to file the brief attached to this Motion in the above-captioned case.

/s/Matthew D. Hardin
Matthew D. Hardin

SO ORDERED.

Valerie Caproni

9/7/2021

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

City of New York, *et al.*,           )
          Plaintiffs,           )
                        )
v.                                    )     Case No. 1:21-cv-4807-VEC
                        )
Exxon Mobil, *et al.*,                )
          Defendants.           )

## MOTION FOR LEAVE TO FILE
## PROPOSED *AMICUS CURIAE* BRIEF OF
## ENERGY POLICY ADVOCATES
## IN SUPPORT OF DEFENDANTS AND
## IN OPPOSITION TO REMAND

Matthew D. Hardin
S.D.N.Y. Bar No. 5815 (VT)
Hardin Law Office
1725 I Street NW, Suite 300
Washington, DC 20006
Phone: 202-802-1948
Email: HardinLawPLLC@icloud.com
*Counsel for Energy Policy Advocates*

i

# Table of Contents

Introduction..............................................................................1

Interest of Amicus Curiae.......................................................1

Summary of Argument............................................................1

Argument

I.    Public Records Affirm this Case Belongs in

Federal Court.........................................................7

a) Outside Groups Have Instigated and Funded

Purported State Law Tort Suits to Obtain

Policy Goals.......................................................8

b) This Suit and Others Like it Represent an

Attempt to Shakedown a Federally Regulated

Industry for Improper Purposes............................20

II.   This Court Must Consider this Suit in Light of its Own

Prior Holdings and Litigation in the New York

County Supreme Court............................................28

III.  Historic Concerns About State Court Bias are Amplified

in this Case...........................................................40

Conclusion..............................................................................44

**Table of Authorities**

*American Electric Power v. Connecticut*,
    564 U.S. 410 (2011) ................................................................................................. 19, 23, 30

*Chevron Corp. v. Donziger*,
    974 F. Supp. 2d 362 (S.D.N.Y. 2014) ....................................................................... 7, 20

*City of N.Y. v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021) ........................................................................... 26, 27, 29, 35

*Exxon Mobil Corporation v. Schneiderman*,
    316 F.Supp. 3d 679 (S.D.N.Y. 2018) ....................................................................... 1, 2

*Murray v. Murray*,
    621 F.2d 103 (5th Cir. 1980) ..................................................................................... 36

*Nemeroff v. Abelson*,
    704 F.2d 652 (2d Cir. 1983) ...................................................................................... 36

*Savoie v. Huntington Ingalls, Inc.*,
    817 F.3d 457 (5th Cir. 2016) ..................................................................................... 36

*Watson v. Philip Morris Cos.*,
    551 U.S. 142 (2007) .................................................................................................. 36

*Willingham v. Morgan*,
    395 U.S. 402 (1969) .................................................................................................. 36

## INTRODUCTION

NOW COMES Energy Policy Advocates, and submits this brief as an Amicus Curiae in support of defendants and in opposition to remand.

## INTEREST OF AMICUS CURIAE

Energy Policy Advocates ("EPA") is a nonprofit organization incorporated under the laws of Washington State, dedicated to bringing transparency to the actions of government. As part of that mission, EPA has obtained public records that illustrate the genesis of the wave of similar litigation of which this lawsuit is a part. EPA has obtained records demonstrating the improper use of public institutions toward these ends and the origins of the veritable tsunami of "climate nuisance" and now consumer fraud or consumer protection state-court lawsuits including the one now before this Court. Additionally, EPA is uniquely positioned in light of the information that it has obtained through its research mission to address the impact of this Court's previous holding in *Exxon Mobil Corporation v. Schneiderman*, 316 F.Supp. 3d 679 (S.D.N.Y. 2018),[1] on the instant case, including how subsequent revelations inform considerations set forth in this Court's holding in that case, which inform a resolution of the instant case.

## SUMMARY OF ARGUMENT

As important as climate policy is to both state and federal governments, equally and arguably more important is the principle that the courts' role is not to make policy judgments. And while federal courts are courts of limited jurisdiction, cases such as the instant one and the multi-front campaign of which it is a part are demonstrably based on the desire of certain activists and parties to obtain national policy which has eluded them through the proper means,

---

[1] On appeal before the Second Circuit as *Exxon Mobil Corp. v. Healey*, Case No. 18-1170.

among other improper uses of the judicial system (e.g., to coerce defendants "to the table" on policy issues or prospecting for "sustainable revenue streams" or "new streams of revenue," see, *infra*). Such cases, therefore, are classic candidates for a resolution in the nation's federal courts.

The past three years since this Court ruled in *Exxon Mobil Corporation v. Schneiderman*, 316 F.Supp. 3d 679 (S.D.N.Y. 2018),[2] have seen a series of remarkable revelations about this coordination, which have continued to emerge, often grudgingly, in public records released from various custodians as recently as last month. Not all custodians are forthcoming with public records (let alone in a timely fashion), a trait for which the Plaintiff City of New York also is notorious.[3] As such, this brief relies principally on records of New York's compatriot "climate" plaintiffs filing similar suits, making similar claims and often also using the same plaintiff's outside counsel in this matter. These public records from numerous institutions across the country demonstrate without ambiguity the definitive links and private coordination in underwriting and recruiting governments to file suit "nationwide." In this campaign, advocacy interests previously revealed to have directly lobbied for these suits and underwritten the media campaign in support of the suits now also enlist local activist groups as their intermediaries, and often law faculty and attorneys general, while nonetheless enjoying sign-off on materials and ensuring the filing of lawsuits in state courts against traditional "fossil fuel" energy companies (as well as others involved in energy production and transport). These parties have convinced

---

[2] See fn. 1.

[3] *See, e.g.,* Errol Louis, *On Foil, Don't Be Fooled Again: New York City Government is Failing in its Obligation to Provide Information to the Public*, New York Daily News (March 12, 2019), accessible at https://www.nydailynews.com/opinion/ny-oped-on-foil-dont-be-fooled-again-20190311-story.html ("In a letter to Council Speaker Corey Johnson, a cluster of news organizations has complained that "City agencies' extensive delays — sometimes of a year or more — in responding to FOIL often render the information useless, effectively shutting the door on accountability.").

2

governments to claim billions of dollars of losses at these parties' hands, in a multi-front campaign seeking to impact national policy.

UCLA School of Law Prof. Cara Horowitz, in an email to the principal private financial backer of her Emmett Institute on Climate Change and the Environment (for which she works) and the backer of a similar center at Harvard Law School, Dan Emmett, described this campaign as "going after climate denialism - along with a bunch of state and local prosecutors nationwide." (Emmett Institute faculty have been on the legal team of counsel to the State of Minnesota and Plaintiff in this matter, Sher Edling, LLP, apparently from around the moment of the firm's founding in 2016[4] (see, *infra*)).

It is possible that, somehow, Prof. Horowitz's characterization does not confess to seeking to silence protected speech. However, that prospect seems even more remote on scrutiny than it does on its face, given that records produced in litigation with a state attorney general reveal it was Prof. Horowitz who, at that very meeting from which she wrote her donor and describing the gathering to him, presented the case for "Consumer protection claims."[5] Those claims, of course, are at play in the instant matter.[6]

---

[4] https://climatelitigationwatch.org/wp-content/uploads/2021/03/Carlson-reporting-forms-Responsive-Documents-20-8525.pdf. See also fn. 43, *infra*. That firm, as Defendants note, "has reportedly received grants worth $1.75 million from Resources Legacy Fund, an organization that advocates curbing the production and sale of fossil fuels." Defendants' Opposition to Plaintiff's Motion to Remand, at 9 (citations omitted).

[5] "Confidential Review Draft—March 20, 2016, Potential State Causes of Action Against Major Carbon Producers: Scientific, Legal, and Historical Perspectives." Obtained in *Energy & Environment Legal Institute v. Attorney General*, Superior Court of the State of Vermont, 349-16-9 Wnc, December 6, 2017. https://climatelitigationwatch.org/wp-content/uploads/2018/08/FN-55-Harvard-AGs-briefing-UCS-fundraiser-agenda-copy.pdf. See also list of "Technical Advisors and Experts" produced by California's Office of Attorney General in response to a Public Records Act request by the Competitive Enterprise Institute.

[6] The Massachusetts OAG, which sent five attorneys to this briefing, subsequently filed a complaint against ExxonMobil for "potential violations of the Massachusetts consumer protection statute," now pending. *Commonwealth of Massachusetts v. Exxon Mobil Corporation*,

Recent revelations have provided the public with the roadmap, or documented *modus operandi* of outside private parties engineering a nationwide campaign of governmental suits against entities the private parties have long targeted. Emails show the Rockefeller Family Fund ("RFF") provided intermediary groups with sample pleadings to work from and to present to public institutions to facilitate filings in their jurisdictions.[7] We know this thanks to one particularly voluble "cutout" engaged by RFF in one of these matters having helpfully forwarded one of his early emails from RFF Director Lee Wasserman, to a public institution he was recruiting for RFF to assist. Wassermann suggested the activist review these sample pleadings to familiarize himself with RFF's desires — and his own newfound priority, for which his group "took only a modest amount of money" — prior to "making initial calls" to enlist University of Minnesota law faculty in "this project." In a subsequent email to Wasserman, the activist called it "our joint project," which was to enlist Minnesota Attorney General Keith Ellison to also enter the multi-front climate litigation campaign against certain Defendants in this matter and similarly positioned companies. Wasserman, whose involvement had emerged as an issue in such litigation and even before this Court, concluded his email, "PS using this email for a specific reason we can discuss when we next talk."

Describing "Judith [Enck] and Alyssa [Johl]" of a group called the Center for Climate Integrity ("CCI"), Noble referred to "the lawyers advising Rockefeller family fund" (see *infra*).

---

Suffolk County Superior Court, 19-3333. See, March 17, 2016, email from OAG's Melissa Hoffer to Harvard Law School's Shaun Goho, Subject: RE: SAVE THE DATE—HLS/UCS Meeting on April 25, 2016. https://climatelitigationwatch.org/wp-content/uploads/2019/10/MA-AAG-Hoffer-to-HLS-on-MA-OAG-attendees.pdf.

[7] This has been established in judicial proceedings in the states of Texas and New York and, ultimately, by the financier's own admission to having organized the media campaign to support the filing of such lawsuits. See *Exxon Mobil Corporation v. Schneiderman*, 17-cv-02301, and *Exxon Mobil Corp. v. City of San Francisco, et al.*, Tx. Sup. Ct. 20-0558.

CCI also appear in public records working through other local entities, such as the Chesapeake Climate Action Network in recruiting Annapolis and Anne Arundel County, Maryland to file similar lawsuits[8] — and have now been shown in Minnesota to have ghost-co-written a memorandum laying out the case they wanted Ellison to bring, and which he did bring, presented to the AG by Noble on University of Minnesota Law School letterhead, but deceptively bearing the appearance of University scholarship under the name of a professor and four students.

