**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF NEW YORK,<br><br>               Plaintiff,<br><br>    v.<br><br>EXXON MOBIL CORPORATION,<br>EXXONMOBIL OIL CORPORATION, ROYAL<br>DUTCH SHELL PLC, SHELL OIL COMPANY,<br>BP P.L.C., BP AMERICA INC., and AMERICAN<br>PETROLEUM INSTITUTE,<br><br>               Defendants. | Case No. 21-cv-04807 (VEC) |

### DEFENDANTS' OPPOSITION TO
### PLAINTIFF'S RENEWED MOTION TO REMAND

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................4

    A.    The City's First Lawsuit Challenging Defendants' Production, Promotion, and Sale of Fossil Fuels Was Dismissed with Prejudice. ........................4

    B.    The Second Circuit Affirmed Dismissal of the City's First Lawsuit and Held That Federal Common Law Governed the City's Nominal State-Law Claims. ..............................................................................................5

    C.    The City Again Seeks Redress for Global Climate Change, This Time Nominally Under a Municipal Consumer Protection Law. .....................6

LEGAL STANDARD ................................................................................................8

ARGUMENT ............................................................................................................8

I.    This Court Has Diversity Jurisdiction Under the Fraudulent Joinder Doctrine. ...........8

    A.    The City Has Committed "Outright Fraud" By Joining EMOC............................9

    B.    Because the City's Claims Are Barred by *Res Judicata*, There Is No Possibility of Recovery Against EMOC................................................10

II.    The City's Claims Are Removable Because They Are Completely Preempted by Federal Common Law. ..............................................................................14

    A.    The Federal Common Law of Transboundary Pollution and Foreign Affairs Completely Preempts State Law Claims. ...................................15

    B.    The City's Claims Are Necessarily Governed by Federal Common Law............20

        1.    The City's Claims Implicate the Federal Common Law of Transboundary Pollution. ................................................................20

        2.    The City's Claims Implicate Federal Common Law of Foreign Affairs. ........................................................................................22

    C.    The Notice of Removal Relied on the Complete Preemption Doctrine. ..............23

III.    This Action Is Removable Under the Federal Officer Removal Statute. ...........................24

    A.    Defendants "Acted Under" Federal Officers. ...........................................26

    B.    Defendants' Defenses Are "Colorable." ..................................................28

IV.    This Action Arises Out of Federal Enclaves. ..................................................29

V.    This Representative Action on Behalf of City Consumers Is Removable under CAFA............................................................................................31

VI.    The Substantial First Amendment Issues Necessarily Raised by the City's Lawsuit Warrant Federal Jurisdiction.........................................................................32

VII.    The City Is Not Entitled to Attorneys' Fees or Costs. ......................................34

CONCLUSION.........................................................................................................35

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*,
  731 F.3d 740 (7th Cir. 2013) ................................................................31

*Agyin* v. *Razmzan*,
  986 F.3d 168 (2d Cir. 2021)..........................................................24, 26

*Connecticut* v. *Am. Elec. Power Co.*,
  582 F.3d 309 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011)..........................32

*Am. Elec. Power Co.* v. *Connecticut*,
  564 U.S. 410 (2011)....................................................................*passim*

*Arbaugh* v. *Y&H Corp.*,
  546 U.S. 501 (2006)............................................................................19

*Baker* v. *Atl. Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020) ..................................................27, 28, 29

*Banco Nacional de Cuba* v. *Sabbatino*,
  376 U.S. 398 (1964)....................................................................15, 16

*Bedminster Fin. Grp., Ltd.* v. *Umami Sustainable Seafood, Inc.*,
  2013 WL 1234958 (S.D.N.Y. Mar. 26, 2013) ........................................35

*Beneficial Nat'l Bank* v. *Anderson*,
  539 U.S. 1 (2003)................................................................................15

*Blockbuster, Inc.* v. *Galeno*,
  472 F.3d 53 (2d Cir. 2006)....................................................................8

*Briarpatch Ltd., L.P.* v. *Phoenix Pictures, Inc.*,
  373 F.3d 296 (2d Cir. 2004).............................................................9, 13

*In re Briscoe*,
  448 F.3d 201 (3d Cir. 2006).................................................................14

*Calhoon* v. *Bonnabel*,
  560 F. Supp. 101 (S.D.N.Y. 1982) .........................................................8

*City of Hoboken* v. *Exxon Mobil Corp.*,
  558 F. Supp. 3d 191 (D.N.J. 2021), *aff'd*, 45 F.4th 699 (3d Cir. 2022),
  *cert. denied*, 143 S. Ct. 2483 (2023) ..................................................32

*Illinois* v. *City of Milwaukee*,
 406 U.S. 91 (1972) ..........................................................................................16

*City of Milwaukee* v. *Illinois*,
 451 U.S. 304 (1981) ....................................................................................16, 19

*City of New York* v. *BP p.l.c.*,
 325 F. Supp. 3d 466 (S.D.N.Y. 2018) ..................................................1, 4, 10, 11

*City of New York* v. *Chevron Corp.*,
 993 F.3d 81 (2d Cir. 2021) .......................................................................*passim*

*Cnty. Bd. of Arlington Cnty., Virginia* v. *Express Scripts Pharmacy, Inc.*,
 996 F.3d 243 (4th Cir. 2021) .....................................................................25, 28

*In re Commonwealth's Motion to Appoint Counsel*,
 790 F.3d 457 (3d Cir. 2015)............................................................................29

*Cuomo* v. *Crane Co.*,
 771 F.3d 113 (2d Cir. 2014)............................................................................29

*Doe* v. *Exxon Mobil Corp.*,
 573 F. Supp. 2d 16 (D.D.C. 2008) .....................................................................9

*Durham* v. *Lockheed Martin Corp.*,
 445 F.3d 1247 (9th Cir. 2006) ........................................................................30

*Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*,
 545 U.S. 546 (2005) ..........................................................................................8

*Franchise Tax Bd.* v. *Hyatt*,
 139 S. Ct. 1485 (2019)................................................................................16, 22

*Gordon* v. *Air & Liquid Sys. Corp.*,
 990 F. Supp. 2d 311 (E.D.N.Y. 2014) ..............................................................29

*Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*,
 545 U.S. 308 (2005).......................................................................................34

*Mississippi ex rel. Hood* v. *AU Optronics Corp.*,
 571 U.S. 161 (2014).........................................................................................9

*Humble Pipe Line Co.* v. *Waggoner*,
 376 U.S. 369 (1964).......................................................................................29

*Int'l Paper Co.* v. *Ouellette*,
 479 U.S. 481 (1987).......................................................................................16

*Isaacson* v. *Dow Chem. Co.*,
   517 F.3d 129 (2d Cir. 2008)................................................................28

*Jefferson Cnty.* v. *Acker*,
   527 U.S. 423 (1999)..........................................................................29

*Johnson* v. *Bank of America, N.A.*,
   594 F. App'x 953 (11th Cir. 2014) ....................................................14

*Joseph* v. *Kaye*,
   2016 WL 3677142 (C.D. Cal. July 7, 2016),
   *aff'd*, 692 Fed. App'x 370 (9th Cir. 2017)..........................................13

*Latiolais* v. *Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) (en banc) .............................................25

*Marcus* v. *AT&T Corp.*,
   138 F.3d 46 (2d Cir. 1998)....................................................15, 16, 17, 18

*Martin* v. *Franklin Cap. Corp.*,
   546 U.S. 132 (2005)..........................................................................34

*Metropolitan Life Insurance Co.* v. *Taylor*,
   481 U.S. 58 (1987).......................................................................17, 18

*Miss. River Fuel Corp.* v. *Cocreham*,
   390 F.2d 34 (5th Cir. 1968) ..............................................................30

*N. Am. Olive Oil Ass'n* v. *D'Avolio Inc.*,
   457 F. Supp. 3d 207 (E.D.N.Y. 2020) ...............................................33

*N.J. Carpenters Vacation Fund* v. *HarborView Mortg. Loan Tr. 2006-4*,
   581 F. Supp. 2d 581 (S.D.N.Y. 2008) ...............................................31

*N.Y. Times Co.* v. *Sullivan*,
   376 U.S. 254 (1964)..........................................................................33

*NASDAQ OMX Grp., Inc.* v. *UBS Securities, LLC*,
   770 F.3d 1010 (2d Cir. 2014).............................................................34

*Native Vill. of Kivalina* v. *ExxonMobil Corp.*,
   696 F.3d 849 (9th Cir. 2012) ............................................................15

*Nordlicht* v. *N.Y. Tel. Co.*,
   799 F.2d 859 (2d Cir. 1986)...............................................................17

*Oneida Indian Nation* v. *County of Oneida*,
   414 U.S. 661 (1974)..........................................................................20

iv

*ONY, Inc.* v. *Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013)...........................................................................33

*Pac. Coast Fed'n of Fishermen's Ass'ns* v. *Chevron Corp.*,
2023 WL 7299195 (N.D. Cal. Nov. 1, 2023) ...................................................32

*Pampillonia* v. *RJR Nabisco, Inc.*,
138 F.3d 459 (2d Cir. 1998).................................................................9, 10, 13

*Philadelphia Newspapers, Inc.* v. *Hepps*,
475 U.S. 767 (1986) .......................................................................................33

*United States* v. *Pink*,
315 U.S. 203 (1942).......................................................................................22

*Purdue Pharma L.P.* v. *Kentucky*,
704 F.3d 208 (2d Cir. 2013).............................................................................32

*Qatar* v. *First Abu Dhabi Bank PJSC*,
432 F. Supp. 3d 401 (S.D.N.Y. 2020) .......................................................34, 35

*Rodriguez* v. *Casa Chapa S.A., de C.V.*,
394 F. Supp. 2d 901 (W.D. Tex. 2005).............................................................9, 10

*Sawyer* v. *Foster Wheeler LLC*,
860 F.3d 249 (4th Cir. 2017) ..........................................................................28

*Simmons* v. *Trans Express Inc.*,
37 N.Y.3d 107 (2021) ...............................................................................11, 12

*Snyder* v. *Phelps*,
562 U.S. 443 (2011)........................................................................................33

*Song* v. *Charter Communications, Inc.*,
2017 WL 1149286 (S.D. Cal. Mar. 28, 2017) ...................................................31