Responding to Noble's text message that "I want to assemble my documents as a package today to send to Lee and Rick at RFF," prior to signing off on its presentation to the state attorney general, the state-school professor confessed that she was running the purported University scholarship past these outside lawyers first: "Judith and Alyssa…seem to want to run it by their people first so check with them before going forward." Noble replied, "Yes I am running all the docs by the same people they are running them by."[9]

Further remarkable, a recently obtained email reveals Noble confirming to his benefactor, RFF's Wasserman, that their "joint project" -- the AG lawsuit against industry targets they requested be filed -- had been on hold until the AG managed to obtain two lawyers to file it from a group created for this purpose by climate activist and political donor Michael Bloomberg. These "environmental fellows" were formally hired and paid by Bloomberg's group, but appointed as "Special Assistant Attorneys General" (other AGs receiving these lawyers and the

---

[8] Records pertaining to CCI and the Annapolis and Anne Arundel suits obtained by Prospective Amicus under the Maryland Public Information Act are available at https://climatelitigationwatch.org/wp-content/uploads/2021/04/CCAN-CCI-Anne-Arundel-lobbying.pdf and https://climatelitigationwatch.org/wp-content/uploads/2021/04/Problematic-Annapolis-withholdings.pdf, and https://eidclimate.org/annapolis-leaders-admit-activist-group-convinced-city-file-climate-lawsuit/.

[9] Text messages released by University of Minnesota to Amicus are available, in full, at https://climatelitigationwatch.org/wp-content/uploads/2021/07/Klass-Noble-texts.pdf-redacted.pdf.

accompanying public relations support that the group also provides include climate plaintiffs Connecticut, Delaware, District of Columbia, New York, and Massachusetts). Vanity seems to have gotten the better of the players, as after those two privately-hired attorneys placed in the Minnesota AG's Office by the Bloomberg group did in fact file the suit, Noble excitedly boasted to other activists of his personal knowledge of these attorneys' work on the matter (*infra*).

There is no reason to believe this case-study of the principals' method of operation is illustrative of only this one among the many suits the same parties are documented as being behind. As detailed herein, more public records obtained from institutions "nationwide" show that those "lawyers advising RFF," the Center for Climate Integrity, now includes in their pitch to governments that the suits can be used to obtain "new streams of revenue." One such recruitment memo obtained by Amicus EPA was sent to at least one state attorney general by CCI via the AG's private Gmail account. See, *infra*. Similarly, not one but two independent sets of notes from a meeting at the Rockefeller mansion at Pocantico quote a cabinet-level official for one "climate" plaintiff describing its suit as pursuing a "sustainable funding stream," and specifically because the legislature would not enact desired policies. See, *infra*.

Documents revealing this and other records obtained under state open records law, detailed *infra*, reveal important details about the expanding, and arguably improper, deployment of municipalities, attorneys general, public law schools, and tax-exempt advocacy groups by or on behalf of private donors in the climate litigation industry, to target private parties whom the activists hope to coerce "to the table," ultimately enlisting these same targets as supporters in their policy campaign through the same coercive means of multi-front litigation, and tap to finance their desired "joint projects" of state and local prosecution of their ideological opponents.

6

The links among the various principals in this campaign are undeniable and material to jurisdictional and other aspects of the cases.

The instant lawsuit is the latest in this series of events. As described by the Plaintiffs' own lawyers and those lawyers' consultants and advisors, after negative outcomes under one theory in federal court, these repackaged suits have serially been brought quite deliberately in state court as they seek to bring their targets "to the table" to agree on public policy, and to find "new sources of revenue" for activists and state budgets. For these reasons and the attendant concerns that accompany such multi-front litigation campaigns (See *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 475 (S.D.N.Y. 2014)), these suits belong in federal court. Such coordinated campaigns cannot be rewarded once their reality is exposed as a coordinated attempt to impact national policy. Further, these records also provide strong impetus to acknowledge, as a formal matter, that the "climate nuisance" and "failure to warn" litigation campaign of various, largely copycat (and indeed coordinated) lawsuits is an impermissible use of the courts, seeking the most favorable forum to obtain political ends by judicial means. When removed, these suits must remain in federal court. These suits also should be dismissed for the same reasons that other suits in this campaign have been dismissed.

**ARGUMENT**

## I. PUBLIC RECORDS AFFIRM THIS CASE BELONGS IN FEDERAL COURT.

Thanks to Amicus EPA's tenacious use of public-records laws, it is clear that the litigation campaign of which the instant matter is the latest entry has a very troubling origin. This suit (like others of its ilk) cloaks what is, and indeed what previously was admitted to be, a federal claim in a manufactured state-law cause of action. Amicus EPA details herein much of the documentation that this campaign of remarkably similar lawsuits was funded and conceived

7

and is now being executed by the same organizers and financiers, which suits were quietly midwifed by outside attorneys working with and funded by the same sources. Equally troubling, this litigation appears to have had its genesis not in well-founded investigation of cognizable legal claims, but in lobbying from ideological activists seeking an outcome that could not be obtained through the political process. Only after being so lobbied, these "climate" plaintiffs have claimed to courts across the country that they suffered billions of dollars in damages at the hands of scheming producers and transporters of energy products who, the plaintiffs understand, might provide them with "new sources of revenue," which are "sustainable" (a term apparently used in the sense that they expect the money will keep flowing).

At least one state court judge has issued a finding of fact that municipal litigation targeting energy companies for ostensible violations of state law in this manner springs from the states' desire "to obtain leverage over these companies… that could eventually lead to… support for legislative and regulatory responses to global warming…," having seen admissions that, e.g.. "Even if your ultimate goal might be to shut down a company, you still might be wise to start out by asking for compensation for injured parties." As discussed below, numerous public records and public statements also reveal the motivation of lawsuit-as-negotiating-leverage for clearing out opposition to the plaintiffs' desired national policies, along the lines of a remark by an official with climate-plaintiff the City of Boulder, Colorado who wrote, in correspondence recently obtained by Amicus EPA, "the pressure of litigation could also lead companies…to work with lawmakers on a deal" about climate policies. (See *infra*).

**a) "Our Joint Project": Outside Groups Have Instigated and Funded a Multi-Front Campaign of State Law Tort and "Consumer" Suits to Obtain Policy Goals.**

These revelations have moved well beyond being revealing links between the activists and the attorneys general and municipal plaintiffs who have brought suit as part of this "nationwide" litigation campaign. Indeed, these records document extraordinary levels of coordination in drafting and bringing these suits as well as laboring to manufacture state jurisdiction. They also raise substantial questions about the sincerity of the claims made.

As demonstrated in this Court in the *Exxon v. Schneiderman* case and as also demonstrated in the Texas state courts (see, e.g., fn. 7, *supra*), the Rockefeller Family Fund ("RFF") instigated the first climate suits against oil companies, and orchestrated the media campaign supporting the initial pre-suit preparations therefor. These were eventually launched by attorneys general. Public records indicate that, after much scrutiny in the tug-of-war that climate litigation has become, the job of recruiting plaintiffs (and even prosecutorial assistance) has been outsourced to local intermediaries, or cutouts, working with "lawyers advising Rockefeller family fund" [*sic*]. That organization is a group called the "Center for Climate Integrity" ("CCI"). A consistent partner in this campaign has been the Union of Concerned Scientists ("UCS")[11] — which, thanks to open records litigation, we know hosted a March 2016 "secret meeting at Harvard,"[12] per one

---

[11] The Union of Concerned Scientists' role in attempting to influence government actors to pursue a certain agenda is illuminated at, e.g., Findings of Fact and Conclusions of Law, Exxon Mobil Corporation, Petitioner, Case No. 096-297222-18 (District Court of Tarrant County, TX), Opinion dated April 25, 2018, which is available at https://climatelitigationwatch.org/wp-content/uploads/2019/10/Tarrant-County-Facts-and-Conclusions.pdf ¶¶ 11,12, 16. See also, e.g., https://climatelitigationwatch.org/emails-suggest-ucusa-union-of-concerned-scientists-is-at-the-center-of-the-climate-litigation-industry/, https://climatelitigationwatch.org/wp-content/uploads/2018/08/FN-42-UCS-says-working-the-state-AGs-copy.pdf, https://climatelitigationwatch.org/fn-51-frumhoff-coordinated-with-ags-in-prior-briefings/, https://climatelitigationwatch.org/fn-71-frumhoff-to-mote-for-ags-briefing-ucs-fundraiser/, https://climatelitigationwatch.org/fn-frumhoff-has-made-this-argument-to-ags-in-prior-briefings/.
[12] "I will be showing this Monday at a secret meeting at Harvard that I'll tell you about next time we chat. very [sic] exciting!" April 22, 2016, email from Oregon State University Professor Philip Mote to unknown party, Subject: [REDACTED], and "I'm actually also planning to show this in a secret meeting next Monday—will tell you sometime." April 20, 2016, Philip Mote

9

presenter there, for staff of state attorneys general, local prosecutors, activists, and "prospective

funders"[13] of "potential state causes of action against major carbon [sic] producers."[14]

This wave of litigation began as public nuisance-focused and later shifted, after experiences

in other federal courts, to consumer protection or consumer fraud causes of action and theories of

recovery, in an effort to gain more favorable reception in state courts. As Defendants note,

Plaintiffs' complaint is a repackaged version of its earlier failed federal claims. Defendants'

Opposition to Plaintiff's Motion to Remand, at 12 - 14.

This campaign and particularly the jurisdictional question of removal made its way to the

United States Supreme Court in *BP, P.L.C v. Mayor and City Council of Baltimore*, 141 S. Ct.

1532, heard in January and decided in May of this year. Public records litigation brought by

---

email to unknown party. Subject: [REDACTED]. Both obtained from Oregon State University on March 29, 2018, in response to a January 9, 2018, Public Records Act (PRA) request by the Competitive Enterprise Institute. https://climatelitigationwatch.org/wp-content/uploads/2019/09/Mote-emails-re-_secret-meeting_-at-Harvard.pdf.

[13] "We will have as small number of climate science colleagues, as well as prospective funders, at the meeting." March 14, 2016, email from Frumhoff to Mote; Subject: invitation to Harvard University—UCS convening. Obtained under same PRA request cited in note 5, *supra*. https://climatelitigationwatch.org/wp-content/uploads/2018/08/FN-71-Frumhoff-to-Mote-for-AGs-briefing-UCS-fundraiser-copy.pdf

[14] "Confidential Review Draft—March 20, 2016, Potential State Causes of Action Against Major Carbon Producers: Scientific, Legal, and Historical Perspectives."

Also presenting at that meeting were UCS's policy director Peter Frumhoff, the professor who boasted of the "secret meeting," as well as at least one academic who testified that she had been retained by counsel to Plaintiff in this matter, Naomi Oreskes who, "[t]he New York Times previously reported ..."conceived" the infamous 2012 La Jolla conference where the playbook for the entire campaign was developed in her role as co-founder of the Rockefeller-funded Climate Accountability Institute." William Allison, "Bombshell: Naomi Oreskes on Retainer with Plaintiffs' Law Firm," Energy in Depth, May 13, 2021, https://eidclimate.org/bombshell-naomi-oreskes-on-retainer-with-plaintiffs-law-firm/; see also, Matt Egan, "Exxon uses Big Tobacco's playbook to downplay the climate crisis, Harvard study finds," CNN, May 25, 2021, https://www.cnn.com/2021/05/13/business/exxon-climate-change-harvard/index.html. A May 25, 2021, update appended to the story reads: "A previous version of this story misstated the nature of Oreskes' legal work for a complaint. She commented on briefs and complaints on climate cases for a law firm that is leading lawsuits against Exxon and others in the industry."