*Georgia* v. *Tennessee Copper Co.*,
206 U.S. 230 (1907)........................................................................................20

*Texas Indus., Inc.* v. *Radcliff Materials, Inc.*,
451 U.S. 630 (1981)...........................................................................15, 17, 18

*Watson* v. *Philip Morris Cos.*,
551 U.S. 142 (2007).................................................................................24, 28

*Whitaker* v. *Am. Telecasting, Inc.*,
261 F.3d 196 (2d Cir. 2001).......................................................................9, 14

*Williams* v. *Int'l Gun-A-Rama*,
    416 F. App'x 97 (2d Cir. 2011) ...................................................................35

*Willingham* v. *Morgan*,
    395 U.S. 402 (1969)...............................................................................24, 28

*In re WorldCom, Inc. Sec. Litig.*,
    2003 WL 21031974 (S.D.N.Y. May 5, 2003) ..........................................35

**Statutes**

28 U.S.C. § 1331 ...............................................................................................8, 23

28 U.S.C. § 1332(a) ................................................................................................8

28 U.S.C. § 1332(d) ....................................................................................4, 31, 32

28 U.S.C. § 1367 ....................................................................................................8

28 U.S.C. § 1441(a) ................................................................................................8

28 U.S.C. § 1442(a)(1)....................................................................................24, 25

28 U.S.C. § 1453(b) ....................................................................................4, 31, 32

**Other Authorities**

14C Charles Alan Wright et al., *Federal Practice and Procedure* § 3722.1
    (Rev. 4th ed. updated July 7, 2023) .........................................................8

Fed. R. Civ. P. 23 .................................................................................................31

S. Rep. No. 109-14 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3........................31

U.S. Const. art. I, § 8, cl. 17................................................................................29

## PRELIMINARY STATEMENT

This case belongs in federal court, just like the case the City of New York ("City") filed against these energy companies over four years ago, challenging the same conduct. Disappointed that its prior suit was dismissed, the City now seeks to relitigate the same issues in a different forum. But despite the City's artful pleading, this case, like the prior lawsuit, belongs in a federal forum. The City's motion to remand should thus be denied.[1]

In 2018, the City sued BP p.l.c., Chevron Corporation, ConocoPhillips, Exxon Mobil Corporation, and Royal Dutch Shell plc in this court, alleging that the defendant energy companies "promote[d] fossil fuel consumption" by "downplay[ing] the threat posed by climate change." Notice Ex. 6 ¶ 131.[2] The district court dismissed the City's complaint, *City of New York* v. *BP p.l.c.* ("*City of New York I*"), 325 F. Supp. 3d 466, 475–76 (S.D.N.Y. 2018), and the Second Circuit affirmed, *City of New York* v. *Chevron Corp.* ("*City of New York II*"), 993 F.3d 81, 91 (2d Cir. 2021).

Rather than seek further appellate review, the City filed this case in state court just weeks later. Like *City of New York*, this case accuses Defendants of promoting oil and natural gas sales by misleading the public about climate change. Hoping to avoid the federal courts where it lost on these same issues once before, the City named as a defendant ExxonMobil Oil Corporation ("EMOC"), a non-diverse affiliate of Exxon Mobil Corporation that had not been named in *City of New York*, and attempts to recast its claims as arising under the City's consumer protection laws. None of those modifications deprive this Court of jurisdiction.

---

[1]   By filing this brief in opposition to the City's motion to remand, Defendants do not waive any right, defense, affirmative defense, or objection, including any challenges to personal jurisdiction over Defendants.

[2]   *See also* ECF No. 1-6, Notice Ex. 6, Am. Compl., *City of New York* v. *BP p.l.c., et al.*, No. 18-cv-0182-JFK (S.D.N.Y. Mar. 16, 2018).

EMOC is a strawman against which the City has made no specific allegations or claims for relief. The City proffers no meaningful reason why it named EMOC a defendant in addition to its diverse parent company, demonstrating the outright fraudulent nature of EMOC's joinder. And there is no possibility that the City can recover against EMOC (a party in privity with a prior defendant) for claims that arise out of the same series of transactions—Defendants' promotion of fossil fuels and their alleged misrepresentations about their products' risks and benefits—that formed the basis of the City's claims in *City of New York*. The City cannot take a second bite at the apple by adding a previous defendant's subsidiary and dressing up its same claims in new legal theories.

Moreover, the City's claims belong in federal court because they remain fundamentally federal in nature. As in *City of New York*, the City seeks relief here that would suppress fossil-fuel sales in order to reduce greenhouse gas emissions and combat what the City believes are fossil fuels' "severe and deadly consequences for people and the environment." Compl. ¶ 3.[3] The City believes, if not hopes, that New York City consumers would "purchase fewer—or no—fossil fuel products" at all absent Defendants' purportedly misleading statements. *Id.* ¶ 24. It hopes to accomplish this objective by controlling the public statements energy companies make in nationwide communications about their businesses and climate change, which have allegedly "enabled the unabated and expanded" extraction, production, and sale of fossil fuels. *Id.* ¶ 8. Such litigation requires a court to pass judgment on the accuracy of statements about the merits of fossil fuels and what role, if any, they might play in meeting energy demand as society transitions toward a lower-carbon future. Resolving the City's claims necessarily implicates the myriad laws,

---

[3]   "Compl." refers to ECF No. 1-5, Notice Ex. 5, Summons and Verified Complaint. "Br." refers to ECF No. 69, Mem. of Law ISO Pl.'s Renewed Mot. to Remand to State Court.

regulations, and treaties of the United States concerning fossil fuel production and greenhouse gas emissions.

The City offers a fig leaf in response. Despite having filed this lawsuit on Earth Day, designating the chief of the City's Environmental Law Division as lead attorney, and boasting in a press release that this lawsuit could help "stop climate change in its tracks," the City promises the Court that its lawsuit has nothing to do with combating climate change or curbing greenhouse gas emissions.[4]  In the City's telling, this is simply a consumer-protection lawsuit under the New York City Consumer Protection Law ("CPL") that will have no effect on energy companies' ability "to extract, produce, and sell as much fossil fuel as they can."  Br. 22.  This Court should not be fooled.  The City has crafted its Complaint to obscure the centrality of federal law (and thereby try to evade federal jurisdiction) by focusing on public statements that allegedly induced greenhouse gas emissions to levels the City considers unlawful, rather than on the emissions themselves.  But, as the Second Circuit recognized just a few weeks before the City filed this action, "the City's focus on this 'earlier moment' in the global warming lifecycle is merely artful pleading and does not change the substance of its claims."  *City of New York II*, 993 F.3d at 97. The federal nature of the City's asserted claims and requested relief, and not Plaintiff's artful pleading, demonstrates that this case belongs in federal court.

All told, there are six separate grounds that provide independent bases for federal subject matter jurisdiction:

- *First*, this Court has diversity jurisdiction.  The City seeks to avoid this by fraudulently joining one New York-based defendant, EMOC.  But the City alleges the same theory of liability it presented in its earlier litigation and makes zero specific substantive

---

[4]   Press Release, City of New York, *New York City Sues ExxonMobil, Shell, BP, and The American Petroleum Institute for Systematically and Intentionally Deceiving New Yorkers* (Apr. 22, 2021), https://www.nyc.gov/office-of-the-mayor/news/293-21/new-york-city-sues-exxonmobil-shell-bp-the-american-petroleum-institute-systematically.

allegations against EMOC.  The City therefore joined EMOC as a "strawman" defendant in an attempt to circumvent and re-litigate its prior claims in state court.

- *Second*, the City's claims necessarily arise under federal common law because they implicate the regulation of transboundary pollution and foreign affairs.  The claims are completely preempted.  They also require the resolution of substantial, disputed questions of federal law about national energy policy and environmental protection.

- *Third*, the City's claims are connected to actions Defendants undertook at the direction of federal officers, warranting removal under the federal officer removal statute.

- *Fourth*, this action arises out of Defendants' promotional activities occurring on federal enclaves across the country and within New York City.

- *Fifth*, the Class Action Fairness Act permits removal of this case because it is in substance a representative action on behalf of a class of New York City consumers.

- *Sixth*, the City's claims involve affirmative federal constitutional elements because they target Defendants' speech on a matter of public concern.

For each of these independent reasons, the City's motion to remand should be denied.

## BACKGROUND

**A.    The City's First Lawsuit Challenging Defendants' Production, Promotion, and Sale of Fossil Fuels Was Dismissed with Prejudice.**

On January 9, 2018, the City filed a lawsuit against BP, Chevron, ConocoPhillips, Exxon Mobil Corporation, and Royal Dutch Shell in the Southern District of New York.  *City of New York I*, 325 F. Supp. 3d at 468.  The City alleged that the defendants "extensively promoted fossil fuels for pervasive use" and misled the public by "denying or downplaying" the risks of climate change.  *Id.* at 469.  The defendants allegedly caused "recurring" and "increasingly severe injuries" to the City by "continu[ing] to produce, market, distribute, and sell fossil fuels in massive quantities" and "promot[ing] fossil fuel consumption in these massive quantities."  *Id.* at 469–70.  That complaint purported to proceed under state common law.  *Id.* at 470.

The district court dismissed the case, concluding that federal common law governed the City's claims even though the complaint referenced only state law.  Because the City's claims

were "based on the 'transboundary' emission of greenhouse gases," the court concluded that they "arise under federal common law and require a uniform standard of decision." *Id.* at 472.  The court dismissed the City's complaint with prejudice because the Clean Air Act displaces claims arising from domestic greenhouse gas emissions, and foreign policy considerations precluded any remaining claims premised on extraterritorial greenhouse gas emissions. *Id.* at 472–76.

**B.      The Second Circuit Affirmed Dismissal of the City's First Lawsuit and Held That Federal Common Law Governed the City's Nominal State-Law Claims.**

In 2021, the Second Circuit unanimously affirmed the district court, holding that the City's claims were governed by federal common law. *City of New York II*, 993 F.3d at 91, 95.  As the Second Circuit explained, federal common law governs claims seeking redress for global climate change, regardless of the plaintiff's chosen cause of action, because climate change is a "uniquely international problem" that is "not well-suited to the application of state law." *Id.* at 85–86.