Amicus EPA inquiring into the origins of that action elicited a claim by the City of Baltimore that CCI and UCS are "outside energy firms" whose correspondence with the City should be shielded from the public as the work product of consulting experts.[15] The public record makes clear that this in no way accurately characterizes these groups — which have filed amicus briefs in this series of litigation that they in fact helped arrange, including in the very same *City of Baltimore* case and, most recently, in the 8th Circuit, together with their partner in engineering the Minnesota lawsuit, Fresh Energy.[16] The City of Baltimore later changed tack to characterize them instead as "outside, for lack of a better way to describe them, environmental groups who are, you know, climate change environmental groups,"[17] and "groups that we were working with and talking to" prior to filing a climate nuisance and product liability lawsuit against nearly two dozen entities.[18]

Whether Baltimore in the end must release the relevant correspondence, as did its fellow Maryland localities Anne Arundel County and Annapolis, is the subject of ongoing litigation. Nonetheless, other public records have now also revealed that such groups did more than successfully help engineer such suits — in addition to Baltimore, CCI prevailed upon at least Annapolis, Anne Arundel County, Hoboken, New Jersey, and the State of Minnesota, while

---

[15] See, e.g., Mayor and City Council of Baltimore's Motion To Dismiss, Or In The Alternative, Motion For Summary Judgment and Request For Hearing, *Energy Policy Advocates v. Mayor and City Council of Baltimore*, Circuit Court of Baltimore City, Case No. 24-C-20-001784.
[16] In addition to CCI's amicus brief in *Mayor & City of Baltimore v. BP P.L.C.., et al.*, 4th Cir. 19-1644, other cases include *State of Rhode Island v. Shell Oil Prods. Co.. et al.*, 1st Cir. 20-900)(CCI and UCS), *City of Oakland v. BP P.L.C.. et al*, 9th Cir., 18-16663 (CCI and UCS), *County of San Mateo v. Chevron Corp., County of Imperial Beach v. Chevron Corp.. County of Marin v. Chevron Corp.., County of Santa Cruz v. Chevron Corp..* 9th Cir., 18-15499, 18-15502, 18-15503, 18-16376, *State of Minnesota v. American Petroleum Institute*, United States Court of Appeals for the Eighth Circuit, 21-1752 (CCI).
[17] *Energy Policy Advocates v. Mayor and City Council of Baltimore*, Circuit Court of Baltimore City, Case No. 24-C-20-001784, Transcript of October 23, 2020, hearing at 4:13 *et seq.*
[18] *Id.*, at 6:21-7:1.

other helpful records have emerged from failed lobbying campaigns of municipalities in Florida (see *infra*). In Hoboken, CCI went so far as to pay for private attorneys to bring the municipality's suit.[19] in addition to serving as legal advisors for RFF, which has bankrolled this litigation campaign.

Public records and, more specifically, "no records" responses affirm that CCI is raising funds for this venture and lobbying officials alongside the Rockefeller Family Fund. Contrary to Baltimore's initial stance in seeking to withhold its correspondence with CCI, CCI does not enter consulting arrangements with its recruiting targets. Instead, it lobbies them.

Although the City of Baltimore has refused to produce its correspondence with CCI and UCS, newly released emails from Minnesota illustrate the anatomy of these suits, in the context of a similar lawsuit whose removal is now pending before the 8th Circuit (and in which CCI also filed an amicus brief).[20] As noted *supra*, there RFF Director Lee Wasserman provided a Minnesota advocacy group's director, a man named Michael Noble, with pleadings to help prepare him prior to "making initial calls" to enlist University law faculty in "this project,"[21] what Noble called, in another email to Wasserman, CCI, a law professor and environmental activst, "our joint project."[22] Wasserman concluded that email to Noble with, "PS using this

---

[19] See, William Allison, "Key Documents Raise Troubling Questions About Money Behind Hoboken Climate Lawsuit," Energy In Depth, September 3, 2020, https://eidclimate.org/key-documents-raise-troubling-questions-about-money-behind-hoboken-climate-lawsuit/.
[20] *See generally* Government Accountability & Oversight, P.C., "Private Funders, Public Institutions: 'Climate' Litigation and a Crisis of Integrity" (May 18, 2021), available at: https://climatelitigationwatch.org/wp-content/uploads/2021/05/GAO-EPA-CCI-RFF-Climate-Paper.pdf.
[21] *Id.* at pp. 5-6, and see November 19, 2018, email from Lee Wasserman to Michael Noble, Subject: materials, at https://climatelitigationwatch.org/wp-content/uploads/2021/05/aklass_4366_20200325_export0001-SD-red_Redacted.pdf.
[22] June 19, 2019, email from Michael Noble to Alexandra Klass, Lee Wasserman, Jeff Blodgett, Judith Enck, Subject, Project Update Call. Available at https://climatelitigationwatch.org/wp-content/uploads/2021/08/aklass_21-319_20210730_LBK_Redacted.pdf.

email for a specific reason we can discuss when we next talk."[23] That Noble did helpfully

forward Wasserman's private-account email to a public institution, saying "I think the politics of

the day will give [Ellison] cover... I'll call the folks in NY and we'll get the whole team on a

call,"[24] does not distract from the efforts Wasserman has undertaken to mask his and RFF's role

in this campaign. Given the history and context, the reasonable conclusion is that Wasserman's

rationale for reserving his explanation for a phone call or in-person discussion involves litigation

discovery and public records requests: at that time, RFF had already become a focus of

discussion in two trials then underway in state courtrooms in New York and Texas.

These records which Amicus EPA has obtained under the Minnesota Government Data

Practices Act ("MGDPA") document that Minnesota's OAG was presented with and was asked

to file its lawsuit very similar to the suit at issue here in a memorandum on University of

Minnesota stationery,[25] nominally prepared by University of Minnesota Law Professor

Alexandra Klass and four students, but which was ghost-co-authored by attorneys in New York

working for the CCI. Emails show RFF's Wasserman recruited Noble almost immediately after

Ellison was elected in November 2018.[26] Noble excluded this from his logorrheic acclamation of

---

[23] November 19, 2018, email from Lee Wasserman to Michael Noble, Subject: materials.
[24] December 30, 2018, email from Michael Noble to Alexandra Klass, Subject: materials, https://climatelitigationwatch.org/wp-
content/uploads/2021/05/aklass_4366_20200325_export0001-SD-red_Redacted.pdf.
[25] The University's Board of Regents Policy: *Individual Business or Financial Conflict of Interest* and Board of Regents Policy: *Institutional Conflict of Interest suggest it was improper to* place an advocacy document prepared for a private interest on University of Minnesota stationery, which bore no disclosure either of Fresh Energy's role or the co- authorship of the memo by those outside "lawyers advising the Rockefeller family fund," who Prof. Klass understood would advise her "what is needed" in the memo. According to this policy, University faculty may not represent their participation in service of Outside Commitments as being performed in their capacity as faculty, and shall not use University stationery in these pursuits. Outside Commitments also must be approved through a formal process involving University administration.
[26] November 19, 2018, email from Lee Wasserman to Michael Noble, Subject: materials.

13

Fresh Energy's organic role in enlisting the AG to pursue RFF's opponents with climate litigation, which soon made its way to YouTube, stating instead that his group had been approached by CCI.[27] That detail aside, public record productions from both the University of Minnesota Law School and AG Ellison's Office otherwise affirm the troubling chain of events.

Other public records obtained by Amicus under MGDPA show that, almost immediately after Ellison was elected in November 2018, Lee Wasserman, Director of RFF, had provided Noble with sample pleadings to assist in preparation before "making initial calls" to enlist University law faculty in "this project," what Noble called, in another email to RFF's Wasserman, "our joint project."[28]

Emails and text messages obtained by Amicus EPA under the MGDPA show that the project was to use University stationery to present an argument for the attorney general to sue identified private parties. This argument was presented as University scholarship, but was produced on behalf of paying private entities, and was produced with the assistance of attorneys provided by RFF.

Further such emails show that after Wasserman engaged him, Noble then contacted University of Minnesota Law Professor, Alexandra Klass, stating: "Big idea! Need your reaction (and hopefully enthusiasm),"[29] then arranged for her to to work with "lawyers advising

---

[27] https://www.youtube.com/watch?v=jbK9XjjkJrs, last viewed August 23, 2021, full video available at https://www.youtube.com/watch?v=2MqX14GTm-o, see 1:45 - 2:26.
[28] June 19, 2019, email from Michael Noble to Lee Wasserman, Subject, "Project Update Call".
[29] November 30, 2018, email from Michael Noble to Alexandra Klass, Subject: Big idea! Need your reaction (and hopefully enthusiasm), at https://climatelitigationwatch.org/wp-content/uploads/2021/05/aklass_4366_20200325_export0001-SD-red_Redacted.pdf.

14

Rockefeller family fund [*sic*]," and learn, from "the folks at Rockefeller," [30] "what is needed" [31] in a memo to Minnesota's AG urging him to file his lawsuit very similar to the instant matter. The professor then produced a memo with these outside lawyers Center for Climate Integrity but placed the memo on Minnesota letterhead as the scholarship of the professor and four research-assistant students. [32]

Other public records obtained by Amicus EPA under MGDPA, specifically text messages between Noble and Klass, state that Noble and CCI both ran the draft "University of Minnesota" memo by RFF's Director Wasserman, and Rick Reed, a consultant for RFF, prior to sending it to AG Ellison.

Other such Emails obtained show the local activist engaged to orchestrate this AG litigation, Noble (and his organization, called "Fresh Energy") "only accepted a modest amount of money" at the outset, because he did not "want to launch any big effort unless" the AG was receptive. [33]

Yet more such emails show that the four law students listed as co-authors on the memo to Ellison were paid by Fresh Energy, with the payment very intentionally run through the University, on the grounds that Prof. Klass also "strongly agrees that there shouldn't be Fresh

---

[30] "Should the three of us speak with the folks at Rockefeller?", December 29, 2018 email from Alexandra Klass to Michael Noble, Subject: materials, at https://climatelitigationwatch.org/wp-content/uploads/2021/05/aklass_4366_20200325_export0001-SD-red_Redacted.pdf.

[31] "Then, yes, I (or both of us) should do a phone call to see what is needed. I don't have a good sense of that right now." December 29, 2018 email from Alexandra Klass to Michael Noble, Subject: materials, at https://climatelitigationwatch.org/wp-content/uploads/2021/05/aklass_4366_20200325_export0001-SD-red_Redacted.pdf.

[32] Memorandum, March 11, 2019 at, e.g., https://climatelitigationwatch.org/wp-content/uploads/2021/05/aklass_4366__export0003-SD-LBK_Redacted.pdf.

[33] December 30, 2018, email from Michael Noble to Alexandra Klass, Subject: materials.

15

Energy funding law students direct."[34] [*sic*] Whether that funding came from Rockefeller Family Fund or was routed through another entity is still unclear.

These records also show that the local activist Noble in turn engaged Ellison transition team members, including another Minnesota Law faculty member named Prentiss Cox who, public records show, then began using an Office of the Attorney General email account which he provided to Noble to correspond about this matter despite having no publicly acknowledged position with the AG's Office.[35]

After the Wasserman private-account email giving sample pleadings to Noble, Noble describing this enlistment of law enforcement to Wasserman as "our joint project," Noble and Klass admitting that RFF got sign-off on the purported University scholarship providing AG Ellison with his case all described, *supra*, the final detail of how these suits are in fact mere extensions of private activists' requests emerged. Another email obtained by Amicus EPA, from Noble to RFF's Wasserman, copying Prof. Klass, an outside activist named Jeff Blodgett, and one of "the lawyers advising Rockefeller family fund", states, *inter alia*:

> "As you recall, we are waiting for the hire of the "environmental fellows". They have been chosen… One is longtime MCEA Energy and Climate Program Director Leigh Currie who Fresh Energy has worked with extremely closely her entire public interest career (woo hoo, yay!!). She starts after Labor Day, and the other has just started, Pete Burda [sic] of the Robins firm, who is an experienced class action litigator. I will reach out to him next week

---

[34] January 8, 2019 email from Michael Noble to Ellen Palmer, copy Alexandra Klass, Subject: $3k contract, https://climatelitigationwatch.org/wp-content/uploads/2021/05/aklass_4366_20200325_export0001-SD-red_Redacted.pdf.