*First*, the Second Circuit rejected the City's argument that the case concerned only the "production, promotion, and sale of fossil fuel" and not the direct regulation of emissions. *Id.* at 91.  As the Second Circuit explained, the City's claims hinged on the link between fossil fuels releasing greenhouse gases and the effect of those emissions on the environment; "artful pleading" of claims could not "transform" the complaint into "anything other than a suit over greenhouse gas emissions" governed by federal law. *Id.*  Nor could the City "disavow[] any intent to address emissions" while "identifying such emissions" as the source of its harm. *Id*.

*Second*, the Second Circuit held that the City's claims amounted to a "clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *Id.*  Because any steps the defendants might take to mitigate their liability would "take effect across" jurisdictions, the case implicated the "conflicting rights" of states and foreign nations, "the quintessential example

of when federal common law is most needed." *Id*. at 92.  "Such a sprawling case," the court held, "is simply beyond the limits of state law." *Id*.

*Third*, subjecting the defendants' global operations to a multitude of state laws "could undermine important federal policy choices." *Id.* at 93.  The Second Circuit reasoned that allowing "this suit to proceed under state law would further risk upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *Id.*  Given these significant federal policy interests and the need for uniformity, the Second Circuit held that federal common law applied.

**C.     The City Again Seeks Redress for Global Climate Change, This Time Nominally Under a Municipal Consumer Protection Law.**

The City did not seek rehearing or Supreme Court review of *City of New York II*.  Instead, just three weeks after the Second Circuit's ruling, the City commenced this action against Defendants, focusing again on an "earlier moment" in the causal chain of greenhouse gas emissions.  *City of New York II*, 993 F.3d at 97.  Specifically, the City challenges Defendants' marketing and promotion as purportedly increasing consumer demand for fossil fuels, resulting in increased greenhouse gas emissions.

Like it did in its 2018 lawsuit, the City again alleges that Defendants engaged in a campaign to mislead consumers about climate change by failing to disclose the climate impacts of their "emissions-reducing" fossil fuel products and by "greenwashing" their corporate brands.  *See* Compl. ¶¶ 20, 26, 34.  According to the City, Defendants' conduct amounted to actionable "deception" because it "enabled the unabated and expanded *extraction*, *production*, promotion, marketing, and sale of fossil fuel products" and corresponding climate impacts.  Compl. ¶ 8 (emphasis added).  Much like its past lawsuit, the City's current claims are largely driven by its

allegations that the emissions caused by the use of Defendants' fossil fuels are the primary driver of climate change, causing harm to the City and its residents.  *Id.* ¶ 3; *see id*. ¶ 18 ("Consumer use of fossil fuel products . . . is a significant contributor to climate change" that creates "threats to people in New York City.").   The identical language used in both of the City's complaints demonstrates the similarities between the cases.[5]

The City's allegations make clear that it does not challenge the factual accuracy of representations about Defendants' products but, rather, whether Defendants' products should be sold *at all*.   The City takes issue with Defendants' "doubling down on fossil fuel extraction, production, and sales" and "maintaining fossil fuels as the core driver of their business model during the next decade" precisely because it is "the crucial window of time in which the world must drastically slash greenhouse gas emissions."   *Id*. ¶ 42.   Its remand motion likewise acknowledges that this suit is about Defendants allegedly using "unlawful deception *to inflate the market for their fossil-fuel products*," as Defendants "plan to *dramatically ramp up* fossil-fuel production in the coming years," with corresponding increases in greenhouse gases.  Br. 4, 14 (emphases added).

The City's own public statements confirm that this lawsuit is part of a larger scheme to decrease fossil fuel sales and curb greenhouse gas emissions.  The City filed this lawsuit on Earth Day and proclaimed it as part of the City's efforts to "do everything in [its] power to . . . stop climate change in its tracks."  Press Release, *supra* n.4.  Tellingly, this suit is being litigated not by the City's Department of Consumer and Worker Protection but by attorneys who specialize in

---

5    *Compare, e.g.*, Notice Ex. 6 ¶ 100, *with* Compl. ¶ 14(c) (claiming that Defendants "promote[d] disinformation"); Notice Ex. 6 ¶ 109, *with* Compl. ¶ 40 (claiming that Defendants "bombard[ed] . . . consumers" with deceptive advertisements); Notice Ex. 6 ¶ 6, *with* Compl. ¶ 6 (claiming that Defendants portrayed fossil fuels as "environmentally responsible"); Notice Ex. 6 ¶ 109(b), *with* Compl. ¶ 65 (claiming that Defendants misleadingly portrayed natural gas as "cleaner-burning"); Notice Ex. 6 ¶ 6, *with* Compl. ¶ 27 (comparing Defendants' strategies to those purportedly used by the tobacco industry to "downplay" the risks of cigarettes).

environmental matters and climate change—i.e., the Chief of the City's Environmental Law Division, as well as Sher Edling LLP, which has brought over a dozen similar lawsuits across the country against the same energy companies aimed at curtailing fossil fuel use,[6] and which has reportedly received grants worth $1.75 million from Resources Legacy Fund, an organization that advocates curbing the production and sale of fossil fuels.[7]

## LEGAL STANDARD

A defendant may remove any civil action over which a federal district court has original jurisdiction. 28 U.S.C. § 1441(a). That applies to "all civil actions arising under the Constitution, laws, or treaties of the United States," *id.* § 1331, or where the matter in controversy exceeds $75,000 and is between citizens of different states, *id.* § 1332(a). Although the party opposing remand bears the burden of establishing that jurisdiction exists in federal court, *see Blockbuster, Inc.* v. *Galeno*, 472 F.3d 53, 57-58 (2d Cir. 2006), removal is proper if jurisdiction exists over any single claim, *see* 28 U.S.C. § 1367; *Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 559 (2005). The inherently federal nature of the claims stated on the face of the complaint, not a plaintiff's characterization of them as state law claims, is controlling. *See Calhoon* v. *Bonnabel*, 560 F. Supp. 101, 104–05 (S.D.N.Y. 1982); *see also* 14C Charles Alan Wright et al., *Federal Practice and Procedure* § 3722.1 (Rev. 4th ed. updated July 7, 2023).

## ARGUMENT

### I.   This Court Has Diversity Jurisdiction Under the Fraudulent Joinder Doctrine.

The Court has diversity jurisdiction, 28 U.S.C. § 1332(a), because the amount in controversy exceeds the jurisdictional threshold and the only non-diverse party, EMOC, is

---

[6]   *See Climate Damage and Deception*, Sher Edling LLP, https://www.sheredling.com/cases/climate-cases/# (last visited Oct. 19, 2023).

[7]   *See* Spencer Walrath, *Law Firm Behind Washington D.C. Climate Lawsuit Received Over $1.7 Million in Grant Money from Activist Foundation*, Energy In Depth (July 7, 2020), https://www.energyindepth.org/law-firm-behind-washington-d-c-climate-lawsuit-received-over-1-7-million-in-grant-money-from-activist-foundation/.

fraudulently joined.  Notice ¶¶ 178–79, 188–91.  "[A] plaintiff may not keep a case out of federal court by fraudulently naming a nondiverse defendant." *Mississippi ex rel. Hood* v. *AU Optronics Corp.*, 571 U.S. 161, 174 (2014); *Briarpatch Ltd., L.P* v. *Phoenix Pictures, Inc.*, 373 F.3d 296, 302 (2d Cir. 2004).  Fraudulent joinder exists if (1) there has been outright fraud in the pleadings or (2) there is no possibility, based on the pleadings, that a cause of action will lie against EMOC. *Pampillonia* v. *RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998).  Defendants have shown both.

### A.    The City Has Committed "Outright Fraud" By Joining EMOC.

For jurisdictional purposes, courts ignore a non-diverse "strawman" defendant with no alleged connection to the events at issue and against whom the plaintiff has "no real interest in gaining a judgment."  *Rodriguez* v. *Casa Chapa S.A., de C.V.*, 394 F. Supp. 2d 901, 908 (W.D. Tex. 2005).  EMOC squarely fits that description.  Aside from identifying the location of EMOC's state of incorporation and principal place of business, and observing that it is a wholly owned subsidiary of Exxon Mobil Corporation, the City does not make a single allegation specific to EMOC.  The City does not allege that EMOC, specifically, created or disseminated any "unlawful advertising[] which deceptively exaggerates [its] investments in clean energy and falsely portrays [its] fossil fuel products as environmentally friendly."  Br. 28.  Nothing in the Complaint explains what role, if any, EMOC played in the misconduct alleged here.  The City instead resorts to inaccurate and improper joint pleading, referring to EMOC and Exxon Mobil Corporation collectively as "ExxonMobil."  Compl. ¶ 11(e).  Conflating the two entities does not make EMOC any less of a strawman.  *See Doe* v. *Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 32 (D.D.C. 2008).

The City also has "no real interest in gaining a judgment against" EMOC.  *Rodriguez*, 394 F. Supp. 2d at 908.  Fraudulent joinder occurs when the plaintiff does not request relief against the non-diverse defendant.  *See Whitaker* v. *Am. Telecasting, Inc.*, 261 F.3d 196, 207 (2d Cir. 2001).  The City does not suggest that a judgment against Exxon Mobil Corporation, EMOC's parent

company, would not yield complete relief. And when the City previously sued Exxon Mobil Corporation for the same misconduct alleged here—"promot[ing] fossil fuels for pervasive use, while denying or downplaying" the threat of climate change—the City did not name EMOC as a defendant, and stated that Exxon Mobil Corporation "control[led] all relevant decisions" of its subsidiaries, who acted only as its agents. *City of New York I,* 325 F. Supp. 3d at 469; *see also* Notice Ex. 6, 2018 Compl. ¶ 22 ("Defendants are responsible for their subsidiaries' . . . production and promotion of fossil fuel products.").

The City argues that it named EMOC as a defendant here because its previous lawsuit sought to recover damages under tort law for physical climate harms, whereas its current suit seeks civil penalties for unlawful advertising. Br. 27–28. That is a meaningless distinction. As discussed above, the City's prior suit challenged Exxon Mobil Corporation's promotion of fossil fuels. And nothing in the Complaint explains what role EMOC, as distinct from Exxon Mobil Corporation, played in the advertising challenged here. Tellingly, the City does not seek any injunctive relief or civil penalties from EMOC in particular. *See* Compl. Prayer for Relief. The City's failure to request any relief specifically from EMOC confirms that EMOC was fraudulently joined here as a "'strawman' to defeat jurisdiction." *Rodriguez,* 394 F. Supp. 2d at 908. Thus, EMOC's joinder is an outright fraud, and this Court should ignore its citizenship.