[35] April 19, 2019 email from Prentiss Cox to Michael Noble, Subject untitled, https://climatelitigationwatch.org/wp-content/uploads/2021/07/coxxx-211_21-102.pdf See also other Noble correspondence about conversations with Cox at https://climatelitigationwatch.org/wp-content/uploads/2021/05/aklass_4366_20200325_export0001-SD-red_Redacted.pdf.

and send Leigh our doc tomorrow. I already spoke to her today to congratulate her and she was super excited to hear about our request to AG".[38]

The "environmental fellows" refers to two lawyers hired, paid for and provided to OAG by the private foundation of climate activist, major political donor, and former Mayor of New York, Michael Bloomberg, through a group he established to advance the "climate" agenda.[39] These "Special Assistant Attorney Generals" or SAAGs are provided to "advanc[e] progressive clean energy, climate change, and environmental legal positions." In his application seeking these private lawyers, Ellison specifically cited his past efforts in pursuing Exxon Mobil, claiming that activities such as "supporting state- led efforts to investigate Exxon Mobil" were and would remain curtailed, barring provision of additional resources to his Office such as those on offer from the Bloomberg group.[40]

Those two "fellows" or SAAGs placed in the Minnesota Office of the Attorney General in fact filed AG Ellison's lawsuit. Shortly thereafter, on a July 6, 2020, Zoom call posted on YouTube soon after these SAAGs filed this suit, Noble boasted of personal knowledge that these two attorneys, by name, had "basically been working on this full time over the last few months." [41]

Another email and a text message obtained by Amicus under MGDPA, both from Noble to Klass, both state, *inter alia*, "When we get a meeting, our delegation will be me, you, CEO of

---

[38] July 11, 2019 email from Michael Noble to Lee Wasserman, Jeff Blodgett, Alexandra Klass, Judith Enck, Subject: Ellison Update. Available at https://climatelitigationwatch.org/wp-content/uploads/2021/08/Screen-Shot-2021-08-03-at-8.04.54-PM.jpg.

[39] See, e.g., Editorial, "State AGs' Climate Cover-up", Wall Street Journal, June 7, 2019, https://www.wsj.com/articles/state-ags-climate-cover- up-11559945410; Editorial, "State AGs for Rent", Wall Street Journal, Nov 6, 2018, https://www.wsj.com/articles/state-ags-for-rent-1541549567.

[40] The Application released under Minnesota's Government Data Practices Act is available at https://climatelitigationwatch.org/wp-content/uploads/2019/09/MN-OAG-NYU-Application.pdf.

[41] See, e.g, https://www.youtube.com/watch?v=jbK9XjjkJrs, last viewed August 23, 2021; full video available at https://www.youtube.com/watch?v=2MqX14GTm-o, (1:45 - 2:26).

Climate Integrity, CEO Rockefeller Family Fund and Jeff Blodgett." ("Jeff Blodgett is a political consultant" in Minnesota. https://ballotpedia.org/Jeff_Blodgett (viewed August 27, 2021). Other public records obtained by Amicus under MGDPA show a meeting on this memorandum between Fresh Energy and OAG occurred on September 30, 2019, with Noble, Ellison, his Chief of Staff Donna Cassutt and 3 OAG attorneys including the two Bloomberg-provided SAAGs, described in the scheduling email as "AG Meet w/ Michael Noble RE Climate Change/Fossil/Fuels [sic] (Donna)".[42]

These records strongly suggest coordination by OAG and other public and private institutions on the filing of the above-described lawsuit against private parties, using the Office of Attorney General, on behalf of private parties. These outside parties, e.g., Rockefeller Family Fund and Michael Bloomberg, are investing in the same agenda, with compliant elected attorneys general often providing the organization to formally execute the job.

The climate plaintiffs' importation and arrangement for 'local color'/cutouts affirms, for jurisdictional purposes (the subject of the federal litigation including the recent *BP plc v. Mayor & City of Baltimore*, 141 S. Ct. 1532), that these cookie-cutter suits are part of a "nationwide" campaign, retooling failed federal claims in state courts which are properly heard by the federal judiciary. This is readily boasted of by UCLA Emmett Institute's Prof. Cara Horowitz in her email describing this litigation campaign to the principal private financial backer of her Institute — a partner for years with Plaintiff's legal counsel in this matter, Sher Edling, LLP[43] — as

---

[42] Text and email both released by University of Minnesota under MGDPA are available, respectively, at https://climatelitigationwatch.org/wp-content/uploads/2021/07/Klass-Noble-texts.pdf-redacted.pdf and https://climatelitigationwatch.org/wp-content/uploads/2021/08/aklass_SchillingEPA_21-258_20210617-SD-SMCK-LBK_Redacted.pdf.

[43] See, e.g., "'There is a lot at stake in this appeal,' said Sean Hecht, co-executive director of the Emmett Institute on Climate Change and the Environment at UCLA School of Law. 'If the cases

18

"going after climate denialism - along with a bunch of state and local prosecutors nationwide." [44] The instant litigation is a part of this.

All of this raises numerous legal and ethical questions for taxpayers and local courts, but it also makes plain for this Court that this case, like other suits instigated by the private donor/coordinators, is a national affair instigated by private donors, in great part to impact national policy through government litigation against private parties, and is best heard in federal court.

Records placed before this Court in the aforementioned *Exxon Mobil v. Schneiderman* matter support these claims. However, when a party comes into court seeking billions of dollars in damages, a reasonable fact finder might also inquire as to when that party became aware of

_____

can move forward in state court, the courts are likely to take the plaintiffs 'claims seriously, and this may affect prospects for cases in other states as well.' Hecht's environmental law clinic provided legal analysis for the plaintiffs in some of the cases." Susanne Rust, "California communities suing Big Oil over climate change face a key hearing Wednesday," *Los Angeles Times*, February 5, 2020, https://www.latimes.com/california/story/2020-02-05/california-counties-suing-oil-companies-over-climate-change-face-key-hearing-wednesday. "UCLA's Emmett Institute has previously consulted for Sher Edling LLP, the California-based law firm representing many of the challengers in the climate liability litigation, including New York City." Maxine Joselow, "Lawsuits target Exxon's social media 'green washing'," E&E News, July 22, 2021, https://subscriber.politicopro.com/article/eenews/2021/07/22/lawsuits-target-exxons-social-mediagreen-washing-275451. See also https://www.ioes.ucla.edu/news/sean-hecht-in-the-new-york-times-supreme-courtcase-could-limit-future-lawsuits-against-fossil-fuel-industry/. See, e.g., June 24, 2018, email from UCLA's Ann Carlson to Dan Emmett, "And as you may remember the clinic has been working on the nuisance cases." https://climatelitigationwatch.org/wp-content/uploads/2021/03/Carlson-Discretionary-Fund-Requested-Records-20-8371.pdf, https://govoversight.org/wp-content/uploads/2021/08/Carlson-reporting-forms-Responsive-Documents-20-8525.pdf.

[44] "Hi Dan, Thought you would like to hear that Harvard's enviro clinic, UCLA Emmett Institute, and the Union of Concerned Scientists are talking together today about going after climate denialism [sic]—along with a bunch of state and local prosecutors nationwide. Good discussion." April 25, 2016, email from UCLA Law School's Cara Horowitz to Dan Emmett, namesake and funder of the Harvard and UCLA centers, Subject: UCLA and Harvard Emmetts come together today. Available at https://climatelitigationwatch.org/on-the-subject-of-recruiting-law-enforcement-email-affirms-origin-of-prosecutorial-abuses/.

19

their claimed loss in the tens of billions and its magnitude. In this series of cases, the plaintiffs have generally been made aware of their spectacular claimed losses by outside activists who whisper, via AG Gmail accounts and in meetings at the Rockefeller family mansion at Pocantico, that such suits are the key to obtaining "new streams of revenue" and a "sustainable funding stream."

This suit and the entire campaign of sister suits belong in federal court.

**b) This Suit and Others Like it Represent an Attempt to Shakedown a Federally Regulated Industry for Improper Purposes.**

As Judge R.H. Wallace, Jr. of the District Court of Tarrant County, Texas wrote in Findings of Fact issued April 24, 2018, the wave of state court claims brought against the energy industry even as of that time appeared to have as its goal "to obtain leverage over these companies… that could eventually lead to… support for legislative and regulatory responses to global warming." Judge Wallace also found that, *e.g.*, "Even if your ultimate goal might be to shut down a company, you still might be wise to start out by asking for compensation for injured parties."[45] Citing to documents written by the parties' and their advisors' own hands, Judge Wallace noted that the plaintiffs in this new breed of state court action appear to target out-of-state companies and appear driven by a desire to punish pro-energy speech.

Using public records laws, Amicus EPA has documented that the objectives are in fact several fold, but that there can be no denying the suits are instigated by a private party orchestrating a media and lobbying as well as legal campaign to convince allies to make these

---

[45] *In re Exxon Mobil Corporation*, Cause No. 096-297222-B (Tarrant Co., Tex. Dist. Ct.), Findings of Fact and Conclusions of Law (April 24, 2018), ¶¶ 6-10. Available at https://eidelimate.org/wp-content/uploads/2018/07/Findings-Fact-Climate-Lawsuit-Conspiracy.pdf.

claims, instigating the use of police powers and other governmental litigation to advance its cause.

For example, further affirming the use of these suits as leverage in coercing private parties to support the national policy agenda, Amicus EPA obtained an email from municipal climate plaintiff Boulder, Colorado, in which a City official admits the City's position in filing its suit, that "the pressure of litigation could also lead companies...to work with lawmakers on a deal" about climate policies.[46] Former Connecticut Attorney General Richard Blumenthal is quoted describing *American Electric Power v. Connecticut*, 564 U.S. 410, 426 (2011), which suit he brought before he was elected to the United States Senate. "My hope is that the court case will provide a powerful incentive for polluters to be reasonable and come to the table...We're trying to compel measures that will stem global warming regardless of what happens in the legislature."[47]

This Court cannot sanction the use of the courts to force legislative change, and it should be especially zealous in protecting federal policies and legislation from being forced by actions taken in various state court systems. This Court has previously recognized the dangers of coordinated, multi-front litigation, such as the case that New York City has filed here and more than a dozen other municipalities have filed using the same counsel nationwide. In *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 475 (S.D.N.Y. 2014), this Court held that the defendant attorney's "multi-front strategy thus [had as its object] to leverage the expense, risks, and

---

[46] January 5, 2018 email from Boulder Chief Sustainability & Resilience officer Jonathan Koehn to Alex Burness of the Boulder Daily Camera, Subject: RE: Follow-up to council discussion. Available at https://climatelitigationwatch.org/boulder-official-climate-litigation-is-tool-to-make-industry-bend-a-knee/.
[47] Editorial, "The New Climate Litigation," Wall Street Journal, December 28, 2009, https://www.wsj.com/articles/SB10001424052748703478704574612150621257422.

burden to Chevron of defending itself in multiple jurisdictions to achieve a swift recovery, most likely by precipitating a settlement." Justice is not served by turning a blind eye as history repeats itself with another wave of coordinated multi-front litigation, by aligned interests again targeting some of the same defendants who were targeted in *Donzinger*.