## B. Because the City's Claims Are Barred by *Res Judicata*, There Is No Possibility of Recovery Against EMOC.

Defendants have also shown fraudulent joinder because the City's claims against EMOC are barred by *res judicata*, conclusively establishing that there is "no possibility" that the City can state a viable cause of action against EMOC in state court. *Pampillonia,* 138 F.3d at 461.[8]

---

[8] The City argues that Defendants have abandoned this argument, but that is incorrect. Contrary to the City's argument, Br. 27–28, Defendants have not "disclaimed" fraudulent joinder under the no-possibility test. Rather,

The doctrine of *res judicata* bars litigation if an earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privities, and (4) involving the same cause of action.  *See Simmons* v. *Trans Express Inc.*, 37 N.Y.3d 107, 111 (2021).  All elements are satisfied here.  First, *City of New York* resulted in a final judgment dismissing the City's claims against Exxon Mobil Corporation on the merits.  Second, the judgment was rendered by a competent court, the Southern District of New York.  Third, this case involves the same parties and their privities.  The City's first suit alleged that Exxon Mobil Corporation was "responsible for [its] subsidiaries' past and current production and promotion of fossil fuel products and future plans regarding production and promotion."  Notice Ex. 6, 2018 Compl. ¶ 22.  The City thus sought to hold Exxon Mobil Corporation liable for "all relevant decisions" of its "respective corporate famil[y]"— including EMOC.  *Id.* ¶ 21.  In other words, *City of New York* encompasses the conduct of EMOC, because it sought to hold Exxon Mobil Corporation liable for its subsidiaries' conduct.

Fourth, the claims in both lawsuits arise out of the same alleged facts—Defendants' promotion of fossil fuels through their alleged misrepresentations about their products' risks and benefits.  Like this action, the City's claims in the 2018 suit were premised on allegations that **(i)** "Defendants continue to produce, ***market***, distribute, and sell fossil fuels," **(ii)** Defendants "***promote*** fossil fuel consumption" despite its role "exacerbat[ing] global warming," and **(iii)** Defendants "***downplay*** the threat" posed by the climate change impacts of these products. *City of New York I*, 325 F. Supp. 3d at 469–70 (emphases added).  As the Second Circuit acknowledged, the City's prior complaint also concerned the "'***promotion***[] and sale of fossil fuels.'" *City of New York II*, 993 F.3d at 91 (emphasis added and citation omitted).  Because this

---

in their previous brief opposing the City's Motion to Remand—a different motion than the one at issue here— Defendants focused instead on the outright fraud in the City's allegations regarding EMOC.  *See* Dkt. 47.

suit arises out of the same set of facts as the 2018 suit, the City should have brought its consumer protection claims in the first complaint. *See Simmons*, 37 N.Y.3d at 111.

The City argues that this case "allege[s] a different cause of action" and therefore does not satisfy the fourth element, because the Complaint pleads consumer protection claims rather than tort claims. Br. 28. But the City cannot escape the preclusive effect of *City of New York* by dressing up claims based on the same alleged misconduct under a different legal theory. New York courts have "consistently applied a 'transactional analysis approach' in determining whether an earlier judgment has claim preclusive effect." *Simmons*, 37 N.Y.3d at 111 (citation omitted). Under that analysis, "once a claim is brought to a final conclusion, *all other claims arising out of the same transaction or series of transactions* are barred, even if based upon different theories or if seeking a different remedy." *Id.* (emphasis in original). This approach prevents litigants from "taking two bites at the apple" by focusing on the *facts* giving rise to the suit, not the legal theories or remedies sought. *Id.* at 111–12.

Having lost its first suit, the City now seeks a second bite. The City challenges Defendants' promotion of fossil fuels as deceptive because they allegedly seek to "attract[] new consumers to their fossil fuel products and prevent[] the mass defection of existing consumers to cleaner alternatives that contribute substantially less to climate change." Compl. ¶ 8; *see also id.* ¶¶ 18–33. As in its prior lawsuit, the City alleges that Defendants' promotion of their products contributes to the alleged harms of climate change. *Id.* ¶¶ 3, 18. Indeed, the Complaint repeatedly references allegedly deceptive advertisements and promotional campaigns that ran long before the 2018 complaint was filed. *See, e.g.*, Compl. ¶¶ 31–32, App'x at 1–3.[9] The City has simply repackaged its prior lawsuit in the guise of consumer protection claims to re-litigate it in another forum.

---

[9] For example, the Complaint refers to advertisements for Synergy fuel stating that this fuel "[c]ontinually improve[s] environmental performance." Compl. ¶ 31(f). ExxonMobil has advertised its fuels in this way since

There is no reason to add a precluded claim against EMOC other than to avoid federal jurisdiction.  The fraudulent joinder doctrine forbids this type of gamesmanship.  *See Pampillonia*, 138 F.3d at 461.  The City argues that EMOC's *res judicata* defense has no bearing on the "outright fraud" test.  Br. 28.  But bringing a precluded claim to induce this Court to deny jurisdiction demonstrates the overall fraudulent nature of the City's pleadings.  And in any event, the City admits that a *res judicata* defense goes to the fact that there is "no possibility" of success against EMOC.  *Id*.  There is "no possibility" of success on a claim when a procedural defense—such as the statute of limitations or *res judicata*—bars the claim against the non-diverse defendant.  In *Briarpatch*, the Second Circuit addressed a claim of fraudulent joinder by asking whether the "defendants have met their burden to show that New York's law on collateral estoppel—i.e., issue preclusion—would have stood in the way of plaintiff's claims had this action remained in state court."  373 F.3d at 302.  If defendants met that burden, the Second Circuit held there would have been "no possibility" that the claims could be asserted in state court, and the non-diverse defendant was fraudulently joined.  *Id.*

*Joseph* v. *Kaye*, 2016 WL 3677142 (C.D. Cal. July 7, 2016), *aff'd*, 692 Fed. App'x 370 (9th Cir. 2017), is particularly instructive.  There, the court considered whether a final judgment in a prior federal RICO claim—stemming from the defendant's issuance and cancellation of a life insurance policy—barred adjudication of California state-law claims that arose out of the "same transactional nucleus of facts."  *Id.* at *6–*8.  The court held that, although the California claims

---

2016.  *See* Exxon Mobil Corp, Environmental Performance, https://web.archive.org/web/20161111122132/https://www.exxon.com/en/environment.  And the statements that the Complaint challenges in paragraph 32(b) have appeared since at least 2015.  *See* Shell, Shell Nitrogen Enriched Gasolines, http://web.archive.org/web/20150908135405/https://www.shell.us/motorist/shell-fuels/shell-nitrogen-enriched-gasolines.html, and Shell, Shell V-Power Nitro+ Premium Gasoline, http://web.archive.org/web/20150820025413/https://www.shell.us/motorist/shell-fuels/shell-v-power-nitro-plus-premium-gasoline.html.  *See also, e.g.*, Compl., App'x at 23 n.31 (challenging a BP YouTube marketing video that allegedly aired on December 6, 2017); *id.* at 32 (challenging API's "Power Past Impossible" campaign, which allegedly ran from November 2017 to January 2018).

alleged violations of different legal rights under a different jurisdiction's laws, both suits arose from the same underlying set of facts—the issuance and cancellation of the life insurance policy. *Id.* Accordingly, the claims against the defendants, including the non-diverse defendant in privity with the defendant in the first suit, were barred by *res judicata*. *Id.* at *5, *8–*9. With no possibility of success on the precluded claims against the non-diverse defendant, the court found fraudulent joinder and exercised diversity jurisdiction. *Id.* at *5.

Other courts have reached similar conclusions. In *Johnson* v. *Bank of America, N.A.*, 594 F. App'x 953 (11th Cir. 2014), the Eleventh Circuit found fraudulent joinder where the claim against the non-diverse defendant was barred by *res judicata* because "there existed no possibility that [plaintiff] could state a viable cause of action." *Id.* at 956. Likewise, the Third Circuit found fraudulent joinder where the cause of action was time-barred—another procedural defense that can establish fraudulent joinder. *See In re Briscoe*, 448 F.3d 201, 219 (3d Cir. 2006).

In sum, joinder is "considered fraudulent when it is established that there can be no recovery against the defendant under the law of the state on the cause alleged." *Whitaker*, 261 F.3d at 207 (citation omitted and alteration adopted). The claims against EMOC are barred under the doctrine of *res judicata*, so there can be no recovery against it under New York law. Accordingly, the claim against EMOC has no possibility of success, EMOC's joinder in this case constitutes outright fraud, and this Court should exercise diversity jurisdiction.

## II. The City's Claims Are Removable Because They Are Completely Preempted by Federal Common Law.

This Court has federal question jurisdiction over this suit because the City's claims are completely preempted by federal common law. "When federal common or statutory law so utterly dominates a preempted field that all claims brought within that field necessarily arise under federal law, a complaint purporting to raise state law claims in that field actually raises federal claims."

*Marcus* v. *AT&T Corp.*, 138 F.3d 46, 53 (2d Cir. 1998).  In this case, the City's claims are completely preempted by—and thus necessarily arise under—federal common law that governs claims based on transboundary pollution or implicating the foreign affairs of the United States. *See Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 425 (1964).

### A.   The Federal Common Law of Transboundary Pollution and Foreign Affairs Completely Preempts State Law Claims.

Facing dozens of lawsuits filed in various state courts asserting state-law claims for injuries allegedly caused by global climate change, Defendants have sounded a consistent theme: state law cannot apply and federal law necessarily governs.  In *Connecticut* v. *Exxon Mobil Corp.*, the Second Circuit made clear that the question of federal common law's complete preemptive effect "remains open" in the Second Circuit.  83 F.4th 122, 138 n.4 (2d Cir. 2023).  This case squarely presents that question.  This Court should resolve that question and hold that the federal common law of transboundary pollution and foreign affairs completely preempts state law, establishing federal question jurisdiction.