In an email to Oregon Attorney General Ellen Rosenblum's Gmail account and obtained by Amicus EPA, CCI itself pitches these suits as a possible way to obtain "new streams of revenue."[48] That is to say, the private activists behind this governmental litigation wave have a new pitch, through the agents discussed herein, that governments can obtain revenues they are otherwise unable to obtain through the typical means of raising taxes.

Perhaps because their citizens have been targeted by this new breed of litigation, states have begun to also enter the fray to seek the protection of the federal courts, with Indiana and 14 other states recently filing a brief in the First[49] and Fourth[50] Circuits arguing that each of those court's previous holdings that these suits could proceed in state court (which have now been vacated and remanded by the U.S. Supreme Court) should be reconsidered and reversed on remand. In the First Circuit matter, the Plaintiff's own Executive Branch is on record confessing that the ostensibly injured State's true goal in litigation was to obtain "a sustainable funding stream" by "suing big oil in state court" because the state's own legislature "do[es]n't care on env/climate."[51]

---

[48] Email available as released by the Oregon Department of Justice via https://climatelitigationwatch.org/wp-content/uploads/2021/04/Lewis-Clark-Event-Proposal-rev-14-Jan-2021.docx.

[49] See *Rhode Island v. Shell et al.*, First Circuit Case No. 19-1818, Brief of Amicus States Filed August 6, 2021.

[50] See BP plc et al. v. Mayor and City Counil of Baltimore, Case No. 19-1644, Brief of Amicus States Filed August 13, 2021.

[51] See petition-stage Amicus Brief of Energy Policy Advocates in *BP P.L.C. v. Mayor and City Council of Baltimore*, available at https://www.supremecourt.gov/DocketPDF/19/19-

Amicus EPA has obtained public records from Colorado State University's Center for a New Energy Economy ("CNEE") under the Colorado Open Records Act (CORA). Those records have been brought to the attention of the First Circuit in related litigation, *State of Rhode Island v. Shell Oil Prods. Co., et al.*, 1st Cir. Case No. 19-1818, Amicus Brief Filed April 3, 2020, and are proper subject for judicial notice by this Court. See Fed. Rule Evid. 201 (b)(2). The records pertain to a two-day meeting in July 2019 hosted by the Rockefeller Brothers Fund (RBF) at the Rockefeller family mansion at Pocantico, NY. They include numerous emails, agendas and other materials. Most pertinent, they also include a set of handwritten notes and a second, corroborating set of typewritten notes. According to the public records themselves, the former was prepared by attendee Carla Frisch of the Rocky Mountain Institute (RMI), and the latter by attendee Katie McCormack of the Energy Foundation.

This was a private event, styled "Accelerating State Action on Climate Change," if hosted as a forum for policy activists and a major funder to coordinate with senior public employees, e.g., a governor's chief of staff and department secretaries and their cabinet equivalents from fifteen states. These states included First Circuit Plaintiff the State of Rhode Island, represented by its Director of the Department of Environmental Management, Janet Coit.

These notes purport to contemporaneously record the comments of Director Coit discussing Rhode Island's entry in this litigation campaign, among peers. One passage in each set of notes, attributed to Director Coit and replicated almost verbatim in both, is particularly striking and relevant, affirming two points that have become obvious and which should inform key decisions confronting the judiciary in this "climate nuisance" litigation campaign.

---

1189/142726/20200430150640415_39742%20pdf%20Hardin.pdf, and citations contained therein.

The records show RMI's Frisch recorded Director Coit speaking to this litigation.[52] Ms.
Frisch recorded Director Coit as saying, about this suit:

> RI - Gen Assembly D but doesn't care on env/climate
> looking for sustainable funding stream
> suing big oil for RI damages in state court

The first line-item attributes to Director Coit the position that the Rhode Island legislature
is not persuaded of the claims set forth by that State in its litigation. This reluctance to politically
impose the revenue-raising measures (taxes) necessary for such funding streams is inherently
shared among all "climate nuisance" plaintiffs. The entry appears to also reflect Director Coit's
view of why the Rhode Island legislature has thereby declined to obtain from the taxpayer, and
then appropriate to the State, the revenue streams that Plaintiff desires.

These notes reflect a senior official confessing that Rhode Island's climate litigation,
substantially similar to that filed by New York City in this case, is in fact a product of Rhode
Island's elected representatives lacking enthusiasm for politically enacting certain policies,
including revenue measures, thus leaving the State "looking for [a] sustainable funding stream",
and so "suing big oil." This characterizes all such extant plaintiffs and suits, including the instant
matter.

Fortunately, we can be confident that Ms. Frisch did not mishear Director Coit. The
Energy Foundation's Katie McCormack provided RBF with a typewritten set of her own notes
transcribing the proceedings. To this Court's further benefit, Ms. McCormack's typewritten
transcription of Director Coit's commentary reads almost verbatim as Ms. Frisch's.

---

[52] (Ms. Frisch's notes are available in full at https://climatelitigationwatch.org/wp-content/uploads/2020/03/Carla-Frisch-handwritten-notes-EPA_CORA1505.pdf.

24

Ms. McCormack recorded Director Coit as saying:[53]

* Assembly very conservative leadership - don't care about env't
* If care, put it in the budget
* Priority - sustainable funding stream
* State court against oil/gas

These notes on their face both affirm two realities that have become inescapable in recent years about this epidemic of "climate nuisance" litigation, all channeled into state courts (after the first generation of suits foundered in federal court, and ultimately were terminated by the Supreme Court in *American Electric Power v. Connecticut*, 131 S. Ct. 2527, 2539, 564 U.S. 410, 426 (2011)). These suits seek to use the courts to stand in for policymakers on two fronts. First, these suits ask the courts to substitute their authority for that of the political branches of government on matters of policy. Second, these suits seek billions of dollars in revenues, again the province of the political branches, for distribution toward political uses and constituencies.

On that first count of policymaking through the courts, the Rockefeller-meeting notes ratify a comment made to The Nation magazine by the tort lawyer credited with inventing this wave of litigation, Matt Pawa. The magazine wrote, "At the end of his speech, Senator [Sheldon] Whitehouse [of Rhode Island] reminded his colleagues of their 'legislative responsibility to address climate change.' But it's clear that too many lawmakers have abdicated, thus the pressure to tackle the climate issue through existing regulations like the Clean Air Act, and through the courts. 'I've been hearing for twelve years or more that legislation is right around the corner that's going to solve the global-warming problem, and that litigation is too long, difficult,

---

[53] Ms. McCormack's notes can be found in full at https://climatelitigationwatch.org/wp-content/uploads/2020/03/EF-Katie-McCormack-typed-notes-EPA_CORA1542.pdf, and the email transmitting them at https://climatelitigationwatch.org/wp-content/uploads/2020/03/Katie-McCormack-notes-transmittal-email-EPA_CORA1516_Redacted.pdf.

25

and arduous a path,' said Matthew Pawa, a climate attorney. 'Legislation is going nowhere, so litigation could potentially play an important role.'"[54]

Such use of the courts is of course improper but also informs a conclusion that these cases, when brought, belong in federal court. The natural corollary is that they should then be dismissed for reasons including their inherently obvious, and now repeatedly confessed, purpose.

The second conclusion affirmed by these twice-sourced assertions by the First Circuit plaintiffs is that this type of litigation is a grab for revenues, which again must properly be pursued through the political process. This is related to the first conclusion, in that, like policy, such revenue-raising measures must be enacted by the voters' elected representatives or approved directly by voters. Instead, with the desire for more "funding streams" being yet another way the political process has failed such plaintiffs, we see them circumventing that process through this litigation campaign.

That the desire for more governmental revenue, without adopting the necessary direct taxes for which there can be a political prices, was behind such litigation was suggested by the U.S. Chamber of Commerce in a 2019 report entitled "Mitigating Municipality Litigation: Scope and Solutions," published by the Chamber's Institute for Legal Reform." That report highlighted:

- "For instance, local government leaders may eye the prospect of significant recoveries as a means of making up for budget shortfalls."
- "Large settlements like those produced in the tobacco litigation are alluring to municipalities facing budget constraints."

---

[54] Zoe Carpenter, *The Government May Already Have the Law It Needs to Beat Big Oil*, The Nation (July 15, 2015), https://www.thenation.com/article/the-government-may-already-have-the-law-it-needs-to-beat-big-oil/ (quoting Pawa, in an article advocating RICO actions against fossil fuel companies: "Legislation is going nowhere, so litigation could potentially play an important role.") (Last viewed May 16, 2019).

26

- "Severe, persistent municipal budget constraints have coincided with the rise of municipal litigation against opioid manufacturers as local governments are promised large recoveries with no risk to municipal budgets by contingency fee trial lawyers.", and

- "Conclusion

  A convergence of factors is propelling municipalities to file affirmative lawsuits against corporate entities.

  There is the "push" factor: municipalities face historic budgetary constraints and a public inundated with news reports on the opioid crisis, rising sea levels, and data breaches. And there is the "pull" of potential multimillion-dollar settlements and low-cost, contingency fee trial lawyers. As a consequence, municipalities are pivoting to the courts by the thousands." [55]

The National Association of Manufacturers' Center for Legal Action has similarly argued that "The towns and lawyers have said that this litigation is solely about money. The towns want funding for local projects, and their lawyers are working on a contingency fee basis, which means they aren't paid if they don't win."[56]

The records EPA has obtained now provide documentary evidence to support these concerns that the courts are being exploited to balance municipal/state budgets and make policy decisions that legislators have declined to make.

In light of the Texas state court's findings discussed above, it appears that suits such as the instant suit for damages are little more than a Trojan Horse in a battle to shut down an industry. That the First Circuit plaintiff is documented in its admission that the state seeks to sue big oil

---

[55] United States Chamber of Commerce, "Mitigating Municipality Litigation: Scope and Solutions," U.S. Chamber Institute for Legal Reform, March 2019, https://www.instituteforlegalreform.com/uploads/sites/1/Mitigating-Municipality-Litigation-2019-Research.pdf, at p. 1, 6, 7 and 18, respectively.

[56] Manufacturers' Accountability Project, "Beyond the Courtroom: Climate Liability Litigation in the United States," p. 2, https://mfgaccountabilityproject.org/wp-content/uploads/2019/06/MAP-Beyond-the-Courtroom-Chapter-One.pdf.

27

mostly out of a desire to obtain revenue through means other than taxation and without

legislative approval, echoed by none other than the "lawyers advising Rockefeller [F]amily

[F]und" behind this and similar suits, should further compel this Court to carefully scrutinize the

pleadings in this matter and ensure that federal claims remain in the federal forum where they

belong.

## IV.     THIS COURT MUST CONSIDER THIS SUIT IN LIGHT OF ITS OWN PRIOR HOLDINGS AND LITIGATION IN THE NEW YORK COUNTY SUPREME COURT.

*Exxon Mobil Corporation v. Schneiderman,* 316 F. Supp. 3d 679 (S.D.N.Y. 2018), currently

on appeal before the 2nd Circuit (Case No. 18-1170), bore the same background and context to

Plaintiff's current suit at issue here, although it presenting different legal claims and issues. The

plaintiff in that matter raised serious First Amendment concerns that the State of New York and

Commonwealth of Massachusetts, by and through their Attorneys General and others, were using

novel legal claims to persecute an out-of-state corporation for First Amendment protected

activity (apparently falling under the advocates' definition of "climate denialism"). Although

Exxon eventually was the prevailing party in the related state-court prosecution, *People v. Exxon*

*Mobil Corporation,* New York Co. Supreme Court Case No. 452044/2018, Exxon and other

defendants have been under the same assault for one climate-related offense or another,

sometimes repackaged but seemingly always originating with the same influential backer who

has confessed to orchestrating the original media and lobbying campaign, RFF. Exxon and others

now find themselves before this Court seeking removal of alleged climate-related offenses by the

City of New York, all related to the same conduct. Worse, these claims and arguments are

repackaged claims already disposed of by this Court and by the Second Circuit in *City of N.Y. v.*

*Chevron Corp.,* 993 F.3d 81, 85 (2d Cir. 2021).