Second Circuit precedent holds that state-law causes of action are completely preempted where federal common law "so utterly dominates a preempted field that all claims brought within that field necessarily arise under federal law." *Marcus*, 138 F.3d at 53.  Federal law necessarily supplies the rule of decision for, and thus completely preempts, state-law claims that implicate "uniquely federal interests," such as where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Texas Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640–41 (1981) (citation omitted).  Such claims are removable to federal court, as they "arise[] under" federal law. *Beneficial Nat'l Bank* v. *Anderson*, 539 U.S. 1, 8 (2003).

Two such areas where federal common law so "utterly dominates a preempted field" that any claim "necessarily arises under federal law," *Marcus*, 138 F.3d at 53, are transboundary pollution and foreign affairs.  Contrary to the City's argument, the Court need not "expand the boundaries of federal common law" to find complete preemption.  Br. 16.  In these contexts, courts have long identified an "overriding federal interest in the need for a uniform rule of decision," *Illinois* v. *City of Milwaukee* ("*Milwaukee I*"), 406 U.S. 91, 105 n.6 (1972), which dictates that "state law cannot be used," *City of Milwaukee* v. *Illinois* ("*Milwaukee II*"), 451 U.S. 304, 313 n.7 (1981).  Those holdings make clear that federal common law dominates the field here.

*First*, "[e]nvironmental protection is undoubtedly an area within national legislative power" for which federal courts may "fashion" federal common law.  *Am. Elec. Power Co.* v. *Connecticut* ("*AEP*"), 564 U.S. 410, 421 (2011).  "When we deal with air and water in their ambient or interstate aspects, there is a federal common law."  *Milwaukee I*, 406 U.S. at 103.  "[I]nterstate . . . pollution is a matter of federal, not state, law."  *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 488 (1987).  The need to apply federal over state law arises from the structure of the U.S. Constitution itself, which "implicitly forbids" states from applying their own laws to resolve "disputes implicating their conflicting rights."  *Franchise Tax Bd.* v. *Hyatt*, 139 S. Ct. 1485, 1498 (2019) (cleaned up).  Allowing particular states to apply their law to govern disputes about interstate pollution would expose energy companies "to a welter of different states' laws" and "undermine important federal policy choices."  *City of New York II*, 993 F.3d at 93.

*Second*, issues concerning the United States' "relationships with other members of the international community must be treated *exclusively* as an aspect of federal law."  *Sabbatino*, 376 U.S. at 425 (emphasis added).  Accordingly, the Supreme Court has held that federal common law

exists to address "interstate and international disputes implicating . . . our relations with foreign nations." *Texas Indus., Inc.*, 451 U.S. at 641.

The Second Circuit has twice held that federal common law can, or likely can, establish complete preemption.  In *Nordlicht* v. *N.Y. Tel. Co.*, the court held that "federal law preempts state law in the area of interstate telecommunications" so completely that the plaintiff's "claims must necessarily arise under federal common law."  799 F.2d 859, 862 (2d Cir. 1986).  "If the only remedy available to plaintiff is federal, because of preemption or otherwise, and the state court necessarily must look to federal law in passing on this claim, the case is removable regardless of what is in the pleading." *Id.*  In light of the Supreme Court's subsequent decision in *Metropolitan Life Insurance Co.* v. *Taylor*, 481 U.S. 58, 66 (1987), the Second Circuit has since acknowledged that "federal common law does not completely preempt state law claims in the area of interstate telecommunications."  *Marcus*, 138 F.3d at 54.  But the court continued to recognize that "federal common or statutory law" may establish complete preemption under the right circumstances.  *Id.* at 53.  Similarly, in *Republic of Philippines* v. *Marcos*, the court stated that it is "probably" the case that "the federal common law in the area of foreign affairs is so 'powerful,' or important, as to displace a purely state cause of action of constructive trust," supporting federal jurisdiction in that case.  806 F.2d 344, 354 (2d Cir. 1986), *cert. denied*, 481 U.S. 1048 (1987).  The *Connecticut* court recently described the analysis of both *Marcus* and *Republic of Philippines* as being fundamentally rooted in the complete preemptive effect of federal law in areas where federal common law applies.  *See* 83 F.4th at 136, 138 n.4.

The City contends that federal law cannot completely preempt state law "unless Congress expressly says so in a statute."  Br. 10.  That is wrong.  When analyzing federal *statutes* for preemptive effect, the Supreme Court has focused on whether "Congress has clearly manifested

an intent to make causes of action . . . removable to federal court." *Metro. Life Ins. Co.* v. *Taylor*, 481 U.S. 58, 66 (1987). But the Court has not addressed whether the same test applies in the context of federal common law. The Second Circuit in *Marcus*—citing *Taylor*—applied a test based on congressional intent to the federal common law of interstate telecommunications, 138 F.3d at 54, but that made sense given the court's prior conclusion that the federal common law of interstate telecommunications *emerged from* the "comprehensive legislation" of the Federal Communications Act, *id.* at 53. The Court was thus analyzing the question whether, although "the FCA does not preempt state law claims directly" in light of *Taylor*, it could "manage[] to do so indirectly under the guise of federal common law." *Id.* at 54. *Marcus* answered no because, where federal common law derives from federal statutory law, "the complete preemption doctrine applies only where Congress has clearly manifested an intent to disallow state law claims in a particular field." *Id.*

It does not follow, however, that congressional intent controls the complete displacement of state law in all areas where federal common law governs—such as where federal common law arises from the constitutional structure itself, rather than comprehensive federal legislation. *See AEP*, 564 U.S. at 421 ("federal common law addresses subjects within national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands" (emphasis added and cleaned up)). Otherwise, a court would not need to ask whether "federal common law . . . so utterly dominates a preempted field" in analyzing its preemptive effect, *Marcus*, 138 F.3d at 53, as that question would be answered solely by statute. Moreover, when the Constitution's structure dictates that federal common law must govern, it is because "our federal system does not permit the controversy to be resolved under state law." *Texas Indus.*, 451 U.S. at 641. In other words, federal law exists because state law "cannot be used" at all.

*Milwaukee II*, 451 U.S. at 313 n.7.  Additional reference to a federal statute to define the scope of federal common law is unnecessary in such circumstances.  Indeed, the City has previously conceded that the federal common law of interstate pollution arises from the constitutional structure, not from any federal statutory law, and that, accordingly, "there is no issue of congressional intent" when courts are interpreting the federal common law of interstate pollution. *See* Br. for Resp'ts Connecticut, New York, California, Iowa, Rhode Island, Vermont, and the City of New York at 37-41, *Am. Elec. Power Co.* v. *Connecticut*, 564 U.S. 410 (2011) (No. 10-174).

*Finally*, the City argues that complete preemption is not possible because the federal common law identified "does not provide an alternative cause of action or remedy" given that the Clean Air Act has displaced "federal common law claims relating to domestic greenhouse gas emissions" and the Second Circuit declined to recognize a "cause of action targeting emissions emanating from beyond our national borders."  Br. 16-17 (citation omitted).  But the Second Circuit made clear that any claims in the area of transboundary pollution must be "federal common law claims," which necessarily substitute for the state-law claims asserted.  *City of New York II*, 993 F.3d at 101.  That makes sense and supports complete preemption regardless of the separate question whether Congress has narrowed the federal cause of action through statute.  In appropriate cases, some federal cause of action may exist for transboundary pollution claims where the source is a foreign state:  for example, only federal law could govern a claim for pollution from Canada affecting Michigan.  The Second Circuit's conclusion that "the scope of federal common law causes of action" for transboundary pollution does not encompass claims premised on global greenhouse gas emissions, *id.*, is fully consistent with the conclusion that "federal common law *can*"—and *does*— "have complete preemptive effect," *Connecticut*, 83 F.4th at 138 n.4.[10]

---

[10]   In any event, the City has confused questions over "jurisdiction" with "merits-related determination[s]."  *Arbaugh* v. *Y&H Corp.*, 546 U.S. 501, 511 (2006).  Whether the City may ultimately *obtain* a substitute remedy provided

**B.      The City's Claims Are Necessarily Governed by Federal Common Law.**

      **1.      The City's Claims Implicate the Federal Common Law of Transboundary Pollution.**

For more than a century, the Supreme Court has applied uniform federal rules of decision to common-law claims seeking redress for interstate pollution.  *See Georgia* v. *Tennessee Copper Co.*, 206 U.S. 230, 237 (1907); *see also City of New York II*, 993 F.3d at 91 (collecting additional cases).  Because the City's claims in this case implicate the transboundary pollution of fossil fuel activities, they "are governed by federal common law."  *City of New York II*, 993 F.3d at 99.

The Second Circuit previously rejected the City's attempt to mischaracterize its nuisance and trespass claims as unrelated to "the regulation of emissions."  *Id.* at 91.  The court concluded that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions.  It is precisely *because* fossil fuels emit greenhouse gases— which collectively 'exacerbate global warming'—that the City is seeking damages."  *Id.*[11]  The court recognized that the claims sought to impose "liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)," forcing energy companies to "cease global production altogether" in order to avoid liability.  *Id.* at 93.  The Second Circuit thus affirmed that federal common law governed the claims and further affirmed the dismissal of such claims as displaced by the Clean Air Act.  *Id.* at 95.

---

under federal common law must be distinguished from the question of whether federal common law applies in the first instance.  The latter is a determination "for jurisdictional purposes" that must be made by this Court regardless of whether the City's "claim[s] may fail at a later stage for a variety of reasons." *Oneida Indian Nation* v. *County of Oneida*, 414 U.S. 661, 675 (1974).  Accordingly, the Second Circuit refused to find that the Clean Air Act had "vaporized any preemptive effect that federal common law had on state law," concluding that "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because" of statutory displacement.  *City of New York II*, 993 F.3d at 98.  And its refusal to allow for recovery under federal common law for international emissions should not be interpreted as permitting state-law causes of action in this area to spring back into existence.  "Such an outcome is too strange to seriously contemplate." *Id.* at 98-99.

[11]   The Second Circuit's decision in *Connecticut* did not undermine its conclusion in *City of New York II* that the City's claims clearly implicated federal interests, but only rejected that federal common law represents "a *fourth* exception from the well-pleaded complaint rule," separate from complete preemption.  83 F.4th at 135–36.