Because this Court has now dealt with largely similar or related allegations in two separate suits, and because New York's state courts have addressed some of the same allegations in a different context, this Court should carefully examine what the record shows to date about the true nature of the claims and controversies between the parties. And this Court should re-examine its own previous conclusion that allegations of coordination were speculative, such that there was a "missing link" between the activists and the those bringing the various "climate" suits. Instead, this Court should review the voluminous body of work developed in great part in the intervening years, and recognize that these links inescapably tie together not just the activists and AGs but also the municipal plaintiffs with whom the AGs share the same California legal counsel, and with whom the plaintifss claim to share privilege and a common legal interest on these very matters (see *infra*).

In *Exxon Mobil Corporation v. Schneiderman*, the current Defendant here (Exxon Mobil) presented before to Court, as plaintiff, evidence that tort lawyers, climate-change activists, donors and also state attorneys general were coordinating on litigation as a means to uncover internal, private-company documents regarding climate change and to, *e.g.*, pressure fossil fuel companies like Exxon to change their stance on climate change policies.[57] Parties which the company featured as central to this coordination included the Rockefeller Family Fund and Union of Concerned Scientists, including the latter's policy director Peter Frumhoff discussed, *supra*.

In that matter, more than three years ago, this Court issued an opinion stating, *inter alia*, that "Exxon attempts to provide the missing link between the activists and the AGs by pointing

---

[57] See, generally, Plaintiff's Second Amended Complaint in Case No. 1:18-cv-2301 and this Court's March 29, 2018, Opinion and Order.

29

to a series of workshops, meetings, and communications between and among [attorney Matt] Pawa and Frumhoff and other climate change activists and the AGs or their staffs," *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp 679 at 709 (S.D.N.Y. 2018). Amicus EPA has now addressed that point in detail and illustrated the further evidence it has developed, *supra*.

This Court also wrote, "There are no allegations that either the [New Yok Office of the Attorney General] or the [Massachusetts Office of the Attorney General] attended the La Jolla conference" (Id. at 39). That "La Jolla Conference" was a 2012 legal strategies meeting in La Jolla, California, convened to contemplate and develop a plan to compensate for the general failure of legislative efforts to impose this "climate" agenda nationally. Plaintiffs' tort lawyer Pawa was a principal in the La Jolla litigation discussion and, as Defendants note in their Opposition, did represent the Plaintiff in its previous, federal lawsuit against Defendants, ultimately losing some of his "climate" clients to Plaintiff's counsel in this matter, Sher Edling, LLP. Pawa has been quoted suggesting that the campaign to use the courts in this way was a response to advocates having failed to impose a policy agenda through the legislative process.[58] The written summary of the relevant part of the La Jolla meeting stated, *inter alia*, "State attorneys general can also subpoena documents, raising the possibility that a single sympathetic state attorney general might have substantial success in bringing key internal documents to light. In addition, lawyers at the workshop noted that even grand juries convened by a district attorney could result in significant document discovery."[59] The same report also stated, "Equally

---

[58] Zoe Carpenter, *The Government May Already Have the Law It Needs to Beat Big Oil*, The Nation (July 15, 2015).

[59] Climate Accountability Institute and Union of Concerned Scientists, *Establishing Accountability for Climate Change Damages: Lessons from Tobacco Control* 11 (Oct. 2012), http://www.climateaccountability.org/pdf/Climate%20Accountability%20Rpt%20Oct12.pdf (Summary of the Workshop on Climate Accountability, Public Opinion, and Legal Strategies).

important was the nearly unanimous agreement on the importance of legal actions, both in wresting potentially useful internal documents from the fossil fuel industry and, more broadly, in maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming."[60]

Vast quantities of information have emerged in the intervening period that is relevant to these considerations, and to the instant matter, thanks to tenacious use of public records laws, including by Amicus EPA. Among these revelations are the material involvement in that La Jolla meeting, from the planning stage, of at least one state attorney general's office — this fact was not previously known because it was removed from the final, public version of the meeting's report.

It has now been revealed that the Office of former California State Attorney General Kamala Harris was present at the LaJolla conference. Specifically, AG Harris's Supervising Deputy Attorney General Coordinator, Global Warming Initiatives, Janill Richards, was involved in organizing for the La Jolla event. Indeed, emails among the organizers at the Union of Concerned Scientists[61] show the hosts asking Richards "to lead the discussion" of the tort litigation presentations calling for recruitment of AGs on June 14-15, 2012.

> We'd like the lead discussants to be: Janill Richards, Joe Mendelson, Ana Unruh-Cohen. We will turn to you for reaction to the panel before opening the session up for general discussion.[62]

---

[60] Id. at 27.

[61] See, e.g., see e.g., https://climatelitigationwatch.org/emails-suggest-ucusa-union-of-concerned-scientists-is-at-the-center-of-the-climate-litigation-industry/.

[62] See https://climatelitigationwatch.org/wp-content/uploads/2020/09/Janill-Richards-CA-OAG-La-Jolla-Pawa-Chronology.pdf or the entire record production posted at https://climatelitigationwatch.org/wp-content/uploads/2019/03/Oregon-Wood-Combined-Files-Redacted.pdf, pp. 359-360; see also pp. 58-59, Workshop Participants. These records were released to the Competitive Enterprise Institute by the University of Oregon under that state's public records law.

That was on May 24, 2012. Ms. Richards also was listed as a participant in the internally circulated June 4, 2012, list of Workshop Participants and on June 11, 2012.[63]

An 18-year veteran in a senior role, Ms. Richards' involvement cannot be explained away as casual participation due to proximity; her office was located in Oakland, nearly 500 miles from La Jolla.

The report published by UCS chronicling the event did not thank Ms. Richards. This document was written for UCS's "primary audience [of]...colleagues in the community — scholars, practitioners, and funders — who were not able to attend", according to records in a production of public records which Oregon attributed to Union of Concerned Scientists' Peter Frumhoff.[64]

But Frumhoff also reflected participants' and organizers' concern that the report might nonetheless get out. As it did. Frumhoff noted in an email, "We will not be posting this report on the web, or otherwise releasing it publicly, and ask that you share the report with key colleagues with these limited distribution goals in mind. These goals notwithstanding, there's always the prospect of broader than intended circulation and readership." *Id.*

This suggests that UCS removing the participation of California's Attorney General's Office from the published version might reveal that UCS (and/or AG Harris's Office) did not wish to advertise an AG's involvement in this scheming. Regardless, it remains documented.

---

[63] See, respectively, https://climatelitigationwatch.org/wp-content/uploads/2020/02/Janill-Richards-a-Workshop-Participant-as-of-6.4.12.png and https://climatelitigationwatch.org/wp-content/uploads/2020/08/6.11.12-email-Janill-Richards-a-Workshop-Participant-as-of-6.11.12.jpg.

[64] October 17, 2012 email from Peter Frumhoff to participants, Subject: Workshop Report on Establishing Accountability for Climate Change Damageshttps://climatelitigationwatch.org/wp-content/uploads/2020/09/Janill-Richards-CA-OAG-La-Jolla-Pawa-Chronology.pdf.

The timing of the 2012 La Jolla meeting is also telling in that the push to enlist state attorneys general to pursue state cases came as a result of the ruling in *AEP v. Connecticut* 564 U.S. 410 (2011), in which the Supreme Court held that regulating CO2 emissions is the Environmental Protection Agency's job, and the Clean Air Act displaces "any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants," as Justice Ruth Bader Ginsburg wrote for the unanimous Court.

A new plan had to be hatched, hence the La Jolla planning session, the report chronicling which also stated:

> Equally important was the nearly unanimous agreement on the importance of legal actions, both in wresting potentially useful internal documents from the fossil fuel industry and, more broadly, in maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming.[65]

The litigation campaign began with attorneys general, specifically two whose offices received briefings requesting just that from the plaintiffs' lawyers from La Jolla, New York and Massachusetts. Tort lawyer Matt Pawa, a La Jolla presenter whose comments about recruiting law enforcement to this cause were emphasized in that same report, had lobbied the New York Attorney General to take up Pawa's cause, and that office did investigate and prosecute Exxon Mobil, without success. *People of the State of New York v. Exxon Mobil Corporation* (452044/2018, N.Y. Sup. Ct.).[66]

---

[65] "Establishing Accountability for Climate Change Damages," at 28.

[66] One Illinois OAG aide, after speaking to a major political donor named Wendy Abrams, wrote to a colleague with whom she was corresponding about arranging a Pawa presentation on "What Exxon Knew". About Abrams, the aide wrote, "The NY AG is investigating the company and she wanted to know if this was something the AG may be interested in supporting or signing on to…She would like to bring in a lawyer named Matt Pawa, who has offices in Boston and DC. Wendy says he may have been the one to go to the NY AG's office about Exxon."[66] February 26, 2016, email from Eva Station to Ali Khadija Courtney Levy, and Kirsten Holmes; Subject, RE:

Also, for example, correspondence obtained from the Massachusetts Office of Attorney General under that state's open records law show that Mr. Pawa wrote to the Massachusetts Office of Attorney General, *inter alia*, "I have been in discussions with Brad Campbell of CLF about the Exxon issue and we are coordinating on this."[67] With and through the Conservation Law Foundation, Campbell advocates for and has developed, assisted, and encouraged attorneys general investigations of private parties for alleged offenses related to claimed catastrophic man-made climate change. Like Pawa, UCS and others who continue appearing in the record of these nationwide affairs, Campbell was an attendee at the meeting at RFF's offices that called for allies to "delegitimize" and "create scandal" involving various industry participants.[68]

The records indicate that the "this" Pawa was referring to in that email was Pawa's pitch to the attorneys general to enlist them in the tort campaign now joined by numerous municipalities including the Plaintiff, titled, "What Exxon Knew—And What It Did Anyway." Mr. Pawa described his slide show as being about "documents that recently came to light",[69] "a mini trial-type presentation on what Exxon knew about global warming, when it knew it and

---

Phone call. Available at https://climatelitigationwatch.org/wp-content uploads/2018/08/FN-147-Abrams-says-Pawa-may-have-brought-investigation-to-NYOAG-copy.pdf.

[67] January 4, 2016, email from Pawa to OAG's Christophe Courchesne and Melissa Hoffer, Subject: global warming, released under Massachusetts' open records law. https://climatelitigationwatch.org/wp-content/uploads/2019/10/Pawa-OAG-recruiting-emails-Records-9-10-19.pdf.

[68] See, generally, Plaintiff's Second Amended Complaint and this Court's March 29, 2018, Opinion and Order, in *Exxon v. Schneiderman*, Case No. 17-cv-02301.