Now the City has refashioned its claims by focusing exclusively on the CPL.  But the City's attempts to distinguish its past claims fall flat, as both suits seek to hold Defendants liable for their promotion, marketing, and sale of fossil fuels.  *See supra* I.B.  Although the City contends it only seeks civil penalties to regulate "Defendants' use of deceptive advertising to sell fossil fuels," Br. 12, the Complaint makes clear that Defendants' alleged "deception" is material and actionable precisely because it allegedly "enabled the unabated and expanded extraction, production, promotion, marketing, and sale of fossil fuel products."  Compl. ¶ 8.  In particular, the City attempts to trace Defendants' advertisements to climate impacts that it is seeking to curb through the suit:  The City alleges that consumers have been influenced to buy fossil fuels rather than "cleaner" alternatives, *see, e.g.*, *id.* ¶¶ 84, 92, 100, that consumers' use of Defendants' products along with "the extraction, refinement, and combustion of [Defendants'] fossil fuels" produces greenhouse gas emissions that contribute to climate change, *id.* ¶¶ 3, 26, 37, 83, and that those emissions allegedly harm the City, including by "driving up global temperatures," "eroding coastal shorelines," and "creating other unprecedented threats to people in New York City and elsewhere," *id.* ¶ 18.

By controlling Defendants' public statements, the City hopes to persuade consumers to "purchase fewer—or no—fossil fuel products" and reduce "a primary driver of climate change and the resultant dangers to the environment and people."  *Id.* ¶ 24.  This raises the risk of "upsetting the careful balance that has been struck" by the federal government "between the prevention of global warming, . . . on the one hand, and energy production, economic growth, foreign policy, and national security, on the other."  *City of New York II*, 993 F.3d at 93.  Even while targeting an "earlier moment" in the causal chain, the City's action still "hinges on the link between the release of greenhouse gases and the effect those emissions have on the environment generally."  *Id.* at 97.

Accordingly, the City's claims "necessarily 'arise[] under'" the federal common law that governs disputes over transboundary emissions. *Franchise Tax Bd.*, 463 U.S. at 24.

### 2. The City's Claims Implicate Federal Common Law of Foreign Affairs.

The City's claims also must arise under federal common law because they implicate the foreign affairs of the United States. Defendants' Notice, ¶¶ 48–55, outlines the complex and carefully calibrated network of international treaties—dating back to 1959 and continuing to as recently as the 2015 Paris Agreement—that have struck the "balance" between environmental protection and "energy production, economic growth, foreign policy, and national security." *City of New York II*, 993 F.3d at 93. As the Second Circuit correctly observed, the "project" of combating climate change "necessarily requires national standards and global participation." *Id.* By contrast, the City's state-law claims would "effectively" seek to require Defendants to take action "across every state (and country)" based on New York law, all "without asking what the laws of those other states (or countries) require." *Id.* at 92. This would infringe on the federal government's exclusive power over external affairs, *see United States* v. *Pink*, 315 U.S. 203, 233 (1942), preventing it from setting uniform environmental, trade, and energy policies with other nations. Based on the "power[]" and "import[ance]" of federal common law in the area of foreign relations, the Second Circuit has indicated that it likely "displace[s] a purely state cause of action" and establishes federal jurisdiction. *Republic of Philippines*¸ 806 F.2d at 354.

The City's lawsuit again seeks to hold Defendants liable for the *worldwide* production, marketing, and sale of fossil fuels. *See, e.g.*, Compl. ¶ 3 ("extraction, refinement, and combustion of [Defendants'] fossil fuels are the primary driver of climate change"), ¶ 6 ("[Defendants'] overall businesses . . . continues to be overwhelmingly focused on fossil fuel production and sales"). The City alleges Defendants' advertising "increases greenhouse gas emissions." *Id.* ¶ 26. But "[g]reenhouse gas molecules cannot be traced to their source," "quickly diffuse," and "comingle

in the atmosphere." *City of New York II*, 993 F.3d at 92.  Defendants are thus faced with the choice of undertaking systemic changes in their operations across the world to avoid future lawsuits.  Such a global remedy "implicates . . . our relations with foreign nations" and is thus "the quintessential example of when federal common law is most needed." *Id.* (cleaned up).

The City cannot seriously claim that the Complaint "does not have anything to do with 'preferred greenhouse gas emissions levels,'" Br. 14, when it makes clear it is targeting Defendants' alleged deception because it has "enabled the unabated and expanded extraction, production, promotion, marketing, and sale of fossil fuel products," Compl. ¶ 8.  Once again, emissions are central to the City's allegations.  *See City of New York II*, 993 F.3d at 91 ("Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions.").  The City's claims are thus completely preempted and necessarily governed by federal common law and may be removed to this Court under 28 U.S.C. § 1331.

## C.    The Notice of Removal Relied on the Complete Preemption Doctrine.

Defendants' argument for removal based on complete preemption by federal common law is properly before this Court.  As the Second Circuit explained in *Connecticut*: a non-diversity case that does not affirmatively allege a federal claim is only removable "(1) if Congress expressly provides, by statute, for removal of state-law claims"; "(2) if the state-law claims are completely preempted by federal law"; and (3) "if the vindication of a state-law right necessarily turns on a question of federal law," and that "the 'artful-pleading doctrine' refers to nothing more and nothing less than the first and second of these exceptions." *Connecticut*, 83 F.4th at 138 (cleaned up).  The Second Circuit held that Exxon's materially identical Notice in *Connecticut*, standing alone, "would squarely present the question" whether federal common law can give rise to complete

23

preemption and completely preempted Connecticut's claims. *Id.* at 139 n.4.[12]  Here, Defendants invoked the artful pleading doctrine, Notice ¶ 63, properly raising complete preemption as a ground for removal.

Moreover, the *Connecticut* court cited two decisions as articulating and affirming a theory of removal based on the complete preemptive effect of federal common law.  *See id.* at 136, 140 n.4 (citing *Republic of Philippines*, 806 F.2d at 354, and *Nordlicht*, 799 F.2d at 862).  These are the very precedents on which Defendants relied in arguing for removal based on federal common law under the artful pleading doctrine.  *See* Notice ¶¶ 43–44, 61.  Accordingly, this Court can (and must) decide Defendants' complete preemption theory of removal.

## III.     This Action Is Removable Under the Federal Officer Removal Statute.

Defendants properly removed this action because the claims necessarily take aim at Defendants' production and supply of oil and gas under the guidance, supervision, and control of the federal government.  *See* 28 U.S.C. § 1442(a)(1).  The federal officer removal statute authorizes removal where, as here, defendants are "person[s] under the statute" who "acted under color of federal office" and who have "a colorable federal defense."  *Agyin* v. *Razmzan*, 986 F.3d 168, 174 (2d Cir. 2021) (cleaned up).  This reflects the policy that persons acting under federal officers "require the protection of a federal forum."  *Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969).

The federal officer removal statute is to be "liberally construed" in favor of a federal forum. *Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 147 (2007).  Courts must credit defendants' "theory of the case when evaluating the relationship between the defendants' actions and the federal officer."  *Agyin*, 986 F.3d at 175 (cleaned up).  The City's focus on Defendants' alleged

---

[12]    The Second Circuit declined to resolve that "important" question *only* because it found that the defendant had "conceded" in subsequent briefings that it was not relying on complete preemption by federal common law.  *Id.* No such concession has occurred here, and the question is squarely presented here for the Court's consideration.

misstatements and omissions "does not change the substance of its claims," *City of New York II*, 993 F.3d at 97, which challenge Defendants' "misinformation" campaigns precisely because they purportedly led to the production and sale of *more* oil and gas and thus *more* emissions.  Because this theory of the case is plausible, the Court must credit it when assessing federal officer removal.

Defendants satisfy all of the statute's elements.  It is undisputed that Defendants are persons under the statute.  Defendants have acted "under color of federal office," and raise numerous colorable federal defenses.  Defendants acknowledge that the Second Circuit in *Connecticut* interpreted the federal officer removal statute to impose a strict causal-nexus requirement that would foreclose the statute's application to this suit on the current record.  Nevertheless, Defendants respectfully renew and preserve the argument, for purposes of potential further appellate review, that, "[b]y the Removal Clarification Act [of 2011], Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc).[13]  Under that standard, and based on the expanded record presented here compared to *Connecticut*, a sufficient connection exists between Defendants' actions under federal officers and the challenged conduct in this lawsuit.  *See, e.g.*, *Cnty. Bd. of Arlington Cnty., Virginia* v. *Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 256 (4th Cir. 2021) (noting that the "'connection or association' standard is broader than the old 'causal nexus' test that we abandoned after the Removal Clarification Act").

---

[13]   In *Connecticut*, the Second Circuit addressed this argument only in a footnote, stating that the Circuit had continued to apply a causal-nexus requirement in decisions post-dating the Removal Clarification Act, citing *Agyin*.  But the *Agyin* Court did not have to consider whether a "connected or associated" test would apply because the defendant was sued "for" the medical care he provided under federal authority, not conduct "relating to" activities under federal officers, which Congress also has stated permits removal.  *See* 28 U.S.C. § 1442(a)(1).

A.      Defendants "Acted Under" Federal Officers.

Defendants have "acted under color of federal office."  Courts should interpret the "acting under" provision of the federal officer removal statute "especially" broadly.  *Agyin*, 986 F.3d at 175.  To satisfy this prong, Defendants must show that their relationship with the government "involves 'an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.' "  *Id.* (quoting *Watson*, 551 U.S. at 152).  The Supreme Court has approved removal in cases involving defendants "working hand-in-hand with the federal government" to further the government's ends, "help[ing] the Government to produce an item that it needed," and "perform[ing] a job that . . . the Government itself would have had to perform."  *Id.* at 175–77 (citations omitted).

In *Connecticut*, the Second Circuit rejected ExxonMobil's attempt "to invoke federal-officer removal jurisdiction based on two categories of its current and historical business dealings with the federal government": (1) its leases of oil drilling sites and (2) its provision of fossil fuels to the military during World War II.  *Connecticut*, 83 F.4th at 143–44.  The City's renewed remand motion attempts to cross-apply the Second Circuit's analysis in *Connecticut* to this case but ignores that Defendants have submitted new evidence to better illustrate the requisite level of governmental control and the underlying federal objective that Defendants' contracts with the government were intended to accomplish.