[69] December 1, 2015, email from Pawa to Massachusetts OAG's Christophe Courchesne and Melissa Hoffer, Subject: global warming. See also, e.g., March 31, 2016, email from Matt Pawa to Perry Zinn-Rowthorn, Matthew Levine and Kimberly Massicotte of the Connecticut OAG, Subject: Climate Change. https://climatelitigationwatch.org/wp-content/uploads/2019/10/Pawa-OAG-recruiting-emails-Records-9-10-19.pdf.

what it did anyway in the next 20 plus years."[70] This correspondence specifies those documents

are public news stories that, the public record also shows, were arranged for by Rockefeller

Family Fund.[71]

Soon after Pawa's January 2016 briefing of the Massachusetts OAG, that Office did

initiate such an investigation.[72] Mr. Campbell and his organization then sued the same company

the next month.[73] Public records show that the litigation AG Healey subsequently filed against

ExxonMobil at Pawa's urging was also pitched to OAG by the UCLA Emmett Institute's Cara

---

[70] December 1, 2015, email from Pawa to Massachusetts OAG's Christophe Courchesne and Melissa Hoffer, Subject: global warming. https://climatelitigationwatch.org/wp-content/uploads/2019/10/Pawa-OAG-recruiting-emails-Records-9-10-19.pdf.

[71] *See. e.g.*, Jess Delaney, *Lee Wasserman Fights Climate Change with Rockefeller Funds*, Institutional Investor (Apr. 18, 2016), https://www.institutionalinvestor.com/article/b14z9ppfj9nlv4/lee-wasserman-fights-climate-change-with-rockefeller-funds. Lee Wasserman is the Director of the Rockefeller Family Fund, where he focuses on initiatives fighting climate change. Although Mr. Wasserman at first denied RFF had singled Exxon out when it granted about $25,000 to *InsideClimate News*, he later appeared, with Valerie Rockefeller Wayne of the Rockefeller Brothers Fund, on CBS This Morning with Charlie Rose and confirmed they funded those groups with the explicit purpose of writing the original #ExxonKnew pieces. https://www.cbsnews.com/news/rockefeller-family-feud-with-exxon-mobil-fossil-fuels-global-warming-climate-change/ He then wrote in the New York Review of Books, with David Kaiser, that the groups did fund those groups with the explicit purpose of writing the original #ExxonKnew pieces. https://www.nybooks.com/articles/2016/12/08/the-rockefeller-family-fund-vs-exxon/ Both Wasserman and Kaiser then wrote in the New York Review of Books that they met with New York Attorney General Eric Schneiderman and pressured him to launch an investigation. https://www.nybooks.com/articles/2016/12/22/rockefeller-family-fund-takes-on-exxon-mobil/. Records obtained in Freedom of Information Law (FOIL) litigation in New York State show his involvement with that State's Attorney General organizing an investigation of energy companies at least nine months before NY OAG issued any subpoenas. *See* Respondent's Exemption Logs in *Energy & Env't Legal Inst. v. The Attorney General of New York*, N.Y. Sup. Ct. Index No. Index No.101678/2016 (Bannon, J.), https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=/4gV1PMC_PLUS_ri7oT5Kb MKdnw==.and *Energy & Env't Legal Inst. v. The Attorney General of New York*, N.Y. Sup. Ct. Index No. 101759/2016 (Mendez, J.), https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=3s1_PLUS_ag7V3BP6D3XR8 qklcA==.

[72] See https://www.mass.gov/lists/attorney-generals-office-exxon-investigation.

[73] See https://www.clf.org/newsroom/clf-sues-exxonmobil/.

Horowitz, of "going after climate denialism along with a bunch of state and local prosecutors nationwide" fame, at that meeting in Cambridge, Massachusetts which was attended by five OAG attorneys.[74]

Two months after his in-office briefing, and moments after Pawa gave his March 29, 2016, presentation to a larger group of attorneys general including Massachusetts AG Healey in a secret, pre-press conference briefing that March,[75] Healey emerged to declare her verdict at the press conference. As a Texas state court put it:

> "[S]he disclosed that she too had begun investigating ExxonMobil and concluded, before receiving a single document from ExxonMobil," that "Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable. That's why I, too, have joined in investigating the practices of ExxonMobil. We can all see today the troubling disconnect between what Exxon knew,

---

[74] A March 17, 2016, email from OAG's Melissa Hoffer to Harvard Law School's Shaun Goho, Subject: RE: SAVE THE DATE—HLS/UCS Meeting on April 25, 2016, listed Andy Goldberg, Glenn Kaplan, Christophe Courchesne, Richard Johnson as OAG lawyers who would attend the meeting in addition to herself. https://climatelitigationwatch.org/wp-content/uploads/2019/10/MA-AAG-Hoffer-to-HLS-on-MA-OAG-attendees.pdf.

[75] In an order transferring a case from the Northern District of Texas to the Southern District of New York, Judge Kinkeade of the Northern District Court noted "[t]he day after the closed door meeting, on March 30, 2017, Mr. Pawa emailed the Office of the New York Attorney General to ask how he should respond if asked by a reporter from *The Wall Street Journal* whether he attended the closed door meeting with the attorneys general. The Office of the New York Attorney General responded by instructing Mr. Pawa 'to not confirm that you attended or otherwise discuss the event.' Does this reluctance to be open suggest that the attorneys general are trying to hide something from the public?" *Exxon v. Healey*, Civil Action No. 4:16-CVK-469-K (N.D. TX, Mar. 29, 2017) at 8. See also, Sean Higgins, *NY atty. general sought to keep lawyer's role in climate change push secret*, Washington Examiner (Apr. 18, 2016), http://www.washingtonexaminer.com/ny-atty-general-sought-to-keep-lawyers-role-in-climate-change-push-secret/article/2588874; Terry Wade, *U.S. state prosecutors met with climate groups as Exxon probes expanded*, Reuters (Apr. 15, 2016), http://www.reuters.com/article/us-exxonmobil-states/u-s-state-prosecutors-met-with-climate-groups-as-exxon-probes-expanded-idUSKCN0XC2U2.

36

what industry folks knew, and what the company and industry chose to share with investors and with the American public."[76]

We now also know from public records of an April 25, 2018, agreement between at least five AGs whose offices Pawa briefed in seeking to recruit them to his cause, including New York and Massachusetts (as well as California, Connecticut, and Maryland), in which the climate plaintiff states all claimed a common legal interest in his cases — lawsuits that none of these AGs were, are or ever will be party to and have no actual common legal interest. This is yet another "tell" about the national, coordinated nature of this litigation campaign. In fact, of the three cases specifically cited in the agreement, "*City of Oakland, et al. v. BP P.L.C. et al.* (N.D. Cal. 17-cv-06011), *City and County of San Francisco, et al. v. BP P.L.C., et al.* (N.D. Cal. 17-cv-06012) and *San Mateo v. Chevron Corp.* (N.D. Cal. 17-cv-04929), and any appeals arising from those matters," two of them involved Pawa's clients at the time, the man who had recently lobbied the AGs to help the cause out.[77] Nine them then filed an amicus brief in the Fourth Circuit on behalf of the Mayor & City of Baltimore in their "nuisance" case.[78]

---

[76] *In re Exxon Mobil Corporation*, Cause No. 096-297222-B (Tarrant Co., Tex. Dist. Ct.), Findings of Fact and Conclusions of Law (April 24, 2018), ¶¶ 6-10. Available at https://eidclimate.org/wp-content/uploads/2018/07/Findings-Fact-Climate-Lawsuit-Conspiracy.pdf. See also, https://ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneysgeneral-across.

[77] "Common Interest Agreement Regarding the Sharing of Information In Anticipation Of Judicial Or Administrative Actions To Require The Federal Government (Or Private Parties) To Take Action (Or To Defend The Federal Government's Authority To Take Action) To Reduce Or Limit Emissions Of Greenhouse Gases That Cause Climate Change," signed by (ultimately) fourteen attorneys general and obtained under the open records statutes of New Mexico and Minnesota. Available at https://climatelitigationwatch.org/wp-content/uploads/2021/04/Climate-Change-Public-Nuisance-Litigation-CIA.pdf and its amended version at https://climatelitigationwatch.org/wp-content/uploads/2021/04/Climate-Change-Public-Nuisance-Litigation-CIA-Amendment.pdf.

[78] https://www.marylandattorneygeneral.gov/News%20Documents/090319_Baltimore_climate_a micus.pdf.

The public and judiciary now also have access to a different, October 2020 "Common Interest Agreement Regarding the Sharing of Information Related to State Lawsuits Against Fossil Fuel Companies for Deceptive Acts and Practices and Other State Law Claims," among AGs for the District of Columbia, Massachusetts and Minnesota (plus recent climate plaintiffs Connecticut and Delaware[79]) all of whom share legal counsel with the Plaintiff in this case, Sher Edling, LLP. (See Defendants' Opposition to Plaintiff's Motion to Remand at 8-9. "The City is also represented by Sher Edling LLP, which has brought over a dozen similar lawsuits against the same or similar energy companies across the country aimed at curtailing fossil fuel use, and has reportedly received grants worth $1.75 million from Resources Legacy Fund, an organization that advocates curbing the production and sale of fossil fuels." (citations omitted)).

That agreement claims "a common interest in the successful prosecution of their respective "State Litigations given the commonalities of fact, law, and purpose. The Parties would benefit from the sharing of information, including but not limited to legal and factual analyses, litigation strategies, draft briefs and other draft court filings, and other documents among the Parties."

This purported confidentiality pact further shows the municipalities' and now states' litigation campaign is indeed a coordinated, national effort that flowed from much "additional conduct" beyond the mere act of filing suit. That campaign involved launching — not even merely *attempting* to launch — contemporaneous assaults by numerous "sympathetic attorneys general" to target industry parties whose behavior the coordinating parties view as actionable behavior and call "climate denialism".

---

[79] https://climatelitigationwatch.org/wp-content/uploads/2021/07/Fossil-Fuel-Misrepresentation-CIA.pdf.

Simply put, whatever concern this Court may have had in 2018 that there was a "missing link" between activists and a wave of lawsuits against the same defendants, has now been put to rest. The "link" is overwhelming not just in the conduct but in the filing, *seriatim*, of often copycat suits[80] (despite rather odd denials thereof[81]), and the serial failure of such lawsuits to bear fruit for the plaintiffs give rise to serious concerns about whether such lawsuits instead have an ulterior or and often admittedly improper motive to, e.g., bringing opponents of a national policy agenda "to the table", or financing Executive Branch spending ambitions after lawmakers decline the opportunity, etc.

Moreover, this Court's previous holding in *Exxon v. Schneiderman et al.*, was largely premised upon the belief that the individuals and entities filing suit against Exxon on various legal theories were acting in "good faith." Even assuming, *arguendo*, that such assumptions of good faith were warranted in 2018, those assumptions no longer hold up to careful scrutiny.

For example, the Second Circuit held that "The City of New York has sidestepped [federal law] and instead instituted a state-law tort suit against five oil companies to recover damages caused by those companies' admittedly legal commercial conduct in producing and selling fossil fuels around the world. In so doing, the City effectively seeks to replace these carefully crafted frameworks — which are the product of the political process — with a patchwork of claims under state nuisance law. *City of N.Y. v. Chevron Corp.*, 993 F.3d 81, 86 (2d Cir. 2021). That

---

[80] See, e.g., William Allison, "Four Things To Know About Washington, D.C.'S New Climate Lawsuit," Energy in Depth, June 25, 2020, https://eidclimate.org/four-things-to-know-about-washington-d-c-s-new-climate-lawsuit/.