Most significantly, the Notice of Removal describes in detail Defendants' provision to the government of highly specialized, noncommercial-grade fuels for military use.  Notice ¶¶ 85–95.[14]  For instance, the Notice describes how Shell Oil Company "developed and produced for the federal government specialized jet fuel to meet the unique performance requirements" of certain spy planes, constructed "special fuel facilities" for handling and storage, including pipelines and

---

[14]   Defendants dispute the City's attempt to attribute the actions of their predecessors, subsidiaries, or affiliates, but accept the allegations as true only for purposes of determining whether the pleading supports removal jurisdiction.

storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts.  *Id.* ¶ 87; *see also, e.g.*, *id.* Ex. 14 at 1 ("This work is under the technical direction of Colonel H. Wilson[.]").

More recently, both Shell Oil Company and BP (or their affiliates) have contracted with the Department of Defense to supply vast quantities of military-grade fuels essential for high-performance military engines.  *See* Notice ¶¶ 89–94.  Defendants' production and supply of bespoke fuel products in conformity with detailed military specifications is the archetypal example of contractors working under federal officers.  *See Baker* v. *Atl. Richfield Co.*, 962 F.3d 937, 943 (7th Cir. 2020).  In addition, the record includes evidence beyond that presented in *Connecticut* of Defendants acting under federal officers during not just World War II but also the Korean War, Notice ¶¶ 96–97, and the oil embargoes of the 1970s, *id.* ¶ 118.

Defendants also have supplemented this record with evidence showing that their federal onshore and Outer Continental Shelf ("OCS") leases are not generic "arm's-length" contracts but, rather, "fulfill[] basic governmental duties" that the federal government would otherwise have had to perform itself.  *See id.* ¶¶ 82; 119–40.  The expanded evidentiary record here shows that the federal government "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own."  *Id.* ¶ 132.  And the *federal government*, not the oil companies, "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" and, accordingly, "the policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling."  *Id.* (cleaned up).  Moreover, contrary to the Second Circuit's conclusion in *Connecticut*, the record in this case establishes that oil produced under OCS leases is *not* "produced to sell on the open market" only, 83 F.4th at 143, but also "on the government's behalf," Notice ¶ 137; *see, e.g.*, *id.*

¶ 135 (explaining federal government's rights to purchase up to 16% of lease production, to direct lessee to deliver reserved production to DOD, and of first refusal to purchase all minerals).

Defendants performed all of these activities subject to federal officers' considerable "subjection, guidance, or control." *Watson*, 551 U.S. at 151. The federal government subjected Defendants to exacting standards and scrutiny, directing not just *what* Defendants would do for the government but *how* they were required to do it. This included detailed specifications for specialized jet fuels "required by military weapon systems." *See* Notice ¶¶ 85–95; *see also, e.g.*, *id.* Exs. 30, 31, 35 (jet fuel specifications), 32 (BP contracts). Defendants thus "*manufactured for the government*" non-commercial, military-grade fuels. *Sawyer* v. *Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017). And federal officer removal is appropriate whenever—as here—the government "require[s]" a defendant to manufacture contracted products "according to detailed [federal] specifications." *Baker*, 962 F.3d at 943, 947. Defendants thus acted under federal officers by "assisting" the federal government "in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm." *Arlington Cnty.*, 996 F.3d at 253 (4th Cir. 2021) (quoting *Watson*, 551 U.S. at 153–54).

**B.      Defendants' Defenses Are "Colorable."**

The City's argument that none of Defendants' asserted federal defenses are "colorable" relies on case law that improperly failed to credit Defendants' theory of the case and applied an impermissibly "narrow, grudging interpretation" of the statute. *Willingham*, 395 U.S. at 407; *see* Br. 20.[15] The federal defense need not be "clearly sustainable" at the remand stage, *Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 139 (2d Cir. 2008), nor should the "evidentiary standard" be too

---

[15]     The Second Circuit in *Connecticut* did not address the "colorable federal defense" prong. *See* 83 F.4th 142-45.

high given the purpose is "to encourage the trial of such complex evidentiary questions in federal court," *Gordon* v. *Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 319 (E.D.N.Y. 2014).

The parties disagree about the strength and applicability of Defendants' asserted federal defenses, but those defenses—including the government contractor defense, res judicata, preemption, and federal immunity, *see* Notice ¶¶ 151-155—are at least "colorable" and should be heard in federal court. *Baker*, 962 F.3d at 944, 947. The City asserts (Br. 20) that the government contractor defense is not "colorable," but federal officers need not have directed the precise conduct at issue for that defense to be "colorable" for removal. *See, e.g.*, *Cuomo* v. *Crane Co.*, 771 F.3d 113, 117 (2d Cir. 2014) (holding that manufacturer provided a "colorable" factual basis in a failure-to-warn case even though government specifications "made no mention of asbestos warnings"). The City also argues that Defendants' other defenses do not "arise out of [Defendants'] official duties." Br. 20 (quoting *Isaacson*, 517 F.3d at 138). But that is irrelevant to federal officer removal. "What matters is that a defense raises a federal question, not that a federal duty forms the defense." *In re Commonwealth's Motion to Appoint Counsel*, 790 F.3d 457, 473 (3d Cir. 2015); *see Jefferson Cnty.* v. *Acker*, 527 U.S. 423, 437 (1999) (allowing removal based on defense unrelated to judicial duties). Thus, federal officer removal is proper.

## IV.   This Action Arises Out of Federal Enclaves.

The Constitution authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever" over federal enclaves. U.S. Const. art. I, § 8, cl. 17. This action arises out of federal enclaves in two ways, each of which is sufficient to justify federal enclave jurisdiction.

*First*, the Complaint targets Defendants' extraction, production, and sale of fossil fuels, as well as the alleged effects of climate change from the use of fossil fuels. *See, e.g.*, Compl. ¶¶ 18, 24. As a result, this action necessarily sweeps in those operations that occur on military bases and other federal enclaves. *See, e.g.*, *Humble Pipe Line Co.* v. *Waggoner*, 376 U.S. 369, 372–74 (1964)

(holding United States exercises exclusive jurisdiction over certain oil and gas within Air Force base); *Miss. River Fuel Corp.* v. *Cocreham*, 390 F.2d 34, 34–36 (5th Cir. 1968) (similar).

The City tries to escape this conclusion by ignoring the true gravamen of its Complaint. But the Complaint does not merely "seek[] to hold Defendants liable for violating the CPL."  Br. 22.  Rather, it seeks to reduce or eliminate altogether consumers' demand for and use of fossil fuel products and thereby halt Defendants' extraction, production, and sale of the same—both on and off federal enclaves across the country.  *See, e.g.*, Compl. ¶¶ 26, 42.[16]

The City argues that exercising federal enclave jurisdiction over this action will cause some "sweeping change" in federal-state jurisdiction, Br. 22, invoking the *Connecticut* district court, 2021 WL 2389739, at *13.  The *Connecticut* district court's analysis is flawed, as it ignored the fact that it is the *plaintiffs* in these climate change cases that seek to effect such a radical shift in federal/state court relations.  That is because the City's claims go far beyond traditional consumer protection claims and are attempting to hold Defendants responsible for global climate change— pursuing inherently federal claims in state court.  The Second Circuit did not address this issue. Because the City's claims have a significant effect on both the production and sale of fossil fuels on federal enclaves, federal enclave jurisdiction is appropriate here.

*Second*, the advertising the City attacks as false reaches federal enclaves, as would any changes the City wants made to that advertising.  For example, API's Super Bowl ads reach federal enclaves, such as Ellis Island and Fort Tilden.  *See* Compl. ¶ 71.  Indeed, the City alleges that Defendants broadcast by the internet and otherwise throughout all of New York City, including its

---

[16]   The City claims that federal enclaves must be the *exclusive* locus in which a plaintiff's claims arose.  Br. 21.  But numerous courts have recognized federal jurisdiction is established where only "some" of a plaintiff's claims arise on federal enclaves.  *Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).  Here, federal enclaves are the loci of a significant portion of the City's claims, which include nationwide fossil fuel activities, many of which take place on federal enclaves.  *See* Notice ¶¶ 172–74.  A strong federal interest exists in exercising jurisdiction over the claims as a whole because many of them necessarily arise from federal enclaves.

federal enclaves.  Thus, even if the City's Complaint were properly viewed as a limited consumer protection action (and it is not), these allegations would suffice to establish federal enclave jurisdiction.  Federal enclave jurisdiction thus supports removal as well.

## V.     This Representative Action on Behalf of City Consumers Is Removable under CAFA.

The lawsuit was properly removed under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1453(b).  CAFA defines a "class action" as "any civil action . . . authorizing an action to be brought by 1 or more representative persons."  *Id.* § 1332(d)(1)(B).  Congress intended for this definition "to be interpreted liberally" in order "to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications."  S. Rep. No. 109-14, at 35 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 34.

The City contends that CAFA is inapplicable because its lawsuit does not meet the traditional requirements of a class action under Rule 23.  But Congress foreclosed such a formulaic interpretation of "class action" by permitting removal of "lawsuits that *resemble* a purported class action" and not limiting CAFA to "solely" those "lawsuits that are labeled 'class actions' by the named plaintiff or the state rulemaking authority."  *Id.* (emphasis added); *see also N.J. Carpenters Vacation Fund* v. *HarborView Mortg. Loan Tr. 2006-4*, 581 F. Supp. 2d 581, 588 (S.D.N.Y. 2008).  In other words, CAFA permits removal of a suit that is "in substance a class action," notwithstanding a plaintiff's "attempt to disguise the true nature of the suit."  *Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013).