[81] See, e.g., "O, What a Tangled Web They Weave," Climate Litigation Watch, August 11, 2021, https://climatelitigationwatch.org/o-what-a-tangled-web-they-weave/; see also, Christin Nielsen, "Evidence of coordination in climate litigation is eroding AG arguments for keeping cases in state court, watchdog says," Legal Newsline, August 27, 2021, https://legalnewsline.com/stories/606856062-evidence-of-coordination-in-climate-litigation-is-eroding-ag-arguments-for-keeping-cases-in-state-court-watchdog-says.

decision was handed down on April 1, 2021. Yet a mere 19 days later, the City filed this suit, in state court, again seeking to end-run federal law by repackaging its claims under a new municipal law framework. The City was no doubt cognizant of the Second Circuit's holding when it filed this suit, and of the State's failure to prevail in its own claims under state law in a courthouse located in Manhattan, when it chose to file the instant suit on Earth Day of 2021.

The Second Circuit has recognized that even when suits or a course of litigation begin in good faith, continuing a suit when it has become apparent that it lacks merit constitutes bad faith. See *Nemeroff v. Abelson*, 704 F.2d 652, 655 (2d Cir. 1983). While this Court's assumptions of good faith in *Exxon v. Schneiderman* have likely been made unsound by subsequent discoveries, detailed above, this Court must nevertheless force the litigants to explain how a suit, even if begun with the noblest of aspirations, has been continually re-packaged and refiled under numerous theories in the years that have followed.

## V.    HISTORIC CONCERNS ABOUT STATE COURT BIAS ARE AMPLIFIED IN THIS CASE

A "historic concern about state court bias" is among the fundamental bases for removal jurisdiction. *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 461 (5th Cir. 2016). The Supreme Court also recognizes bias as a concern justifying removal to federal court. "State-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007). Bias exists, as these opinions acknowledge, and there is no reasoned basis for declaring that such bias extends only to parties who are unpopular government officials. Indeed, the Supreme Court has cautioned against "narrow, grudging interpretation" of removal. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Simply put, "[t]he removal statute is an incident of federal supremacy." *Murray v. Murray*, 621 F.2d 103, 106 (5th Cir. 1980).

40

In this suit, New York City is effectively engaged in a campaign through the courts to overturn "unpopular federal laws" or to seek climate remedies that have never been authorized by the legislative branch of either the New York State or federal governments – and which it has failed to obtain in previous opinions issued by this Court and the Second Circuit. Rather than recognizing the U.S. Constitution and federal laws as supreme, governmental climate "nuisance" and now "consumer protection" plaintiffs are applying "narrow, grudging" interpretation of the removal statute to seek to overturn federal law through imposing ostensible tort liability in state courts.

It is difficult to imagine a more striking case where fear of state court bias could be a concern than is presented in the instant matter: the *hope* for state court bias is demonstrably at play in this campaign of which the instant matter is a part, as shown in records obtained by Amicus EPA through public records laws.

As documented, *supra*, the instant case began when New York-based donors and attorneys advising them, directly and through intermediaries they provided support to, began lobbying states and municipalities "nationwide" to file a wave of similar suits in state courts. This eager desire by interested activists and donors to obtain ostensibly local relief in various state courts from sea to shining sea might seem remarkable, if not for the history of climate litigation efforts that have been addressed in the proper, federal *fora*. For example, and again turning to documents obtained through open records laws, consider the description by a member of the State's outside legal counsel's own team. In June 2018, U.S. District Judge William Alsup dismissed the City of Oakland's "climate nuisance" suit against at least one of the current

41

defendants, and others.[82] At the time, New York City's outside counsel in this suit nominally

about enforcing its own municipal laws, California's Sher Edling, LLP, was working with

lobbyists hired to assist with recruiting more governmental plaintiffs.[83] One of these lobbyists,

hired to recruit Fort Lauderdale, Florida, to file suit, passed along a note of encouragement to

---

[82] *City of Oakland, et al., v. BP P.L.C., et al.*, Case 3:17-cv-06011-WHA (N.D. Calif.), Order Granting Motion to Dismiss Amended Complaints, Dkt. 283.

[83] The web is somewhat involved. G. Seth Platt is one of the network's consultants, engaged to help lobby Florida municipalities to file suit similar to the State's. At the time of the correspondence cited herein, Platt was a registered lobbyist for the Institute for Governance & Sustainable Development (IGSD)(www.igsd.org) (see searchable index of lobbying registrations at ftlweb01app.azurewebsites.us/Ethicstrac/Lobbyists.aspx). Platt worked with IGSD and others pitching municipalities to file "climate nuisance" litigation against energy interests, with Rhode Island's counsel Sher Edling.
 In the wake of Rhode Island's initial (state) Superior Court filing, on July 27, 2018, Fort Lauderdale Interim City Attorney Alain Boileau wrote Mayor Dean Trantalis, copying other aides, in pertinent part:
   "Mayor…I had a positive meeting yesterday with Marco Simons, Esquire of the EarthRights International Group, Matt Edling, Esquire, Vic Sher, Esquire, of SherEdling, and Jorge Mursuli [IGSD]." See https://climatelitigationwatch.org/wp-content/uploads/2020/03/Boileau-explains-to-Mayor-his-mtg-w-Sher-Edling.pdf
 That same day, Boileau wrote the same parties: "I suggested they prepare a presentation for the commission. They just need a target date." See https://climatelitigationwatch.org/wp-content/uploads/2020/03/Boileau-explains-to-Mayor-his-mtg-w-Sher-Edling.pdf
 When that presentation was arranged, Mr. Mursuli wrote to Mayda Pineda of Fort Lauderdale's government "to include additional co-counsel on the phone during our face-to-face meeting with Mr. Boileau.
   They are:
   Vic Sher 415/595-9969
   Matt Edling 415/531-1829
   Please let me know if patching them into our meeting is doable. Again, thanks very much." https://climatelitigationwatch.org/wp-content/uploads/2020/03/Mursuli-seeks-inclusion-ofSherEdling-in-pitching-FTL-litigation.pdf
 Mr. Mursuli then wrote Lizardo Corandao of Fort Lauderdale's government seeking to ensure that Sher Edling participation on the pitch call "is doable". See https://climatelitigationwatch.org/wp-content/uploads/2020/03/Mursuli-seeks-inclusion-ofSherEdling-in-pitching-FTL-litigation-II.pdf
 EPA has obtained other emails showing Rhode Island, through Special Assistant Attorney General Greg Schultz, referring Sher Edling to Connecticut's Office of Attorney General for similar purposes. See https://climatelitigationwatch.org/wp-content/uploads/2020/03/Pawa-SherEdling-chronology.pdf.

Fort Lauderdale officials, whose counsel had expressed concern over that latest failure. This lobbyist/recruiter, G. Seth Platt, sent an email flatly stating the team's position that state courts are the "more advantageous venue for these cases."

Mr. Platt then quotes then-UCLA Law professor and also then-consultant to Sher Edling,[84] Ann Carlson, linking in the email to an article quoting her further on this belief that, for whatever reasons, plaintiffs' chances for recovery are much better in state *fora*.[85] And as noted, *supra*, just last year a *Los Angeles Times* news article quoted Carlson's Emmett Institute colleague and also consultant for plaintiffs' counsel, Sean Hecht, on this topic of state courts being "more favorable to 'nuisance' lawsuits."[86] Other emails obtained under California's Public Records Act by Amicus from UCLA quote Cal Berkeley Law School's Daniel Farber affirming to a "Disaster Law" listserv his belief these cases will be heard in state court, while also stating, *inter alia*, "I've always considered suits like this to be long-shots regardless of forum, though the state courts provide somewhat better odds than federal court."[87] Prof. Farber was responding to an email to the same group by Louisiana State University Law Prof. Edward P. Richards,

---

[84] Matt Dempsey, "UCLA Professor's Role In Climate Litigation Raises Transparency Questions," Western Wire, November 27, 2018, https://westernwire.net/ucla-professors-role-in-climate-litigation-raises-transparency-questions/

[85] "[U.S. District Judge William Alsup's] decision is irrelevant from a legal perspective, 'Carlson said, as long as these cases stay in state courts. Federal courts, like Alsup's, are less favorable to lawsuits like San Francisco and Oakland's, which contend that fossils fuel companies are liable for damages because they've created a public "nuisance," said Carlson." Mark Kaufman, "Judge tosses out climate suit against big oil, but it's not the end for these kinds of cases," mashable.com, June 26, 2018, https://mashable.com/article/climate-change-lawsuit-big-oil-tossed-out/

[86] FN 42, *supra*.

[87] March 4, 2018 email from Daniel Farber to disaster law@lists.berkeley.edu, Subject A California Court Might Have Just Opened The Floodgates For Climate Litigation," at https://climatelitigationwatch.org/wp-content/uploads/2021/08/Responsive-Documents-Redacted-21-9211.pdf.

Director: LSU Law Center Climate Change Law and Policy Project[88], *inter alia*, "There is little chance that the claims will survive federal review in the long-term. By recognizing them in the short-term, the court gets the cases out of state court. The only chance the cases had was to stay in state court, where there might be a sympathetic state judge who would let the cases go forward." [89]

The Plaintiff's efforts to now hide what were previously admitted to be federal, environmental claims, and an effort to impose federal policy, under the guise of a state court "consumer protection" lawsuit filed by its Environmental Law Division, not Department of Consumer and Worker Protection, is deliberate and should not be indulged further. This case should remain in a federal forum, where national policy matters can be addressed without the specter of state court bias in a matter so plainly seeking "new sources of revenue" to be channeled to that state.

## CONCLUSION

This suit and dozens of others began when financiers and activists dedicated themselves and their substantial resources to orchestrating the filing of state and local tort suits by governmental entities seeking similar relief under ostensibly state law theories nationwide. This interest was spawned when federal suits were continually dismissed, and the instant suit follows on the heels of an unsuccessful attempt to prosecute the same defendants in both state and federal

---

[88] "Climate change poses a grave threat to humankind and the environment. The Climate Change Law and Policy Project focuses on the unique risks faced by Southern Louisiana and the Mississippi Delta. The Project provides impartial analysis of adaptation strategies and guidance for policy makers. It is produced by Professor Edward Richards," https://sites.law.lsu.edu/coast/ (viewed August 30, 2021).

[89] March 4, 2018 email from Edward P. Richards to disaster law@lists.berkeley.edu, Subject A California Court Might Have Just Opened The Floodgates For Climate Litigation," at https://climatelitigationwatch.org/wp-content/uploads/2021/08/Responsive-Documents-Redacted-21-9211.pdf.

44

court. The instant suit is a repackaged version of that failed federal litigation. Amicus EPA respectfully requests this Court consider the information detailing the now-exposed genesis and orchestration of these suits as they inform assessment of the instant matter, all of which represent improper uses of the judiciary and other public institutions instigated by deeply troubling means, and conclude that this suit, like all such suits, belongs in federal court. Only the federal court system will be able to properly adjudicate the merits of this matter in an unbiased fashion, without prejudice against "unpopular federal laws" or "unpopular federal officials."

Dated: August 30, 2021                    Respectfully submitted,

                                          /s/ Matthew D. Hardin
                                          Matthew D. Hardin
                                          S.D.N.Y. Bar No. 5815 (VT)
                                          Hardin Law Office
                                          1725 I Street NW, Suite 300
                                          Washington, DC 20006
                                          Phone: 202-802-1948
                                          Email: HardinLawPLLC@icloud.com

                                          *Counsel for Energy Policy Advocates*


## CERTIFICATE OF SERVICE

I, Matthew D. Hardin, hereby certify that on August 30, 2021, the foregoing document was filed and served on all counsel of record through the CM/ECF system.

                                          Respectfully submitted,
                                          /s/ Matthew D. Hardin
                                          Matthew D. Hardin