*Song* v. *Charter Communications, Inc.*, 2017 WL 1149286 (S.D. Cal. Mar. 28, 2017), is particularly instructive.  Though not styled as a class action, the plaintiff sued California cable companies for unlawfully charging their customers a monthly surcharge—not only for the plaintiff's benefit "but also for the benefit of millions of California consumers" targeted by this scheme.  *Id.* at *1.  Moreover, contrary to the City's contention, the court expressly found CAFA

jurisdiction, noting that lawsuits "that *resemble* a purported class action should be considered class action[s]" under CAFA.  *Id.* at *1 n.1 (emphasis added).[17]

The City's lawsuit is removable under CAFA because it "resembles" a class action "in substance."  The Complaint represents that the City has filed suit in order to protect "the welfare of its more than 8.5 million residents, as well as the millions of additional people who work in or visit New York City each day."  Compl. ¶ 10.  The City alleges that Defendants "intentionally depriv[ed] NYC consumers of information" in order to attract new consumers, prevent mass defection to renewables, realize "massive profits," and expand their extraction and production of fossil fuels.  *Id.* ¶ 8.  The Complaint is replete with allegations concerning Defendants' purported efforts to "mislead[] NYC consumers about the climate impacts of using fossil fuel products," *id.* ¶ 19, and the injuries suffered by those consumers as a result of their use of fossil fuel products "increasing the frequency of deadly weather events" and "creating other unprecedented threats to people in New York City," *id.* ¶ 18.  *See also id.* ¶¶ 20–21, 24–25, 35–37, 40, 47, 55, 57, 65.[18]

## VI.  The Substantial First Amendment Issues Necessarily Raised by the City's Lawsuit Warrant Federal Jurisdiction.

The City's attempt to regulate Defendants' speech on climate change necessarily raises substantial First Amendment questions that belong in federal court.  The City's CPL claims hinge

---

[17]  In its renewed motion to remand, the City cites several climate-related cases in which district courts rejected jurisdiction under CAFA.  Br. 30 n.9.  But these cases dealt with different lawsuits under different States' statutes, and many rejected the CAFA argument in conclusory terms.  *See, e.g.*, *City of Hoboken* v. *Exxon Mobil Corp.*, 558 F. Supp. 3d 191, 209 (D.N.J. 2021) ("This argument can be dealt with in short order because Plaintiff is not bringing this matter under Rule 23 or any similar state law."), *aff'd*, 45 F.4th 699 (3d Cir. 2022), *cert. denied*, 143 S. Ct. 2483 (2023).  Needless to say, none of those decisions binds this Court.  Moreover, contrary to the City's suggestion, courts have accepted federal jurisdiction under CAFA where plaintiffs sued an energy company on behalf of an entire community for losses purportedly caused by climate change.  *See Pac. Coast Fed'n of Fishermen's Ass'ns* v. *Chevron Corp.*, 2023 WL 7299195, at *1 (N.D. Cal. Nov. 1, 2023).

[18]  The City's reliance on *Purdue Pharma L.P.* v. *Kentucky*, 704 F.3d 208 (2d Cir. 2013), is also misplaced.  There, the Second Circuit held that "*parens patriae* suits are not removable as 'class actions' under CAFA."  *Id.* at 212.  But "New York City may not assert *parens patriae* standing."  *Connecticut* v. *Am. Elec. Power Co.*, 582 F.3d 309, 339 n.17 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011).  Here, the City is not protecting "quasi-sovereign" interests but is stepping in as a representative of a class of allegedly misled consumers.

on showing that Defendants' protected speech on an issue of public concern was deceptive because it did not parrot the City's approved viewpoint on climate change.  *See* Compl. ¶ 8 (alleging that Defendants' conduct amounted to actionable "deception").  The asserted falsity of that speech is "a necessary element" of the City's claims.  *Connecticut*, 83 F.4th at 136 (cleaned up).

That "necessary element" cannot "be resolved without applying" federal law.  *Id.* (cleaned up).  It requires confronting the "[s]peech on matters of public concern" at "the heart of the First Amendment's protection."  *Snyder* v. *Phelps,* 562 U.S. 443, 451–52 (2011) (citation omitted).  In fact, "statements of pure opinion—that is, statements incapable of being proven false—are protected under the First Amendment."  *ONY, Inc.* v. *Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013).  Almost all the speech the Complaint targets is protected opinion or prediction of future events concerning climate change and national energy policy—i.e., fully protected speech on issues of public concern that cannot be proven false (but that the City must prove is false to prevail).[19]

In situations like this, the First Amendment injects affirmative federal elements in the plaintiff's cause of action, making those elements the plaintiff must prove rather than defenses it must overcome.  *See, e.g.*, *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 777 (1986) ("[T]he government cannot limit speech protected by the First Amendment without bearing the burden of showing that its restriction is justified."); *N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 280, 286 (1964) (public officials have the burden of proving with "convincing clarity" that a "statement was made with 'actual malice'").  Here, the City must affirmatively prove that Defendants' statements regarding climate change are false statements of fact it can constitutionally regulate

---

[19]   For example, the Complaint attacks an API Super Bowl advertisement stating that the petroleum industry could help people "lead better lives."  Compl. ¶ 71. This is a statement of opinion regarding the future that merits full constitutional protection.  *See N. Am. Olive Oil Ass'n* v. *D'Avolio Inc.*, 457 F. Supp. 3d 207, 230 (E.D.N.Y. 2020).

rather than fully protected opinion.  Because this requires proving the deceptiveness of that speech, the City's claims necessarily raise, and require resolution of, disputed questions of federal law.

These questions of federal constitutional law are uniquely substantial.  *See Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 320 n.7 (2005).  The global debate over climate change policy, the veracity of Defendant's speech about the same, and the constitutional validity of the City's efforts to impose its views on private parties are of indisputable importance across the federal system.  *See NASDAQ OMX Grp., Inc.* v. *UBS Securities, LLC*, 770 F.3d 1010, 1028 (2d Cir. 2014) (substantiality exists where "validity of actual governmental action" is part of dispute over federal law).  Contrary to the City's assertions, Br. 24-25, these are not "fact-bound" issues with "situation-specific effects."  Rather, they have "broad implications for federal law well beyond" this case."  *Qatar* v. *First Abu Dhabi Bank PJSC*, 432 F. Supp. 3d 401, 419 (S.D.N.Y. 2020).  Thus, while other kinds of federal questions in state-law cases may prove insubstantial, "the federal law dispute in this case . . . is of a different sort."  *NASDAQ*, 779 F.3d at 1029.

Finally, given the compelling federal interests at stake here, federal courts may entertain the City's claims "without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545 U.S. at 314.  The City's claims of deceptive statements regarding the global phenomenon of climate change and how to address it mean this action involves national and international issues properly adjudicated in a federal forum.  That conclusion does not threaten undue expansion of federal jurisdiction; rather, it reflects the uniquely broad implications of the federal concerns presented by this action.

## VII.    The City Is Not Entitled to Attorneys' Fees or Costs.

Removal of this action was "objectively reasonable" and no "unusual circumstances" warrant an award of costs and fees.  *Martin* v. *Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005).  Removal is not "objectively unreasonable" unless foreclosed by "clearly established law."

*Williams* v. *Int'l Gun-A-Rama*, 416 F. App'x 97, 99 (2d Cir. 2011).  The law is not "clearly established" where there is even "a small measure of disagreement."  *Bedminster Fin. Grp., Ltd.* v. *Umami Sustainable Seafood, Inc.*, 2013 WL 1234958, at *12 (S.D.N.Y. Mar. 26, 2013).

In *Connecticut*, the Second Circuit made clear that Defendants' complete preemption argument "remains open."  83 F.4th at 138 n.4.  This case squarely presents that question, and thus provides an objectively *reasonable* basis for removal.  Moreover, *City of New York II* demonstrates that suits seeking redress for global climate change are subject to federal common law.  993 F.3d at 92.  That other circuits have remanded other climate change cases, *see* Br. 5, does not "foreclose" removal here.  Those decisions are distinguishable, misapplied the law to the facts of those cases, and cannot "render the law clearly established."  *Williams*, 416 F. App'x at 99.  Moreover, removal was objectively reasonable in order to preserve the issues for appeal.  *See In re WorldCom, Inc. Sec. Litig.*, 2003 WL 21031974, at *3 (S.D.N.Y. May 5, 2003).

The City incorrectly argues that the Court should still award fees in light of unspecified "unusual circumstances" presented here.  Br. 35.  But the City cites no case awarding costs and fees due to "unusual circumstances" where objectively reasonable grounds for removal were present.  The City does not and cannot present any evidence that Defendants acted in bad faith or that "their motion rises to the level of abuse or harassment."  *Qatar*, 432 F. Supp. 3d at 416, 421.  To the contrary, Defendants' legal arguments are well-supported by precedent, including the Second Circuit's decision in *City of New York II.*

## **CONCLUSION**

This Court has subject matter jurisdiction, and the motion to remand should be denied.

DATE:  November 14, 2023

Respectfully submitted,

By:

/s/ Daniel J. Toal
Theodore V. Wells, Jr.
Daniel J. Toal
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
Email: twells@paulweiss.com
Email: dtoal@paulweiss.com

*Attorneys for Defendants Exxon Mobil
Corporation and ExxonMobil Oil
Corporation*

Aaron F. Jaroff
MCGUIREWOODS LLP
1251 Avenue of the Americas, 20th Floor
New York, NY 10020-1104
Tel:  (212) 548-2133
Email: ajaroff@mcguirewoods.com

Brian D. Schmalzbach (*pro hac vice*)
Jeremiah J. Anderson (*pro hac vice*)
Kathryn M. Barber (*pro hac vice*)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Tel: (804) 775-100
Email: bschmalzbach@mcguirewoods.com
Email: jjanderson@mcguirewoods.com
Email: kbarber@mcguirewoods.com

*Attorneys for Defendant American Petroleum
Institute*

David C. Frederick (*pro hac vice*)
James M. Webster, III (*pro hac vice*)
Daniel S. Severson
Grace W. Knofczynski (*pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
Email:  dfrederick@kellogghansen.com
Email:  jwebster@kellogghansen.com
Email:  dseverson@kellogghansen.com
Email:  gknofczynski@kellogghansen.com

Loly G. Tor
K&L GATES LLP
599 Lexington Ave.
New York, NY 10022
Tel: (973) 848-4026
Fax: (973) 848-4001
Email: loly.tor@klgates.com

*Attorneys for Defendants SHELL PLC (F/K/A
ROYAL DUTCH SHELL PLC) and SHELL
USA, INC. (F/K/A SHELL OIL COMPANY)*

Nancy G. Milburn
Diana E. Reiter
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Tel:  (212) 836-8000
Fax:  (212) 836-8689
Email: nancy.milburn@arnoldporter.com
Email: diana.reiter@arnoldporter.com

John D. Lombardo (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail: john.lombardo@arnoldporter.com

Jonathan W. Hughes (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
Email: jonathan.hughes@arnoldporter.com

*Attorneys for Defendants BP p.l.c. and BP America Inc.*